1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   DARREN J. ROBBINS (168593)
    JASON A. FORGE (181542)
3   LUKE O. BROOKS (212802)
    ANGEL P. LAU (286196)
4   BRIAN E. COCHRAN (286202)
    JEFFREY J. STEIN (265268)
5   655 West Broadway, Suite 1900
    San Diego, CA 92101
6   Telephone:  619/231-1058
    619/231-7423 (fax)
7   darrenr@rgrdlaw.com
    jforge@rgrdlaw.com
8   lukeb@rgrdlaw.com
    alau@rgrdlaw.com
9   bcochran@rgrdlaw.com
    jstein@rgrdlaw.com
10         – and –
    SHAWN A. WILLIAMS (213113)
11  Post Montgomery Center
    One Montgomery Street, Suite 1800
12  San Francisco, CA  94104
    Telephone:  415/288-4545
13  415/288-4534 (fax)
    shawnw@rgrdlaw.com
14
    Attorneys for Plaintiff
15
                    UNITED STATES DISTRICT COURT
16
                  NORTHERN DISTRICT OF CALIFORNIA
17
    IRVING FIREMEN'S RELIEF &          )   Case No.
18  RETIREMENT FUND, Individually and on )
    Behalf of All Others Similarly Situated, )   CLASS ACTION
19                                      )
                              Plaintiff, )   COMPLAINT FOR VIOLATIONS OF
20                                      )   CALIFORNIA CORPORATIONS CODE
           vs.                          )   §§25400 AND 25500
21                                      )
    UBER TECHNOLOGIES INC. and TRAVIS )
22  KALANICK,                          )
                                        )
23                            Defendants. )
    _____ )   DEMAND FOR JURY TRIAL
24
25
26
27
28

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ......................................................................................1

PARTIES .................................................................................................................6

JURISDICTION AND VENUE ...............................................................................6

BACKGROUND TO THE FRAUD...........................................................................6

    Defendants Successfully Solicit Billions of Dollars in Private Investment.......................8

    Defendants' False and Misleading Statements About Uber's Rapid Growth and
    Revenues ............................................................................................................9

    Defendants' False and Misleading Statements About Uber's Compliance with
    Applicable Laws and Regulations .......................................................................18

    Defendants' False and Misleading Statements About Uber's Focus on Innovation
    and Development of Self-Driving Car Technologies ..........................................21

    Defendants' False and Misleading Statements Regarding Uber's Competition................24

    Defendants' False and Misleading Statements Regarding Uber's Corporate
    Culture................................................................................................................27

    Defendants' Uber Story Unravels .......................................................................29

    Uber Attempts to Steal Its Way into the Future...................................................30

    Uber Uses "Greyball" to Surveil and Evade Authorities.....................................34

    Uber Unleashes "Hell" on Its Competition..........................................................36

    Uber's Toxic Culture of Institutionalized Harassment and Discrimination ....................39

    Uber Takes Its Law Breaking Global ..................................................................43

    Uber Executives Steal a Victim's Medical Records in Order to Discredit Her.................46

    Benchmark Lawsuit .............................................................................................47

    Plaintiff and the Class Have Been Damaged as Their Uber Investments Plummet .........48

CLASS ALLEGATIONS .........................................................................................49

COUNT.....................................................................................................................50

PRAYER FOR RELIEF ...........................................................................................51

JURY DEMAND ......................................................................................................51

1    Plaintiff Irving Firemen's Relief & Retirement Fund ("plaintiff" or the "Retirement Fund"),

2   individually and on behalf of all others similarly situated, alleges the following based on the

3   investigation conducted by and through plaintiff's attorneys, which included, among other things, a

4   review of Uber Technologies Inc. ("Uber" or the "Company") releases, media reports, articles, court

5   documents, regulatory filings and other online materials.  Plaintiff believes that substantial additional

6   evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

7   discovery.

8                    **NATURE OF THE ACTION**

9    1.    Uber is a private technology startup that develops, markets, and operates car

10   transportation and food delivery mobile applications, or "apps."  Founded in San Francisco in 2009,

11   the Company's most popular service is an app that allows users to remotely hail car rides.

12    2.    The Retirement Fund brings this action on behalf of itself and all persons who

13   directly or indirectly purchased an interest in Uber securities between June 6, 2014 and September

14   22, 2017 (the "Class") against Uber and its former Chief Executive Officer ("CEO") Travis Kalanick

15   ("Kalanick") for the dissemination of false and misleading statements about Uber and its operations,

16   which statements were made for the purpose of inducing the purchase of billions of dollars of Uber

17   securities.  As the truth about defendants' material misrepresentations and omissions has been

18   revealed, the price of Uber securities has declined significantly, causing class members to suffer

19   billions of dollars of losses on their investments.

20    3.    Beginning in 2014 Uber and Kalanick commenced a mass media campaign designed

21   to induce investors to invest billions of dollars in the Company, as Uber expanded to grow its global

22   operations and offer a wider array of transportation and delivery services.  Intending for their

23   statements to reach potential investors, Kalanick and Uber repeatedly told the public that they had

24   designed a revolutionary platform that was "changing the logistical fabric of cities around the

25   world."  According to defendants, "everyone benefits" from the Uber app – drivers benefited

26   because the app "represents a flexible new way to earn money"; riders benefited because it made

27   "transportation as reliable as running water"; and the cities in which Uber operated benefited

28   because it would "help strengthen local economies, improve access to transportation, and make

1    streets safer." The Company portrayed itself as a force for good that was taking on entrenched

2    interests, most notably the taxi industry, which according to Uber had artificially stifled

3    transportation needs to the detriment of consumers, drivers and local communities.

4           4.      In dozens of interviews and presentations – designed to coincide with Uber's

5    solicitation of billions of dollars in private financing – Uber and its executives pushed the narrative

6    that the Company's rapid revenue growth, increased ridership and expanded global footprint was

7    attributable to its uniquely innovative corporate culture built around cutting-edge advancements and

8    the promotion of innovative technologies.

9           5.      Kalanick became the poster child of the Uber revolution. He gave dozens of

10   interviews with *Forbes*, *Bloomberg*, *Fortune*, *CNBC* and other news services touting the Company's

11   "hyper" growth and "gangbusters" operating success. He pitched the Company on the Late Show

12   with Stephen Colbert and was named the *Financial Times*' "Boldness in Business 2015 Person of the

13   Year" and a runner-up for *TIME* magazine's 2015 Person of the Year. In his many media

14   appearances and public statements, which Kalanick intended to be widely disseminated and impact

15   the demand for and price of the Company's securities, Kalanick repeatedly attributed Uber's success

16   to an entrepreneurial company culture that strictly adhered to Uber's "values" and "principles,"

17   which purportedly centered around promoting technological innovation and offering a superior

18   product that had dramatically improved the relationship between supply and demand in the

19   transportation industry.

20          6.      Defendants' effort to induce investors to invest in the Company was a resounding

21   success. By 2016, defendants had directly or indirectly through investment vehicles raised more

22   than *$10 billion* from plaintiff and other investors. And by mid-2016, Uber had reached a valuation

23   of nearly *$70 billion* – making it the most highly valued private technology startup. At this rarefied

24   level, Uber was more valuable than established industry titans such as Ford Motor Company,

25   General Motors, Twenty-First Century Fox and tech giant eBay. The following graphic from *The*

26   *Wall Street Journal* illustrates this stunning growth and solicitation of private investment:

27

28

## Driving Growth

Uber's valuation rose rapidly as it pursued global market share.

**Uber's valuation***



*Uber last raised funding at a $68 billion valuation one year ago before a series of scandals
Sources: Dow Jones VentureSource; WSJ staff reports

7.     In early 2017, defendants' story began to unravel.  In a span of only a few months a shocking litany of corporate misconduct came to the fore, and investors learned startling truths about the willingness of Uber's C-Suite executives to flout local, national and international law, stifle competition, misappropriate trade secrets and seek vengeance against detractors.   And the Company's vaunted corporate culture was revealed to in truth consist of a toxic hotbed of misogyny, sexual discrimination, and disregard for the law that threatened the Company's reputation, business and prospects.

8.     While outwardly representing itself as a start-up darling fueled by technical innovation and entrepreneurial gumption in order to induce billions of dollars of investment, behind the scenes Uber was operating in violation of applicable law and driving its expansion by a Company-wide commitment to short-term growth at all costs, no matter the legal, financial or reputational risks involved.  The following are just some of the Company scandals that would come

to light in 2017, in a series of revelations that rattled the startup community and sent Uber securities into a freefall:

- "***Hell***": Uber developed a secret program aptly code-named "Hell" used to pilfer driver and rider data from its main competitor, Lyft Inc. ("Lyft"), unfairly undercut rivals and stifle competition.  The Federal Bureau of Investigation ("FBI") and the U.S. Attorney's Office for the Southern District of New York have launched federal investigations to determine whether Uber used Hell to illegally thwart competition.

- "***Greyball***": Uber developed another covert program code-named "Greyball" that it used to mislead regulators and evade detection by government officials in jurisdictions in which it was operating illegally or had faced opposition.  Greyball is now the subject of a criminal probe by the U.S. Attorney's Office for the Northern District of California and an investigation by the San Francisco District Attorney's Office.

- ***Waymo Theft***: After publicly touting the Company's innovation in self-driving car technologies as critical to Uber's future success, it was revealed that Uber had engaged in a scheme to simply steal self-driving car technologies from Waymo LLC ("Waymo"), a subsidiary of Google-parent Alphabet Inc.  Now, Uber is embroiled in a multi-million dollar lawsuit with Waymo, its former employee has invoked the protections of the Fifth Amendment against self-incrimination to avoid testifying about documents in his possession, and the federal judge overseeing the case referred the matter to federal prosecutors to determine if criminal charges are warranted.

- ***Foreign Corrupt Practices***: Uber's vaunted international expansion was revealed to be the product of shady business dealings.  To take one particularly galling example, Uber knowingly rented out recalled and unsafe vehicles to its drivers in Singapore after knowing that the vehicles could and have caught fire.  The Company is also now the target of a preliminary investigation by the U.S. Department of Justice ("DOJ") into potential violations of the Foreign Corrupt Practices Act ("FCPA").

- ***Medical Record Theft***: In 2014, an Uber driver sexually assaulted a passenger in India.  While Kalanick publicly condemned the horrendous act – "We will do everything, I repeat, everything to help bring this perpetrator to justice and to support the victim and her family in her recovery" – Uber and its executives secretly (and cynically) attacked the victim, stealing the victim's sensitive medical reports and then using them to attempt to discredit her story, concocting the fantastical notion that she had fabricated the sexual assault in order to bolster Uber's rivals in India. The Company has now been sued twice by the victim.

- ***Systemic Discrimination***: In February 2017, a former Uber employee posted an explosive blog detailing rampant and institutionalized misogyny, gender discrimination and sexual harassment at the Company.  The blog quickly went viral, and soon after reports surfaced of a 2014 Uber-sponsored trip to a South Korean escort bar attended by Kalanick and other executives.  The allegations forced Uber to launch an internal investigation helmed by former U.S. Attorney General Eric Holder

("Holder"). The investigation called for sweeping changes to Uber's culture, policies and practices, and spawned a mass employee exodus of firings and resignations.

9.      As a result of this pervasive pattern of unlawful behavior, Kalanick was forced to resign as CEO of Uber in June 2017 and the Company has lost many high-level employees, impairing its business, operations and prospects. Since the beginning of 2017, the Company has parted ways with no fewer than 14 top executives, including its president, chief business officer, heads of communications, ridesharing, advanced technologies, finance, artificial intelligence, maps and business platform, engineering, product, and self-driving car divisions. Most recently, the Company's Chief Legal Officer and Global Compliance Officer have both resigned. Uber also has become the subject of multiple criminal investigations and was named as a defendant in numerous lawsuits. In August 2017, one of the Company's earliest investors, Benchmark Capital Partners VII, L.P. ("Benchmark"), which controls a seat on Uber's Board of Directors (the "Board"), sued Uber claiming it had been defrauded by Kalanick and others and accusing Uber of covering up gross mismanagement and crooked business tactics – and this was *before* some of the most recent scandals, such as a federal probe of the Hell program, came to light.

10.     The seriatim disclosures that Uber was operating a business far different than what investors had been led to believe has caused the Company's securities to plummet. For example, investors have marked down their Uber investments by as much as 15%, which translates to more than $10 billion in lost market capitalization in 2017 alone. These markdowns were reported before certain of the most recent scandals have come to light, driving Uber's value down even more. News reports indicate investors now value Uber at a valuation representing at least *$18 billion* in lost market capitalization, and plaintiff anticipates additional markdowns caused by the most recently revealed frauds. Uber's newly appointed CEO summed it up on the last day of the Class Period: "The truth is that there is a high cost to a bad reputation."

11.     Plaintiff brings this action under the California Corporations Code on behalf of a Class (defined in ¶106 below) consisting of all persons who directly or indirectly purchased or committed to purchase Uber securities between June 6, 2014 and September 22, 2017, inclusive (the "Class Period").

**PARTIES**

12.   Plaintiff Irving Firemen's Relief & Retirement Fund is a retirement fund operated for the benefit of retired firefighters for the City of Irving, Texas.  Plaintiff has its principal place of business in and is organized under the laws of Texas.  Plaintiff purchased Uber securities through an interest in New Riders LP ("New Riders"), a Delaware limited partnership, in January 2016.  The sole purpose of New Riders is to invest in Uber Series G preferred shares.  New Riders is managed by Morgan Stanley Investment Management Inc. and its general partner is MS Alternatives Holding D Inc., an entity owned by Morgan Stanley.

13.   Defendant Uber Technologies Inc. is an on-demand ride service and transportation technology company based in San Francisco, California.  Uber's principal place of business is in California, and it is incorporated in Delaware.

14.   Defendant Travis Kalanick is the founder and former CEO of Uber.  He currently serves as a Company director.  Kalanick reportedly owns about 10% of Uber's stock and about 35% of its Class B common shares, giving him about 16% of Uber's voting power.  In addition, Kalanick reportedly controls at least three of eleven seats on Uber's Board, and as a result of his positions and share ownership has effectively controlled the Company and exerted substantial influence over it at all relevant times.

**JURISDICTION AND VENUE**

15.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(d)(2) as this is a class action where at least one of the members of the class is a citizen of a state different from any defendant, and the controversy exceeds the sum or value of $5,000,000.

16.   Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) and (b) because: (1) one or more defendants reside in this District; and (2) a substantial part of the events or omissions giving rise to the claims occurred in this District.

**BACKGROUND TO THE FRAUD**

17.   Uber was founded in 2009 by Kalanick and others as a luxury car service.  Following a beta run, Uber's services and mobile app officially launched in San Francisco in 2011.  The Company started as an on-demand car service that allowed users to hail black luxury cars using a

1    text message or an app.  Uber employed a dynamic pricing model that adjusted prices based on

2    perceived demand, and earned 20% to 30% commission for connecting passengers with drivers.

3         18.    In July 2012, the Company introduced UberX, a cheaper service which allowed

4    anyone to drive for Uber using their own car, subject to a background check and certain car

5    requirements.  By early 2013, the service was operating in 35 cities and Uber was experimenting

6    with other on-demand services.  During this time, the Company grew from 75 employees to more

7    than 300 and claimed month-to-month revenue growth of 18%.  It also raised more than $400

8    million in startup financing and boasted a valuation of approximately $3.5 billion.

9         19.    Prior to June 2014, Kalanick laid the groundwork for Uber's first billion-dollar

10   funding round by disseminating a barrage of false and misleading statements touting the Company's

11   high revenue growth rates, which were designed to and did induce investments.  In an interview

12   published by *Bloomberg* on July 30, 2013, Kalanick recognized, "[c]ompanies that are meeting

13   aggressive growth targets are able to raise money faster than the average company."  As such, he

14   constantly talked up Uber's "hyper" growth rate and its implications for the Company, the U.S.

15   economy, and the American people in interviews, media, conferences and speeches.  For example,

16   during the September 2012 Disrupt conference, Kalanick emphasized that Uber was "***growing 26%***

17   ***month-over-month***, and that means in the last twelve months, we are sixteen times bigger than we

18   were twelve months ago."

19        20.    Entering 2014 the stage was set for Kalanick to kick Uber's growth ambitions into

20   overdrive.  That year, Uber and Kalanick embarked on a widespread media and publicity campaign

21   designed to correspond with massive rounds of private investment.  Uber touted itself as a

22   revolutionary logistics company that would usher in a global reordering of transportation and on-

23   demand services.  The key to this revolutionary strategy was the Company's "culture" of innovation,

24   its "values" and "principles" of entrepreneurship, and its commitment to improving the lives of all

25   involved: riders, drivers and the local communities in which Uber operated.  Uber wowed potential

26   investors and courted the media with tales of exponential growth, with gross bookings and net

27   revenue more than doubling year-over-year and a rapid global expansion that would ultimately see

28   the Company operating in more than 700 cities and more than 80 countries worldwide.  The

1  Company emphasized its investments in next-generation technologies, most importantly self-driving

2  cars, as a way of driving its growth into the future.  Throughout this period, Uber and Kalanick

3  claimed the Company's rapid growth adhered to legal and regulatory requirements, as well as the

4  Company's culture and ethical ethos.

5         21.  Defendants' statements were made for the purpose of, and did, induce investors to

6  directly and indirectly invest billions of dollars in Uber.  With the Uber narrative of exponential but

7  principled growth firmly planted in the public imagination by defendants, beginning in 2014 Uber

8  and Kalanick ramped up their media and mass marketing campaign in order to induce billions of

9  dollars of new funding from investors.  Uber regularly informed investors of its business

10  performance each quarter via conference calls and issued a barrage of press releases and media

11  materials.  Kalanick, meanwhile, made the rounds on the venture capital and startup circuits, posted

12  on his blogs and Uber's website, spoke at technology conferences, and sat for numerous interviews

13  with widely circulated publications and television stations in order to induce additional investment.

14  **Defendants Successfully Solicit Billions**
   **of Dollars in Private Investment**

15

16        22.  Prior to June 2014, Uber had successfully solicited more than $400 million in private

17  investment.  Early investors reportedly included Benchmark, a venture capital firm, TPG Equity

18  Partners, a private equity firm, and Google, the technology and search engine behemoth, among

19  others.

20        23.  However, once Kalanick and Uber saturated the print, air and digital media space

21  with a narrative of hyperbolic growth spurred by the Company's innovative, responsible and

22  forward-looking culture, investments in the Company skyrocketed.  Beginning in June 2014, Uber

23  began several private fundraising rounds in which it went from raising hundreds of millions of

24  dollars to raising multi-***billions*** in new capital from investors, either directly or indirectly by way of

25  pass-through investment vehicles such as New Riders.  Between August 2013 and June 2014, the

26  price at which the Company sold its shares increased by more than 300%, with its value reaching

27  $18.2 billion.  The price at which Uber was selling its shares more than tripled from this already

28  substantial pricing in 2014 to a staggering valuation of ***$68 billion*** by mid-2016, or $48.77 per share,

making Uber the most valuable private technology startup.  In a span of just two years, the Company raised more than *$10 billion* from plaintiff and the Class to fuel its epic growth.  The following table summarizes the sale of Uber securities:

| First Sale Date | Securities | Amount Sold | Price Per Share | Valuation |
|---|---|---|---|---|
| December 2015 | Series G Preferred Stock | At least $5.6 billion | $48.772 | $68 billion |
| May 2015 | Series F Preferred Stock | $1.0 billion | $39.638 | $51 billion |
| December 2014 | Series E Preferred Stock | $2.8 billion | $33.318 | $42 billion |
| June 2014 | Series D Preferred Stock | $1.3 billion | $15.513 | $18.2 billion |

**Defendants' False and Misleading Statements About Uber's Rapid Growth and Revenues**

24.     Defendants provided false and misleading statements regarding Uber's growth and revenues to investors.  For 2012, 2013 and 2014, defendants told investors that Uber generated net revenues of approximately $16 million, $210 million and $495 million, respectively.[1]  However, Kalanick and Uber failed to disclose that, in order to show strong short-term growth, the Company was employing and plotting to employ a variety of illicit business tactics that threatened Uber's business, reputation and long-term prospects.  Kalanick and Uber misrepresented Uber's true business prospects while omitting the fact that Uber's continued growth was built on a corporate culture of dishonesty and illegality.  Prior to Uber's June 2014 financing round, defendants made a series of statements that laid the groundwork to induce the purchase of Uber securities, including:

- "We **grow 26% month-over-month** on average compounded.  That means we are sixteen times larger today than we were exactly a year ago."  Kalanick's interview on Bloomberg Television, July 5, 2012.

- "We've had 26 percent month-over-month growth over the past 12 months – that's in revenue.  *From day one we were making money*."  August 13, 2012 *Bloomberg Businessweek* interview.

- "We're doing 26 percent month-over-month growth, that's an average over the last now 16, 17 months.  You go okay, well, if you start really low and you can grow really big.  But we were pretty big twelve months ago and if you do 26 percent month-over-month growth that means in 12 months you're 16 times bigger than you were 12 months ago *so we're growing fast*.  And in fact September over August was

---
[1]  *Bloomberg*, Dec. 11, 2013, June 2, 2016; *Silicon Valley Business Journal*, Jan. 22, 2016.

29 percent month-over-month." October 20, 2012 Kalanick speech at Y Combinator Startup School.

- "***The startup has grown seven times its size over the past year***, or an average compounded 18 percent increase in revenue each month for the past year." Kalanick's July 30, 2013 *Bloomberg* interview.

25.     These statements remained alive in the market for Uber securities and uncorrected at the start of the Class Period. Defendants ramped up the rhetoric as they sought to induce billions of additional investment beginning in mid-2014. For example, following the June 6, 2014 Series D fundraising round ("June 6, 2014 Issuance"), Kalanick and Uber continued to tout the Company's revenues and growth rate, and Uber boasted net revenues of $495 million, $2 billion, $6.5 billion and $3.3 billion for 2014, 2015, 2016 and the first half of 2017, respectively.[2]  As Kalanick put it, Uber's business was going "***gangbusters***."[3]  When asked right before the June 6, 2014 Issuance how Uber could get to $18.2 billion valuation, Kalanick emphasized the Company's revenue growth rate: "Again, it comes down to, the size we're at, and the fact that we're growing faster this year than last year at this size, is ***mostly unprecedented.  It's incredibly rare***. . . .  We're at least doubling every six months.  ***It's probably more robust than that***, but that's good enough . . . .  That's revenue."[4]  Similarly, on December 4, 2014, during the Series E fundraising round, Kalanick blogged "[w]e are 6 times bigger today than 12 months ago – and grew faster this year than last . . . .  ***This kind of continued growth requires investment***."[5]  Kalanick's efforts were successful in attracting investors, as Uber's head of global communication Nairi Hourdajian admitted: "The participation we have seen in Uber's Series E underscores the confidence investors have in Uber's growth."[6]

---

[2]     *Reuters*, Aug. 20, 2015; *Silicon Valley Business Journal*, Jan. 22, 2016; *Bloomberg*, Apr. 17, 2017, Aug. 25, 2017.

[3]     *Uber CEO Kalanick: Our Valuation Is $18.2 Billion*, YouTube (July 17, 2014), https:// www.youtube.com/watch?v=VcD6oY3pLlk.

[4]     *Uber CEO Travis Kalanick, We're Doubling Revenue Every Six Months*, Wall St. J., June 5, 2014.

[5]     Kalanick's Blog, "The Ride Ahead" (Dec. 4, 2014), *available at* https://newsroom.uber.com/the-ride-ahead.

[6]     *Uber Seeking Out Another US$1 billion in New Funding Round*, Bloomberg, Feb. 18, 2015.

26. Defendants' emphasis of Uber's meteoric growth rate also included:

- "Today Uber Technologies, Inc., reported the unprecedented jobs impact of its platform: at its current rate, *the Uber platform is generating 20,000 new driver jobs every month*."

  \*      \*      \*

  "*The Uber platform generates $2.8 billion per year for the U.S. economy and is growing*."

  \*      \*      \*

  "*Uber is Available to 137,451,768 Americans* with an Average Pickup Time of Less Than 10 Minutes – That's 43 Percent of the U.S. Population Covered in Just Four Years." *Business Wire*, May 27, 2014.

- Kalanick's interview with *Bloomberg Businessweek* on June 6, 2014, where he stated: "We just turned four years old this week. *The growth is remarkable* . . . . We are now in 128 cities, probably closing in on 40 countries if we are not there already." When asked to explain Uber's valuation, he stated "[i]t comes down to our revenue numbers, the growth of those numbers and our business model itself. . . . *The [numbers] are incredibly compelling*."

- Kalanick's interview posted by *Bloomberg* on July 17, 2014, in which he reiterated the growth of Uber's business, saying "[w]e see a huge amount of growth," "[o]ur business is growing real fast" and "*[b]usiness is going gangbusters*."[7]

- Kalanick speaking at the IoD Annual Convention on October 3, 2014: "We've just seen *incredible growth* over a very short period of time."

- Kalanick's blog on Uber's website on December 4, 2014: "2014 has been a year of tremendous growth for Uber. It was just a year ago that Uber was operating in 60 cities and 21 countries – today we are in over 250 cities in 50 countries. We are 6 times bigger today than 12 months ago – and grew faster this year than last. *This progress is remarkable, but it is in the coming years that Uber truly scales and the impact in cities becomes visible*."

- Kalanick's January 18, 2015 statement during the DLD-Conference: "We want to make 2015 the year where we establish a new partnership with EU cities where we push for progressive regulations that ensure innovation and help build the smart cities of tomorrow, some of which I've outlined earlier. Where we promote core city functions through partnerships on data and technology. And where we provide massive economic benefit to cities and their economies. What does this mean at the end of 2015? It means if we can make these partnerships happen we create 50,000 new EU jobs. And remember that's for 2015. That's in one year. And *this is an exponentially growing company with operations that exponentially grow in each of the cities*. So what happens when that triples the year after and doubles the year after

---

[7]   *Uber CEO Kalanick: Our Valuation Is $18.2 Billion*, YouTube (July 17, 2014), https://www.youtube.com/watch?v=VcD6oY3pLlk.

that? It becomes a huge job generator." DLD-Conference in Munich, YouTube (Jan. 18, 2015), https://www.youtube.com/watch?v=gS6OsUaHCi4.

- Senior Vice President of Policy and Strategy David Plouffe's February 2, 2015 statement in an interview published by *The New York Times*: "***Uber is growing every month***, and is becoming a bigger part of not just cities and transportation systems, but of the whole economy . . . . We're likely to be one of the biggest job-producing companies for the economy over the coming years."

- Uber's statement in *The Wall Street Journal*, August 8, 2016: "In the first six months of this year, Uber said it completed a billion rides, ***doubling its lifetime total to two billion*** since March 2009. . . . Uber touts a recent Pew finding that 15% of Americans have used either Uber or rival Lyft Inc., suggesting both companies have much room to grow."

- Rachel Holt, Head of U.S. and Canada Operations, hosted a conference call on March 21, 2017 as reported by *Fortune*: "In fact, in our most mature country, ***we've grown faster*** in the first 10 weeks of 2017 than in the first 10 weeks of 2016."

- Uber spokesman's statement to *The New York Times* on May 31, 2017: When announcing first quarter revenue of $3.4 billion, Uber stated "[t]hese results demonstrate that ***our business remains healthy and resilient*** as we focus on improving our culture, management and relationship with drivers."

27.     Defendants Uber and Kalanick knew or had reason to believe that the statements in ¶¶25-26 misrepresented material facts and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  Defendants failed to disclose that Uber's results and growth had been artificially inflated by illicit conduct, and that as a result of defendants' illicit conduct Uber's prospects were subject to numerous material undisclosed legal, reputational and operational risks, including:

(a)     As set forth in ¶¶61-69, *infra*, in order to fuel Uber's rapid expansion, defendants developed and utilized a covert surveillance program code-named "Greyball" which was designed to and did target, monitor and then evade government officials in jurisdictions around the world in which Uber services were illegal or challenged by authorities.

(i)     Beginning at least as early as 2014, Uber used Greyball to expand its low-cost UberX services into new cities, which often contravened local regulations because of its less stringent driver and car requirements than were in place for its black car service.  Uber used data collected from the Uber app and other techniques to identify and circumvent officials who were

1  trying to enforce rules governing Uber's ride-hailing service in cities including Portland, Boston,

2  Paris and Las Vegas, and in countries including Australia, China and South Korea.

3      (ii)    Upon entering a new city, Uber appointed a general manager to head

4  the Company's Greyball operations.  Uber used at least a dozen technologies and techniques to

5  identify and clandestinely monitor enforcement officers, including using credit card information to

6  determine whether the card was tied directly to an institution such as a police credit union.  Once

7  identified, government officials were tagged with a small piece of code that read "Greyball" and

8  provided a dummy version of the app.  This dummy version would mimic the real Uber app, but

9  allowed the Company to populate the screen with fictitious cars or show that no cars were available

10  in order to allow Uber drivers to evade detection.

11      (iii)    Once the Greyball tool was put in place and tested, Uber engineers

12  compiled a playbook with a list of tactics and distributed it to general managers in more than a dozen

13  countries on five continents.  Greyball was an official Company-sponsored program, developed and

14  operated by at least 50 Uber employees and approved by Uber's central office and highest

15  executives.

16      (iv)    Ultimately, Uber was forced to confirm the existence of its secret

17  monitoring of government and law enforcement officers and that Greyball had been used to target

18  government officials.  The U.S. Attorney's Office for the Northern District of California has

19  reportedly opened a criminal probe into the Company's use of the Greyball program, and the FBI has

20  issued subpoenas to public officials in Portland, Philadelphia and Austin in connection with that

21  investigation.

22      (b)    As set forth in ¶¶70-72, *infra*, between 2014 and the early part of 2016 Uber

23  used a secret program code-named "Hell" to monitor and steal driver and rider data from its main

24  competitor, Lyft, unlawfully undercutting Lyft's growth and operations, and stifling competition.

25  For example:

26      (i)    Uber used "spoofed" (*i.e.*, fake) Lyft accounts to obtain information on

27  Lyft's drivers in cities where the companies were competing and clandestinely track Lyft drivers.

28  The Hell program allowed Uber to engage in anticompetitive conduct, including tracking how many

1  Lyft drivers were available for new rides and where they were, and identifying which of the tracked

2  drivers were driving for both Lyft and Uber, providing an illegal advantage in a business where

3  finding enough people to drive is a top operational challenge.  Armed with data about when and

4  where Lyft's drivers were operating, Uber used various techniques to induce them to work only for

5  Uber instead.  The program was referred to as "Hell" because it paralleled Uber's dashboard of Uber

6  drivers and riders known as "God View," or "Heaven."

7             (ii)      Defendants knew the "Hell" program (a product of the Company's

8  competitive intelligence group) was anticompetitive and illegal and thus kept its existence hidden

9  from all but a small group of Uber employees, which included Kalanick.  This small group had

10 special access to a room at Uber's headquarters in San Francisco, where the intelligence

11 clandestinely obtained on Lyft's drivers was collected via computers that had the spoof accounts.

12            (iii)     Uber has confirmed the Hell program's existence, and in September

13 2017 it was reported that the Company is under investigation by the FBI and the U.S. Attorney's

14 Office for the Southern District of New York for illegally thwarting competition and violating

15 computer access laws.

16        (c)      As set forth in ¶¶49-60, *infra*, Uber's growth strategy was dependent on a

17 scheme to secretly misappropriate technology from Google's self-driving car affiliate Waymo

18 instead of developing its own.

19            (i)       By the summer of 2015, Anthony Levandowski ("Levandowski"), a

20 manager at Waymo, had begun to devise a scheme to steal Waymo's self-driving car technologies.

21 Public filings in Waymo's lawsuit against Uber suggest that Uber and Levandowski began

22 discussing certain technical matters as early as May 2015, that Levandowski met with Uber

23 representatives five times between October 2015 and December 11, 2015, and that Kalanick

24 suggested that Levandowski should create a company for Uber to acquire.

25            (ii)      By the end of 2015, Levandowski had registered an internet domain

26 for his new startup, secretly downloaded 14,000 Waymo proprietary files and other highly sensitive

27 data, and attempted to erase any evidence of his actions.  On January 15, 2016, the day after he

28 attended a high-level executive meeting at Uber, Levandowski formed Ottomotto LLC ("Otto").  In

1   August 2016, Uber acquired Otto and its "in-house" LiDAR system, a proprietary laser system

2   critical to the development of self-driving cars.  In a March 2017 deposition, Levandowski refused to

3   testify about documents in his possession, citing his Fifth Amendment right against self-

4   incrimination.

5            (iii)    In a May 2017 order, Judge William Alsup found that Waymo had

6   presented evidence that Levandowski had downloaded proprietary Waymo files before resigning,

7   that Uber had planned to acquire Otto and hire Levandowski as the head of its self-driving car

8   technologies, that Uber had specifically prepared for litigation with Waymo in connection with its

9   acquisition of Otto, and that the evidence indicated that Uber had acquired Otto with reason to

10  believe that Levandowski had taken confidential trade secrets from Waymo.  The Court

11  provisionally enjoined Uber from using any documents Levandowski downloaded from Waymo,

12  prohibited Levandowski from working on LiDAR systems at Uber, and required Uber to conduct an

13  investigation and accounting of Levandowski's activities.  Judge Alsup also referred the matter to

14  the U.S. Attorney's Office for investigation of possible theft of trade secrets from Waymo.

15  Levandowski was subsequently fired from Uber after refusing to assist the Company in its internal

16  investigation.

17           (d)     As set forth in ¶¶88-94, *infra*, Uber's rapid international expansion was aided

18  by violations of foreign law.

19           (i)     As part of its expansion into South Korea, Uber was using private

20  vehicles for commercial purposes in violation of South Korean law since at least June 2013.  Uber

21  had expanded into Europe by disregarding local laws and regulations in France and other countries

22  where, since at least February 2014, it was operating in contravention of local transportation laws

23  and failed to comply with European transportation rules and should have been regulated as a taxi

24  service.  As a result, certain of Uber's low-cost services were subject to being banned in those

25  countries as illegal.  In South Korea, France, and several other international jurisdictions Uber had

26  been using Greyball to evade authorities.

27           (ii)    Uber knowingly leased recalled and unsafe vehicles to its drivers in

28  Singapore and continued to do so even after one of its vehicles caught fire.  On August 3, 2017, *The*

*Wall Street Journal* reported that Uber had intentionally leased out unsafe Honda SUVs subject to a recall to its drivers in Singapore in order to chase breakneck growth.  After Uber expanded into Singapore in 2013, Uber created a unit that would rent Uber-purchased vehicles to drivers for a daily rate.  In early 2016, Kalanick approved a plan to buy thousands of new cars from auto importers, a legal channel outside manufacturers' authorized networks where safety, service and legal contracts are difficult to enforce, allowing the Company to pay less for the vehicles than it otherwise would have paid.  On April 4, 2016, Honda issued a recall for the SUVs Uber had purchased, advising owners to have them serviced as quickly as possible as the vehicles were prone to overheating. Despite being aware of the recall and safety issue, Uber knowingly purchased over 1,000 of the defective vehicles and continued to rent them out in disregard for the safety of Uber drivers and their riders.  Even after an Uber driver reported that his Company-supplied Honda Vezel had caught on fire and after Company executives, including those in San Francisco, were informed of the fire, Uber decided to keep the cars in service so as not to lose revenues or "alarm" drivers.  Uber failed to apprise its drivers and passengers of the true risks to their safety and well-being from the defective cars, instead developing an information campaign designed to limit any negative publicity that may result from the fire and Uber's actions.

(iii)    Uber managers had violated the FCPA (which bans the use of bribes to foreign officials to obtain or keep business), calling into question the legality of the Company's entire international operations, which misconduct was revealed when it was reported on August 29, 2017 that the DOJ has taken preliminary steps to investigate it.

(iv)    In London, Uber had failed to: (i) properly report serious criminal offenses; (ii) cooperate with authorities investigating the Company's illicit use of the Greyball tool; and (iii) conduct proper driver background checks, exposing the Company to the risk that its license would not be renewed in one of its largest and most important international locations.  On September 22, 2017, London's transport authority found that Uber "is not fit and proper to hold a private hire operator licence [sic]" as a result of its demonstrated "lack of corporate responsibility" and declined to renew the Company's license.  London reportedly accounts for about 5% of Uber's global active

1    user base of 65 million, and nearly a third of its active user base of 11 million in Europe, casting

2    further doubt on the Company's global growth prospects.

3            (e)    Uber also faced undisclosed material legal and reputational risks arising out of

4    attempts by high-level Uber executives to discredit a sexual assault victim and their fostering of a

5    hidden culture of institutionalized sexual harassment and discrimination.

6            (i)    As set forth in ¶¶95-100, *infra*, in 2014 defendants illicitly obtained a

7    passenger's medical records for the purpose of discrediting her claim that she had been sexually

8    assaulted by an Uber driver on a ride.  Uber senior executive Eric Alexander ("Alexander") brought

9    the medical files to the attention of Kalanick and other executives.  Kalanick reportedly reviewed the

10   medical report and discussed it at length with Alexander.  Uber executives then discussed the claim

11   that the victim had fabricated the whole incident in order to bolster Uber's rival in India – and did so

12   even though none of the executives had medical training and the perpetrator had already been

13   convicted of rape and sentenced to life in prison.  Alexander reportedly carried around the victim's

14   medical files for months without her knowledge.  The victim has sued Uber for unlawful intrusion of

15   private affairs, the public disclosure of private facts and defamation.

16           (ii)    As set forth in ¶¶73-87, *infra*, on February 19, 2017, former Uber

17   engineer Susan Fowler ("Fowler") published a blog post detailing widespread harassment,

18   discrimination and retaliation during her employment at Uber, and laying bare the Company's then-

19   existing policies and procedures.  The revelations sparked a publicity crisis for the Company, which

20   quickly led to an investigation by Holder and his colleagues at Covington & Burling LLP

21   ("Covington") of: (a) Uber's workplace environment; (b) the sufficiency of Uber's policies and

22   practices to address discrimination, harassment and retaliation in the workplace; and (c) the steps

23   Uber could take to enhance the Company's practices with respect to establishing a diverse and

24   inclusive workplace so that they matched Uber's stated policies.  The investigation resulted in a

25   series of recommendations that Uber enact sweeping changes to its business practices, management

26   and culture.  The first recommendation was to "review and reallocate the responsibilities of Travis

27   Kalanick."  On February 22, 2017, *The New York Times* reported that interviews with more than 30

28   current and former Uber employees, and a review of internal documents and recordings, revealed an

COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500      - 17 -

1  "unrestrained workplace culture," including incidents of groping, "homophobic slur[s]" and threats.

2  *The New York Times* detailed evidence that complaints were raised to Kalanick and other senior

3  Uber executives.  Because of the breadth and seriousness of the misconduct, Uber attempted to clean

4  house in connection with the investigation, firing at least 20 employees for misconduct (including

5  senior executive Alexander) and subjecting dozens of others to prolonged investigations or

6  disciplinary actions.  Another top executive, Emil Michael, resigned.

7  **Defendants' False and Misleading Statements About Uber's**
   **Compliance with Applicable Laws and Regulations**

8

9           28.     Defendants claimed that Uber was committed to complying with all applicable rules

10  and regulations in growing its business, while concealing Uber's institutionalized practice of flouting

11  rules whenever necessary in order to gain a competitive advantage.  In addition, when critics

12  questioned the legality of its novel service, Uber responded with false assurances of its knowledge

13  of, and adherence to, all applicable legal requirements.  For instance, on September 12, 2012, during

14  a Disrupt conference hosted by TechCrunch, Kalanick defended the legality of Uber's practices in

15  response to an interviewer question: "***Hold on . . . I do pay attention to the rules***."  He explained

16  Uber's practice of first checking the regulations before entering a new market: "***you go in, you look***

17  ***at the rules, and then you roll out your business***."[8]  Leading up to the June 6, 2014 Issuance,

18  defendants made a number of additional statements representing that Uber complied with all

19  applicable laws and regulations, including for example:

20      •   On September 12, 2012, during an interview at the Disrupt conference, Kalanick
            continued to insist Uber operated lawfully: "[Q.] Are you legal?  [A.] ***We are legal,***

21          ***we are legal***.  [Q.] According to you or according to the Taxi and Limo
            Commission?  [A.] ***According to the law***."  *Travis Kalanick Onstage at Disrupt*,

22          YouTube (Sept. 12, 2012), https://www.youtube.com/watch?v=O7iokgEsWcM.

23      •   On October 20, 2012, Kalanick stated: "In DC we had a really interesting situation.
            We went there, by the way, we were ***as far as we could tell we were totally legal,***

24          ***White Glove legal***."  *Travis Kalanick at Startup School 2012*, YouTube (Oct. 20,
            2012), https://www.youtube.com/watch?v=rQ6GoY2_Ujw.

25

26

27  _____
    [8]   TechCrunch, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 12, 2012), https://

28  www.youtube.com/watch?v=O7iokgEsWcM.

- On January 22, 2013, Kalanick stated: "We go to cities sometimes where the regulators and the city councils you know give us a little flack at the beginning. ***We go in when we're legal. We do***." *Travis Cordell Kalanick, Uber CEO Part 1*, YouTube (Jan. 22, 2013), https://www.youtube.com/watch?v=_uuTW2LidpU.

29.   These statements remained alive in the market for Uber securities and uncorrected at the start of the Class Period.  Later, during an interview with *Fortune Magazine* on June 14, 2013, Kalanick claimed he actually ***preferred*** jurisdictions with "a clear set of rules," because they avoided "regulatory ambiguity" that made it "very hard for a real company to operate."[9]  During an interview at the Brainstorm Tech conference on July 23, 2013, an interviewer expressed concern about Uber drivers' ability to "game the system" and induce surge pricing by avoiding popular areas.  Kalanick again referenced Uber's faithful obedience to the rules.  He told the interviewer that Uber would "***make sure that that doesn't happen***" because "***it goes against the DNA of our company***" and "marketplaces don't work when people are cheating."[10]  During the same speech, Kalanick unambiguously stated: "***We go into cities where we're legal; we operate where we're legal***."[11]  Likewise, in an August 2013 interview with *Forbes*, Kalanick again confirmed, "***we make sure [when] we go into cities we're legal***."[12]

30.   Following the June 6, 2014 Issuance, defendants continued to portray Uber as operating within legal bounds as it accelerated its rapid expansion.  For example, in October 2014, after Uber had grown into one of the largest private companies in history, Kalanick told investors that Uber's solid foundation would allow it to operate more conservatively, with strict adherence to applicable laws.  He explained, "when you're the small underdog I think you can be a little more

---

[9]   Fortune Magazine, *The Future Model of Transportation*, YouTube (June 14, 2013), https://www.youtube.com/watch?v=Edob6hpJBQY.

[10]   Fortune Magazine, *Travis Kalanick CEO of Uber Technologies Speaks at Brainstorm Tech 2013*, YouTube (July 23, 2013), https://www.youtube.com/watch?v=vGbuitwkZiM&t=40s.

[11]   *Id.*

[12]   *Travis Kalanick, Uber, speaking at the IoD Annual Convention 2014*, YouTube (Aug. 9, 2013), https://www.youtube.com/watch?v=Vi_AiIQolJ8.

brash than . . . when you are the big guy."[13]  In October 2014, Kalanick claimed the Company had engaged with municipalities to ensure Uber understood their expectations: "*We work with regulators and cities to make things work*."[14]  On June 3, 2015, he stressed Uber's commitment to compliance, claiming "*whenever we're asked to abide by modern regulations that protect the rights and safety of passengers and drivers, we do*."[15]

31.    Uber went out of its way to assure the market that it played fair and by the rules, particularly with respect to its main competitor, Lyft.  When Lyft alleged in August 2014 that Uber had attempted to frustrate its business by booking and cancelling rides, Uber immediately denied the allegations.[16]  Throughout Uber's solicitation efforts, Kalanick made numerous additional representations that Uber complied with the law.  For example:

- On July 12, 2014, Uber issued a statement claiming "[w]e've been working in good faith with regulators to modernize laws and to find a permanent home for Uber in cities around the world." Tom Fontaine, *Despite challenges, ridesharing operations flourish*, Pitt. Trib. Rev., July 12, 2014.

- On December 14, 2014, the *Washington Post* quoted David Plouffe, Uber's "campaign manager" as saying "the Company has aimed to '*work with regulators, work with elected officials, to find a way forward*' in dealing with laws."

- On December 15, 2016, when discussing the future of driverless cabs in San Francisco, Kalanick said the Company is "*following all the rules*."  He added, "often regulators feel like they want to get their arms around it.  We are following the rules but they are still sort of getting up to speed in adapting to the change."  NDTV, *Uber CEO Says Demonetisation Is Beneficial and Surge Pricing Is Vital*, Dec. 16, 2016.

32.    Defendants Uber and Kalanick knew or had reason to believe that the statements in ¶¶29-31 misrepresented material facts and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  Defendants failed to disclose that Uber's results and record growth had been artificially

---

[13]    *Travis Kalanick, Uber, speaking at the IoD Annual Convention 2014*, YouTube (Oct. 3, 2014), https://www.youtube.com/watch?v=Vi_AiIQolJ8.

[14]    BBC News, Oct. 3, 2014.

[15]    *5-Year Anniversary Remarks from Uber CEO Travis Kalanick*, YouTube (June 3, 2015), https://www.youtube.com/watch?v=idjrouG_8vY.

[16]    *Plouffe at Uber: Tough start*, Politico.com, Aug. 26, 2014.

1  inflated by illicit conduct, and that as a result of defendants' illicit conduct Uber's prospects were

2  subject to numerous material undisclosed legal, reputational and operational risks, including:

3       (a)    As set forth in ¶¶49-60, *infra*, Uber's growth strategy was dependent on a

4  scheme to secretly misappropriate technology from a competitor, Google's self-driving car affiliate

5  Waymo, instead of developing its own.

6       (b)    As set forth in ¶¶61-69, *infra*, in order to fuel Uber's rapid expansion,

7  defendants, beginning at least as early as 2014, developed and utilized a covert program code-named

8  "Greyball" designed to surveil and then evade government officials in jurisdictions around the world

9  in which Uber services were illegal or had been resisted by authorities.

10      (c)    As set forth in ¶¶70-72, *infra*, between 2014 and the early part of 2016 Uber

11  used a secret program code-named "Hell" to steal driver and rider data from its main competitor,

12  Lyft, unfairly undercutting Lyft's growth and operations, and stifling competition.

13      (d)    As set forth in ¶¶88-94, *infra*, defendants knew or recklessly disregarded that

14  Uber's rapid international expansion was aided by violations of foreign law.

15  **Defendants' False and Misleading Statements**
    **About Uber's Focus on Innovation and**
16  **Development of Self-Driving Car Technologies**

17      33.    Prior to and during the Class Period, Uber sought to increase investment by touting its

18  focus on progressive technology and cutting-edge innovation, claiming they formed the foundation

19  that would sustain the Company's rapid growth rate for years into the future.  Defendants repeatedly

20  described Uber as an "innovative" company infused with "creative problem-solvers" working to

21  better the world, and Kalanick framed Uber as a company with a passion for taking on tough

22  technological challenges.[17]

23      34.    According to defendants, Uber's development and advancement of self-driving car

24  technologies was particularly crucial to its success.  Early on, Kalanick suggested that the

25  Company's penchant for innovation meant it needed to be at the vanguard in the development of

26

27  ─────────────
    [17] *See, e.g.*, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 12, 2012), https://
    www.youtube.com/watch?v=O7iokgEsWcM; *Fireside Chat with Travis Kalanick and Marc Benioff*,
28  YouTube (Sept. 16, 2015), https://www.youtube.com/watch?v=Zt8L8WSSr1g&t=61s.

self-driving car technologies.  For example, in an article posted on May 28, 2014, CNBC quoted Kalanick saying that autonomous vehicles were "the way the world is going."[18]  Autonomous vehicles represented Uber's most revolutionary innovation and – according to Kalanick – an "*existential*" requirement for the Company's continued success.[19]

35.     To position itself as an apparent leader in the development of self-driving car technologies, on February 2, 2015, Uber announced "a strategic partnership" with Carnegie Mellon University that included the creation of the Uber Advanced Technologies Center in Pittsburgh.  Uber claimed the research center would focus "*primarily in the areas of mapping and vehicle safety and autonomy technology*."[20]  The following day, CNBC celebrated the partnership as "a move analysts believe could eventually mean driverless cars."

36.     Uber made a concerted effort to portray itself as the equal of other tech companies, such as Google and its affiliate Waymo, who were also racing to develop driverless car technologies.  In a *New York Times* article published on February 9, 2015, Nairi Hourdajian, an Uber spokeswoman, stated, "'Uber has a strong relationship with Google'" and "'look[s] forward to continuing our collaborative dialogue with Google about the future of our partnership in the years to come.'"[21]  On March 6, 2015, Raj Rajkumar, one of the leading experts on self-driving cars at Carnegie Mellon University, claimed Uber's ability to innovate offset Google's superior resources and data.  He stated, "Google is capable of collecting all this information.  In our case, we don't have that capability, *so we have to be creative.  It turns out that's sufficient*."[22]

37.     In August 2015, after Uber opened its research center in Pittsburgh, the Company announced that it had entered into a partnership with the University of Arizona "focuse[d] on

---

[18]  CNBC, *Uber CEO Self-Driving Cars Are the Future, Drivers Are Not*, May 28, 2014.

[19]  *Uber Bringing Self-Driving Volvos To Pittsburgh Soon*, MediaPost.com, Aug. 19, 2016.

[20]  *Uber and CMU Announce Strategic Partnership and Advanced Technologies Center*, Uber Blog (Feb. 2, 2015), https://www.uber.com/blog/uber-and-cmu-announce-strategic-partnership-and-advanced-technologies-center.

[21]  Mike Isaac, *A Prickly Partnership*, N.Y. Times, Feb. 9, 2015.

[22]  Alexi Oreskovic, *Silicon Valley debate on self-driving cars: do you need a map?*, Reuters, Mar. 6, 2015.

1   research and development in the optics space for mapping and safety."[23]   The partnership reaffirmed

2   to investors that Uber planned to be a leader in developing its own self-driving technology.   Brian

3   McClendon, Uber vice president of advanced technologies, described the innovations that Uber was

4   working to develop: "A lot of this is about lenses and the acquisition of imagery and in other cases

5   technologies like LiDAR (a remote-measurement technology using a laser) that scanning the world

6   around you in high resolution depends on."   He explained that the technology "get[s] detail like

7   street names, street address, or more importantly things like the depth of potholes, being able to read

8   the exact geometry of the world around you and determining if it is part of your environment or a

9   dynamic object that will be here today and gone tomorrow, and we need to know how to react to

10  that."   He concluded, "we'll be working on this project for years."[24]   On September 17, 2015,

11  Kalanick described Uber as an "optimistic leader" that would help the world "transition" from cars

12  with drivers to driverless cars.[25]

13          38.      On February 23, 2016, Uber inflamed excitement further when it announced progress

14  toward autonomism.   In an announcement on its website, Uber stated, "[t]he investments we're

15  making in Pittsburgh today are key to the long-term future of transportation.  Self-driving technology

16  has the potential to drastically cut down on accidents and congestion while making transportation

17  even more affordable and convenient for everyone."[26]   On May 19, 2016, Uber posted an update on

18  its blog.   It stated, "[r]eal-world testing is critical to our efforts to develop self-driving technology. . .

19  .   While Uber is still in the early days of our self-driving efforts, *every day of testing leads to*

20  *improvements*.   Right now we're focused on getting the technology right and ensuring it's safe for

21  everyone on the road – pedestrians, cyclists and other drivers."   Uber stated that these innovations

22

23  [23]   *Driver Innovation in Arizona*, Uber Blog (Aug. 25, 2015), https://www.uber.com/blog/
     tuscon/driving-innovation-in-arizona/.

24  [24]   David Wichner, *UA, Uber team for driverless research; Optics program to aid in mapping*, Ariz.
25  Daily Star, Aug. 25, 2015.

26  [25]   *Fireside Chat with Travis Kalanick and Marc Benioff*, YouTube (Sept. 17, 2015), https://
     www.youtube.com/watch?v=Zt8L8WSSr1g&t=61s.

27  [26]   *Growing in the Steel City*, Uber Blog (Feb. 23, 2016), https://www.uber.com/blog/
28  pittsburgh/growing-in-the-steel-city/.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500          - 23

1    would "help[] us shape the future of transportation."  On August 1, 2016, Uber added to investor

2    enthusiasm when it announced it had "***built test models of self-driving cars, which we are currently***

3    ***piloting in Pittsburgh***."  The next day, Uber stressed its independence from Google, saying it had

4    invested $500 million to "***wean itself off dependence on Google Maps and pave the way for***

5    ***driverless cars***."[27]

6         39.    In August 2016, Uber acquired self-driving car startup, Otto.  Rather than telling the

7    truth about how the acquisition helped Uber acquire stolen technology, Uber celebrated the deal as a

8    means to develop its own technology.  Kalanick described Otto as "a 90-plus person technology

9    startup ***whose mission is to rethink transportation, starting with self-driving trucks***."  Kalanick

10   went on to state that "[w]hen it comes to this advanced technology stack, ***Otto plus*** Uber is a dream

11   team. . . .   Together, ***we now have one of the strongest autonomous engineering groups in the***

12   ***world***."[28]

13        40.    Defendants Uber and Kalanick knew or had reason to believe that the statements in

14   ¶¶33-39 misrepresented material facts and/or omitted material facts necessary to make the statements

15   made, at the time made and in light of the circumstances under which they were made, not

16   misleading.  As set forth in ¶¶49-60, *infra*, defendants knew or had reason to know but failed to

17   disclose that Uber's self-driving car program was dependent on a scheme to secretly misappropriate

18   technology from Google's self-driving car affiliate Waymo in order to maintain and increase its

19   competitive advantage, rather than simply rely on technological innovations or legitimate business

20   acquisitions.

21   **Defendants' False and Misleading Statements**
     **Regarding Uber's Competition**
22

23        41.    When Lyft arrived to market in 2012, Uber publicly welcomed the competitive

24   challenge.  Behind the scenes, however, Uber plotted to undercut Lyft by any means possible,

     regardless of legality.  For example, at a Disrupt conference on September 12, 2012, Kalanick
25

26   _____
     [27]  *Uber to pour $500m into global mapping project*, Prime-News, Aug. 2, 2016.

27   [28]  *Rethinking transportation*, Uber Blog (Aug. 18, 2016), https://newsroom.uber.com/rethinking-
28   transportation/.

1   expressed excitement about the challenge of a new rival.  He said, "competition is fun . . . ***if there***

2   ***wasn't competition like what is the freakin' purpose?***  Let's have some fun then let's make the

3   world a better place at the same time."[29]  Uber and Kalanick repeated this pro-competition sentiment

4   throughout the period leading up to the June 2014 financing round, and their stance was well-

5   publicized.  For instance, in response to a question about Lyft, Kalanick said he was not afraid of the

6   new company because, according to him, "***competition is good***."[30]

7         42.     These statements remained alive in the market for Uber securities and uncorrected at

8   the start of the Class Period, and defendants repeated these pro-competitive sentiments in the months

9   leading up to the 2014 financing rounds.  For example, on July 23, 2013, Kalanick argued for

10   relaxed competitive restrictions in various cities and accused the municipalities of "doing anti-

11   competitive things" that thwarted the free market.[31]  During this same conference, Kalanick

12   hypocritically accused Lyft – a company Uber would later illicitly attack with spyware – of illegal

13   activity.  He claimed Lyft had engaged in "regulatory arbitrage" because it entered markets after

14   Uber had already established a presence in them.  He went so far as to claim that "every trip" with

15   Lyft was "a criminal misdemeanor" because – according to Kalanick – Lyft's drivers lacked the

16   proper insurance and licensure.[32]  By all appearances, Uber continued to welcome the "challenge" of

17   increased competition during the Class Period.  For instance, in a *Wall Street Journal* article

18   published on August 11, 2014, Uber described how "competitive clones," such as Lyft, create a

19   "***competitive spirit [that] is good for consumers and for the marketplace***."[33]  Kalanick continued to

20   relay this message on August 19, 2014, when he said, "***competition can be fun***" and "***at the end of***

---

21  [29]  TechCrunch, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 12, 2012), https://
22  www.youtube.com/watch?v=O7iokgEsWcM.

23  [30]  Julie Bort, *Uber CEO: Bring On The Cheap Competition*, Bus. Insider, Sept. 12, 2012; *see also*
 TechCrunch, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 12, 2012), https://
24  www.youtube.com/watch?v=O7iokgEsWcM (same).

25  [31]  Fortune Magazine, *Travis Kalanick CEO of Uber Technologies Speaks at Brainstorm Tech 2013*,
 YouTube (July 23, 2013), https://www.youtube.com/watch?v=vGbuitwkZiM&t=40s.

26  [32]  *Id.*

27  [33]  Douglas MacMillan, *Tech's Fiercest Rivalry: Uber vs. Lyft; The Two Heavily Financed Upstarts*
28  *Also Aim to Supplant the Taxi Industry*, Wall St. J., Aug. 11, 2014, at B1.

---

COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500   - 25 -

1   *the day it's better for the consumer*."[34]   Kalanick repeatedly embraced competition throughout the

2   Class Period, stating:

3   • On January 18, 2015, Kalanick stated, "it is ***important for a regulatory regime to***
    ***also codify choice and competition choice***."   DLD Conference, *Uber and Europe:*
4   *Partnering to Enable City Transformation I (Travis Kalanick, CEO at Uber)*,
    YouTube (Jan. 18, 2015), https://www.youtube.com/watch?v=iayagHygV0Q.
5

6   • In an interview published on September 23, 2015, Kalanick stated, "***[c]ompetition***
    ***makes us better***." ET Now, *In Conversation With Uber Inc's CEO – Travis Kalanick*,
7   YouTube (Sept. 23, 2015), https://www.youtube.com/watch?v=ByF2MVufBlU.

8   • On April 27, 2016, Kalanick said "we've gotten into a situation where some of these
    ***old rules have become protectionist and have essentially outlawed competition*** and
9   you know ultimately ***those things need to need to change***."   CNBC, *Uber CEO*
    *Travis Kalanick On Making Ends Meet*, YouTube (Apr. 27, 2016), https://
10  www.youtube.com/watch?v=VnH_7YDWGKE&t=36s.

11

12      43.   Defendants Uber and Kalanick knew or had reason to believe the statements in ¶42

13  misrepresented material facts and/or omitted material facts necessary to make the statements made,

14  at the time made and in light of the circumstances under which they were made, not misleading.

15  Defendants failed to disclose that Uber's results and growth had been artificially inflated by illicit

16  conduct, and that as a result of defendants' illicit conduct Uber's prospects were subject to numerous

17  material undisclosed legal, reputational and operational risks, including:

18      (a)   As set forth in ¶¶49-60, *infra*, Uber's growth strategy was dependent on a

19  scheme to secretly misappropriate technology from a competitor, Google's self-driving car affiliate

20  Waymo, instead of developing its own.

21      (b)   As set forth in ¶¶61-69, *infra*, in order to fuel Uber's rapid expansion,

22  defendants, beginning at least as early as 2014, developed and utilized a covert program code-named

23  "Greyball" designed to surveil and then evade government officials in jurisdictions around the world

24  in which Uber services were illegal or had been resisted by authorities.

25      (c)   As set forth in ¶¶70-72, *infra*, between 2014 and the early part of 2016 Uber

26  used a secret program code-named "Hell" to steal driver and rider data from its main competitor,

27  Lyft, unfairly undercutting Lyft's growth and operations, and stifling competition.

28  ---
    [34]   *Uber CEO Travis Kalanick and David Plouffe on Bloomberg TV*, CEO Wire, Aug. 19, 2014.

1          (d)     As set forth in ¶¶88-94, *infra*, defendants knew or recklessly disregarded that

2   Uber's rapid international expansion was aided by violations of foreign law.

3   **Defendants' False and Misleading Statements**
    **Regarding Uber's Corporate Culture**

4

5          44.     Prior to and during the Class Period, defendants portrayed Uber to potential investors

6   as honest and principled.  For example, during his speech at the Tech Cocktail's Startup Mixology

7   Conference in Washington, D.C. on June 16, 2011, Kalanick asserted that "***principles do matter*** and

8   that's how you change the world is by holding those principles over sometimes corrupt systems."  In

9   the same speech, he further proclaimed that "fak[ing] it til you make it" was "bullshit" because

10  "you're lying to yourself and everybody around you" and "people who lie to themselves and other

11  people, it's obvious to others."  Again, shortly before the June 6, 2014 Issuance, during an interview

12  with the *Financial Times* on May 9, 2014, Kalanick extolled Uber's organizational honesty and

13  stated that "***[w]e feel we are very honest and authentic, to the point of being brutally honest*** . . . .

14  Not everyone likes that style, and I get that, but ***at least we're trustworthy***."

15         45.     During the period when Uber was implementing its billion-dollar fundraising rounds,

16  defendants continued to place great emphasis on the Company's "culture" and "principles"

17   as a cornerstone for its success.  On December 4, 2014, Kalanick kicked off the Series E fundraising

18  round by stating in his blog that Uber would be refining its "company culture effectively."  Again,

19  on September 16, 2015, shortly before the Series G fundraising round, for the purpose of inducing

20  the purchase of Uber securities, Kalanick held up Uber's corporate culture as principled and central

21  to its operations: "I don't know how many companies and how many people go as deep as they need

22  to on culture.  We're in the process right now of creating essentially what I call a philosophy of

23  work.  You know you spend half of your day working and it should matter.  It should be more than

24  just work; ***it should be something you believe in and how you do it should matter, the principles***

25  ***and in how you approach your work should matter*** . . . one of our cultural values is celebrate the

26  city right so that's so perfect for us you really wouldn't see that on any other company's cultural

27  values but it matters to us."  In particular, defendants highlighted Uber's commitment to women as

28

well as its purported commitment to "diversity, fairness and equality" as important aspects of the Company's culture.

46.    Additional statements by Kalanick and Uber regarding the importance of Uber's workplace culture and its commitment to various stakeholders included:

- Salle Yoo, general counsel, in an interview with *Reuters* on March 10, 2015: when asked by a journalist on why women might find working for Uber attractive, Yoo responded that Uber "***offers [women] the chance to be entrepreneurial***, the chance to balance work and family."

- Kalanick's joint statement with UN Women's executive director on March 10, 2015: "Today, UN Women and Uber are launching a partnership to work together around the world toward ***a shared vision of equality and women's empowerment***. . . .  This important mission can only be accomplished when all women have direct access to ***safe and equitable*** earning opportunities."

- Uber's July 27, 2015 press release: "***For many women, Uber is a flexible, equitable opportunity*** that not only gives them control over their schedules and supplements income, but also helps them pursue their passions."

- Ryan Graves, Uber's Executive Sponsor, in a press release on September 3, 2015: "***Uber's leadership is a strong example of innovation stemming from the creation of more diverse and inclusive environments***."

- Rachel Holt, Head of American Operations, in a statement published by *HuffPost* on October 31, 2016: "***Discrimination has no place in society, and no place on Uber***."

47.    Defendants Uber and Kalanick knew or had reason to believe that the statements in ¶¶44-46 misrepresented material facts and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  Defendants failed to disclose that Uber and Kalanick had encouraged and fostered a toxic corporate culture defined by misogyny, gender discrimination, sexual harassment, and a flagrant disregard for the law, that would cause immense damage to the Company's reputation, brand, and ability to attract and retain qualified employees, customers and drivers once its true nature became publicly known.  In particular:

(a)    As set forth in ¶¶73-87, *infra*, Uber institutionalized gender discrimination and the harassment of women, causing an 80% decline in female employees in certain operations from November 2015 to December 2016; maintained completely ineffective internal complaint policies

1   and procedures to prevent employee misconduct; and sponsored a Company trip to a female escort

2   bar.

3           (b)      As set forth in ¶¶95-100, *infra*, Uber executives had illicitly obtained a sexual

4   assault victim's medical records in order to discredit her traumatic experience.

5           (c)      As set forth in ¶¶49-60, *infra*, Uber's growth strategy was dependent on a

6   scheme to secretly misappropriate technology from a competitor, Google's self-driving car affiliate

7   Waymo, instead of developing its own.

8           (d)      As set forth in ¶¶61-69, *infra*, in order to fuel Uber's rapid expansion,

9   defendants, beginning at least as early as 2014, developed and utilized a covert program code-named

10  "Greyball" designed to surveil and then evade government officials in jurisdictions around the world

11  in which Uber services were illegal or had been resisted by authorities.

12          (e)      As set forth in ¶¶70-72, *infra*, between 2014 and the early part of 2016 Uber

13  used a secret program code-named "Hell" to steal driver and rider data from its main competitor,

14  Lyft, unfairly undercutting Lyft's growth and operations, and stifling competition.

15          (f)      As set forth in ¶¶88-94, *infra*, defendants knew or recklessly disregarded that

16  Uber's rapid international expansion was aided by violations of foreign law.

17  **Defendants' Uber Story Unravels**

18          48.      Beginning in early 2017, the Uber growth story and the narrative disseminated by

19  defendants began to unravel.  Headline after breaking headline revealed the Company was bent on

20  short-term growth and expansion at all costs, incubated in a toxic corporate culture of misogyny,

21  institutionalized gender discrimination and sexual harassment, and was driven by an operating ethos

22  of blatant disregard for the law, no matter the reputational, legal or operational risks involved.

23  Within months, Kalanick would be forced to resign his position as CEO and Uber found itself in

24  existential crisis, as top flight talent exited the Company in droves, Uber's reputation and brand

25  suffered severe and lasting damage, its operations and prospects were diminished, and Uber

26  securities plummeted.  As Uber's new CEO wrote in an e-mail to employees following the news that

27  London had barred Uber from operating in the city, "[t]he truth is that there is a high cost to a bad

28  reputation."

**Uber Attempts to Steal Its Way into the Future**

49.     As detailed elsewhere herein, defendants had characterized Uber's development and implementation of self-driving car technologies as essential to the Company's continued success and future growth prospects.  The advancement of futuristic technologies such as self-driving cars also fit with the Company's narrative that it was a leader in technological innovation and was key to the Company's appeal to investors.  In early 2015, Uber and Kalanick announced that they were taking dramatic steps to put this commitment to innovation into practice by announcing a strategic partnership with premier engineering university Carnegie Mellon to create an "Advanced Technologies Center" in Pittsburgh.  The primary research focus of the partnership was on developing self-driving car technologies, such as mapping, vehicle safety and autonomy.  The Company reportedly used cash from its recent equity raises to fund the investment.  In the ensuing months, Uber continued to cite major progress on its self-driving car initiatives, including an agreement with Pittsburgh to allow Uber to test autonomous vehicles in the city and the acquisition of self-driving car startup Otto.

50.     Then, on February 23, 2017, Google's self-driving car affiliate Waymo rocked the tech community by filing a lawsuit against Uber in the U.S. District Court for the Northern District of California.  The suit alleges that Uber had simply stolen self-driving car technologies from Waymo instead of developing its own after its publicly vaunted attempts to do so had stalled.  *See Waymo LLC v. Uber Technologies, Inc.*, No. 3:17-cv-00939-WHA (N.D. Cal.) ("*Waymo*").

51.     According to the lawsuit, Waymo had developed and improved extremely valuable laser technology, known as "LiDAR," that was a key component to the successful development of autonomous vehicles.  Whereas Waymo relied on its in-house LiDAR systems, Uber relied on third-party vendors for its LiDAR systems, a function of the Company jumping into the self-driving car space at least five years behind Waymo.

52.     To alleviate this fundamental competitive disadvantage, in the summer of 2015, Levandowski, a manager at Waymo, had begun to devise a scheme to steal Waymo's self-driving car technologies in order to enrich himself and his associates.  Kalanick would later refer to Levandowski as his "brother from another mother."  Public filings in Waymo's lawsuit against Uber

1    suggest that Uber and Levandowski began discussing certain technical matters as early as May 2015

2    (eight months before he left Waymo), that Levandowski met with Uber representatives five times

3    between October 2015 and December 11, 2015, and that Kalanick suggested that Levandowski

4    should create a company for Uber to acquire.  *Waymo*, Dkt. No. 756, at 8-10.  By November 2015,

5    Levandowski had registered an internet domain for his new startup, which he confided to colleagues

6    would be used to replicate Waymo's technologies.  In December 2015, Levandowski installed

7    special software on his Waymo laptop that he used to download 14,000 proprietary files and other

8    highly sensitive data.  Thereafter, Levandowski attempted to erase any evidence of his actions.

9         53.     On January 14, 2016, Levandowski attended a high-level executive meeting at Uber's

10   offices in San Francisco while he was still a Waymo employee.  The next day he formed Otto and,

11   by the end of January, he had resigned his position with Waymo.  In May 2016, Levandowski

12   publicly launched Otto with the stated goal of developing hardware and software for autonomous

13   vehicles.  Other Waymo employees, including a supply chain manager and a hardware engineer,

14   resigned their positions to join Otto – but not before they had also downloaded secure files

15   containing proprietary Waymo information.

16        54.     In August 2016, Uber acquired Otto for $680 million.  In an interview with *Business

17   Insider* on August 18, 2016, Kalanick sought to justify spending $680 million of investors' funds to

18   acquire Otto and spending millions more on an 180,000 square feet Palo Alto facility to

19   accommodate the newly acquired company by emphasizing the crucial need to be first in the self-

20   driving car race to ensure Uber's survival.  Kalanick told *Business Insider*, "[w]hat I know is that I

21   can't be wrong.  Right?  I have to make sure that I'm ready when it's ready or that I'm making it

22   ready.  So, I have to be tied for first at the least."  He explained that the failure to be first would

23   threaten Uber's existence: "the entity that's in first, then rolls out a ride-sharing network that is far

24   cheaper or far higher-quality than Uber's, then **Uber is no longer a thing**."  It was reported that a

25   key reason for the acquisition was Otto's "in-house" LiDAR system.  Uber quickly named

26   Levandowski as its vice president and he was placed in charge of Uber's self-driving car project.

27   According to Waymo, within a month of the acquisition Uber had promptly put LiDAR to work and

28   represented to regulatory authorities that it had developed its own LiDAR technology in-house.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500        - 31

55.     Following this acquisition, in December 2016, a Waymo employee was inadvertently copied on a vendor e-mail that suggested that Otto and Uber were actually using Waymo's trade secrets and patented LiDAR designs.  The e-mail was addressed to Uber and attached a machine drawing of what was purported to be an Otto circuit board that was strikingly similar to – and shared several unique characteristics with – Waymo's highly confidential LiDAR circuit board, the designs for which Levandowski had downloaded before his resignation.  To confirm its suspicion that Uber had misappropriated Waymo trade secrets, Waymo sent a public records request to Nevada's Office of Economic Development and Department of Motor Vehicles.  Waymo alleged that the documents it received from this request conclusively established that Uber and Otto were using a custom LiDAR system with the same characteristics as Waymo's proprietary system.

56.     In May 2017, Judge Alsup, who is overseeing the case between Waymo and Uber, issued an order finding that Waymo had presented evidence that Levandowski had downloaded proprietary Waymo files before resigning, that Uber had planned to acquire Otto and hire Levandowski as the head of its self-driving car technologies, and that Uber had specifically prepared for litigation with Waymo in connection with its acquisition of Otto.  Significantly, Judge Alsup found that the evidence indicated that Uber had acquired Otto with reason to believe that Levandowski had taken confidential trade secrets from Waymo.

57.     Court records also show that in March 2016, Uber commissioned a due diligence report with a litigation support consultancy and went so far as to craft and execute a joint defense agreement with Levandowski in April.  Notably, Uber entered into a broad agreement to indemnify Levandowski months before the Company acquired Otto.  The agreement indemnified Levandowski for any "Bad Act," which, as stated in the Court's June 5, 2017 Order re: Waymo's Motion to Compel, was defined in a February 22, 2016 term sheet signed between Uber and Otto to include "fraud, misappropriation of Waymo's patents, copyrights, trademarks or trade secrets, breach of a fiduciary duty owed to Waymo, or breach of a non-solicitation agreement with Waymo."  *Waymo*, Dkt. No. 566 at 2.  This indemnification was effective regardless of whether the Otto acquisition was consummated as long as Levandowski and other Otto employees disclosed all such Bad Acts to forensic expert Stroz Friedman.  Uber has resisted turning over the Stroz Friedman report to Waymo,

1   but on September 13, 2017, the Federal Circuit Court of Appeals issued an opinion affirming the

2   District Court's discovery orders directing Uber to turn over the report and related documents.

3   Waymo immediately filed a motion to continue the trial, asserting "the Stroz Report unequivocally

4   establishes the facts underlying Waymo's trade secret misappropriation claims." *Waymo*, Dkt. No.

5   1604 at 1.

6        58.    In a March 2017 deposition, Levandowski asserted his Fifth Amendment right against

7   self-incrimination to avoid testifying about documents in his possession.  During an April 5, 2017

8   Court hearing, Judge Alsup commented that "[t]his is an extraordinary case.  I have never seen a

9   record this strong in 42 years."  *Waymo*, Dkt. No. 160 at 11.  On May 11, 2017, the Court

10  provisionally enjoined Uber from using any documents Levandowski downloaded from Waymo,

11  prohibited Levandowski from working on LiDAR systems at Uber, required Uber to conduct an

12  investigation and accounting of Levandowski's activities, and ordered that Uber must immediately

13  prevent all employees and agents from "consulting, copying, or using the downloaded materials" and

14  return such materials to Waymo or the Court. *Waymo*, Dkt. No. 433 at 23.  The Court also entered

15  an Order of Referral to United States Attorney to conduct an "investigation of possible theft of trade

16  secrets based on the evidentiary record supplied thus far concerning plaintiff Waymo LLC's claims

17  for trade secret misappropriation." *Waymo*, Dkt. No. 428.  A commentator in the *Washington Post*

18  observed that "[i]t is very rare for a judge to refer a matter over to the U.S. Attorney and signals the

19  judge's displeasure with Uber in the trade secrets civil lawsuit."  Levandowski was subsequently

20  fired from Uber after refusing to assist the Company in its internal investigation.

21       59.    In light of the Waymo scandal, Magellan Financial Group analogized Uber's

22  fundraising strategy to a Ponzi scheme: "They've got no advantage over anyone else when it comes

23  to autonomous driving technology.  They tried to steal it from Google, they've ended up in court.

24  That whole side of the business is falling apart.  It's constantly losing money and its capital-raising

25  strategy is a Ponzi scheme."

26       60.    On September 20, 2017, it was reported that Uber quantified its exposure to just one

27  of the nine counts brought against it for trade secret theft by Waymo at $2.6 billion.

28

COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500       - 33

**Uber Uses "Greyball" to Surveil and Evade Authorities**

61.     On March 3, 2017, *The New York Times* ran an explosive article entitled, "*How Uber Deceives the Authorities Worldwide*," that detailed how Uber had developed and utilized a covert program code-named "Greyball" designed to target and then evade government officials in jurisdictions around the world in which Uber services were illegal or had been opposed by authorities.

62.     The article revealed how, since at least 2014, Uber had used data collected from the Uber app and other techniques to identify and circumvent officials who were trying to assess and/or regulate the ride-hailing service in cities like Portland, Boston, Paris and Las Vegas, and in countries like Australia, China and South Korea.  It had used the program to expand its low-cost UberX services into new cities, which often ran afoul of local regulations.

63.     According to the article, when Uber entered a new city, the Company appointed a general manager to head the Company's Greyball operations.  This person would then use at least a dozen technologies and techniques to try to spot enforcement officers.  One technique involved drawing a digital perimeter, or "geofence," around the government offices on a digital map of a city that Uber was monitoring.  The Company watched which people were frequently opening and closing the app – a process known internally as eyeballing – near such locations as evidence that the users might be associated with city agencies.  Other techniques included looking at a user's credit card information and determining whether the card was tied directly to an institution like a police credit union.  Another involved sending employees to look up device numbers of the cheapest mobile phones that were likely to be acquired by local officials as part of their sting operations against the Company.  In addition, Uber employees would search social media profiles and other information available online to identify officers.

64.     Once government officials were identified by the Company, they would be internally tagged with a small piece of code that read "Greyball" followed by a string of numbers and provided a dummy version of the Uber app.  This dummy version would mimic the real version, but allowed the Company to populate the screen with ghost cars or show that no cars were available in order to

1  allow Uber drivers to evade detection.  Occasionally, if a driver accidentally picked up someone

2  tagged as an officer, Uber called the driver with instructions to end the ride.

3      65.     Elsewhere, it was reported that Uber had also turned Greyball on cabdrivers in an

4  effort to thwart them from using the Uber app to learn the whereabouts of Uber drivers.  The secret

5  program thus became another tool in Uber's vast toolbox to gain improper advantages over the

6  Company's competition.

7      66.     Once the Greyball tool was put in place and tested, Uber engineers compiled a

8  playbook with a list of tactics and distributed the playbook to general managers in more than a dozen

9  countries on five continents.  The development and use of Greyball was not the product of some

10  rogue group of employees, but an official Company-sponsored program.  It was developed and

11  operated by at least 50 Uber employees and approved by Uber's central office and highest

12  executives, including the Company's Senior Vice President of Global Operations.  Kalanick, as a

13  result of his position as a hands-on manager and CEO of Uber and the Company-wide distribution

14  and use of the Greyball program as a central component of Uber's growth strategy, knew about the

15  program and that it was illegal.  Indeed, in a 2013 tech conference, Kalanick accused rival Lyft of

16  operating a "criminal" ridesharing model under similar circumstances:

17          The way to think about it: Lyft basically goes into the markets that Uber is in and
            then gets folks who don't have commercial licenses and don't have commercial
18          insurance and says 'bring your own car' and provide Uber-like service. . . .  I'm like,
            holy cow, every trip that's happening – I'm reading the law – every trip that's
19          happening is a criminal misdemeanor being committed by the person driving. I don't
            think that's a good law. **But that is the law**.
20

21      67.     Uber would ultimately confirm the existence of the Greyball program and that it had

22  been used to target government officials.

23      68.     By May 2017, it was reported that Uber was the target of a criminal probe by the U.S.

24  Attorney's Office for the Northern District of California into the Company's use of the Greyball

25  program.   The U.S. Attorney's Office has issued subpoenas to public officials in Portland,

26  Philadelphia and Austin and is being assisted by the FBI in connection with its investigation.

27  Reportedly, potential legal violations by Uber as a result of its use of the program include violations

28  of the federal Computer Fraud and Abuse Act and intentional obstruction of justice.

COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500        - 35 -

1    69.    On September 15, 2017, the Portland Bureau of Transportation ("PBT") announced

2  the conclusion of its investigation into Uber's Greyball program.  The PBT found that Uber used

3  Greyball to evade authorities when operating without permits in December 2014, and stated that

4  "[i]n using Greyball, Uber has sullied its own reputation."  The San Francisco District Attorney's

5  Office also opened an investigation.

6  **Uber Unleashes "Hell" on Its Competition**

7    70.    On April 12, 2017, subscription technology news service *The Information* published a

8  bombshell report detailing how Uber had developed a covert software program code-named "Hell"

9  that it used to pilfer rider and driver data from its main competitor, Lyft, and otherwise stifle

10  competition in the jurisdictions in which Uber operated.  The report described the Hell spyware

11  program as follows:

12        As the ride-sharing market was exploding in the U.S. between 2014 and the
       early part 2016, Uber had an advantage over Lyft that helped Uber maintain its lead,
13       The Information has learned. Thanks to a secret software-based effort within Uber
       called "Hell," Uber could track how many Lyft drivers were available for new rides
14       and where they were, according to a person who was involved in the program and a
       person who was briefed about it.
15
        More importantly, "Hell" showed Uber employees which of the tracked
16       drivers were driving for both Lyft and Uber, helping Uber figure out how to lure
       those drivers away from its rival. That's a crucial edge in a business where finding
17       enough people to drive is a constant battle.

18       THE TAKEAWAY

19        The revelation of a controversial Uber program aimed at hurting rival Lyft
       could further complicate CEO Travis Kalanick's attempt to lead Uber out of its
20       deepening cultural and management crisis. It also opens up the company to potential
       legal claims.
21
        Only a small group of Uber employees, including top executives such as CEO
22       Travis Kalanick, knew about the program, said the person who was involved in it.
       Not even Uber's then-powerful "general managers" who ran the business in
23       individual cities were supposed to know about it.

24        The program, part of the company's competitive intelligence, or "COIN,"
       group, was referred to as "Hell" because it paralleled Uber's dashboard of Uber
25       drivers and riders known as "God View," or "Heaven."

26        "Hell" was discontinued sometime in the early part of 2016, this person said.
       This person asked for anonymity because they aren't authorized to discuss Uber's
27       internal matters. A spokesman for Uber said the company wouldn't publicly discuss
       its internal processes. Lyft said in a statement: "We are in a competitive industry.
28       However, if true, these allegations are very concerning."

Revelation of the program could open up Uber to possible civil legal claims by Lyft, according to lawyers from two law firms that have represented Uber on other matters.  Such potential state and federal claims could include "breach of contract"; "unfair business practices"; misappropriation of trade secrets; and a civil violation of the federal Computer Fraud and Abuse Act because of the way Uber allegedly accessed information from Lyft. Such an action could give Lyft the ability to probe certain Uber business practices in court. Antitrust claims also are a possibility if Uber used Hell to help maintain its market power over Lyft – it generates between 70% to 85% of ridehailing app revenue versus Lyft in key U.S. cities, according to third parties and people inside the companies – these lawyers said.

The public disclosure of Hell and Mr. Kalanick's involvement with it also could make it harder for him to pull Uber out of a deepening cultural and management crisis that started in mid-February. Four of his 13 direct reports have resigned because of conflicts with Mr. Kalanick or because their past behavior was questioned. Mr. Kalanick, despite losing credibility with employees and executives throughout his company because of a variety of revelations, has said he is determined to continue as CEO, albeit with help from a COO he is trying to hire.

Spoofed Riders

Uber and Lyft have waged a war for market share in the U.S. since 2012, when Uber launched UberX, a lower-cost version of its ride-hailing service that let most anyone use their car to pick up Uber riders. UberX was similar to Lyft, which had launched a month earlier. Uber leveraged its early lead in riders, thanks to a high-end "black car" version of the service that began three years earlier, to capture market share against Lyft.

In 2014, Lyft expanded its operations from 20 cities to 65 cities, covering most major U.S. metro areas – places where Uber had already been operating for some time. Lyft's market share was thus small but the company was able to take advantage of the demand for, and awareness of, ride-hailing that Uber had generated previous to Lyft's entrance.

A key weapon in the war between the companies was getting enough drivers so that riders don't have to wait long for a ride. Recruiting drivers through advertising and other marketing has been Uber's top operating expense, judging by confidential financial statements 2015 seen by The Information. That expense easily could have reached $1 billion in 2016, assuming a steady rate of growth.

Hell started like this: Uber created fake Lyft rider accounts and used commonly available software to fool Lyft's system into thinking those riders were in particular locations, according to the person. (That in and of itself is a violation of Lyft's terms of service, which prohibits users from "impersonat[ing] any person or entity," which Lyft riders must agree to when they open the app.)

The spoofed Lyft accounts made by Uber then could get information about as many as eight of the nearest available Lyft drivers who could accommodate a ride request. Uber made sure that in each city where it was competing with Lyft, the fake rider locations were organized in a grid-like format so that it could view the entire city.

In other words, Uber could see, nearly in real time, all of Lyft's drivers who were available for new rides – and where those drivers were located. That also

allowed Uber to track the prices Lyft would offer to riders for certain trips, and how many cars were available to pick up riders at a particular time in one city or another.

Lyft's Flaw

But Uber executives realized there was vulnerability in Lyft's system. The information about the nearby Lyft drivers included a special numbered ID, or token, that was tied to each individual driver. That ID remained consistent over time. So Uber could identify the same drivers again and again no matter where they were in a city.  Thus, it learned some of those drivers' habits, such as what time of day or what days of the week they would run the Lyft app. (Uber constantly changes the IDs of its drivers for the Uber app so they can't be tracked in the same way, said the person involved with Hell.)

Here's the critical part of Hell: Because Uber tracked Lyft's drivers over time, it was able to figure out which of them were driving for Uber too, because it would be able to match the locations of its own drivers with those of Lyft. In many cities, more than 60% of Lyft's drivers also drive for Uber because they want to maximize their earnings. (As of a year ago, Lyft said it had about 315,000 drivers.) Uber thus had specific identities and contact information for the majority of Lyft's weekly or monthly active drivers in a particular place. "We achieved ground truth," said the person involved in the program.

Armed with data about when and where Lyft's drivers were operating, Uber aimed to sway them to work only for Uber instead, this person said. One way was to give them special financial bonuses for reaching a certain number of rides per week.

Uber employees involved with the Hell program passed along a list of drivers that should be targeted by the city general managers, who oversaw driver bonus budgets at that time.

Another goal of the program was to make sure Uber steered rides more reliably to Uber drivers who were also available on the Lyft network than to those who weren't, this person said. In other words, if there were several Uber drivers near an Uber rider but one of those drivers was also frequently available on the Lyft network, as seen by the Hell program, Uber's ride-dispatch team was supposed to "tip" that ride request to the driver who was "dual apping," or typically looking for riders through both the Lyft and Uber apps, sometimes by using two different smartphones at the same time.

The person involved in the program called it "privileged dispatch" and said Uber aimed to use that to squeeze Lyft's supply of drivers. This person didn't know how much the ride-dispatch team used data derived from Hell as part of its calculations. An Uber spokesman said the company does not give preference to "dual-apping" drivers.

"Hustle"

It's unclear if anyone at Uber quantified how helpful Hell was to its business overall, but the program got information about Lyft's network across the country, said the person who was involved with it. During meetings with the small group of people involved in Hell, Mr. Kalanick would often praise the team for the work they were doing and how well it fit into Uber's culture of "hustle" in order to win.

While it's hard to estimate the potential impact of Hell on Lyft, even after the program was shut down, Uber could derive value from knowing which of its drivers were active drivers for Lyft generally, at least for a period of time. "The damage was done," this person said.

Uber and Lyft have other ways of finding out which of their drivers might be driving for the competition. For instance, Lyft can see whether certain of its drivers – those who use Android-powered smartphones – also have the Uber app installed on their phone. (The Android operating system allows app developers to "scan" the phones to see what other apps are on them.) The iPhone is different. Apple stopped allowing app scanning on iPhones starting in mid-2015. But Hell gave Uber much more valuable data.

Hell was overseen by several employees, including a product manager and data scientists who had special access to a room at Uber's headquarters in San Francisco, where the intel on Lyft's drivers was collected via computers that had the spoof accounts, this person said.

Some at Uber might argue that some drivers benefited from Uber's surveillance of Lyft because they made more money when Uber decided to boost their bonuses or give them more rides. But the drivers who benefited most were those who showed less loyalty to Uber. Also, the destruction of Lyft would be bad for drivers in the long run. Lyft's presence in the market has ensured greater bonuses overall, though those may need to disappear if either company wants to make a profit.

71. On January 22, 2015 Uber took steps to conceal its illegal conduct in poaching drivers from Lyft by releasing what was reported by *VentureBeat* as "an ambitious study of its U.S. drivers" that "argues the company's explosive growth is being fueled by ***competitive pay and flexible work schedules that are attracting hordes of new drivers*.*"  Maintaining a robust pool of drivers was so critical that, according to an April 2, 2017 *New York Times* report, instability in Uber's driver pool ultimately "threatened to cap the company's growth and throw it into crisis."

72. Uber subsequently confirmed the existence of Hell.  In September 2017, it was reported that the Company was under federal investigation by the FBI and the U.S. Attorney's Office for the Southern District of New York for its use of the program.  Reportedly, authorities are investigating whether Uber used Hell to illegally thwart competition and violate computer access laws.

**Uber's Toxic Culture of Institutionalized Harassment and Discrimination**

73. On February 19, 2017, former Uber engineer Fowler posted a blog exposing rampant misogyny, gender discrimination and sexual harassment at Uber.  Fowler detailed how in her first

1    couple of weeks on the job her manager expressly propositioned her for sex.  When she reported the

2    improper conduct to Uber's HR Department, they brushed off the offense because they "wouldn't

3    feel comfortable giving him anything other than a warning and a stern talking-to" in light of the fact

4    that the manager was a "'high performer.'"  In a perverse twist of proper procedures, Fowler was

5    then told that if she stayed on the team she would likely be given a negative review because she had

6    reported the individual to HR.

7          74.    Forced to rotate to another team to avoid continued harassment and repercussions,

8    Fowler wrote that in the subsequent weeks she met many other women at Uber who had similar

9    stories to hers, ***including with the same manager***.  She stated that these women "had reported

10   inappropriate interactions with him long before I had even joined the company."  Despite the fact

11   that several women had reported inappropriate conduct by this individual, each was told by HR it

12   was his "first offense" so as to justify not taking any actions against him.

13         75.    Fowler also described gender discrimination that worked to block women from

14   promotions and favorable job transfers at the Company.  She recounted how she was personally told

15   she had "undocumented performance problems" as a means to prevent her from transferring to a

16   position she wanted, even though she was eminently qualified.  Even after she achieved great

17   reviews and a flawless performance score, these scores were ***retroactively*** changed by her superiors

18   in order to keep her in her current position and prevent her upward trajectory.

19         76.    In addition, Fowler described a toxic corporate culture at Uber she compared to the

20   bloody television drama "game-of-thrones."  According to Fowler, "[i]t seemed like every manager

21   was fighting their peers and attempting to undermine their direct supervisor so that they could have

22   their direct supervisor's job."  Fowler gave examples of managers frequently boasting about ways

23   that they were trying to undercut their superiors in order to supplant them and rise up in the

24   organization.  She recounted a manager once even withholding "business-critical information from

25   one of the executives so that he could curry favor with one of the other executives (and, he told us

26   with a smile on his face, it worked!)."

27         77.    Fowler stated that institutionalized sexism occurred at Uber in a variety of forms,

28   both large and small.  When she reported clearly unequal treatment to HR, Fowler was told that she

1   was the problem.  The HR person then interrogated Fowler about her contacts with other women and

2   told she was being "unprofessional" by reporting an issue via e-mail, presumably because it created

3   a record of the incident.  Shortly thereafter a manager threatened to fire Fowler because she had

4   dared to contact HR.  She voluntarily left the Company a week later.

5       78.    Fowler stated that when she joined Uber in November 2015, her organization was

6   25% women.  By the time she left in December 2016, the percentage of female employees had

7   plummeted by more than 80% due to organizational chaos and institutionalized sexism.

8       79.    Fowler's blog post quickly went viral.  Within days its accusations had morphed into

9   a full-blown publicity crisis for the Company.  New reports began to surface of Uber's toxic "bro-

10  culture" and the unhealthy and counterproductive work environment it fostered.  Perhaps most

11  shocking, it came to light that Kalanick and other top Uber executives had led an official Company

12  outing to a female escort bar in South Korea in 2014.  Girls, tagged with numbers, were paid to sit

13  with male Uber employees as they sang karaoke.  A female manager later complained to Uber's HR

14  Department that the experience "made me feel horrible as a girl (seeing those girls with number tags

15  and being called out is really degrading)."  Following Fowler's blog post, Uber's Senior Vice

16  President of Business, Emil Michael, reached out to Kalanick's former girlfriend, who had attended

17  the event, to make sure that she had not spoken to reporters about it and that, if asked, she would tell

18  people that they had just gone for karaoke and "had a good time."

19      80.    After Fowler's blog post, *The New York Times* documented employees who came

20  forward with similar experiences.  In a February 22, 2017 article, *The New York Times* reported that

21  "[i]nterviews with more than 30 current and former Uber employees, as well as reviews of internal

22  emails, chat logs and tape-recorded meetings, paint a picture of an often unrestrained workplace

23  culture."  One employee e-mailed Kalanick concerning harassment, and at least two "notified Thuan

24  Pham, the company's chief technical officer, of workplace harassment at the hands of managers and

25  colleagues in 2016."

26      81.    By the end of February 2017, Uber was facing mounting negative publicity.  To avoid

27  a complete collapse of the Company, Uber was forced to hire former U.S. Attorney General Holder

28

1   to investigate the sexual harassment claims and evaluate the Company's work culture.  A special

2   committee of the Board was formed to oversee the work shortly thereafter.

3          82.     On February 23, 2017, venture capital fund Kapor Capital – an investor in Uber since

4   2010 – published "An Open Letter to the Uber Board and Investors" expressing disappointment,

5   frustration and concerns that it had "hit a dead end in trying to influence the company quietly from

6   the inside."  The letter stated that "[a]s early investors in Uber, starting in 2010, we have tried for

7   years to work behind the scenes to exert a constructive influence on company culture."  Kapor

8   Capital stressed that Uber's impressive valuations and revenue "can never excuse a culture plagued

9   by disrespect, exclusionary cliques, lack of diversity, and tolerance for bullying and harassment of

10  every form."  The fund was also dissatisfied with the selection of Holder, Arianna Huffington and

11  Liane Hornsey, who reported to Kalanick's executive team, to investigate the "destructive culture"

12  as these individuals had "inherent conflicts that impede the necessary independence to make a deep

13  and accurate assessment."

14         83.     Over the next few months, Holder and his team at Covington led a far-reaching

15  investigation of Uber.   Covington conducted over 200 interviews with current and former

16  employees; retained a consulting firm to hold online focus groups of Uber employees; and reviewed

17  over three million Company documents.  The results of the investigation and recommendations by

18  Covington were approved by the Board in June, and released to the public in a report shortly

19  thereafter (the "Holder Report").  The Holder Report proposed sweeping changes to the Company's

20  leadership, organization, management and culture, offering proscriptions that contradicted

21  defendants' prior representations about Uber's culture and workplace.

22         84.     First and foremost, the Holder Report proposed changes to Uber's senior leadership,

23  including reducing Kalanick's responsibilities.  It encouraged the Company to find leaders who

24  would promote diversity and inclusion, hold senior executives accountable to improve the work

25  culture and reduce complaints and compliance issues, and require the HR Department to actually

26  implement the workplace responsibilities delegated to it.  The Holder Report provided a laundry list

27  of additional recommendations, the breadth of which exposed the massive scope of the problems at

28  the Company.  These recommendations included: (1) increasing Board independence and oversight

1    of management; (2) enhancing the Company's internal controls, risk management, financial controls,

2    and compliance policies and procedures; (3) reformulating the Company's "cultural values," which

3    at the time promoted values such as "Always Be Hustlin" and "Principled Confrontation" that Uber

4    employees had used to justify misbehavior, to new values that would "reflect more inclusive and

5    positive behaviors"; (4) greatly expanding and improving employee training, including by teaching

6    Uber's executives how to implement effective corporate controls; (5) improving the employee

7    complaint process and revamping Uber's HR Department; (6) promoting diversity and inclusiveness

8    initiatives; and (7) implementing a variety of policies, procedures, and practices that the Company

9    lacked to combat discrimination, harassment, and inappropriate workplace conduct.

10         85.     According to a June 6, 2017 *Business Insider* article, in conjunction with hiring

11    Covington, Uber also hired law firm Perkins Coie LLP to investigate 215 "inappropriate workplace

12    incidents."  These incidents included discrimination (25%), sexual harassment (22%), unprofessional

13    behavior (21%), bullying (15%), harassment (9%), retaliation (6%), and other offenses.  The

14    majority of the incidents took place in the San Francisco headquarters.  "The Perkins Coie

15    investigation lays the groundwork for the investigation being conducted for Uber by Eric Holder,"

16    according to the article.

17         86.     Uber attempted to clean house in connection with the Holder Report and

18    investigation, firing at least 20 employees for misconduct.  An additional 31 employees were subject

19    to further training, 7 received final warnings, and as of the *Business Insider* article, 57 claims were

20    under continued review.  Uber took no action on the remaining 100 claims.

21         87.     On June 21, 2017, *The New York Times* reported that five investors – Benchmark,

22    First Round Capital, Lowercase Capital, Menlo Venture and Fidelity Investments – representing

23    25% of Uber's stock and 40% of the voting power, demanded Kalanick's resignation.

24    **Uber Takes Its Law Breaking Global**

25         88.     A string of disclosures have called into question the legality, and thus sustainability,

26    of Uber's rapid international expansion.  For example, on April 26, 2017, *Reuters* reported that a

27    South Korean court had ruled that the Company had been using private vehicles for commercial

28    purposes in violation of South Korean law.  In June 2013, Uber had entered the South Korean market

1   with its UberBlack service in violation of South Korean law prohibiting paid chauffeur services.  In

2   August 2014, Uber doubled down on its illegal expansion into South Korea with its UberX service in

3   knowing violation of the country's Passenger Transport Services Act.  Similarly, in July 2017, a

4   senior adviser to the European Court of Justice, Europe's highest court, issued an adverse opinion

5   against the Company that it needed to comply with European transportation rules and that Uber

6   should be regulated as a taxi service.  As a result, certain of Uber's low-cost current services could

7   be banned as illegal.  In France, a court had found that Uber had been operating an illegal taxi

8   service in the country following the launch of Uber's low-cost UberPOP service in February 2014 in

9   violation of French criminal law.  It was later reported in 2017 that in South Korea, France, and

10  several other international jurisdictions Uber had been using Greyball to evade authorities.

11          89.     Then, on August 3, 2017, *The Wall Street Journal* reported, in an article entitled

12  "Smoke, Then Fire: Uber Knowingly Leased Unsafe Cars to Drivers," that Uber had intentionally

13  leased out unsafe Honda SUVs subject to a recall to its drivers in Singapore in order to chase

14  breakneck growth.

15          90.     According to *The Wall Street Journal*, which cited internal Company documents and

16  interviews with employees in the region, Uber managers in Singapore were aware of the Honda

17  recall when they bought more than 1,000 defective Vezels and rented them to drivers without needed

18  repairs.  After Uber expanded into Singapore in 2013, it struggled to find enough drivers owing to

19  the high cost of car ownership in the country.  To remedy this problem, Uber created a unit that

20  would rent Uber-purchased vehicles to drivers for a daily rate.  In early 2016, Kalanick approved a

21  plan to borrow 800 million Singapore dollars (about $590 million) in order to buy thousands of new

22  cars.  However, instead of acquiring the cars from authorized dealers, Uber purchased the vehicles

23  from auto importers who reportedly operate in a legal gray zone, a channel outside manufacturers'

24  authorized networks where safety, service and legal contracts are difficult to enforce.  This maneuver

25  allowed the Company to pay approximately 12% less for the vehicles.

26          91.     On April 4, 2016, Honda issued a recall for new, gas-powered Vezel SUVs, advising

27  owners to have them serviced as quickly as possible.  The issue was an electrical component that

28  was prone to overheating.  Despite being aware of the recall and safety issue, Uber knowingly

1   purchased over 1,000 Honda Vezels.  Uber was unable to procure the necessary replacement parts

2   for many of the vehicles, but rented out the unsafe vehicles anyway in disregard for the safety of

3   Uber drivers and their riders.  Then, on January 11, 2017, an Uber driver reported that his Company-

4   supplied Honda Vezel had caught on fire soon after he dropped off a passenger.  Flames reportedly

5   burst from the dashboard, melting the interior of his car and cracking a football-sized hole in his

6   windshield.

7          92.    Shortly thereafter, Company executives, including those in the San Francisco office,

8   were informed of the fire.  Rather than take the defective cars off of the road until Uber could

9   perform the necessary repairs, Uber decided to keep the cars in service so as not to lose revenues or

10  "alarm" drivers.  Uber placed the onus on drivers to seek repairs of their own accord in a vaguely

11  worded notice, although the notice failed to mention the overheating and fire dangers Honda had

12  spelled out in its advisory.  As a result, Uber drivers and passengers were not apprised of the true

13  risks to their safety and well-being from the defective cars.  Rather than come clean, Uber's

14  communication team developed an information campaign designed to limit any negative publicity

15  that may result from the fire and Uber's actions.  By February 2017, more than 65% of the defective

16  vehicles had still not been repaired, even as internal e-mails by Uber managers reviewed by *The Wall

17  Street Journal* joked about the "Vezel snafu" and "other shenanigans" at the Company.

18         93.    Since news of the Singapore fire broke, Uber's international legal issues have

19  continued to mount.  On August 29, 2017, it was reported that the DOJ had taken preliminary steps

20  to investigate whether Uber managers had violated the FCPA, which bans the use of bribes to

21  foreign officials to get or keep business.  As a result, the legality of the Company's entire

22  international operations has been called into question.  According to a *Bloomberg* report on

23  September 20, 2017, Uber retained O'Melveny & Myers LLP to investigate its foreign payments in

24  at least five countries: Malaysia, Indonesia, China, South Korea, and India.  If a formal investigation

25  goes forward and finds Uber violated the FCPA, the Company and its employees may be subject to

26  civil and criminal penalties and some may even face imprisonment.

27         94.    Then, on September 22, 2017, London's transport authority held that Uber "is not fit

28  and proper to hold a private hire operator licence [sic]" and declined to renew the Company's license

1    to operate in the city.  As reasons for the decision, London's transport authority cited Uber's

2    demonstrated "lack of corporate responsibility in relation to a number of issues which have potential

3    public safety and security implications," including the Company's "approach to reporting serious

4    criminal offences [sic]," handling of London's inquiry into Greyball, failure to conduct proper driver

5    background checks, and other issues.  According to reports, London accounts for about 5% of Uber's

6    global active user base of 65 million, and nearly a third of its active user base of 11 million in

7    Europe, casting further doubt on the viability of the Company's global growth prospects.

8    **Uber Executives Steal a Victim's Medical Records**
     **in Order to Discredit Her**

9

10       95.    Allegations against Uber went from very bad to much worse when, in June 2017,

11   news organizations reported that Alexander, a top Uber executive, had illicitly obtained a

12   passenger's medical records in December 2014 for the unconscionable purpose of discrediting her

13   claim that she had been sexually assaulted by an Uber driver on a ride.  Alexander brought the

14   medical files to the attention of Kalanick and other executives.  Kalanick reportedly reviewed the

15   report and discussed it at length with Alexander.  Uber executives then discussed the preposterous

16   claim that the victim had fabricated the whole incident in order to bolster Uber's rival in India, even

17   though none of the executives had medical training and the perpetrator had already been convicted of

18   rape and sentenced to life in prison.  Alexander reportedly carried around the victim's medical files

19   for months without her knowledge.

20       96.    Alexander's actions caused serious concerns among former and current Uber

21   employees.  On June 7, 2017, *Bloomberg* reported that, as part of the Holder investigation, former

22   and current employees discussed the India case with Holder's investigators.  Some employees

23   "expressed misgivings about Alexander's cavalier attitude toward sharing the private information of

24   an alleged rape victim."

25       97.    On June 23, 2017, *The New York Post* reported that Uber retained O'Melveny &

26   Myers LLP to also investigate how Alexander obtained the victim's medical records.

27

28

1    98.    Defendants' conduct behind the scenes directly contradicted their representations to

2    the public at the time of the incident in 2014.  Then, Kalanick offered public support and solidarity

3    with the victim, releasing the following statement on December 7, 2014:

4           What happened over the weekend in New Delhi is horrific. Our entire team's
            hearts go out to the victim of this despicable crime. *We will do everything, I repeat,*
5           *everything to help bring this perpetrator to justice and to support the victim and*
            *her family in her recovery*.
6
            We will work with the government to establish clear background checks
7           currently absent in their commercial transportation licensing programs.  We will also
            partner closely with the groups who are leading the way on women's safety here in
8           New Delhi and around the country and invest in technology advances to help make
            New Delhi a safer city for women.
9
10   99.    Far from "doing everything" to support the victim, Uber associates actually went out

11   of their way to belittle her trauma and invade the victim's most sensitive personal information.  By

12   focusing on "whether she was really raped at all," and painting the victim as an opportunist and a

13   liar, defendants seemed to be assuring themselves that the only reason why a woman would report a

14   sexual assault is for personal gain, rather than to prevent similar crimes or to right an injustice.  The

15   callous episode demonstrates the radical extremes to which defendants would push (and often

16   exceed) the bounds of acceptable business conduct in order to chase growth and/or stifle

17   competition.

18   100.   The shocking disclosure has further battered Uber's already tattered reputation and

19   spawned a lawsuit by the victim against the Company for unlawful intrusion of private affairs, the

20   public disclosure of private facts and defamation.

**Benchmark Lawsuit**

21   101.   On August 10, 2017, one of Uber's earliest investors filed a complaint in Delaware

22   Chancery Court accusing the Company and Kalanick of fraud, fiduciary breach and contract

23   violations (the "Benchmark Complaint").  Specifically, the Benchmark Complaint alleged that

24   Kalanick had intentionally concealed and failed to disclose his gross mismanagement and other

25   misconduct at Uber, including:

26
27          •    his personal involvement in the alleged misappropriation of self-driving car trade
                 secrets from a competitor;
28

- an Uber executive's alleged theft of a woman's medical records following her sexual assault by an Uber driver;

- the use of Greyball to deceive authorities in markets where law enforcement had banned or resisted Uber's services;

- a pervasive culture of gender discrimination and sexual harassment that ultimately prompted an investigation by former U.S. Attorney General Eric Holder; and

- a "host of other inappropriate and unethical directives issued by Kalanick." *See Benchmark Capital Partners VII, L.P. v. Kalanick*, No. 2017-0575, Verified Complaint (Del. Ch. Aug. 10, 2017).

102.   According to the Benchmark Complaint, Kalanick knew he would likely be forced to resign as CEO of the Company once these misdeeds came to light, and fraudulently induced Benchmark to sign off on a voting rights agreement that gave him control over three new Board seats.  By way of this agreement, Kalanick could maintain his disproportionate influence over the Board and the Company even if forced to resign as CEO.

103.   Benchmark's lawsuit, which attempts to oust Uber's founder from the Company, has been called "extraordinary" and "unprecedented" by some in the press and demonstrates that even the Company's closest and oldest investors were duped by Kalanick and the Uber story.

**Plaintiff and the Class Have Been Damaged
as Their Uber Investments Plummet**

104.   As a result of defendants' conduct, plaintiff and the Class have lost billions of dollars. While Uber shares are not publicly traded, in connection with Uber's Series G preferred stock financing round in 2016, Uber's valuation skyrocketed to approximately $68 billion.  Plaintiff invested in Uber in connection with this round of financing through New Riders.

105.   As Uber's various corporate scandals have come to light in 2017, investors have begun to significantly mark down their investments in Uber.  For example, mutual fund companies such as Vanguard Group and T. Rowe Price Inc. have marked down their shares of Uber by as much as 15% as a direct result of this drumbeat of bad news.  At the same time, dozens of employees, including many of the Company's most senior officers, have left, significantly impairing the Company's business, operations and prospects, and Uber's brand has been gravely tarnished. Consequently, to date the Company has suffered a loss in market capitalization of at least ***$18 billion***

1    as a direct result of the fraudulent conduct complained of herein, causing damages and economic

2    losses to plaintiff and the Class.

3                                    **CLASS ALLEGATIONS**

4             106.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

5    of Civil Procedure and seeks certification of the following Class:

6              All persons or entities who, directly or indirectly, purchased or committed to
               purchase (and subsequently closed a binding commitment to purchase) an interest in
7              Uber securities between June 6, 2014 and September 22, 2017 (the "Class").

8    Excluded from the proposed Class are defendants, their officers and directors, and members of their

9    immediate families or their legal representatives, heirs, successors or assigns, and any entity in

10   which defendants have or had a controlling interest.

11            107.    The members of the proposed Class are so numerous that joinder of all members is

12   impracticable.  Plaintiff believes that there are several hundred members in the proposed Class.

13   Members of the proposed Class may be identified from records maintained by defendants.

14            108.    Plaintiff's claims are typical of the claims of the members of the proposed Class as all

15   members of the proposed Class are similarly affected by defendants' wrongful conduct as alleged

16   herein.

17            109.    Plaintiff will fairly and adequately protect the interests of the members of the

18   proposed Class and has retained counsel competent and experienced in complex class litigation.

19            110.    Common questions of law and fact exist as to all members of the proposed Class and

20   predominate over any questions solely affecting individual members of the proposed Class.  Among

21   the questions of law and fact common to the proposed Class are:

22                       (a)    Whether defendants misrepresented material facts;

23                       (b)    Whether defendants' statements omitted material facts necessary in order to

24   make the statements made, in light of the circumstances under which they were made, not

25   misleading;

26                       (c)    Whether defendants knew or had reasonable grounds to believe that their

27   statements were false or misleading;

28

1             (d)      Whether defendants' statements were made for inducing the purchase of Uber

2 securities by others; and

3             (e)      The extent of damage sustained by class members.

4        111.    A class action is superior to all other available methods for the fair and efficient

5 adjudication of this controversy since joining all members is impracticable, and this action will be

6 manageable as a class action.

7 **COUNT**

8 **For Violation of Cal. Corp. Code §§25400(d) and 25500**<br>**Against All Defendants**

9

10        112.    Plaintiff repeats and realleges the allegations contained above as if fully set forth

herein.

11

12        113.    Defendants directly and/or indirectly, for the purpose of inducing the purchase of

13 Uber securities by others, made or materially participated in making false and misleading statements

of material fact and/or omitted to state material facts necessary in order to make the statements

14 made, in light of the circumstances under which they were made, not misleading.   These

15 misrepresented and omitted material facts include, but are not limited to, an extensive advertising

16 campaign that employed press releases, interviews with the media, and extensive social media,

17 including web pages, in which they made statements that were materially false, misleading or

18 contained material omissions.

19        114.    Defendants made these statements with the intent to induce the purchase of Uber

20 securities by others.

21        115.    Defendants knew or had reasonable grounds to believe that these statements and

22 omissions were false and misleading.

23        116.    As a direct and proximate result of the fraudulent conduct of defendants, plaintiff and

24 the Class have been damaged.

25

26

27

28

1

**PRAYER FOR RELIEF**

2    WHEREFORE, plaintiff prays for judgment as follows:

3    A.    Determining that this action is a proper class action, certifying plaintiff as Class

4 Representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's

5 counsel as Class Counsel;

6    B.    Awarding compensatory damages in favor of plaintiff and the other class members

7 against all defendants, jointly and severally, for all damages sustained as a result of defendants'

8 wrongdoing, in an amount to be proven at trial, including interest thereon;

9    C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

10 action, including counsel fees and expert fees; and

11    D.    Awarding such other and further relief as the Court may deem just and proper.

12

**JURY DEMAND**

13    Plaintiff demands a trial by jury.

14 DATED:  September 26, 2017                    ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
15                                              DARREN J. ROBBINS
                                                JASON A. FORGE
16                                              LUKE O. BROOKS
                                                ANGEL P. LAU
17                                              BRIAN E. COCHRAN
                                                JEFFREY J. STEIN

18

19                                                      *s/ Darren J. Robbins*
20                                                  DARREN J. ROBBINS

21                                              655 West Broadway, Suite 1900
                                                San Diego, CA 92101
22                                              Telephone:  619/231-1058
                                                619/231-7423 (fax)

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500          - 51 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff