1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   JASON A. FORGE (181542)
    LUKE O. BROOKS (212802)
3   DARRYL J. ALVARADO (253213)
    JEFFREY J. STEIN (265268)
4   ERIKA OLIVER (306614)
    655 West Broadway, Suite 1900
5   San Diego, CA 92101-8498
    Telephone: 619/231-1058
6   619/231-7423 (fax)
    jforge@ rgrdlaw.com
7   lukeb@ rgrdlaw.com
    dalvarado@rgrdlaw.com
8   jstein@rgrdlaw.com
    eoliver@rgrdlaw.com
9
    Attorneys for Plaintiff
10
    [Additional counsel appear on signature page.]
11
                    UNITED STATES DISTRICT COURT
12
                   NORTHERN DISTRICT OF CALIFORNIA
13

14   IRVING FIREMEN'S RELIEF &            )   Case No. 3:17-cv-05558-HSG
     RETIREMENT FUND, Individually and on )
     Behalf of All Others Similarly Situated, )   CLASS ACTION
15                                         )
                             Plaintiff,    )   FIRST AMENDED COMPLAINT FOR
16                                         )   VIOLATIONS OF CALIFORNIA
            vs.                            )   CORPORATIONS CODE §§25400 AND
17                                         )   25500
     UBER TECHNOLOGIES INC., et al.,       )
18                                         )
                             Defendants.   )
19   _____)   DEMAND FOR JURY TRIAL

20

21

22

23

24

25

26

27

28

1340259_2

1

## TABLE OF CONTENTS

2

**Page**

3   NATURE OF THE ACTION ................................................................1

4   PARTIES ................................................................................6

5   JURISDICTION AND VENUE ..........................................................7

6   SUBSTANTIVE ALLEGATIONS ........................................................7

7         Defendants Successfully Solicit Billions of Dollars in Private Investment........................9

8         Defendants' False and Misleading Statements About Uber's Rapid Growth and
              Revenues ..................................................................10

9

10        Defendants' False and Misleading Statements About Uber's Compliance with
              Applicable Laws and Regulations ................................................20

11        Defendants' False and Misleading Statements About Uber's Focus on Innovation
              and Development of Self-Driving Car Technologies ...........................24

12

13        Defendants' False and Misleading Statements Regarding Uber's Data Security..............27

14        Defendants' False and Misleading Statements Regarding Uber's Competition...............32

        Defendants' False and Misleading Statements Regarding Uber's Corporate
15            Culture........................................................................34

16        Defendants' Uber Story Unravels ................................................36

17        Uber Attempts to Steal Its Way into the Future................................37

18        Uber Fails to Adequately Protect Users' Private Information, and Then Lies to
              Them When Theft Occurs....................................................44

19

20        Uber Uses "Greyball" to Surveil and Evade Authorities.................................53

21        Uber Unleashes "Hell" on Its Competition....................................................55

22        Uber's Toxic Culture of Institutionalized Harassment and Discrimination ...................59

23        Uber Takes Its Law Breaking Global .............................................63

24        Uber Executives Steal a Victim's Medical Records in Order to Discredit Her................66

25        Kalanick Oversaw Every Facet of Uber's Business Since Its Inception .........................67

26        Benchmark Lawsuit ......................................................................70

27        Plaintiff and the Class Have Been Damaged as Their Uber Investments Plummet ..........71

        CLASS ALLEGATIONS ....................................................................73

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                              - i -

1

2                                                                                                   **Page**

3
COUNT I For Violation of Cal. Corp. Code §§25400(d) and 25500 Against All
4        Defendants ...................................................................................................................75

5   PRAYER FOR RELIEF .........................................................................................................75

6   JURY DEMAND ....................................................................................................................76

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                            - ii -

1    Plaintiff Irving Firemen's Relief & Retirement Fund ("plaintiff" or the "Retirement Fund"),
2  individually and on behalf of all others similarly situated, alleges the following based on the
3  investigation conducted by and through plaintiff's attorneys, which included, among other things, a
4  review of Uber Technologies Inc. ("Uber" or the "Company") releases, media reports, articles, court
5  documents, regulatory filings and other online materials.  Plaintiff believes that substantial additional
6  evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for
7  discovery.

8                              **NATURE OF THE ACTION**

9    1.    Uber is a private technology startup that develops, markets, and operates car
10  transportation and food delivery mobile applications, or "apps."  Founded in San Francisco in 2009,
11  the Company's most popular service is an app that allows users to remotely hail car rides.

12    2.    The Retirement Fund brings this action on behalf of itself and all persons who
13  directly or indirectly purchased an interest in Uber securities between June 6, 2014 and November
14  27, 2017 (the "Class") against Uber and its former Chief Executive Officer ("CEO") Travis Kalanick
15  ("Kalanick") for the dissemination of false and misleading statements and omissions about Uber and
16  its operations, which statements were made for the purpose of inducing the purchase of billions of
17  dollars of Uber securities.  As the truth about defendants' material misrepresentations and omissions
18  has been revealed, the price of Uber securities has declined significantly, causing class members to
19  suffer billions of dollars of losses on their investments.

20    3.    Beginning in 2014, Uber and Kalanick commenced a mass media campaign designed
21  to induce investors to invest billions of dollars in the Company, as Uber expanded to grow its global
22  operations and offer a wider array of transportation and delivery services.  Intending for their
23  statements to reach potential investors, Kalanick and Uber repeatedly told the public that they had
24  designed a revolutionary platform that was "changing the logistical fabric of cities around the
25  world."  According to defendants, "everyone benefits" from the Uber app – drivers benefited
26  because the app "represents a flexible new way to earn money"; riders benefited because it made
27  "transportation as reliable as running water"; and the cities in which Uber operated benefited
28  because it would "help strengthen local economies, improve access to transportation, and make

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                              - 1 -

1    streets safer."  The Company portrayed itself as a force for good that was taking on entrenched

2    interests, most notably the taxi industry, which, according to Uber, had artificially stifled

3    transportation needs to the detriment of consumers, drivers and local communities.

4         4.      In dozens of interviews and presentations – designed to coincide with Uber's

5    solicitation of billions of dollars in private financing – Kalanick and Uber's other executives pushed

6    the narrative that the Company's rapid revenue growth, increased ridership and expanded global

7    footprint was attributable to its uniquely innovative corporate culture built around cutting-edge

8    advancements and the promotion of innovative technologies.

9         5.      Kalanick became the poster child of the Uber revolution.  He gave dozens of

10   interviews with *Forbes*, *Bloomberg*, *Fortune*, *CNBC* and other news services touting the Company's

11   "hyper" growth and "gangbusters" operating success.  He pitched the Company on the Late Show

12   with Stephen Colbert and was named the *Financial Times*' "Boldness in Business 2015 Person of the

13   Year" and a runner-up for *TIME* magazine's 2015 Person of the Year.  In his many media

14   appearances and public statements, which Kalanick intended to be widely disseminated and impact

15   the demand for and price of the Company's securities, Kalanick repeatedly attributed Uber's success

16   to an entrepreneurial company culture that strictly adhered to Uber's "values" and "principles,"

17   which purportedly centered around promoting technological innovation and offering a superior

18   product that had dramatically improved the relationship between supply and demand in the

19   transportation industry.

20        6.      Defendants' effort to induce investors to invest in the Company was a resounding

21   success.  By 2016, defendants had directly or indirectly through investment vehicles raised more

22   than ***$10 billion*** from plaintiff and other investors.  And by mid-2016, Uber had reached a valuation

23   of nearly ***$70 billion*** – making it the most highly valued private technology startup.  At this rarefied

24   level, Uber was more valuable than established industry titans such as Ford Motor Company,

25   General Motors, Twenty-First Century Fox and tech giant eBay.  The following graphic from *The*

26   *Wall Street Journal* illustrates this stunning growth and solicitation of private investment:

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                              - 2 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**Driving Growth**

Uber's valuation rose rapidly as it pursued global market share.

**Uber's valuation\***

$70 billion

June 2016
$68 billion

60

July 2015
$51 billion

50

40

30

June 2014
$18 billion

20

10

Launches
June 2010

0

2010   '11   '12   '13   '14   '15   '16

*Uber last raised funding at a $68 billion valuation one year ago before a series of scandals
Sources: Dow Jones VentureSource; WSJ staff reports

16    7.    In early 2017, defendants' story began to unravel.  In a span of only a few months a

17  shocking litany of corporate misconduct came to the fore, and investors learned startling truths about

18  the willingness of Uber's C-Suite executives to flout local, national and international law, stifle

19  competition, misappropriate trade secrets, expose its users' data to cyberattack, secretly pay bribes to

20  criminal enterprises, and seek vengeance against detractors.  And the Company's vaunted corporate

21  culture was revealed to in truth consist of a toxic hotbed of misogyny, sexual discrimination, and

22  disregard for the law that threatened the Company's reputation, business and prospects.

23    8.    While outwardly representing itself as a start-up darling fueled by technical

24  innovation and entrepreneurial gumption in order to induce billions of dollars of investment, behind

25  the scenes Uber was operating in violation of applicable law and driving its expansion by a

26  Company-wide commitment to short-term growth at all costs, no matter the legal, financial or

27  reputational risks involved.  The following are just some of the Company scandals that would come

28

to light in 2017, in a series of revelations that rattled the startup community and sent Uber securities into a freefall:

- "***Hell***": Uber developed a secret program aptly code-named "Hell" used to pilfer driver and rider data from its main competitor, Lyft Inc. ("Lyft"), unfairly undercut rivals and stifle competition. The Federal Bureau of Investigation ("FBI") and the U.S. Attorney's Office for the Southern District of New York have launched federal investigations to determine whether Uber used Hell to illegally thwart competition.

- "***Greyball***": Uber developed another covert program code-named "Greyball" that it used to mislead regulators and evade detection by government officials in jurisdictions in which it was operating illegally or had faced opposition. Greyball is now the subject of a criminal probe by the U.S. Attorney's Office for the Northern District of California and an investigation by the San Francisco District Attorney's Office.

- ***Waymo Theft***: After publicly touting the Company's innovation in self-driving car technologies as critical to Uber's future success, it was revealed that Uber had engaged in a scheme to simply steal self-driving car technologies from Waymo LLC ("Waymo"), a subsidiary of Google-parent Alphabet Inc. Now, Uber is embroiled in a multi-billion dollar lawsuit with Waymo, its former employee has invoked the protections of the Fifth Amendment against self-incrimination to avoid testifying about documents in his possession, the federal judge overseeing the case referred the matter to federal prosecutors to determine if criminal charges are warranted, and another former employee has testified about Uber's efforts to conceal ill-gotten proprietary information using self-destructing messages and unattributable computers.

- ***Data Breach***: After an embarrassing data breach in 2014 resulted in the theft of personal information from 50,000 Uber drivers, the Company assured the public that it had instituted new systems that would prevent future breaches. It spent months touting its new hires and renewed focus on security, which it claimed made Uber's security system "world-class." However, in October of 2016, Uber's security systems were easily breached again – using a method that was nearly identical to the method used in the initial breach. This time, the damage was far more severe, as the hackers stole private information from 57 million drivers and riders. Rather than own up to its still-deficient security system, Uber doubled down on its deception and concealed the second breach. Moreover, it secretly paid the hackers $100,000 to keep quiet and continued to publicly boast about its bulletproof security system. Uber kept up the façade for more than a year, until November 2017, when Uber's newly-appointed CEO Dara Khosrowshahi ("Khosrowshahi") finally came clean about the shocking breach and cover-up.

- ***Foreign Corrupt Practices***: Uber's vaunted international expansion was revealed to be the product of shady business dealings. To take one particularly galling example, Uber knowingly rented out recalled and unsafe vehicles to its drivers in Singapore after knowing that the vehicles could and had caught fire. The Company is also now

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                    - 4 -

the target of a preliminary investigation by the U.S. Department of Justice ("DOJ") into potential violations of the Foreign Corrupt Practices Act ("FCPA").

- ***Medical Record Theft***: In 2014, an Uber driver sexually assaulted a passenger in India.  While Kalanick publicly condemned the act – "We will do everything, I repeat, everything to help bring this perpetrator to justice and to support the victim and her family in her recovery" – Uber and its executives secretly (and cynically) attacked the victim, stealing her sensitive medical reports and then using them to attempt to discredit her story, concocting the fantastical notion that she had fabricated the sexual assault in order to bolster Uber's rivals in India.  The Company has now been sued twice by the victim.

- ***Systemic Discrimination***: In February 2017, a former Uber employee posted an explosive blog detailing rampant and institutionalized misogyny, gender discrimination and sexual harassment at the Company.  The blog quickly went viral, and soon after reports surfaced of a 2014 Uber-sponsored trip to a South Korean escort bar attended by Kalanick and other executives.  The allegations forced Uber to launch an internal investigation helmed by former U.S. Attorney General Eric Holder ("Holder").  The investigation called for sweeping changes to Uber's culture, policies and practices, and spawned a mass employee exodus of firings and resignations.

9.      As a result of this pervasive pattern of unlawful behavior, Kalanick was forced to resign as CEO of Uber in June 2017 and the Company has lost many high-level employees, impairing its business, operations and prospects.  Since the beginning of 2017, the Company has parted ways with at least 15 top executives, including its president, chief business officer, chief security officer, and its heads of communications, ridesharing, advanced technologies, finance, artificial intelligence, maps and business platform, engineering, product, and self-driving car divisions.  Most recently, the Company's chief legal officer, global compliance officer, and several key members of its security team have resigned.  Uber also has become the subject of multiple criminal investigations and has been named as a defendant in numerous lawsuits.  In August 2017, one of the Company's earliest investors, Benchmark Capital Partners VII, L.P. ("Benchmark"), which controls a seat on Uber's Board of Directors (the "Board"), sued Uber claiming it had been defrauded by Kalanick and others and accusing Uber of covering up gross mismanagement and crooked business tactics.  Numerous municipalities have also sued Uber for its failure to secure users' information and the subsequent cover-up of the October 2016 data breach.  Meanwhile, due to Uber's discovery misconduct in *Waymo LLC v. Uber Techs., Inc.*, No. 3:17-cv-00939-WHA (N.D.

1  Cal.) ("*Waymo*"), Judge Alsup has continued the trial and remarked, "I have never seen a case where

2  there were so many bad things . . . like Uber has done in this case."

3        10.    The seriatim disclosures that Uber was operating a business far different than what

4  investors had been led to believe has caused the Company's securities to plummet.  Over the course

5  of 2017, news reports showed dramatic decreases in Uber's $68 billion valuation.  In April, media

6  outlets reported that Uber had lost $10 billion since the start of the year.  In August, several investors

7  marked down their Uber investments by as much as 15%, or $10.2 billion.  In September, news

8  reports indicated that investors valued the Company at $50 billion, representing at least $18 billion

9  in lost market capitalization.  Most recently, in November, reports indicated that the same investors

10 made a tender offer to buy nearly $9 billion of shares from existing shareholders at $32.96 per share,

11 a $48 billion valuation for the Company, representing a ***$20 billion loss***.  Khosrowshahi summed it

12 up: "The truth is that there is a high cost to a bad reputation."

13       11.    Plaintiff brings this action under the California Corporations Code on behalf of a

14 Class (defined in ¶151, *infra*) consisting of all persons who directly or indirectly purchased or

15 committed to purchase Uber securities between June 6, 2014 and November 27, 2017, inclusive (the

16 "Class Period").

17                                   **PARTIES**

18       12.    Plaintiff Irving Firemen's Relief & Retirement Fund is a retirement fund operated for

19 the benefit of retired firefighters for the City of Irving, Texas.  Plaintiff has its principal place of

20 business in and is organized under the laws of Texas.  Plaintiff purchased Uber securities through an

21 interest in New Riders LP ("New Riders"), a Delaware limited partnership, in January 2016.  The

22 sole purpose of New Riders is to invest in Uber Series G preferred shares.  New Riders is managed

23 by Morgan Stanley Investment Management Inc. and its general partner is MS Alternatives Holding

24 D Inc., an entity owned by Morgan Stanley.

25       13.    Defendant Uber Technologies Inc. is an on-demand ride service and transportation

26 technology company based in San Francisco, California.  Uber's principal place of business is in

27 California, and it is incorporated in Delaware.

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG              - 6 -

14.     Defendant Travis Kalanick is the founder and former CEO of Uber.  He currently serves as a Company director.  Kalanick reportedly owns about 10% of Uber's stock and about 35% of its Class B common shares, giving him about 16% of Uber's voting power.  In addition, Kalanick reportedly controls at least three of eleven seats on Uber's Board.  From Uber's inception until June 2017, Kalanick acted as the Company's primary spokesperson to give interviews, inform the public about the Company, and solicit investment.  During that timeframe Kalanick participated in substantial market activities related to Uber's capital fundraising, and offered to sell, and sold, Uber securities.  As a result of his positions, roles, and share ownership, Kalanick exerted substantial influence over Uber's operations and fundraising at all relevant times.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(d)(2) as this is a class action where at least one of the members of the class is a citizen of a state different from any defendant, and the controversy exceeds the sum or value of $5,000,000.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) and (b) because: (1) one or more defendants reside in this District; and (2) a substantial part of the events or omissions giving rise to the claims occurred in this District.

## SUBSTANTIVE ALLEGATIONS

17.     Uber was founded in 2009 by Kalanick and others as a luxury car service.  Following a beta run, Uber's services and mobile app officially launched in San Francisco in 2011.  The Company started as an on-demand car service that allowed users to hail black luxury cars using a text message or an app.  Uber employed a dynamic pricing model that adjusted prices based on perceived demand, and earned 20% to 30% commission for connecting passengers with drivers.

18.     In July 2012, the Company introduced UberX, a cheaper service which allowed anyone to drive for Uber using their own car, subject to a background check and certain car requirements.  By early 2013, the service was operating in 35 cities and Uber was experimenting with other on-demand services.  During this time, the Company grew from 75 employees to more than 300 and claimed month-to-month revenue growth of 18%.  It also raised more than $400 million in startup financing and boasted a valuation of approximately $3.5 billion.

19.     Prior to June 2014, Kalanick laid the groundwork for Uber's first billion-dollar funding round by disseminating a barrage of false and misleading statements touting the Company's high revenue and growth rates, which were designed to and did induce investments.  In an interview published by *Bloomberg* on July 30, 2013, Kalanick recognized, "[c]ompanies that are meeting aggressive growth targets are able to raise money faster than the average company."  As such, he constantly talked up Uber's "hyper" growth rate and its implications for the Company, the U.S. economy, and the American people in interviews, media, conferences and speeches.  For example, during the September 2012 Disrupt conference, Kalanick emphasized that Uber was "***growing 26% month-over-month***, and that means in the last twelve months, we are sixteen times bigger than we were twelve months ago."

20.     Entering 2014, the stage was set for Kalanick to kick Uber's growth ambitions into overdrive.  That year, Uber and Kalanick embarked on a widespread media and publicity campaign designed to correspond with massive rounds of private investment.  Uber touted itself as a revolutionary logistics company that would usher in a global reordering of transportation and on-demand services.  The key to this revolutionary strategy was the Company's "culture" of innovation, its "values" and "principles" of entrepreneurship, and its commitment to improving the lives of all involved: riders, drivers and the local communities in which Uber operated.  Uber and Kalanick wowed potential investors and courted the media with tales of exponential growth, with gross bookings and net revenue more than doubling year-over-year and a rapid global expansion that would ultimately see the Company operating in more than 700 cities and more than 80 countries worldwide.  Defendants emphasized the Company's investments in next-generation technologies, most importantly self-driving cars, as a way of driving its growth into the future.  Throughout this period, Uber and Kalanick claimed the Company's rapid growth adhered to legal and regulatory requirements, as well as the Company's culture and ethical ethos.

21.     Defendants' statements were made for the purpose of, and did, induce investors to directly and indirectly invest billions of dollars in Uber.  With the Uber narrative of exponential but principled growth firmly planted in the public imagination by defendants, beginning in 2014 Uber and Kalanick ramped up their media and mass marketing campaign in order to induce billions of

1  dollars of new funding from investors.   Uber regularly informed investors of its business

2  performance each quarter via conference calls and issued a barrage of press releases and media

3  materials.  Kalanick, meanwhile, made the rounds on the venture capital and startup circuits, posted

4  on his blogs and Uber's website, spoke at technology conferences, and sat for numerous interviews

5  with widely circulated publications and television stations in order to induce additional investment.

6  **Defendants Successfully Solicit Billions of**
   **Dollars in Private Investment**

7       22.     By June 2014, Uber and Kalanick had successfully solicited more than $400 million

8  in private investment.  Early investors reportedly included Benchmark, a venture capital firm; TPG

9  Equity Partners, a private equity firm; and Google, the technology and search engine behemoth,

10  among others.

11       23.     However, once Kalanick and Uber saturated the print, air and digital media space

12  with a narrative of hyperbolic growth spurred by the Company's innovative, responsible and

13  forward-looking culture, investments in the Company skyrocketed.  Beginning in June 2014,

14  Kalanick and Uber began several private fundraising rounds in which they offered to sell and sold

15  Uber securities, going from raising hundreds of millions of dollars to raising multi-***billions*** in new

16  capital from investors, either directly or indirectly by way of pass-through investment vehicles such

17  as New Riders.  Between August 2013 and June 2014, the price at which Kalanick and Uber offered

18  to sell and sold Uber shares increased by more than 300%, with its value reaching $18.2 billion.  The

19  price at which Kalanick and Uber offered to sell and sold Uber shares more than tripled from this

20  already substantial pricing in 2014 to a staggering valuation of ***$68 billion*** by mid-2016, or $48.77

21  per share, making Uber the most valuable private technology startup.  In a span of just two years,

22  Kalanick and Uber raised more than ***$10 billion*** from plaintiff and the Class to fuel its epic growth.

23  The following table summarizes the sale of Uber securities:

24

| First Sale Date | Securities | Amount Sold | Price Per Share | Valuation |
|---|---|---|---|---|
| December 2015 | Series G Preferred Stock | At least $5.6 billion | $48.772 | $68 billion |
| May 2015 | Series F Preferred Stock | $1.0 billion | $39.638 | $51 billion |

| First Sale Date | Securities | Amount Sold | Price Per Share | Valuation |
|---|---|---|---|---|
| December 2014 | Series E Preferred Stock | $2.8 billion | $33.318 | $42 billion |
| June 2014 | Series D Preferred Stock | $1.3 billion | $15.513 | $18.2 billion |

**Defendants' False and Misleading Statements
About Uber's Rapid Growth and Revenues**

24.     Defendants provided false and misleading statements regarding Uber's growth and revenues to investors.  For 2012, 2013 and 2014, defendants told investors that Uber generated net revenues of approximately $16 million, $210 million and $495 million, respectively.[1]  However, Kalanick and Uber failed to disclose that, in order to achieve this short-term growth, the Company was employing and plotting to employ a variety of illicit business tactics that threatened Uber's business, reputation and long-term prospects.  Kalanick and Uber misrepresented Uber's true business prospects while omitting the fact that Uber's continued growth was built on a corporate culture of dishonesty and illegality.  Prior to Uber's June 2014 financing round, defendants made a series of statements that laid the groundwork to induce the purchase of Uber securities, including:

- Kalanick's interview on Bloomberg Television on July 5, 2012: "We **grow 26% month-over-month** on average compounded.  That means we are sixteen times larger today than we were exactly a year ago."

- Kalanick's *Bloomberg Businessweek* interview published on August 13, 2012: "We've had 26 percent month-over-month growth over the past 12 months – that's in revenue.  **From day one we were making money.**"

- Kalanick's speech at Y Combinator Startup School on October 20, 2012: "We're doing 26 percent month-over-month growth, that's an average over the last now 16, 17 months.  You go okay, well, if you start really low and you can grow really big.  But we were pretty big twelve months ago and if you do 26 percent month-over-month growth that means in 12 months you're 16 times bigger than you were 12 months ago **so we're growing fast**.  And in fact September over August was 29 percent month-over-month."

- Kalanick's *Bloomberg* interview on July 30, 2013: "**The startup has grown seven times its size over the past year**, or an average compounded 18 percent increase in revenue each month for the past year."

---

[1]     *Bloomberg*, Dec. 11, 2013, June 2, 2016; *Silicon Valley Business Journal*, Jan. 22, 2016.

25.     These statements remained alive in the market for Uber securities and uncorrected at the start of the Class Period.  Defendants ramped up the rhetoric as they sought to induce billions of additional investment beginning in mid-2014.  For example, following the June 6, 2014 Series D fundraising round ("June 6, 2014 Issuance"), Kalanick and Uber continued to tout the Company's revenues and growth rate, and Uber boasted net revenues of $495 million, $2 billion, $6.5 billion and $3.3 billion for 2014, 2015, 2016 and the first half of 2017, respectively.[2]  As Kalanick put it, Uber's business was going "***gangbusters***."[3]  When asked right before the June 6, 2014 Issuance how Uber could get to an $18.2 billion valuation, Kalanick emphasized the Company's revenue growth rate: "Again, it comes down to, the size we're at, and the fact that we're growing faster this year than last year at this size, is ***mostly unprecedented.  It's incredibly rare***. . . .  We're at least doubling every six months.  ***It's probably more robust than that***, but that's good enough . . . .  That's revenue."[4]  Similarly, on December 4, 2014, during the Series E fundraising round, Kalanick blogged "[w]e are 6 times bigger today than 12 months ago – and grew faster this year than last . . . .  ***This kind of continued growth requires investment***."[5]  Kalanick's efforts were successful in attracting investors, as Uber's head of global communication Nairi Hourdajian admitted: "The participation we have seen in Uber's Series E underscores the confidence investors have in Uber's growth."[6]

26.     Defendants' emphasis of Uber's meteoric growth rate also included:

- In *Business Wire* on May 27, 2014: "Today Uber Technologies, Inc., reported the unprecedented jobs impact of its platform: at its current rate, ***the Uber platform is***

---

[2]   *Reuters*, Aug. 20, 2015; *Silicon Valley Business Journal*, Jan. 22, 2016; *Bloomberg*, Apr. 17, 2017, Aug. 25, 2017.

[3]   *Uber CEO Kalanick: Our Valuation Is $18.2 Billion*, YouTube (July 17, 2014), https://www.youtube.com/watch?v=VcD6oY3pLlk.

[4]   Evelyn M. Rusli, *Uber CEO Travis Kalanick, We're Doubling Revenue Every Six Months*, Wall St. J. (June 5, 2014), https://blogs.wsj.com/digits/2014/06/06/uber-ceo-travis-kalanick-were-doubling-revenue-every-six-months/.

[5]   Kalanick's Blog, "The Ride Ahead" (Dec. 4, 2014), *available at* https://newsroom.uber.com/the-ride-ahead.

[6]   David Ramos, *Uber Seeking Out Another US$1 billion in New Funding Round*, Bloomberg (Feb. 18, 2015), http://business.financialpost.com/technology/uber-seeking-out-another-us1-billion-in-new-funding-round.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500 - 3:17-cv-05558-HSG                                                                                          - 11 -

*generating 20,000 new driver jobs every month*. . . . ***The Uber platform generates $2.8 billion per year for the U.S. economy and is growing*. . . . *Uber is Available to 137,451,768 Americans*** with an Average Pickup Time of Less Than 10 Minutes – That's 43 Percent of the U.S. Population Covered in Just Four Years."

- Kalanick's interview with *Bloomberg Businessweek* on June 6, 2014: "We just turned four years old this week. ***The growth is remarkable*** . . . . We are now in 128 cities, probably closing in on 40 countries if we are not there already." When asked to explain Uber's valuation, he stated "[i]t comes down to our revenue numbers, the growth of those numbers and our business model itself. . . . ***The [numbers] are incredibly compelling***."

- Kalanick's interview posted by *Bloomberg* on July 17, 2014: He reiterated the growth of Uber's business, saying "[w]e see a huge amount of growth," "[o]ur business is growing real fast" and ***[b]usiness is going gangbusters***."[7]

- Kalanick speaking at the IoD Annual Convention on October 3, 2014: "We've just seen ***incredible growth*** over a very short period of time."[8]

- Kalanick's blog on Uber's website on December 4, 2014: "2014 has been a year of tremendous growth for Uber. It was just a year ago that Uber was operating in 60 cities and 21 countries – today we are in over 250 cities in 50 countries. We are 6 times bigger today than 12 months ago – and grew faster this year than last. ***This progress is remarkable, but it is in the coming years that Uber truly scales and the impact in cities becomes visible***."

- Kalanick's January 18, 2015 statement during the DLD-Conference: "We want to make 2015 the year where we establish a new partnership with EU cities where we push for progressive regulations that ensure innovation and help build the smart cities of tomorrow, some of which I've outlined earlier. Where we promote core city functions through partnerships on data and technology. And where we provide massive economic benefit to cities and their economies. What does this mean at the end of 2015? It means if we can make these partnerships happen we create 50,000 new EU jobs. And remember that's for 2015. That's in one year. And ***this is an exponentially growing company with operations that exponentially grow in each of the cities***. So what happens when that triples the year after and doubles the year after that? It becomes a huge job generator."[9]

---

[7] *Uber CEO Kalanick: Our Valuation Is $18.2 Billion*, YouTube (July 17, 2014), https://www.youtube.com/watch?v=VcD6oY3pLlk.

[8] *Travis Kalanick, Uber, speaking at the IoD Annual Convention 2014*, YouTube (Oct. 9, 2014), https://www.youtube.com/watch?v=Vi_AiIQolJ8.

[9] *Speech and Interview at the DLD-Conference in Munich*, YouTube (Jan. 18, 2015), https://www.youtube.com/watch?v=gS6OsUaHCi4.

- • Senior Vice President of Policy and Strategy David Plouffe's February 2, 2015 statement in an interview published by *The New York Times*: "***Uber is growing every month***, and is becoming a bigger part of not just cities and transportation systems, but of the whole economy . . . .  We're likely to be one of the biggest job-producing companies for the economy over the coming years."

- • Uber's statement in *The Wall Street Journal*, August 8, 2016: "In the first six months of this year, Uber said it completed a billion rides, ***doubling its lifetime total to two billion*** since March 2009. . . .  Uber touts a recent Pew finding that 15% of Americans have used either Uber or rival Lyft Inc., suggesting both companies have much room to grow."

- • Rachel Holt, Head of U.S. and Canada Operations, hosted a conference call on March 21, 2017 as reported by *Fortune*: "In fact, in our most mature country, ***we've grown faster*** in the first 10 weeks of 2017 than in the first 10 weeks of 2016."

- • Uber spokesman's statement to *The New York Times* on May 31, 2017: When announcing first quarter revenue of $3.4 billion, Uber stated "[t]hese results demonstrate that ***our business remains healthy and resilient*** as we focus on improving our culture, management and relationship with drivers."

27.     Defendants Uber and Kalanick knew or had reason to believe that the statements in ¶¶24-26 misrepresented material facts and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  Defendants failed to disclose that Uber's results and growth had been artificially inflated by illicit conduct, and that as a result of defendants' illicit conduct Uber's prospects were subject to numerous material undisclosed legal, reputational and operational risks, including:

(a)     As set forth in ¶¶95-103, *infra*, in order to fuel Uber's rapid expansion, defendants developed and utilized a covert surveillance program code-named "Greyball" which was designed to and did target, monitor and then evade government officials in jurisdictions around the world in which Uber services were illegal or challenged by authorities.

(i)     Beginning at least as early as 2014, Uber used Greyball to expand its low-cost UberX services into new cities, which often contravened local regulations because of its less stringent driver and car requirements than were in place for its black car service.  Uber used data collected from the Uber app and other techniques to identify and circumvent officials who were trying to enforce rules governing Uber's ride-hailing service in cities including Portland, Boston, Paris and Las Vegas, and in countries including Australia, China and South Korea.

1          (ii)       Upon entering a new city, Uber appointed a general manager to head

2 the Company's Greyball operations.  Uber used at least a dozen technologies and techniques to

3 identify and clandestinely monitor enforcement officers, including using credit card information to

4 determine whether the card was tied directly to an institution such as a police credit union.  Once

5 identified, government officials were tagged with a small piece of code that read "Greyball" and

6 provided a dummy version of the app.  This dummy version would mimic the real Uber app, but

7 allowed the Company to populate the screen with fictitious cars or show that no cars were available

8 in order to allow Uber drivers to evade detection.

9          (iii)      Once the Greyball tool was put in place and tested, Uber engineers

10 compiled a playbook with a list of tactics and distributed it to general managers in more than a dozen

11 countries on five continents.  Greyball was an official Company-sponsored program, developed and

12 operated by at least 50 Uber employees and approved by Uber's central office and highest

13 executives.

14          (iv)      Ultimately, Uber was forced to confirm the existence of its secret

15 monitoring of government and law enforcement officers and that Greyball had been used to target

16 government officials.  The U.S. Attorney's Office for the Northern District of California has

17 reportedly opened a criminal probe into the Company's use of the Greyball program, and the FBI has

18 issued subpoenas to public officials in Portland, Philadelphia and Austin in connection with that

19 investigation.

20       (b)      As set forth in ¶¶104-107, *infra*, between 2014 and the early part of 2016 Uber

21 used a secret program code-named "Hell" to monitor and steal driver and rider data from its main

22 competitor, Lyft, unlawfully undercutting Lyft's growth and operations, and stifling competition.

23 For example:

24          (i)       Uber used "spoofed" (*i.e.*, fake) Lyft accounts to obtain information on

25 Lyft's drivers in cities where the companies were competing and clandestinely track Lyft drivers.

26 The Hell program allowed Uber to engage in anticompetitive conduct, including tracking how many

27 Lyft drivers were available for new rides and where they were, and identifying which of the tracked

28 drivers were driving for both Lyft and Uber, providing an illegal advantage in a business where

1    finding enough people to drive is a top operational challenge.  Armed with data about when and

2    where Lyft's drivers were operating, Uber used various techniques to induce them to work only for

3    Uber instead.  The program was referred to as "Hell" because it paralleled Uber's dashboard of Uber

4    drivers and riders known as "God View," or "Heaven."

5                    (ii)        Defendants knew the "Hell" program (a product of the Company's

6    competitive intelligence group) was anticompetitive and illegal and thus kept its existence hidden

7    from all but a small group of Uber employees, which included Kalanick.  This small group had

8    special access to a room at Uber's headquarters in San Francisco, where the intelligence

9    clandestinely obtained on Lyft's drivers was collected via computers that had the spoof accounts.

10                   (iii)       Uber has confirmed the Hell program's existence, and in September

11   2017 it was reported that the Company is under investigation by the FBI and the U.S. Attorney's

12   Office for the Southern District of New York for illegally thwarting competition and violating

13   computer access laws.

14                   (c)        As set forth in ¶¶54-75, *infra*, Uber's growth strategy was dependent on a

15   scheme to secretly misappropriate technology from Google's self-driving car affiliate Waymo

16   instead of developing its own.

17                   (i)        By the middle of 2015, Anthony Levandowski ("Levandowski"), a

18   manager at Waymo, had begun to devise a scheme to steal Waymo's self-driving car technologies.

19   Public filings in Waymo's lawsuit against Uber suggest that Uber and Levandowski began

20   discussing certain technical matters as early as May 2015, that Levandowski met with Uber

21   representatives five times between October 2015 and December 11, 2015, and that Kalanick

22   suggested that Levandowski should create a company for Uber to acquire.

23                   (ii)       By the end of 2015, Levandowski had registered an internet domain

24   for his new startup, secretly downloaded 14,000 Waymo proprietary files and other highly sensitive

25   data, and attempted to erase any evidence of his actions.  On January 15, 2016, the day after he

26   attended a high-level executive meeting at Uber, Levandowski formed Ottomotto LLC ("Otto").  In

27   August 2016, Uber acquired Otto and its "in-house" LiDAR system, a proprietary laser system

28   critical to the development of self-driving cars.  In a March 2017 deposition, Levandowski refused to

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                           - 15 -

1  testify about documents in his possession, citing his Fifth Amendment right against self-
2  incrimination.

3          (iii)        In a May 2017 order, Judge William Alsup found that Waymo had
4  presented evidence that Levandowski had downloaded proprietary Waymo files before resigning,
5  that Uber had planned to acquire Otto and hire Levandowski as the head of its self-driving car
6  technologies, that Uber had specifically prepared for litigation with Waymo in connection with its
7  acquisition of Otto, and that the evidence indicated that Uber had acquired Otto with reason to
8  believe that Levandowski had taken confidential trade secrets from Waymo.   The Court
9  provisionally enjoined Uber from using any documents Levandowski downloaded from Waymo,
10 prohibited Levandowski from working on LiDAR systems at Uber, and required Uber to conduct an
11 investigation and accounting of Levandowski's activities.   Judge Alsup also referred the matter to
12 the U.S. Attorney's Office for investigation of possible theft of trade secrets from Waymo.
13 Levandowski was subsequently fired from Uber after refusing to assist the Company in its internal
14 investigation.

15          (iv)        In November 2017, the DOJ disclosed an important witness – former
16 Uber employee Richard Jacobs ("Jacobs") – that Uber had withheld from Waymo.   Months before
17 this discovery, Jacobs sent a letter to Uber attorneys who then forwarded it to Kalanick.   In the letter,
18 Jacobs detailed Uber's practices of using self-destructing messages, storing proprietary information
19 on unattributable computers, and spying on competitors.   Judge Alsup reprimanded Uber for
20 withholding the evidence, and delayed trial for two months to allow Waymo to investigate the
21 evidence previously withheld from Waymo.

22      (d)     As set forth in ¶¶123-130, *infra*, Uber's rapid international expansion was
23 aided by violations of foreign law.

24          (i)        As part of its expansion into South Korea, Uber was using private
25 vehicles for commercial purposes in violation of South Korean law since at least June 2013.   Uber
26 had expanded into Europe by disregarding local laws and regulations in France and other countries
27 where, since at least February 2014, it was operating in contravention of local transportation laws
28 and failed to comply with European transportation rules and should have been regulated as a taxi

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                    - 16 -

1   service.  As a result, certain of Uber's low-cost services were subject to being banned in those

2   countries as illegal.  In South Korea, France, and several other international jurisdictions Uber had

3   been using Greyball to evade authorities.

4               (ii)      Uber knowingly leased recalled and unsafe vehicles to its drivers in

5   Singapore and continued to do so even after one of its vehicles caught fire.  On August 3, 2017, *The*

6   *Wall Street Journal* reported that Uber had intentionally leased out unsafe Honda SUVs subject to a

7   recall to its drivers in Singapore in order to chase breakneck growth.  After Uber expanded into

8   Singapore in 2013, Uber created a unit that would rent Uber-purchased vehicles to drivers for a daily

9   rate.  In early 2016, Kalanick approved a plan to buy thousands of new cars from auto importers, a

10  legal channel outside manufacturers' authorized networks where safety, service and legal contracts

11  are difficult to enforce, allowing the Company to pay less for the vehicles than it otherwise would

12  have paid.  On April 4, 2016, Honda issued a recall for the SUVs Uber had purchased, advising

13  owners to have them serviced as quickly as possible as the vehicles were prone to overheating.

14  Despite being aware of the recall and safety issue, Uber knowingly purchased over 1,000 of the

15  defective vehicles and continued to rent them out in disregard for the safety of Uber drivers and their

16  riders.  Even after an Uber driver reported that his Company-supplied Honda Vezel had caught on

17  fire and after Company executives, including those in San Francisco, were informed of the fire, Uber

18  decided to keep the cars in service so as not to lose revenues or "alarm" drivers.  Uber failed to

19  apprise its drivers and passengers of the true risks to their safety and well-being from the defective

20  cars, instead developing an information campaign designed to limit any negative publicity that may

21  result from the fire and Uber's actions.

22              (iii)     Uber managers had violated the FCPA (which bans the use of bribes to

23  foreign officials to obtain or keep business), calling into question the legality of the Company's

24  entire international operations, which misconduct was revealed when it was reported on August 29,

25  2017 that the DOJ has taken preliminary steps to investigate it.

26              (iv)      In London, Uber had failed to: (i) properly report serious criminal

27  offenses; (ii) cooperate with authorities investigating the Company's illicit use of the Greyball tool;

28  and (iii) conduct proper driver background checks, exposing the Company to the risk that its license

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                    - 17 -

1   would not be renewed in one of its largest and most important international locations.  On September

2   22, 2017, London's transport authority found that Uber "is not fit and proper to hold a private hire

3   operator licence [sic]" as a result of its demonstrated "lack of corporate responsibility" and declined

4   to renew the Company's license.  London reportedly accounts for about 5% of Uber's global active

5   user base of 65 million, and nearly a third of its active user base of 11 million in Europe, casting

6   further doubt on the Company's global growth prospects.

7           (e)     As set forth in ¶¶76-94, *infra*, Uber knowingly employed a deficient security

8   system that failed to protect its users' highly personal data, and failed to meaningfully improve its

9   practices despite knowledge of deficient systems.

10            (i)     Uber and Kalanick learned about Uber's insufficient controls at least

11   as early as September 2014, after an internet hacker stole the personal information of 50,000 drivers

12   using information obtained from the coding website GitHub.

13            (ii)     Uber publicly expressed shock over the data breach and assured

14   investors it had "remov[ed] the possibility of unauthorized access."  In the following months, Uber

15   repeatedly publicized its renewed focus on cyber security, and promoted several moves that

16   purportedly secured its data.  Uber touted its revamped security systems, regular monitoring of the

17   database, and its appointment of a chief security officer.  Kalanick ultimately labeled Uber as a

18   "world-class people-centric protector of privacy."

19            (iii)     In reality, however, Uber had done little to prevent future attacks,

20   risking further breaches and severe reputational damage.  It refused to implement specific

21   improvements it expressly agreed to as part of a settlement with the New York Attorney General.

22   Former employees claimed that the Company "did not have regard for data protection" and that

23   "security was an afterthought."

24            (iv)     In October 2016, Uber suffered a second attack that was far more

25   substantial and devastating than the first.  This time, the private information of ***57 million*** Uber

26   drivers and riders was stolen by internet hackers.  Incredibly, these hackers accomplished the breach

27   using a method that was nearly identical to the method used in the prior attack: they gained access to

28   the database using information obtained on the coding website GitHub.  The second hack reveals the

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                - 18 -

1   falsity of Uber's assurance that it was "deeply committed to protecting the privacy and personal data

2   of riders and drivers."

3           (v)      Although Uber had vowed to "continue to be transparent" about its

4   data security, it made every effort to cover up the 2016 breach.  Kalanick and the Company went so

5   far as to pay the criminals who committed the hack $100,000 in hush money.  Uber further covered

6   its tracks by disguising this ransom as a "bug bounty" reward.  Defendants' ploy worked for over a

7   year, during which time they continued to tout the Company's "world-class" security program, until

8   Khosrowshahi finally came clean about the cover-up on November 21, 2017.  Since the revelation,

9   multiple municipalities and government agencies have initiated investigations or filed suit against

10   Uber for its faulty practices.

11          (f)      Uber also faced undisclosed material legal and reputational risks arising out of

12   attempts by high-level Uber executives to discredit a sexual assault victim and their fostering of a

13   hidden culture of institutionalized sexual harassment and discrimination.

14          (i)      As set forth in ¶¶131-136, *infra*, in 2014 defendants illicitly obtained a

15   passenger's medical records for the purpose of discrediting her claim that she had been sexually

16   assaulted by an Uber driver on a ride.  Uber senior executive Eric Alexander ("Alexander") brought

17   the medical files to the attention of Kalanick and other executives.  Kalanick reportedly reviewed the

18   medical report and discussed it at length with Alexander.  Uber executives then discussed the claim

19   that the victim had fabricated the whole incident in order to bolster Uber's rival in India – and did so

20   even though none of the executives had medical training and the perpetrator had already been

21   convicted of rape and sentenced to life in prison.  Alexander reportedly carried around the victim's

22   medical files for months without her knowledge.  The victim has sued Uber for unlawful intrusion of

23   private affairs, the public disclosure of private facts and defamation.

24          (ii)     As set forth in ¶¶108-122, *infra*, on February 19, 2017, former Uber

25   engineer Susan Fowler ("Fowler") published a blog post detailing widespread harassment,

26   discrimination and retaliation during her employment at Uber, and laying bare the Company's then-

27   existing policies and procedures.  The revelations sparked a publicity crisis for the Company, which

28   quickly led to an investigation by Holder and his colleagues at Covington & Burling LLP

1   ("Covington") of: (a) Uber's workplace environment; (b) the sufficiency of Uber's policies and

2   practices to address discrimination, harassment and retaliation in the workplace; and (c) the steps

3   Uber could take to enhance the Company's practices with respect to establishing a diverse and

4   inclusive workplace so that they matched Uber's stated policies.  The investigation resulted in a

5   series of recommendations that Uber enact sweeping changes to its business practices, management

6   and culture.  The first recommendation was to "review and reallocate the responsibilities of Travis

7   Kalanick."  On February 22, 2017, *The New York Times* reported that interviews with more than 30

8   current and former Uber employees, and a review of internal documents and recordings, revealed an

9   "unrestrained workplace culture," including incidents of groping, "homophobic slur[s]" and threats.

10   *The New York Times* detailed evidence that complaints were raised to Kalanick and other senior

11   Uber executives.  Because of the breadth and seriousness of the misconduct, Uber attempted to clean

12   house in connection with the investigation, firing at least 20 employees for misconduct (including

13   senior executive Alexander) and subjecting dozens of others to prolonged investigations or

14   disciplinary actions.  Another top executive, Emil Michael, resigned.

**Defendants' False and Misleading Statements**
**About Uber's Compliance with Applicable Laws**
**and Regulations**

17        28.    Defendants claimed that Uber was committed to complying with all applicable rules

18   and regulations in growing its business, while concealing Uber's institutionalized practice of flouting

19   rules whenever necessary in order to gain a competitive advantage.  In addition, when critics

20   questioned the legality of its novel service, Uber responded with false assurances of its knowledge

21   of, and adherence to, all applicable legal requirements.  For instance, on September 12, 2012, during

22   a Disrupt conference hosted by TechCrunch, Kalanick defended the legality of Uber's practices in

23   response to an interviewer question: "***Hold on . . . I do pay attention to the rules***."  He explained

24   Uber's practice of first checking the regulations before entering a new market: "***you go in, you look***

25   ***at the rules, and then you roll out your business***."[10]  Leading up to the June 6, 2014 Issuance,

---

[10]   TechCrunch, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 12, 2012), https://www.youtube.com/watch?v=O7iokgEsWcM.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                    - 20 -

1    defendants made a number of additional statements representing that Uber complied with all

2    applicable laws and regulations, including for example:

3       •   On September 12, 2012, during an interview at the Disrupt conference, Kalanick
            continued to insist Uber operated lawfully: "[Q.] Are you legal?  [A.] *We are legal,*
4           *we are legal*.   [Q.] According to you or according to the Taxi and Limo
            Commission?  [A.] *According to the law*."[11]
5

6       •   On October 20, 2012, Kalanick stated: "In DC we had a really interesting situation.
            We went there, by the way, we were *as far as we could tell we were totally legal,*
7           *White Glove legal*."[12]

8       •   On January 22, 2013, Kalanick stated: "We go to cities sometimes where the
            regulators and the city councils you know give us a little flack at the beginning.  *We*
9           *go in when we're legal.  We do*."[13]

10       29.    Later, during an interview with *Fortune Magazine* on June 14, 2013, Kalanick

11   claimed he actually *preferred* jurisdictions with "a clear set of rules," because they avoided

12   "regulatory ambiguity" that made it "very hard for a real company to operate."[14]  During an

13   interview at the Brainstorm Tech conference on July 23, 2013, an interviewer expressed concern

14   about Uber drivers' ability to "game the system" and induce surge pricing by avoiding popular areas.

15   Kalanick again referenced Uber's faithful obedience to the rules.  He told the interviewer that Uber

16   would "*make sure that that doesn't happen*" because "*it goes against the DNA of our company*"

17   and "marketplaces don't work when people are cheating."[15]  During the same speech, Kalanick

18   unambiguously stated: "*We go into cities where we're legal; we operate where we're legal*."[16]

19

20

21   [11]   *Id.*

22   [12]   *Travis Kalanick at Startup School 2012*, YouTube (Oct. 20, 2012), https://www.youtube.com/
     watch?v=rQ6GoY2_Ujw.

23   [13]   *Travis Cordell Kalanick, Uber CEO Part 1*, YouTube (Jan. 22, 2013), https://www.youtube.com/
     watch?v=_uuTW2LidpU.
24

25   [14]   Fortune Magazine, *The Future Model of Transportation*, YouTube (June 14, 2013), https://www.youtube.
     com/watch?v=Edob6hpJBQY.

26   [15]   Fortune Magazine, *Travis Kalanick CEO of Uber Technologies Speaks at Brainstorm Tech 2013*,
27   YouTube (July 23, 2013), https://www.youtube.com/watch?v=vGbuitwkZiM&t=40s.

28   [16]   *Id.*

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                    - 21 -

1  Likewise, in an August 2013 interview with *Forbes*, Kalanick again confirmed, "***we make sure***
2  ***[when] we go into cities we're legal***."[17]

3       30.   These statements remained alive in the market for Uber securities and uncorrected at
4  the start of the Class Period.  Following the June 6, 2014 Issuance, defendants continued to portray
5  Uber as operating within legal bounds as it accelerated its rapid expansion.  For example, in October
6  2014, after Uber had grown into one of the largest private companies in history, Kalanick told
7  investors that Uber's solid foundation would allow it to operate more conservatively, with strict
8  adherence to applicable laws.  He explained, "when you're the small underdog I think you can be a
9  little more brash than . . . when you are the big guy."[18]  In October 2014, Kalanick claimed the
10  Company had engaged with municipalities to ensure Uber understood their expectations: "***We work***
11  ***with regulators and cities to make things work***."[19]  On June 3, 2015, he stressed Uber's
12  commitment to compliance, claiming "***whenever we're asked to abide by modern regulations that***
13  ***protect the rights and safety of passengers and drivers, we do***."[20]

14       31.   Uber went out of its way to assure the market that it played fair and by the rules,
15  particularly with respect to its main competitor, Lyft.  When Lyft alleged in August 2014 that Uber
16  had attempted to frustrate its business by booking and cancelling rides, Uber immediately denied the
17  allegations.[21]   Throughout Uber's solicitation efforts, Kalanick made numerous additional
18  representations that Uber complied with the law.  For example:

19

20

21

22  _____
   [17]   *Travis Kalanick, Uber, speaking at the IoD Annual Convention 2014*, YouTube (Aug. 9, 2013), https://
23  www.youtube.com/watch?v=Vi_AiIQolJ8.

24  [18]   *Travis Kalanick, Uber, speaking at the IoD Annual Convention 2014*, YouTube (Oct. 3, 2014), https://
   www.youtube.com/watch?v=Vi_AiIQolJ8.

25  [19]   BBC News, Oct. 3, 2014.

26  [20]   *5-Year Anniversary Remarks from Uber CEO Travis Kalanick*, YouTube (June 3, 2015), https://
27  www.youtube.com/watch?v=idjrouG_8vY.

28  [21]   *Plouffe at Uber: Tough start*, Politico.com, Aug. 26, 2014.

- On July 12, 2014, Uber issued a statement claiming "*[w]e've been working in good faith with regulators* to modernize laws and to find a permanent home for Uber in cities around the world."[22]

- On December 14, 2014, the *Washington Post* quoted David Plouffe, Uber's "campaign manager" as saying "the Company has aimed to '*work with regulators, work with elected officials, to find a way forward*' in dealing with laws."

- On December 15, 2016, when discussing the future of driverless cabs in San Francisco, Kalanick said the Company is "*following all the rules*." He added, "often regulators feel like they want to get their arms around it.  We are following the rules but they are still sort of getting up to speed in adapting to the change."[23]

32.     Defendants Uber and Kalanick knew or had reason to believe that the statements in ¶¶28-31 misrepresented material facts and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  Defendants failed to disclose that Uber's results and growth had been artificially inflated by illicit conduct, and that as a result of defendants' illicit conduct Uber's prospects were subject to numerous material undisclosed legal, reputational and operational risks, including:

(a)     As set forth in ¶¶54-75, *infra*, Uber's growth strategy was dependent on an illegal scheme to secretly misappropriate technology from a competitor, Google's self-driving car affiliate Waymo, instead of developing its own.

(b)     As set forth in ¶¶95-103, *infra*, in order to fuel Uber's rapid expansion, defendants, beginning at least as early as 2014, developed and utilized an illicit covert program code-named "Greyball" designed to surveil and then evade government officials in jurisdictions around the world in which Uber services were illegal or had been resisted by authorities.

(c)     As set forth in ¶¶104-107, *infra*, between 2014 and the early part of 2016 Uber used a secret program code-named "Hell" to steal driver and rider data from its main competitor, Lyft, unfairly undercutting Lyft's growth and operations, and stifling competition.

(d)     As set forth in ¶¶123-130, *infra*, defendants knew or recklessly disregarded that Uber's rapid international expansion was aided by violations of foreign law.

---

[22]  Tom Fontaine, *Despite challenges, ridesharing operations flourish*, Pitt. Trib. Rev., July 12, 2014.

[23]  NDTV, *Uber CEO Says Demonetisation Is Beneficial and Surge Pricing Is Vital*, Dec. 16, 2016.

**Defendants' False and Misleading Statements**
**About Uber's Focus on Innovation and**
**Development of Self-Driving Car Technologies**

33.   Prior to and during the Class Period, Uber sought to increase investment by touting its focus on progressive technology and cutting-edge innovation, claiming they formed the foundation that would sustain the Company's rapid growth rate for years into the future.  Defendants repeatedly described Uber as an "innovative" company infused with "creative problem-solvers" working to better the world, and Kalanick framed Uber as a company with a passion for taking on tough technological challenges.[24]

34.   According to defendants, Uber's development and advancement of self-driving car technologies was particularly crucial to its success.  Early on, Kalanick suggested that the Company's penchant for innovation meant it needed to be at the vanguard in the development of self-driving car technologies.  For example, in an article posted on May 28, 2014, CNBC quoted Kalanick saying that autonomous vehicles were "the way the world is going."[25]  Autonomous vehicles represented Uber's most revolutionary innovation and – according to Kalanick – an "*existential*" requirement for the Company's continued success.[26]

35.   To position itself as an apparent leader in the development of self-driving car technologies, on February 2, 2015, Uber announced "a strategic partnership" with Carnegie Mellon University that included the creation of the Uber Advanced Technologies Center in Pittsburgh.  Uber claimed the research center would focus "***primarily in the areas of mapping and vehicle safety and***

---

[24]   *See, e.g.*, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 12, 2012), https://www.youtube.com/watch?v=O7iokgEsWcM; *Fireside Chat with Travis Kalanick and Marc Benioff*, YouTube (Sept. 16, 2015), https://www.youtube.com/watch?v=Zt8L8WSSr1g&t=61s.

[25]   Jason Del Rey, *Uber CEO Self-Driving Cars Are the Future, Drivers Are Not*, CNBC (May 28, 2014), https://www.cnbc.com/2014/05/28/uber-ceo-self-driving-cars-are-the-future-drivers-are-not.html.

[26]   Thom Forbes, *Uber Bringing Self-Driving Volvos To Pittsburgh Soon*, MediaPost (Aug. 19, 2016), https://www.mediapost.com/publications/article/282840/uber-bringing-self-driving-volvos-to-pittsburgh-so.html.

1  *autonomy technology*."[27]  The following day, CNBC celebrated the partnership as "a move analysts

2  believe could eventually mean driverless cars."

3       36.     Uber made a concerted effort to portray itself as the equal of other tech companies,

4  such as Google and its affiliate Waymo, who were also racing to develop driverless car technologies.

5  In a *New York Times* article published on February 8, 2015, Nairi Hourdajian, an Uber

6  spokeswoman, stated, "'Uber has a strong relationship with Google'" and "'look[s] forward to

7  continuing our collaborative dialogue with Google about the future of our partnership in the years to

8  come.'"[28]  On March 6, 2015, Raj Rajkumar, one of the leading experts on self-driving cars at

9  Carnegie Mellon University, claimed Uber's ability to innovate offset Google's superior resources

10  and data.  He stated, "Google is capable of collecting all this information.  In our case, we don't have

11  that capability, *so we have to be creative.  It turns out that's sufficient*."[29]

12      37.     In August 2015, after Uber opened its research center in Pittsburgh, the Company

13  announced that it had entered into a partnership with the University of Arizona "focuse[d] on

14  research and development in the optics space for mapping and safety."[30]  The partnership reaffirmed

15  to investors that Uber planned to be a leader in developing its own self-driving technology.  Brian

16  McClendon, Uber vice president of advanced technologies, described the innovations that Uber was

17  working to develop: "A lot of this is about lenses and the acquisition of imagery and in other cases

18  technologies like LiDAR (a remote-measurement technology using a laser) that scanning the world

19  around you in high resolution depends on."  He explained that the technology "get[s] detail like

20  street names, street address, or more importantly things like the depth of potholes, being able to read

21

22  [27]  *Uber and CMU Announce Strategic Partnership and Advanced Technologies Center*, Uber Blog (Feb. 2,
    2015), https://www.uber.com/blog/uber-and-cmu-announce-strategic-partnership-and-advanced-technologies-
23  center.

24  [28]  Mike Isaac, *A Prickly Partnership*, N.Y. Times (Feb. 8, 2015), https://www.nytimes.com/2015/02/09/
    technology/a-prickly-partnership-for-uber-and-google.html.

25  [29]  Alexi Oreskovic, *Silicon Valley debate on self-driving cars: do you need a map?*, Reuters (Mar. 6, 2015),
    https://www.reuters.com/article/us-autos-selfdriving-technology-analysis/silicon-valley-debate-on-self-
26  driving-cars-do-you-need-a-map-idUSKBN0M20EK20150307.

27  [30]  *Driver Innovation in Arizona*, Uber Blog (Aug. 25, 2015), https://www.uber.com/blog/tuscon/driving-
    innovation-in-arizona/.
28

1  the exact geometry of the world around you and determining if it is part of your environment or a

2  dynamic object that will be here today and gone tomorrow, and we need to know how to react to

3  that."  He concluded, "we'll be working on this project for years."[31]  On September 17, 2015,

4  Kalanick described Uber as an "optimistic leader" that would help the world "transition" from cars

5  with drivers to driverless cars.[32]

6       38.    On February 23, 2016, Uber inflamed excitement further when it announced progress

7  toward autonomism.  In an announcement on its website, Uber stated, "[t]he investments we're

8  making in Pittsburgh today are key to the long-term future of transportation.  Self-driving technology

9  has the potential to drastically cut down on accidents and congestion while making transportation

10  even more affordable and convenient for everyone."[33]  On May 19, 2016, Uber posted an update on

11  its blog.   It stated, "[r]eal-world testing is critical to our efforts to develop self-driving

12  technology. . . .  While Uber is still in the early days of our self-driving efforts, *every day of testing*

13  *leads to improvements*.  Right now we're focused on getting the technology right and ensuring it's

14  safe for everyone on the road – pedestrians, cyclists and other drivers."  Uber stated that these

15  innovations would "help[] us shape the future of transportation."  On August 1, 2016, Uber added to

16  investor enthusiasm when it announced it had "*built test models of self-driving cars, which we are*

17  *currently piloting in Pittsburgh*."  The next day, Uber stressed its independence from Google,

18  saying it had invested $500 million to "*wean itself off dependence on Google Maps and pave the*

19  *way for driverless cars*."[34]

20       39.    In August 2016, Uber acquired self-driving car startup, Otto.  Rather than telling the

21  truth about how the acquisition helped Uber acquire stolen technology, Uber celebrated the deal as a

22  means to develop its own technology.  Kalanick described Otto as "a 90-plus person technology

23  ----

[31]  David Wichner, *UA, Uber team for driverless research; Optics program to aid in mapping*, Ariz. Daily
24  Star, Aug. 25, 2015.

25  [32]  *Fireside Chat with Travis Kalanick and Marc Benioff*, YouTube (Sept. 17, 2015), https://
www.youtube.com/watch?v=Zt8L8WSSr1g&t=61s.

26  [33]  *Growing in the Steel City*, Uber Blog (Feb. 23, 2016), https://www.uber.com/blog/pittsburgh/growing-in-
27  the-steel-city/.

28  [34]  *Uber to pour $500m into global mapping project*, Prime-News, Aug. 2, 2016.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                    - 26 -

startup *whose mission is to rethink transportation, starting with self-driving trucks*."  Kalanick went on to state that "[w]hen it comes to this advanced technology stack, *Otto plus* Uber is a dream team. . . .  Together, *we now have one of the strongest autonomous engineering groups in the world*."[35]

40.   Defendants Uber and Kalanick knew or had reason to believe that the statements in ¶¶33-39 misrepresented material facts and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  As set forth in ¶¶54-75, *infra*, defendants knew or had reason to know but failed to disclose that Uber's self-driving car program was dependent on a scheme to secretly misappropriate technology from Google's self-driving car affiliate Waymo in order to maintain and increase its competitive advantage, rather than simply rely on technological innovations or legitimate business acquisitions.

**Defendants' False and Misleading Statements**
**Regarding Uber's Data Security**

41.   In May 2014, internet hackers infiltrated Uber using information obtained on the coding website GitHub, stealing personal data from 50,000 Uber drivers.  After the breach, defendants falsely assured the public that the deficiencies in its security systems had been corrected and claimed they were doing everything in their power to prevent future breaches.  For instance, on November 18, 2014, Uber released a data protection statement on its blog (since deleted), which assured the public that "*rider and driver accounts [are] being closely monitored and audited by data security specialists on an ongoing basis*."[36]  On April 2, 2015, when Uber announced the hiring of Joe Sullivan ("Sullivan") as chief security officer, Kalanick called Uber a "*world-class people-centric protector of privacy*," and Sullivan vowed to "continue building upon the safety and security initiatives that are the backbone of Uber's success."[37]  And on January 7, 2016, Uber

---

[35]   *Rethinking transportation*, Uber Blog (Aug. 18, 2016), https://newsroom.uber.com/rethinking-transportation/.

[36]   Paul B. Carr, *Amid escalating scandal, Uber publishes new data privacy statement*, Pando (Nov. 18, 2014), https://pando.com/2014/11/18/amid-escalating-scandal-uber-publishes-new-data-privacy-statement/.

[37]   *Joe Sullivan Joining Uber as First Chief Security Officer*, Uber Newsroom (Apr. 2, 2015).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                                  - 27 -

1  announced the resolution of a New York Attorney General investigation into the breach, claiming it

2  had adopted substantial changes to its privacy program, including the imposition of a multifactor

3  authentication for services like GitHub, as part of the settlement.[38]  In reality, according to former

4  employees and a lawsuit filed by the City of Chicago, Uber never implemented many of the

5  promised changes.[39]   Rather than disclose its ongoing vulnerabilities, an Uber spokesperson

6  commenting on the settlement said, "'*[w]e are deeply committed to protecting the privacy and*

7  *personal data of riders and drivers*.'"[40]

8        42.    Other false statements after the 2014 data breach include:

9    •    On November 20, 2014, Uber announced it had hired experts to examine its privacy
          policies, claiming "'*we understand that we must treat [rider data] carefully and*
10         *with respect, protecting it from unauthorized access*.'"[41]

11   •    Two months later, on January 30, 2015, Uber spokesperson Molly Spaeth ("Spaeth")
          announced the findings of Uber's privacy experts, claiming "[t]he review was
12         comprehensive   and   found   that   *overall  our  Privacy  Program  is  strong*."
          Additionally, Uber stated "*[o]ur approach is to constantly review and iterate on our*
13         *policies, processes and technology so that we ultimately become a leader in the*
          *area of privacy and data protection*."  Spaeth went on to say, "[o]ur promise to the
14         Uber Community is that when it comes to privacy, our commitment doesn't stop with
          the findings of this report; it is ongoing.  *We won't rest until our Privacy Program is*
15         *world class and we are confident our roadmap will get us there*."[42]

16
17   •    The January 30, 2015 Uber announcement also included a direct quote from
          Kalanick, who said: "'*At Uber, protecting the personal information of riders is a*
18         *core responsibility and company value*.  Delivering on that value means that privacy

19  ───────────────
    [38]   Anita Balakrishnan, *Uber agrees to 20 years of privacy audits after FTC says it 'failed consumers,'*
20  CNBC  (Aug.  15,  2017),  https://www.cnbc.com/2017/08/15/uber-ftc-case-over-data-privacy-has-been-
    settled.html.

21  [39]   *City of Chicago, et al. v. Uber Techs. Inc.*, Case No. 2017CH15594 (Ill. Cir. Ct., Cook Cty. Nov. 28,
22  2017); Cyrus Farivar, *Chicago: Uber's claim that hackers fully deleted stolen data is "nonsensical*,*"* Ars
    Technica,        https://arstechnica.com/tech-policy/2017/11/in-data-breach-lawsuit-chicago-slams-uber-for-
23  trusting-word-of-criminals/.

24  [40]   Douglas MacMillan, *Uber Agrees to $20,000 Fine and Controls on Data in Privacy Probe*, Wall St. J.
    (Jan. 7, 2016), https://blogs.wsj.com/digits/2016/01/06/uber-agrees-to-20000-fine-and-controls-on-data-in-
25  privacy-probe/.

26  [41]   James Kosur, *Uber Hires Outside Privacy Experts To Examine Company Policies*, Business 2
    Community (Nov. 20, 2014), https://www.business2community.com/tech-gadgets/uber-hires-outside-privacy-
27  experts-examine-company-policies-01075096.

    [42]   *Protecting Privacy: Our Commitment*, Uber Newsroom (Jan. 30, 2015).
28

is woven into every facet of our business, from the design of new products to how we interact with riders, drivers and the public at large. ***We will continue to make it a priority to ensure that everyone at the company understands just how critically important it is to build and protect this trust with all of these constituents***."[43]

• On May 28, 2015, Uber's Managing Counsel of Data Privacy, Katherine Tassi ("Tassi") said: "***We care deeply about the privacy of our riders and drivers. It's why we're always looking at ways to improve our practices***. In the last few months we have doubled the size of our privacy team, overhauled our data protection training for employees, published an external review of our privacy program and hired Joe Sullivan, a former cybercrime prosecutor, as our Chief Security Officer."[44]

• An article published on June 23, 2015 quoted an Uber statement saying, "'***[w]e care deeply about the privacy of our riders and driver-partners***, and ***have significantly streamlined our privacy statements in order to improve readability and transparency***.'"[45]

• On August 18, 2015 The Huffington Post published a statement from Uber that said, "'[w]e are scaling teams – including the security team – across the company to match our growth, not in reaction to any events.'"[46]

• On January 27, 2016, Forbes quoted an Uber spokesperson as saying "'[w]e take partner privacy very seriously and ***make every effort to ensure the security of personal information***.'"[47]

• On March 22, 2016, Uber posted a statement on its blog addressing a new securities program designed to find flaws in Uber's code that said, "***we're focused on being as transparent as possible so that researchers have access to the right information***, right from the start."[48]

• At the Infosecurity Europe conference in London in June of 2016, Uber security awareness and education program manager Samantha Davison said the Company

---

[43] *Id.*

[44] *An Update on Privacy at Uber*, Uber Newsroom (May 28, 2015).

[45] *Uber Could Get Up To $1 Billion From New Chinese Investor*, Jewish Business News (June 23, 2015), http://jewishbusinessnews.com/2015/06/23/uber-could-get-up-to-1-billion-from-new-chinese-investor/.

[46] Alexis S. Fitts, *Can Uber Keep Your Data Safe? It's Trying*, Huffington Post (Aug. 18, 2015), https://www.huffingtonpost.com/entry/uber-data-security_us_55d230b7e4b07addcb43a7d8.

[47] Kelly P. Erb, *'Bug' Exposes Uber Driver's Tax Info, Including Name and Social Security Number*, Forbes (Jan. 27, 2016), https://www.forbes.com/sites/kellyphillipserb/2016/01/27/bug-exposes-uber-drivers-tax-info-including-name-and-social-security-number/#1b8027468ef0.

[48] *Welcome All Bug Bounty Hunters*, Uber Newsroom (Mar. 22, 2016).

sought to "'***bake security into our culture***'" and "'make security as instinctive as breathing for all our employees, so they automatically know what to do.'"[49]

43.     After the 2014 breach, defendants failed to correct even the most obvious security deficiencies, which led to a second, nearly identical breach in October 2016.  Contrary to the laws of multiple states and countries in which it operates, Uber did not to disclose the 2016 breach.  Instead, it paid the hackers a $100,000 ransom to keep quiet, and continued to falsely tout its new and improved security systems and withhold the truth about its deficient systems.  For instance, on October 28, 2016, Uber expressly denied a major breach when a wave of riders reported unauthorized access and faulty charges to their accounts.  Uber attributed this surge of fraud to individual instances of "phishing" and recommended only that "'riders use unique passwords for their accounts.'"[50]  Further, in an email publicized on December 20, 2016, Uber Chief Information Security Officer John Flynn ("Flynn") said, "'***we continue to make major improvements to our security systems and policies to ensure that rider and driver data is protected***,'" but did not disclose the massive breach that occurred just two months earlier.[51]

44.     Other false statements after the 2016 data breach include:

*   On December 12, 2016, in response to allegations concerning Uber's improper use of "God View," the Company released the following statement: "'Uber continues to increase our security investments and many of these efforts, like our multi-factor authentication checks and bug bounty program, have been widely reported . . . . ***We have hundreds of security and privacy experts working around the clock to protect our data***.  This includes enforcing strict policies and technical controls to limit access to user data to authorized employees solely for purposes of their job responsibilities, and ***all potential violations are quickly and thoroughly investigated***.'"[52]

---

[49]   AJ Dellinger, *When it comes to your data, Uber is actually pretty reliable*, The Daily Dot (June 17, 2016), https://www.dailydot.com/debug/uber-cybersecurity-protection-infosecurity-europe-conference/.

[50]   Shanifa Nasser, *Privacy experts call on Uber to investigate after man gets nearly $1000 bogus bill*, CBC News (Oct. 24, 2016), http://www.cbc.ca/news/canada/toronto/privacy-experts-call-on-uber-to-investigate-after-man-gets-nearly-1000-bogus-bill-1.3819640.

[51]   Will Evans, *Why privacy advocates are worried about Uber's security problems*, Reveal (Dec. 20, 2016), https://www.revealnews.org/blog/why-privacy-advocates-are-worried-about-ubers-security-problems/.

[52]   Avery Hartmans, *Uber employees used the platform to stalk celebrities and their exes, a former employee claims*, Business Insider (Dec. 12, 2016), http://www.businessinsider.com/uber-employees-stalked-celebrities-ex-employee-claims-2016-12.

- Also on December 12, 2016, Flynn sent a memo to Uber employees, which was published in *Fortune* the same day.  He said: "Over the past several years, ***we've hired hundreds of security and privacy experts who work around the clock to protect user data***.  Our team includes experts in authentication, authorization, encryption and access management. . . .  We want our security and privacy practices and technology to be ***world-class***, and we're moving quickly toward that goal.  Every time a rider or driver uses Uber, ***they entrust us with data that it's the responsibility of each and every one of us to protect it***."[53]

- On January 5, 2017, *The Washington Post* published a statements from Uber, which said: "'***We have an obligation to protect our riders' data***, especially in an age when information collected by government agencies like the TLC can be hacked, shared, misused or otherwise made public . . . .'"[54]

- On August 15, 2017, *The Wall Street Journal* and *Wired* announced that Uber had settled an Federal Trade Commission ("FTC") investigation regarding the  2014 breach.  The articles included a statement from Uber conveying that its vulnerability to such breaches was a thing of the past: "'The complaint involved practices that date as far back as 2014 . . . .  ***We've significantly strengthened our privacy and data security practices since then and will continue to invest heavily in these programs***.'"  "'In 2015, we hired our first chief security officer and now employ hundreds of trained professionals dedicated to protecting user information.'"[55]

45.     Defendants Uber and Kalanick knew or had reason to believe that the statements in ¶¶41-44 misrepresented material facts and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  As set forth in ¶¶76-94, *infra*, defendants knew or had reason to know but failed to disclose that Uber had not sufficiently improved its security system and practices, and instead focused on "growth at all costs."  Defendants' indifference to sufficient security left its users' data vulnerable to cyberattacks of all kinds, including attacks nearly identical to past attacks.

---

[53]   Jeff J. Roberts & Kia Kokalitcheva, *Uber Security Head Warns Staff After Latest Tracking Controversy*, Fortune (Dec. 13, 2016), http://fortune.com/2016/12/12/uber-privacy-memo/.

[54]   Faiz Siddiqui, *Uber and New York City spar over rider data*, Wash. Post (Jan. 5, 2017), https://www.washingtonpost.com/news/dr-gridlock/wp/2017/01/05/uber-and-new-york-city-spar-over-rider-data/?utm_term=.1f58e715d1ab.

[55]   Greg Bensinger, *Uber Settles With FTC Over Data-Privacy Protections*, Wall St. J. (Aug. 15, 2017), https://www.wsj.com/articles/uber-settles-with-ftc-over-data-privacy-protections-1502819449; Klint Finley, *Uber Settles with FTC Again, This Time over 2014 Privacy Breach*, Wired (Aug. 15, 2017), https://www.wired.com/story/uber-settles-with-ftc-again-this-time-over-2014-privacy-breach/.

**Defendants' False and Misleading Statements**
**Regarding Uber's Competition**

46.     When Lyft arrived to market in 2012, Uber publicly welcomed the competitive challenge.  Behind the scenes, however, Uber plotted to undercut Lyft by any means possible, regardless of legality.  For example, at a Disrupt conference on September 12, 2012, Kalanick expressed excitement about the challenge of a new rival.  He said, "competition is fun . . . ***if there wasn't competition like what is the freakin' purpose***?  Let's have some fun then let's make the world a better place at the same time."[56] Uber and Kalanick repeated this pro-competition sentiment as the service continued to gain popularity, and their stance was well-publicized.  For instance, in response to a question about Lyft, Kalanick said he was not afraid of the new company because, according to him, "***competition is good***."[57]

47.     These statements remained alive in the market for Uber securities and uncorrected at the start of the Class Period, and defendants repeated these pro-competitive sentiments in the months leading up to the 2014 financing rounds.  For example, on July 23, 2013, Kalanick argued for relaxed competitive restrictions in various cities and accused the municipalities of "doing anti-competitive things" that thwarted the free market.[58]  During this same conference, Kalanick hypocritically accused Lyft – a company Uber would later illicitly attack with spyware – of illegal activity.  He claimed Lyft had engaged in "regulatory arbitrage" because it entered markets after Uber had already established a presence in them.  He went so far as to claim that "every trip" with Lyft was "a criminal misdemeanor" because – according to Kalanick – Lyft's drivers lacked the proper insurance and licensure.[59]  By all appearances, Uber continued to welcome the "challenge" of increased competition during the Class Period.  For instance, in a *Wall Street Journal* article

---

[56]    TechCrunch, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 12, 2012), https://www.youtube.com/watch?v=O7iokgEsWcM.

[57]    Julie Bort, *Uber CEO: Bring On The Cheap Competition*, Bus. Insider (Sept. 12, 2012) http://www.businessinsider.com/uber-ceo-travis-kalanick-lyft-2012-9; *see also* TechCrunch, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 12, 2012), https://www.youtube.com/watch?v=O7iokgEsWcM (same).

[58]    Fortune Magazine, *Travis Kalanick CEO of Uber Technologies Speaks at Brainstorm Tech 2013*, YouTube (July 23, 2013), https://www.youtube.com/watch?v=vGbuitwkZiM&t=40s.

[59]    *Id.*

published on August 11, 2014, Uber described how "competitive clones," such as Lyft, create a "*competitive spirit [that] is good for consumers and for the marketplace*."[60]  Kalanick continued to relay this message on August 19, 2014, when he said, "*competition can be fun*" and "*at the end of the day it's better for the consumer*."[61]   Kalanick repeatedly stated that defendants embraced competition throughout the Class Period, stating:

- On January 18, 2015, Kalanick stated, "it is *important for a regulatory regime to also codify choice and competition choice*."[62]

- In an interview published on September 23, 2015, Kalanick stated, "*[c]ompetition makes us better*."[63]

- On April 27, 2016, Kalanick said "we've gotten into a situation where some of these *old rules have become protectionist and have essentially outlawed competition* and you know ultimately *those things need to need to change*."[64]

48.   Defendants Uber and Kalanick knew or had reason to believe that the statements in ¶¶46-47 misrepresented material facts and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  Defendants failed to disclose that Uber's results and growth had been artificially inflated by illicit conduct, and that as a result of defendants' illicit conduct Uber's prospects were subject to numerous material undisclosed legal, reputational and operational risks, including:

(a)   As set forth in ¶¶54-75, *infra*, Uber's growth strategy was dependent on an illegal scheme to secretly misappropriate technology from a competitor, Google's self-driving car affiliate Waymo, instead of developing its own.

---

[60]   Douglas MacMillan, *Tech's Fiercest Rivalry: Uber vs. Lyft; The Two Heavily Financed Upstarts Also Aim to Supplant the Taxi Industry*, Wall St. J., Aug. 11, 2014, at B1.

[61]   *Uber CEO Travis Kalanick and David Plouffe on Bloomberg TV*, CEO Wire, Aug. 19, 2014.

[62]   DLD Conference, *Uber and Europe: Partnering to Enable City Transformation I (Travis Kalanick, CEO at Uber)*, YouTube (Jan. 18, 2015), https://www.youtube.com/watch?v=iayagHygV0Q.

[63]   ET Now, *In Conversation With Uber Inc.'s CEO – Travis Kalanick*, YouTube (Sept. 23, 2015), https://www.youtube.com/watch?v=ByF2MVufBIU.

[64]   CNBC, *Uber CEO Travis Kalanick On Making Ends Meet*, YouTube (Apr. 27, 2016), https://www.youtube.com/watch?v=VnH_7YDWGKE&t=36s.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500 - 3:17-cv-05558-HSG                                                                                                    - 33 -

(b)     As set forth in ¶¶95-103, *infra*, in order to fuel Uber's rapid expansion, defendants, beginning at least as early as 2014, developed and utilized an illicit covert program code-named "Greyball" designed to surveil and then evade government officials in jurisdictions around the world in which Uber services were illegal or had been resisted by authorities.

(c)     As set forth in ¶¶104-107, *infra*, between 2014 and the early part of 2016 Uber used a secret program code-named "Hell" to steal driver and rider data from its main competitor, Lyft, unfairly undercutting Lyft's growth and operations, and stifling competition.

(d)     As set forth in ¶¶123-130, *infra*, defendants knew or recklessly disregarded that Uber's rapid international expansion was aided by violations of foreign law.

**Defendants' False and Misleading Statements**
**Regarding Uber's Corporate Culture**

49.     Prior to and during the Class Period, defendants portrayed Uber to potential investors as honest and principled.  For example, during his speech at the Tech Cocktail's Startup Mixology Conference in Washington, D.C. on June 16, 2011, Kalanick asserted that "***principles do matter*** and that's how you change the world is by holding those principles over sometimes corrupt systems."  In the same speech, he further proclaimed that "fak[ing] it til you make it" was "bullshit" because "you're lying to yourself and everybody around you" and "people who lie to themselves and other people, it's obvious to others."  Again, shortly before the June 6, 2014 Issuance, during an interview with the *Financial Times* on May 9, 2014, Kalanick extolled Uber's organizational honesty and stated that "***[w]e feel we are very honest and authentic, to the point of being brutally honest*** . . . . Not everyone likes that style, and I get that, but ***at least we're trustworthy***."

50.     During the period when Uber was implementing its billion-dollar fundraising rounds, defendants continued to place great emphasis on the Company's "culture" and "principles" as a cornerstone for its success.  On December 4, 2014, Kalanick kicked off the Series E fundraising round by stating in his blog that Uber would be refining its "company culture effectively."  Again, on September 16, 2015, shortly before the Series G fundraising round, for the purpose of inducing the purchase of Uber securities, Kalanick held up Uber's corporate culture as principled and central to its operations: "I don't know how many companies and how many people go as deep as they need

1   to on culture.  We're in the process right now of creating essentially what I call a philosophy of

2   work.  You know you spend half of your day working and it should matter.  It should be more than

3   just work; *it should be something you believe in and how you do it should matter, the principles*

4   *and in how you approach your work should matter* . . . one of our cultural values is celebrate the

5   city right so that's so perfect for us you really wouldn't see that on any other company's cultural

6   values but it matters to us."  In particular, defendants highlighted Uber's commitment to women as

7   well as its purported commitment to "diversity, fairness and equality" as important aspects of the

8   Company's culture.

9          51.     Additional statements by Kalanick and Uber regarding the importance of Uber's

10   workplace culture and its commitment to various stakeholders included:

11   •   Salle Yoo, general counsel, in an interview with *Reuters* on March 10, 2015: when
          asked by a journalist on why women might find working for Uber attractive, Yoo
12        responded that Uber "*offers [women] the chance to be entrepreneurial*, the chance
          to balance work and family."
13

14   •   Kalanick's joint statement with UN Women's executive director on March 10, 2015:
          "Today, UN Women and Uber are launching a partnership to work together around
15        the world toward *a shared vision of equality and women's empowerment*. . . .  This
          important mission can only be accomplished when all women have direct access to
16        *safe and equitable* earning opportunities."

17   •   Uber's March 20, 2015 statement: "Uber will be seeking advice from UN Women
          and groups around the world on the best way to achieve the important goal of
18        *economic equality and opportunity for women*."
19
     •   Uber's July 27, 2015 press release: "*For many women, Uber is a flexible, equitable*
20        *opportunity* that not only gives them control over their schedules and supplements
          income, but also helps them pursue their passions."
21

22   •   Ryan Graves, Uber's Executive Sponsor, in a press release on September 3, 2015:
          "*Uber's leadership is a strong example of innovation stemming from the creation*
23        *of more diverse and inclusive environments*."

24   •   Rachel Holt, Head of American Operations, in a statement published by *HuffPost* on
          October 31, 2016: "*Discrimination has no place in society, and no place on Uber*."
25

26          52.     Defendants Uber and Kalanick knew or had reason to believe that the statements in

27   ¶¶49-51 misrepresented material facts and/or omitted material facts necessary to make the statements

28   made, at the time made and in light of the circumstances under which they were made, not

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                    - 35

misleading.  Defendants failed to disclose that Uber and Kalanick had encouraged and fostered a toxic corporate culture defined by misogyny, gender discrimination, sexual harassment, and a flagrant disregard for the law, that would cause immense damage to the Company's reputation, brand, and ability to attract and retain qualified employees, customers and drivers once its true nature became publicly known.  In particular:

(a)     As set forth in ¶¶108-122, *infra*, Uber institutionalized gender discrimination and the harassment of women, causing an 80% decline in female employees in certain operations from November 2015 to December 2016; maintained completely ineffective internal complaint policies and procedures to prevent employee misconduct; and sponsored a Company trip to a female escort bar.

(b)     As set forth in ¶¶131-136, *infra*, Uber executives had illicitly obtained a sexual assault victim's medical records in order to discredit her traumatic experience.

(c)     As set forth in ¶¶54-75, *infra*, Uber's growth strategy was dependent on a scheme to secretly misappropriate technology from a competitor, Google's self-driving car affiliate Waymo, instead of developing its own.

(d)     As set forth in ¶¶95-103, *infra*, in order to fuel Uber's rapid expansion, defendants, beginning at least as early as 2014, developed and utilized a covert program code-named "Greyball" designed to surveil and then evade government officials in jurisdictions around the world in which Uber services were illegal or had been resisted by authorities.

(e)     As set forth in ¶¶104-107, *infra*, between 2014 and the early part of 2016 Uber used a secret program code-named "Hell" to steal driver and rider data from its main competitor, Lyft, unfairly undercutting Lyft's growth and operations, and stifling competition.

(f)     As set forth in ¶¶123-130, *infra*, defendants knew or recklessly disregarded that Uber's rapid international expansion was aided by violations of foreign law.

**Defendants' Uber Story Unravels**

53.     Beginning in early 2017, the Uber growth story and the narrative disseminated by defendants began to unravel.  Headline after breaking headline revealed the Company was bent on short-term growth and expansion at all costs, incubated in a toxic corporate culture of misogyny,

1   institutionalized gender discrimination and sexual harassment, and was driven by an operating ethos

2   of blatant disregard for the law, no matter the reputational, legal or operational risks involved.  By

3   June 2017, in the midst of many of the scandals, Uber investors forced Kalanick to resign from his

4   position as CEO. This caused the Company to fall into an existential crisis, as top flight talent exited

5   the Company in droves, Uber's reputation and brand suffered severe and lasting damage, its

6   operations and prospects were diminished, and Uber securities plummeted.

7   **Uber Attempts to Steal Its Way into the Future**

8       54.    As detailed elsewhere herein, defendants had characterized Uber's development and

9   implementation of self-driving car technologies as essential to the Company's continued success and

10  future growth prospects.  The advancement of futuristic technologies such as self-driving cars also fit

11  with the Company's narrative that it was a leader in technological innovation and was key to the

12  Company's appeal to investors.  In early 2015, Uber and Kalanick announced that they were taking

13  dramatic steps to put this commitment to innovation into practice by announcing a strategic

14  partnership with premier engineering university Carnegie Mellon to create an "Advanced

15  Technologies Center" in Pittsburgh.  The primary research focus of the partnership was on

16  developing self-driving car technologies, such as mapping, vehicle safety and autonomy.  The

17  Company reportedly used cash from its recent equity raises to fund the investment.  In the ensuing

18  months, Uber continued to cite major progress on its self-driving car initiatives, including an

19  agreement with Pittsburgh to allow Uber to test autonomous vehicles in the city and the acquisition

20  of self-driving car startup Otto.

21      55.    Then, on February 23, 2017, Google's self-driving car affiliate Waymo rocked the

22  tech community by filing a lawsuit against Uber in the U.S. District Court for the Northern District

23  of California.  The *Waymo* suit alleges that Uber had simply stolen self-driving car technologies

24  from Waymo instead of developing its own after its publicly vaunted attempts to do so had stalled.

25      56.    According to the lawsuit, Waymo had developed and improved extremely valuable

26  laser technology, known as "LiDAR," that was a key component to the successful development of

27  autonomous vehicles.  Whereas Waymo relied on its in-house LiDAR systems, Uber relied on third-

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                              - 37

1  party vendors for its LiDAR systems, a function of the Company jumping into the self-driving car

2  space at least five years behind Waymo.

3      57.      Uber knew it could not overcome this fundamental competitive disadvantage, so it

4  devised a scheme with Levandowski, a manager at Waymo, to steal Waymo's self-driving car

5  technologies.  Public filings in Waymo's lawsuit against Uber suggest that Uber and Levandowski

6  began discussing certain technical matters as early as May 2015 (eight months before he left

7  Waymo), that Levandowski and Kalanick exchanged hundreds of text messages in the following

8  months, that Levandowski met with Uber representatives five times between October 2015 and

9  December 11, 2015, and that Kalanick suggested that Levandowski should create a company for

10  Uber to acquire.  *Waymo*, ECF No. 756 at 8-10.  Kalanick would later refer to Levandowski as his

11  "brother from another mother."  By November 2015, Levandowski had registered an internet domain

12  for his new startup, which he confided to colleagues would be used to replicate Waymo's

13  technologies.  In December 2015, Levandowski installed special software on his Waymo laptop that

14  he used to download 14,000 proprietary files and other highly sensitive data.    Thereafter,

15  Levandowski attempted to erase any evidence of his actions.

16      58.      On January 14, 2016, Levandowski attended a high-level executive meeting at Uber's

17  offices in San Francisco while he was still a Waymo employee.  The next day he formed Otto and,

18  by the end of January, he had resigned his position with Waymo.  In May 2016, Levandowski

19  publicly launched Otto with the stated goal of developing hardware and software for autonomous

20  vehicles.  Other Waymo employees, including a supply chain manager and a hardware engineer,

21  resigned their positions to join Otto – but not before they had also downloaded secure files

22  containing proprietary Waymo information. In all, Otto came away with tens of thousands of

23  Waymo's files, including technical drawings, source code files, pictures, videos, and emails.

24      59.      In August 2016, Uber acquired Otto for $680 million.  In an interview with *Business*

25  *Insider* on August 18, 2016, Kalanick sought to justify spending $680 million of investors' funds to

26  acquire Otto and spending millions more on an 180,000 square feet Palo Alto facility to

27  accommodate the newly acquired company by emphasizing the crucial need to be first in the self-

28  driving car race to ensure Uber's survival.  Kalanick told *Business Insider*, "[w]hat I know is that I

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                - 38 -

1   can't be wrong.  Right?  I have to make sure that I'm ready when it's ready or that I'm making it

2   ready.  So, I have to be tied for first at the least."  He explained that the failure to be first would

3   threaten Uber's existence: "the entity that's in first, then rolls out a ride-sharing network that is far

4   cheaper or far higher-quality than Uber's, then **Uber is no longer a thing**."  It was reported that a

5   key reason for the acquisition was Otto's "in-house" LiDAR system.  Uber quickly named

6   Levandowski as its vice president and he was placed in charge of Uber's self-driving car project.

7   According to Waymo, within a month of the acquisition Uber had promptly put LiDAR to work and

8   represented to regulatory authorities that it had developed its own LiDAR technology in-house.

9          60.     Following this acquisition, in December 2016, a Waymo employee was inadvertently

10   copied on a vendor email that suggested that Otto and Uber were actually using Waymo's trade

11   secrets and patented LiDAR designs.  The email was addressed to Uber and attached a machine

12   drawing of what was purported to be an Otto circuit board that was strikingly similar to – and shared

13   several unique characteristics with – Waymo's highly confidential LiDAR circuit board, the designs

14   for which Levandowski had downloaded before his resignation.  To confirm its suspicion that Uber

15   had misappropriated Waymo trade secrets, Waymo sent a public records request to Nevada's Office

16   of Economic Development and Department of Motor Vehicles.  Waymo alleged that the documents

17   it received from this request conclusively established that Uber and Otto were using a custom

18   LiDAR system with the same characteristics as Waymo's proprietary system.

19          61.     In May 2017, Judge Alsup, who is overseeing the case between Waymo and Uber,

20   issued an order finding that Waymo had presented evidence that Levandowski had downloaded

21   proprietary Waymo files before resigning, that Uber had planned to acquire Otto and hire

22   Levandowski as the head of its self-driving car technologies, and that Uber had specifically prepared

23   for litigation with Waymo in connection with its acquisition of Otto.  Significantly, Judge Alsup

24   found that the evidence indicated that Uber had acquired Otto with reason to believe that

25   Levandowski had taken confidential trade secrets from Waymo.

26          62.     Court records also show that in March 2016, Uber commissioned a due diligence

27   report by forensic expert Stroz Friedberg (the "Stroz Report") in preparation for the Otto transaction.

28   Uber initially resisted turning over the Stroz Report to Waymo, but ultimately produced it after both

1    the District Court and the Federal Circuit Court of Appeals ordered it to do so.  *Waymo*, ECF No.

2    1929-20.  One of the primary purposes of the report was to determine whether Otto employees "took

3    with them or retained confidential and/or proprietary information from their former employer,

4    Google, Inc."  In preparation for the report, Stroz Friedberg interviewed Levandowski and other Otto

5    employees, conducted a forensic examination of their electronic devises, reviewed documents, and

6    investigated Levandowski's disposal of Google materials.

7         63.     The Stroz Report affirmed many of Waymo's allegations.  In the Levandowski

8    interview, he confirmed meeting with Uber in the middle of 2015 and exchanging hundreds of text

9    messages with Kalanick.  Levandowski and Lior Ron, another former Otto employee, also conceded

10   that Levandowski possessed and accessed Google intellectual property, including prototypes, source

11   code, and software, well after he left Waymo.  Levandowski admitted he destroyed the materials just

12   a week before his interview with Stroz Friedberg because Kalanick told him to "do what he needed

13   to do" to get rid of them.  Stroz Friedberg's review of Levandowski's computer turned up tens of

14   thousands of Google work emails and hundreds of files, many of which included crucial proprietary

15   information such as pictures, videos, source code, diagrams, and system files.  Levandowski said he

16   did not know he had these materials, but forensic analysis proved he accessed them even after he left

17   Waymo.

18        64.     Despite this damning report, Uber moved forward with the transaction.  Worse, it was

19   revealed by Benchmark's representative on the Uber Board that at a 2016 Board meeting, "Kalanick

20   told the board that the Stroz report of that investigation came up clean" and that Kalanick's

21   misrepresentation was "critical" to Benchmark's decision to vote in favor of the acquisition of

22   Otto.[65]  Kalanick later testified at a deposition that he knew the due diligence investigation was

23   taking place, but did not care if the Stroz Report "came up clean."  Instead, he deflected

24   responsibility, claiming he only cared whether "the legal team . . . gave us the green light or not" to

25   complete the transaction.  *Waymo*, ECF No. 2194-2 at 10.  Waymo has argued that "the Stroz Report

26

27

---
28   [65]   *Waymo*, 9/27/17 Hearing Tr. at 95:1-3, 99:22.

1   unequivocally establishes the facts underlying Waymo's trade secret misappropriation claims."

2   *Waymo*, ECF No. 1604 at 1.

3       65.   Tellingly, Uber entered into a broad agreement to indemnify Levandowski months

4   before the Company acquired Otto.  The agreement indemnified Levandowski for any "Bad Act,"

5   which, as stated in the Court's June 5, 2017 Order, was defined in a February 22, 2016 term sheet

6   signed between Uber and Otto to include "fraud, misappropriation of Waymo's patents, copyrights,

7   trademarks or trade secrets, breach of a fiduciary duty owed to Waymo, or breach of a non-

8   solicitation agreement with Waymo."  *Waymo*, ECF No. 566 at 2.  This indemnification was

9   effective regardless of whether the Otto acquisition was consummated as long as Levandowski and

10  other Otto employees disclosed all such Bad Acts to Stroz Friedberg.

11      66.   In a March 2017 deposition, Levandowski asserted his Fifth Amendment right against

12  self-incrimination to avoid testifying about documents in his possession.  During an April 5, 2017

13  Court hearing, Judge Alsup commented that "[t]his is an extraordinary case.  I have never seen a

14  record this strong in 42 years."  *Waymo*, ECF No. 160 at 11.  On May 11, 2017, the Court

15  provisionally enjoined Uber from using any documents Levandowski downloaded from Waymo,

16  prohibited Levandowski from working on LiDAR systems at Uber, required Uber to conduct an

17  investigation and accounting of Levandowski's activities, and ordered that Uber must immediately

18  prevent all employees and agents from "consulting, copying, or using the downloaded materials" and

19  return such materials to Waymo or the Court.  *Waymo*, ECF No. 433 at 23.  Levandowski was

20  subsequently fired from Uber after refusing to assist the Company in its internal investigation.

21      67.   Also on May 11, 2017, Judge Alsup entered an Order of Referral to United States

22  Attorney to conduct an "investigation of possible theft of trade secrets based on the evidentiary

23  record supplied thus far concerning plaintiff Waymo LLC's claims for trade secret

24  misappropriation."  *Waymo*, ECF No. 428.  A commentator in the *Washington Post* observed that

25  "'[i]t is very rare for a judge to refer a matter over to the U.S. Attorney and signals the judge's

26  displeasure with Uber in the trade secrets civil lawsuit.'"

27      68.   The U.S. Attorney for the Northern District of California began its investigation and,

28  on November 22, 2017, wrote a letter to Judge Alsup reporting that it had uncovered information

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                    - 41 -

1   from former Uber Manager of Global Intelligence Jacobs. *Waymo*, ECF No. 2383.  During his

2   interview with the U.S. Attorney, Jacobs described how Uber's Strategic Services Group

3   communicated about the Company's illegal practices using self-destructing messages, exchanged

4   and stored "sensitive" information using non-attributable devices, and concealed meetings between

5   Kalanick and Levandowski prior to the Otto acquisition.

6       69.     Jacobs also revealed that he had detailed these same allegations in a 37-page letter he

7   sent to Uber in May 2017, seven months earlier.  In the letter, Jacobs (through his attorney) alleged

8   that Uber "implemented a sophisticated strategy to destroy, conceal, cover up, and falsify records or

9   documents with the intent to impede or obstruct government investigations as well as discovery

10  obligations in pending and future litigation." *Waymo*, ECF No. 2401-1 at 6.  He also wrote that

11  "Uber used the [Marketplace Analytics] team to steal trade secrets from Waymo in the United

12  States," and that Uber's Autonomous Vehicle Group used ephemeral communications "with the

13  specific intent of preventing Uber's unlawful schemes from seeing the light of day." *Id.* at 9, 12-13.

14  The letter also described Uber's shocking and sinister practice of deploying surveillance teams to

15  hotels or event spaces hosting private competitor events so the Company could "record and observe

16  private conversations among the executives." *Id.* at 19-20.  He claimed "these collections tactics

17  were tasked directly by Sullivan on behalf of Uber's CEO, Travis Kalanick." *Id.* at 20.  Angela

18  Padilla ("Padilla"), Uber's Vice President and Deputy General Counsel, testified that Kalanick knew

19  about Jacobs's letter. In response to these allegations, Uber struck a deal with Jacobs that paid him

20  and his lawyer a total of $7.5 million, and prevented him from discussing the allegations with

21  anyone unless compelled to do so during a government investigation.  When Judge Alsup learned of

22  this payment, he observed "people don't pay that kind of money for B.S."

23      70.     In response to the new evidence, the court delayed the impending trial, and ordered an

24  evidentiary hearing where Jacobs and other Uber employees testified.  Jacobs's allegations had

25  softened some since receiving his multi-million-dollar settlement, but he nonetheless affirmed many

26  of the claims in his letter.  For instance, he testified that Uber provided "legal training" concerning

27  the "implementation of encrypted and ephemeral communications" that were "intended to impede,

28  obstruct or influence . . . ongoing lawsuits."  He said executives of the company used these secret

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                            - 42

communications in order to "communicate sensitive company business."  He classified Uber's approach toward competitive intelligence as "overly aggressive and invasive and inappropriate."  On the second day of the two-day hearing, Uber's Manager of the Strategic Services Group Nicholas Gicinto testified that Uber conducted covert surveillance on its competitors, including by recording their conversations without consent.

71.   Judge Alsup reprimanded Uber for failing to disclose the Jacobs letter to Waymo during discovery.  He said, "[o]n the surface [it] looks like you covered this up . . . for reasons that, to me, are inexplicable."  He observed that Uber created "a surreptitiously clandestine alternative communication system that is off the servers, which would be ready-made for explaining why [Waymo] hasn't found the trade secrets on the server."  After two days of testimony, Judge Alsup said, "I've never seen a case where there were so many bad things . . . like Uber has done in this case.  So many."

72.   In response, new management at Uber admitted to prior bad conduct, and forbade such practices in the future.  Khosrowshahi wrote on Twitter: "True that Wickr, Telegram were used often at Uber when I came in.  As of Sept 27th I directed my teams NOT to use such Apps when discussing Uber-related business."  The same day, Uber Chief Legal Officer Tony West ("West") wrote an email to the security team acknowledging the Company's prior "human surveillance of individuals who work for competitors."  The email said, "to the extent anyone is working on any kind of competitive intelligence project that involves the surveillance of individuals, stop it now." Khosrowshahi subsequently forwarded West's email to the entire Company.

73.   On December 4, 2017, Judge Alsup referred the matter to Special Master John Cooper to determine whether the Jacobs letter should have been produced.  Judge Alsup noted that withholding the letter was just the latest of a "long list" of evidence suppression that resulted in a trial delay, including Levandowski's destruction of materials and the invocation of attorney-client privilege to stall production of the Stroz Report.[66]  Judge Alsup stated he would assess "'how much

---

[66]   Cara Bayles, *Waymo Jury Could Hear Uber "Hid The Ball" In Discovery*, Law 360 (Dec. 4, 2017), https://www.law360.com/articles/991079.

1  of that story should be told to the jury,'" and that "'[t]here's a lot of what looks like hide the ball.'"[67]

2  Judge Alsup further stated that if the Special Master found the letter had been concealed, "'it could

3  come in for the cover-up, even if it's not true.'"[68]  On December 15, 2017, Special Master Cooper

4  determined the Jacobs letter was responsive to multiple discovery requests and Uber should have

5  produced it to Waymo because it was "certainly . . . 'reasonably accessible,'" contained allegations

6  specifically involving the *Waymo* litigation, and was disclosed to the DOJ shortly after it was sent to

7  Uber's Deputy General Counsel Padilla.[69]

8          74.     In light of the Waymo scandal, Magellan Financial Group analogized Uber's

9  fundraising strategy to a Ponzi scheme: "They've got no advantage over anyone else when it comes

10  to autonomous driving technology.  They tried to steal it from Google, they've ended up in court.

11  That whole side of the business is falling apart.  It's constantly losing money and its capital-raising

12  strategy is a Ponzi scheme."

13          75.     Uber's potential liability for this conduct is enormous. Waymo alleges nine counts

14  against Uber for trade secret theft, and has quantified its damages at ***$1.86 billion***.  Additionally, on

15  December 13, 2017, an Uber shareholder brought a derivative action against the Company alleging

16  that it never should have spent $680 million to purchase Otto, which the shareholder described as "a

17  startup built upon stolen intellectual property."[70]

18  **Uber Fails to Adequately Protect Users' Private**
    **Information, and Then Lies to Them When**
19  **Theft Occurs**

20          76.     On September 17, 2014, Uber learned that hackers had stolen valuable information –

21  including names and driver's license numbers – from 50,000 of its drivers.  Hackers often target

22  personal data, which can be used to commit identify theft, financial fraud, and other identity-related

23  [67]  *Id.*  Judge Alsup also stressed that "[t]here has been a lot of this destruction of evidence."  *Waymo*,
24  12/4/17 Hearing Tr. at 38:23-24.

25  [68]  Cara Bayles, *Special Master Says Uber Should Have Produced Letter*, Law 360 (Dec. 15, 2017), https://
    www.law360.com/articles/995624/special-master-says-uber-should-have-produced-letter.

26  [69]  *Waymo* ECF No. 2396 at 13-15, 18.

27  [70]  *McElrath v. Kalanick, et al.*, Case No. 2017-0888, Verified Stockholder Derivative Complaint, ¶59 (Del.
28  Ch. Dec. 13, 2017).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                    - 44 -

1    crimes. In this instance, the hackers first obtained a single "security key" that Uber employees made

2    available on one or more GitHub webpages, and then used that key to gain access to Uber's

3    database.[71]  GitHub is a source code repository that allows developers to publicly access the code

4    from any location.  For years prior to the 2014 breach, the development and security industries have

5    widely understood that storing credentials on GitHub repositories increases the risk of a data

6    breach.[72]

7          77.    A group of the drivers ultimately sued Uber, alleging that it "could have prevented

8    this Data Breach."  *Antman v. Uber Techs. Inc.*, Case No. 3:15-cv-01175-LB, Class Action

9    Complaint, ¶16 (N.D. Cal. Mar. 12, 2015).  The New York Attorney General's Office and the FTC

10    each launched investigations into the 2014 data breach. The FTC complaint stressed the

11    preventability of the breach, claiming Uber's conduct was "a bit like leaving all its users' personal

12    data in unlocked filing cabinets inside a building for which every employee has a key.  All it would

13    take for an outsider to gain access was for an employee to leave their key in plain sight."[73]

14          78.    When Uber announced the breach months later on February 27 2015, it attempted to

15    quell public concern by downplaying its severity and minimizing the risk of future attacks.  Tassi,

16    Uber's then-managing counsel for data privacy, posted a statement on Uber's website assuring that

17    the hack was a "one-time" event, and assuring the public that Uber "takes seriously our

18    responsibility to safeguard personal information" and had since "remov[ed] the possibility of

19    unauthorized access."[74]

20          79.    After the 2014 breach, Uber launched a years-long campaign to assure the market that

21    it had extinguished its prior vulnerability to cyberattacks.  Uber claimed maintenance of user privacy

22

---

23  [71]   *See* Kieren McCarthy, *FORK ME! Uber hauls GitHub into court to find who hacked database of 50,000 drivers*, The Register (Feb. 28, 2015), http://www.theregister.co.uk/2015/02/28/uber_subpoenas_

24  github_for_hacker_details.

25  [72]   *See* Best Practices for Managing AWS Access Keys, available at https://web.archive.org/web/ 20171208015922/http://docs.aws.amazon.com/general/latest/gr/aws-access-keys-best-practices.html.

26  [73]   Klint Finley, *Uber Settles With FTC Again, This Time Over 2014 Privacy Breach*, Wired (Aug. 15, 2017),

27  https://www.wired.com/story/uber-settles-with-ftc-again-this-time-over-2014-privacy-breach/.

  [74]   *Uber Statement*, Uber Newsroom (Feb. 27, 2015).

28

---

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG             - 45 -

represented "'a core responsibility and company value,'"[75] and declared itself a "world-class, people-centric protector of privacy" moving forward.[76]  It reinforced these sentiments countless times throughout the Class Period, repeatedly publicizing improvements to its security systems.  For example, on November 18, 2014, Uber released a "data protection statement," in which it claimed that "access to rider and driver accounts is being closely monitored and audited by data security specialists on an ongoing basis."[77]

80.     On November 20, 2014, Uber announced it had hired outside privacy experts to examine the Company's policies.  Uber went out of its way to emphasize its obligations to users: "'we understand that we must treat [rider data] carefully and with respect, protecting it from unauthorized access.'"[78]  On January 30, 2015, Uber announced the results of its expert analysis. The Company claimed the experts had determined "our Privacy Program is strong," but said "[o]ur promise to the Uber Community is that when it comes to privacy, our commitment doesn't stop with the findings of this report; *it is ongoing*."  The announcement also included the following quote from Kalanick:

> "At Uber, protecting the personal information of riders is a core responsibility and company value.  Delivering on that value means that ***privacy is woven into every facet of our business***, from the design of new products to how we interact with riders, drivers and the public at large.  ***We will continue to make it a priority to ensure that everyone at the company understands just how critically important it is to build and protect this trust with all of these constituents***."[79]

81.     On April 2, 2015, Uber announced the hiring of Sullivan as chief security officer, claiming he would work with Tassi to continue "expanding and improving safety and security."

---

[75]  *Protecting Privacy: Our Commitment*, Uber Newsroom (Jan. 30, 2015).

[76]  *Joe Sullivan Joining Uber As First Chief Security Officer*, Uber Newsroom (Apr. 2, 2015).

[77]  Paul B. Carr, *Amid escalating scandal, Uber publishes new data privacy statement*, Pando (Nov. 18, 2014), https://pando.com/2014/11/18/amid-escalating-scandal-uber-publishes-new-data-privacy-statement/.

[78]  James Kosur, *Uber Hires Outside Privacy Experts To Examine Company Policies*, Business 2 Community (Nov. 20, 2014), https:// www.business2community.com/tech-gadgets/uber-hires-outside-privacy-experts-examine-company-policies-01075096.

[79]  *Protecting Privacy: Our Commitment*, Uber Newsroom (Jan. 31, 2015).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500 - 3:17-cv-05558-HSG                                                      - 46 -

1 Sullivan vowed to "continue building upon the safety and security initiatives that are the backbone of

2 Uber's success."[80]

3     82.    On August 17, 2015, the *Financial Times* reported that Uber had developed a plan to

4 quadruple its security staff from 25 to 100 members in order to "soothe worries about data privacy,

5 defend against hackers and even protect its offices and employees from physical attack." According

6 to the article, Sullivan claimed "access to data is monitored with random auditing."[81]

7     83.    On January 1, 2016, Uber announced it had agreed to resolve the New York Attorney

8 General investigation by paying a $20,000 fine. An Uber spokesperson attempted to frame the

9 settlement in a positive light, claiming the Company had "adopted all of the privacy measures

10 requested by the attorney general," including "a privacy audit and limiting employee access to the

11 location and other personal information of riders."[82] Uber also promised to institute a multifactor

12 authentication process for services like GitHub.[83]

13     84.    Uber made every effort to appear diligent and assure investors that its security issues

14 were a thing of the past. Meanwhile, however, it knowingly continued to use deficient systems that

15 subjected its database to future breaches. According to Michael Sierchio ("Sierchio"), a senior

16 security engineer at Uber from early 2015 until June 2016, Uber "'never enforced'" its obligation to

17 limit access to user data, as required by the New York Attorney General settlement.[84] Similarly,

18

19

20

---

[80]   *Joe Sullivan Joining Uber As First Chief Security Officer*, Uber Newsroom (Apr. 2, 2015).

21

22 [81]   Hannah Ruchler, *Uber to beef up security team in push to strengthen data safety*, Financial Times (Aug. 16, 2015), https://www.ft.com/content/1fbaeee8-4072-11e5-9abe-5b335da3a90e.

23 [82]   Douglas MacMillan, *Uber Agrees to $20,000 Fine and Controls on Data in Privacy Probe*, Wall St. J. (Jan. 7, 2016), https://blogs.wsj.com/digits/2016/01/06/uber-agrees-to-20000-fine-and-controls-on-data-in-
24 privacy-probe/.

25 [83]   Anita Balakrishnan, *Uber agrees to 20 years of privacy audits after FTC says it 'failed consumers'*, CNBC (Aug. 15, 2017), https://www.cnbc.com/2017/08/15/uber-ftc-case-over-data-privacy-has-been-
26 settled.html.

27 [84]   Will Evans, *Uber said it protects you from spying. Security sources say otherwise*, Reveal (Dec. 12, 2016), https://www.revealnews.org/article/uber-said-it-protects-you-from-spying-security-sources-say-
28 otherwise/.

1   according to a complaint filed by the City of Chicago, Uber "failed to implement" the multifactor

2   authentication process designed to prevent unauthorized access to private data.[85]

3        85.    Defendants were repeatedly warned about these deficiencies, but chose to ignore

4   them. In a December 2016 *Reveal* article, Sierchio summarized Uber's mindset: "'Early on, "growth

5   at all costs" was the mantra, so you can imagine that security was an afterthought.'" The *Reveal*

6   article also cited three anonymous former employees, who corroborated Sierchio's experience,

7   claiming the Company "pushed back against security protections in favor of unbridled growth."[86]

8   On October 5, 2016, Samuel Ward Spangenberg ("Spangenberg"), a former forensic investigator at

9   Uber who sued it for age discrimination and retaliation, filed a declaration describing his repeated

10  attempts to raise concerns about Uber's security systems. In the declaration, he wrote:

11         ***Specifically, I complained that Uber did not have regard for data
12  protection***, including, among other items, that payroll information for all Uber
       employees was contained in an unsecure Google spreadsheet. ***I also reported that
13  Uber's lack of security regarding its customer data was resulting in Uber
       employees being able to track high profile politicians, celebrities, and even
14  personal acquaintances*** of Uber employees, including ex-boyfriends/girlfriends, and
       ex-spouses. I also reported that Uber's lack of security, and allowing all employees
15  to access this information (as opposed to a small security team) was resulting in a
       ***violation of governmental regulations regarding data protection and consumer
16  privacy rights***.

                   *      *      *

17
18         ***During my employment, I also reported that Uber lacked security regarding
       its storage of driver information***, including social security numbers, which were
19  available, again, to all Uber employees, without regard to any particular level of
       employment or security clearance.[87]

20

21

22

---

23  [85]  *City of Chicago, et al. v. Uber Techs. Inc.*, Case No. 2017CH15594 (Ill. Cir. Ct., Cook Cty. Nov. 28,
24  2017).

25  [86]  Will Evans, *Uber said it protects you from spying. Security sources say otherwise*, Reveal (Dec. 12,
2016), https://www.revealnews.org/article/uber-said-it-protects-you-from-spying-security-sources-say-
26  otherwise/.

27  [87]  *Spangenberg v. Uber Techs. Inc.*, Case No. CGC-16-552156 Declaration of Samuel Ward Spangenberg
Filed in Opposition to Defendants' Motion to Compel Arbitration, ¶¶3, 5 (Cal. Super. Ct., San Fran. Cty. Oct.
28  5, 2016).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                   - 48 -

86.     Rather than heed Spangenberg's warnings, Uber fired him.  As a result of its reckless disregard for security, in October 2016 Uber was hacked *again*.[88]  Incredibly, despite Uber's incessant assurances of improved security, the 2016 hack was achieved using means nearly identical to those used to carry out the 2014 hack.  Indeed, the hacker obtained access information through the GitHub coding site and used it to log in to Uber's database and steal user information.  The City of Chicago has since sued Uber for this second breach, noting its "striking similarity" to the 2014 breach, and Uber's ostensible failure to improve security as it promised.[89]  The second hack had a much higher cost than the first, with the private information of *57 million* drivers and riders falling into the hands of internet criminals, making it among the most serious data breaches in U.S. history by volume.[90]

87.     Kalanick knew of the hack by no later than November 2016, but made a conscious decision to withhold the information from the public *for an entire year*, violating most if not all of the laws of 48 states requiring prompt disclosure to affected consumers.  In fact, Uber actually rewarded the internet villains for their crime, *paying them $100,000 in exchange for a promise to keep quiet about the breach*.  To cover up this illicit payment, Uber misleadingly tagged the ransom as a "bug bounty" – a reward Uber paid to independent cybersecurity researchers for identifying vulnerabilities in its software.  Uber's explanation was clearly a farce, as the 2016 breach did not involve Uber software and, in any event, the maximum payout under Uber's bug bounty program is $10,000 – far less than Uber paid its hackers.[91]

---

[88]   Eric Newcomer, *Uber Paid Hackers to Delete Stolen Data on 57 Million People*, Bloomberg (Nov. 21, 2017), https://www.bloomberg.com/news/articles/2017-11-21/uber-concealed-cyberattack-that-exposed-57-million-people-s-data.

[89]   *City of Chicago, et al. v. Uber Techs. Inc.*, Case No. 2017CH15594 (Ill. Cir. Ct., Cook Cty. Nov. 28, 2017).

[90]   Elizabeth Weise, *USA Today's list of the biggest data breaches and hacks of all time (Hint: Uber's only #12)*, USA Today (Oct. 3, 2017), https://www.usatoday.com/story/tech/2017/10/03/biggest-data-breaches-and-hacks-all-time/729294001/.

[91]   *Welcome All Bug Bounty Hunters*, Uber Newsroom (Mar. 22, 2016), https://www.uber.com/newsroom/bug-bounty-program/.

88.      During the year-long period where Uber wrongfully withheld this crucial information from the public, it **continued to tout its purported focus on security**, again demonstrating its unmatched willingness to blatantly lie to the public.  Shortly after the 2016 breach, users began to report that their accounts had been accessed and hit with false charges.  Rather than disclose the recent breach, Uber suggested that the faulty charges resulted from several separate phishing scams, and reminded users to "use unique passwords for their accounts."[92]  On December 13, 2016, just two months after the breach, *Fortune* published a memorandum from Uber Chief Information Security Officer Flynn, who said "in the last year, we've significantly strengthened the tools and processes that restrict internal access to user data," and "built entire systems to implement technical and administrative controls that limit access to customer data to those employees who require it to perform their jobs."  Flynn concluded the memo with the following assurance:

> We want our security and privacy practices and technology to be world-class, and we're moving quickly toward that goal.  Every time a rider or driver uses Uber, they entrust us with data that **it's the responsibility of each and every one of us to protect it**.[93]

89.      On August 15, 2017, Uber announced the resolution of the FTC investigation, which it reached by signing a "consent decree" and submitting to 20 years of government oversight.  Importantly, during its negations with the FTC, Uber never disclosed the 2016 breach.  Instead, upon announcing the settlement, Uber again falsely claimed that security breaches were a thing of the past:

> "The complaint involved practices that date as far back as 2014 . . . .  **We've significantly strengthened our privacy and data security practices since then** and will continue to invest heavily in these programs."[94]

Further:

> "In 2015, we hired our first chief security officer and now employ hundreds of trained professionals dedicated to protecting user information."[95]

---

[92]   WLN articles from CBC News (10/24/16).

[93]   Jeff J. Roberts & Kia Kokalitchera, *Uber Security Head Warns Staff After Latest Tracking Controversy*, Fortune (Dec. 13, 2014), http://fortune.com/2016/12/12/uber-privacy-memo/.

[94]   Greg Besinger, *Uber Settles With FTC Over Data-Privacy Protections*, Wall St. J. (Aug. 15, 2017), https://www.wsj.com/articles/uber-settles-with-ftc-over-data-privacy-protections-1502819449.

90.     William McGeveran, a law professor focusing on data privacy at the University of Minnesota Law School, noted that Uber's failure to disclose the 2016 breach to the FTC could lead to criminal liability.  He said, "[t]his is not just a casual chat over a cup of tea[,] it's a formalized investigative procedure . . . .  They're already being asked investigative questions by a government official.  They not only know about the breach, but they're allegedly paying hackers to cover it up."

91.     On November 21, 2017, news about the second breach and Uber's payment to the hacker sent shockwaves through the community.  *Bloomberg* called Uber's efforts to conceal the attack "alarming" and "extreme."  *Infosecurity Magazine* said "[t]he information security industry is in shock after Uber confessed."[96]  *GIZMODO* called the news a "bombshell."[97]  *The Wall Street Journal* noted that the disclosure would lead government agencies "world-wide" to investigate Uber's conduct.[98]  On Twitter, Sen. Richard Blumenthal (D-CT) called the breach "outrageous" and Uber's conduct "inexplicable."

92.     The revelation demonstrated that defendants had not fixed the deficiencies in Uber's security system as they had repeatedly promised.  Indeed, the hackers used a near identical method as the 2014 hackers to gain access to users' information.  Centrify, a cybersecurity leader, deemed the most recent hack "utterly preventable."[99]  James Maude, a senior security engineer at cyberattack specialist Avecto, criticized Uber's continued practice of "'storing the keys to its data store on a GitHub code repository which the attackers could access.'"  He said, "'[t]his is the digital equivalent

---

[95]   Klint Finley, *Uber Settles with FTC Again, This Time over 2014 Privacy Breach*, Wired (Aug. 15, 2017), https://www.wired.com/story/uber-settles-with-ftc-again-this-time-over-2014-privacy-breach/.

[96]   Phil Muncaster, *Uber Shock: Firm Hid Breach of 57 Million Users*, Infosecurity Magazine (Nov. 22, 2017), https://www.infosecurity-magazine.com/news/uber-shock-firm-hid-breach-57/.

[97]   George Dvorsky, *Uber's New CEO Was Told About the Company's Massive Data Breach Months Ago*, GIZMODO (Nov. 24, 2017), https://gizmodo.com/uber-s-new-ceo-was-told-about-the-companys-massive-data-1820722228.

[98]   Stu Woo, *Uber Breach and Response Draw Global Government Scrutiny*, Wall St. J. (Nov. 22, 2017), https://www.wsj.com/articles/european-regulators-look-into-uber-handling-of-data-breach-1511378731.

[99]   *57m Uber data breach "utterly preventable,"* Scoop Media (Nov. 22, 2017), http://www.scoop.co.nz/stories/BU1711/S00725/57m-uber-data-breach-utterly-preventatable.htm.

of writing the password down on a bit of paper.  Once the attackers had this key, they could access data easily.'"[100]

93.     When the news broke, Khosrowshahi admitted that "'*[n]one of this should have happened, and I will not make excuses for it*.'"  In the fallout, Uber fired Sullivan and Craig Clark, a senior lawyer and Sullivan's direct report.[101]  Most of the remaining people who reported directly to Sullivan either resigned or took leave, including Pooja Ashok, Sullivan's chief of staff; Mat Henley, Uber's head of global threat operations; Prithvi Rai, a senior security engineer and the number two manager in the department; and Jeff Jones, who handled physical security.[102]

94.     Since the disclosure, several municipalities have sued Uber for failing to shore up vulnerabilities in its security system.  For example, in the *City of Chicago* litigation, the city alleged: "For the past several years, Uber has repeatedly failed to protect the privacy of its customers' and drivers' personal information."  The city noted that, after the 2014 breach, Uber entered settlements with government agencies in which it  "promised, among other things, to correct the vulnerabilities in its data management."  Despite this promise, however, Uber "altogether ignored its obligations and agreement with the government and once again knowingly put user data at risk."  It claimed that Uber's failure to "implement[] and maintain[] reasonable safeguards" consistent with its promises ultimately led to the 2016 breach.[103]  U.S. senators are also investigating the 2016 data breach.[104]

---

[100]   Phil Muncaster, *Uber Shock: Firm Hid Breach of 57 Million Users*, Infosecurity Magazine (Nov. 22, 2017), https://www.infosecurity-magazine.com/news/uber-shock-firm-hid-breach-57/.

[101]   Eric Newcomer, *Uber Paid Hackers to Delete Stolen Data on 57 Million People*, Bloomberg (Nov. 21, 2017), https://www.bloomberg.com/news/articles/2017-11-21/uber-concealed-cyberattack-that-exposed-57-million-people-s-data.

[102]   Joseph Menn & Dustin Volz, *Three Uber security managers resign after CEO criticizes practices*, Reuters (Dec. 1, 2017), https://www.reuters.com/article/us-uber-executives/three-uber-security-managers-resign-after-ceo-criticizes-practices-idUSKBN1DV5SD.

[103]   *City of Chicago, et al. v. Uber Techs. Inc.*, Case No. 2017CH15594, Complaint, ¶¶1, 3, 7 (Ill. Cir. Ct., Cook Cty. Nov. 28, 2017).

[104]   Anita Balakrishnan, *Uber hacking 'merits further scrutiny,' US senators say in a letter to the company*, CNBC (Nov. 27, 2017), https://www.cnbc.com/2017/11/27/uber-hacking-senate-finance-commerce-committees-request-more-info.html; *There's a criminal investigation linked to Uber-Waymo spat, Justice Department letter confirms*, L.A. Times (Dec. 13, 2017), http://www.latimes.com/business/technology/la-fi-tn-uber-hackers-20171213-story.html.

1

**Uber Uses "Greyball" to Surveil and Evade Authorities**

2

3      95.     On March 3, 2017, *The New York Times* ran an explosive article entitled, "*How Uber*

4   *Deceives the Authorities Worldwide*," that detailed how Uber had developed and utilized a covert

5   program code-named "Greyball" designed to target and then evade government officials in

6   jurisdictions around the world in which Uber services were illegal or had been opposed by

7   authorities.

8      96.     The article revealed how, since at least 2014, Uber had used data collected from the

9   Uber app and other techniques to identify and circumvent officials who were trying to assess and/or

10  regulate the ride-hailing service in cities like Portland, Boston, Paris and Las Vegas, and in countries

11  like Australia, China and South Korea.  It had used the program to expand its low-cost UberX

12  services into new cities, which often ran afoul of local regulations.

13     97.     According to the article, when Uber entered a new city, the Company appointed a

14  general manager to head the Company's Greyball operations.  This person would then use at least a

15  dozen technologies and techniques to try to spot enforcement officers.  One technique involved

16  drawing a digital perimeter, or "geofence," around the government offices on a digital map of a city

17  that Uber was monitoring.  The Company watched which people were frequently opening and

18  closing the app – a process known internally as eyeballing – near such locations as evidence that the

19  users might be associated with city agencies.  Other techniques included looking at a user's credit

20  card information and determining whether the card was tied directly to an institution like a police

21  credit union.  Another involved sending employees to look up device numbers of the cheapest

22  mobile phones that were likely to be acquired by local officials as part of their sting operations

23  against the Company.  In addition, Uber employees would search social media profiles and other

24  information available online to identify officers.

25     98.     Once government officials were identified by the Company, they would be internally

26  tagged with a small piece of code that read "Greyball" followed by a string of numbers and provided

27  a dummy version of the Uber app.  This dummy version would mimic the real version, but allowed

28  the Company to populate the screen with ghost cars or show that no cars were available in order to

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                    - 53 -

1   allow Uber drivers to evade detection.  Occasionally, if a driver accidentally picked up someone

2   tagged as an officer, Uber called the driver with instructions to end the ride.

3       99.    Elsewhere, it was reported that Uber had also turned Greyball on cabdrivers in an

4   effort to thwart them from using the Uber app to learn the whereabouts of Uber drivers.  The secret

5   program thus became another tool in Uber's vast toolbox to gain improper advantages over the

6   Company's competition.

7       100.   Once the Greyball tool was put in place and tested, Uber engineers compiled a

8   playbook with a list of tactics and distributed the playbook to general managers in more than a dozen

9   countries on five continents.  The development and use of Greyball was not the product of some

10  rogue group of employees, but an official Company-sponsored program.  It was developed and

11  operated by at least 50 Uber employees and approved by Uber's central office and highest

12  executives, including the Company's Senior Vice President of Global Operations.  Kalanick, as a

13  result of his position as a hands-on manager and CEO of Uber and the Company-wide distribution

14  and use of the Greyball program as a central component of Uber's growth strategy, knew about the

15  program and that it was illegal.  Indeed, in a 2013 tech conference, Kalanick accused rival Lyft of

16  operating a "criminal" ridesharing model under similar circumstances:

17          The way to think about it: Lyft basically goes into the markets that Uber is in and
            then gets folks who don't have commercial licenses and don't have commercial
18          insurance and says 'bring your own car' and provide Uber-like service. . . .  I'm like,
            holy cow, every trip that's happening – I'm reading the law – every trip that's
19          happening is a criminal misdemeanor being committed by the person driving. I don't
            think that's a good law.  *But that is the law*.
20

21      101.   Uber would ultimately confirm the existence of the Greyball program and that it had

22  been used to target government officials.

23      102.   By May 2017, it was reported that Uber was the target of a criminal probe by the U.S.

24  Attorney's Office for the Northern District of California into the Company's use of the Greyball

25  program.  The U.S. Attorney's Office has issued subpoenas to public officials in Portland,

26  Philadelphia and Austin and is being assisted by the FBI in connection with its investigation.

27  Reportedly, potential legal violations by Uber as a result of its use of the program include violations

28  of the federal Computer Fraud and Abuse Act and intentional obstruction of justice.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                   - 54 -

1    103.    On September 15, 2017, the Portland Bureau of Transportation ("PBT") announced

2    the conclusion of its investigation into Uber's Greyball program.  The PBT found that Uber used

3    Greyball to evade authorities when operating without permits in December 2014, and stated that

4    "[i]n using Greyball, Uber has sullied its own reputation."  The San Francisco District Attorney's

5    Office also opened an investigation.

6    **Uber Unleashes "Hell" on Its Competition**

7    104.    On April 12, 2017, subscription technology news service *The Information* published a

8    bombshell report detailing how Uber had developed a covert software program code-named "Hell"

9    that it used to pilfer rider and driver data from its main competitor, Lyft, and otherwise stifle

10   competition in the jurisdictions in which Uber operated.  The report described the Hell spyware

11   program as follows:

12            As the ride-sharing market was exploding in the U.S. between 2014 and the
         early part 2016, Uber had an advantage over Lyft that helped Uber maintain its lead,
13       The Information has learned.  Thanks to a secret software-based effort within Uber
         called "Hell," Uber could track how many Lyft drivers were available for new rides
14       and where they were, according to a person who was involved in the program and a
         person who was briefed about it.

15

16            More importantly, "Hell" showed Uber employees which of the tracked
         drivers were driving for both Lyft and Uber, helping Uber figure out how to lure
17       those drivers away from its rival.  That's a crucial edge in a business where finding
         enough people to drive is a constant battle.

18   THE TAKEAWAY

19            The revelation of a controversial Uber program aimed at hurting rival Lyft
         could further complicate CEO Travis Kalanick's attempt to lead Uber out of its
20       deepening cultural and management crisis.  It also opens up the company to potential
         legal claims.

21

22            Only a small group of Uber employees, including top executives such as CEO
         Travis Kalanick, knew about the program, said the person who was involved in it.
23       Not even Uber's then-powerful "general managers" who ran the business in
         individual cities were supposed to know about it.

24            The program, part of the company's competitive intelligence, or "COIN,"
         group, was referred to as "Hell" because it paralleled Uber's dashboard of Uber
25       drivers and riders known as "God View," or "Heaven."

26            "Hell" was discontinued sometime in the early part of 2016, this person said.
         This person asked for anonymity because they aren't authorized to discuss Uber's
27       internal matters.  A spokesman for Uber said the company wouldn't publicly discuss
         its internal processes.  Lyft said in a statement: "We are in a competitive industry.
28       However, if true, these allegations are very concerning."

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                                    - 55 -

1    Revelation of the program could open up Uber to possible civil legal claims
2    by Lyft, according to lawyers from two law firms that have represented Uber on
     other matters.  Such potential state and federal claims could include "breach of
3    contract"; "unfair business practices"; misappropriation of trade secrets; and a civil
     violation of the federal Computer Fraud and Abuse Act because of the way Uber
     allegedly accessed information from Lyft.  Such an action could give Lyft the ability
4    to probe certain Uber business practices in court.  Antitrust claims also are a
     possibility if Uber used Hell to help maintain its market power over Lyft – it
5    generates between 70% to 85% of ridehailing app revenue versus Lyft in key U.S.
     cities, according to third parties and people inside the companies – these lawyers
6    said.

7    The public disclosure of Hell and Mr. Kalanick's involvement with it also
     could make it harder for him to pull Uber out of a deepening cultural and
8    management crisis that started in mid-February.  Four of his 13 direct reports have
     resigned because of conflicts with Mr. Kalanick or because their past behavior was
9    questioned. Mr. Kalanick, despite losing credibility with employees and executives
     throughout his company because of a variety of revelations, has said he is determined
10   to continue as CEO, albeit with help from a COO he is trying to hire.

11   Spoofed Riders

12   Uber and Lyft have waged a war for market share in the U.S. since 2012,
     when Uber launched UberX, a lower-cost version of its ride-hailing service that let
13   most anyone use their car to pick up Uber riders. UberX was similar to Lyft, which
     had launched a month earlier.  Uber leveraged its early lead in riders, thanks to a
14   high-end "black car" version of the service that began three years earlier, to capture
     market share against Lyft.

15
     In 2014, Lyft expanded its operations from 20 cities to 65 cities, covering
16   most major U.S. metro areas – places where Uber had already been operating for
     some time. Lyft's market share was thus small but the company was able to take
17   advantage of the demand for, and awareness of, ride-hailing that Uber had generated
     previous to Lyft's entrance.

18
     A key weapon in the war between the companies was getting enough drivers
19   so that riders don't have to wait long for a ride.  Recruiting drivers through
     advertising and other marketing has been Uber's top operating expense, judging by
20   confidential financial statements 2015 seen by The Information.  That expense easily
     could have reached $1 billion in 2016, assuming a steady rate of growth.

21
     Hell started like this: Uber created fake Lyft rider accounts and used
22   commonly available software to fool Lyft's system into thinking those riders were in
     particular locations, according to the person.  (That in and of itself is a violation of
23   Lyft's terms of service, which prohibits users from "impersonat[ing] any person or
     entity," which Lyft riders must agree to when they open the app.)

24
     The spoofed Lyft accounts made by Uber then could get information about as
25   many as eight of the nearest available Lyft drivers who could accommodate a ride
     request.  Uber made sure that in each city where it was competing with Lyft, the fake
26   rider locations were organized in a grid-like format so that it could view the entire
     city.

27
     In other words, Uber could see, nearly in real time, all of Lyft's drivers who
28   were available for new rides – and where those drivers were located.  That also

allowed Uber to track the prices Lyft would offer to riders for certain trips, and how many cars were available to pick up riders at a particular time in one city or another.

Lyft's Flaw

But Uber executives realized there was vulnerability in Lyft's system. The information about the nearby Lyft drivers included a special numbered ID, or token, that was tied to each individual driver. That ID remained consistent over time. So Uber could identify the same drivers again and again no matter where they were in a city. Thus, it learned some of those drivers' habits, such as what time of day or what days of the week they would run the Lyft app. (Uber constantly changes the IDs of its drivers for the Uber app so they can't be tracked in the same way, said the person involved with Hell.)

Here's the critical part of Hell: Because Uber tracked Lyft's drivers over time, it was able to figure out which of them were driving for Uber too, because it would be able to match the locations of its own drivers with those of Lyft. In many cities, more than 60% of Lyft's drivers also drive for Uber because they want to maximize their earnings. (As of a year ago, Lyft said it had about 315,000 drivers.) Uber thus had specific identities and contact information for the majority of Lyft's weekly or monthly active drivers in a particular place. "We achieved ground truth," said the person involved in the program.

Armed with data about when and where Lyft's drivers were operating, Uber aimed to sway them to work only for Uber instead, this person said. One way was to give them special financial bonuses for reaching a certain number of rides per week.

Uber employees involved with the Hell program passed along a list of drivers that should be targeted by the city general managers, who oversaw driver bonus budgets at that time.

Another goal of the program was to make sure Uber steered rides more reliably to Uber drivers who were also available on the Lyft network than to those who weren't, this person said. In other words, if there were several Uber drivers near an Uber rider but one of those drivers was also frequently available on the Lyft network, as seen by the Hell program, Uber's ride-dispatch team was supposed to "tip" that ride request to the driver who was "dual apping," or typically looking for riders through both the Lyft and Uber apps, sometimes by using two different smartphones at the same time.

The person involved in the program called it "privileged dispatch" and said Uber aimed to use that to squeeze Lyft's supply of drivers. This person didn't know how much the ride-dispatch team used data derived from Hell as part of its calculations. An Uber spokesman said the company does not give preference to "dual-apping" drivers.

"Hustle"

It's unclear if anyone at Uber quantified how helpful Hell was to its business overall, but the program got information about Lyft's network across the country, said the person who was involved with it. During meetings with the small group of people involved in Hell, Mr. Kalanick would often praise the team for the work they were doing and how well it fit into Uber's culture of "hustle" in order to win.

While it's hard to estimate the potential impact of Hell on Lyft, even after the program was shut down, Uber could derive value from knowing which of its drivers were active drivers for Lyft generally, at least for a period of time. "The damage was done," this person said.

Uber and Lyft have other ways of finding out which of their drivers might be driving for the competition. For instance, Lyft can see whether certain of its drivers – those who use Android-powered smartphones – also have the Uber app installed on their phone. (The Android operating system allows app developers to "scan" the phones to see what other apps are on them.) The iPhone is different. Apple stopped allowing app scanning on iPhones starting in mid-2015. But Hell gave Uber much more valuable data.

Hell was overseen by several employees, including a product manager and data scientists who had special access to a room at Uber's headquarters in San Francisco, where the intel on Lyft's drivers was collected via computers that had the spoof accounts, this person said.

Some at Uber might argue that some drivers benefited from Uber's surveillance of Lyft because they made more money when Uber decided to boost their bonuses or give them more rides. But the drivers who benefited most were those who showed less loyalty to Uber. Also, the destruction of Lyft would be bad for drivers in the long run. Lyft's presence in the market has ensured greater bonuses overall, though those may need to disappear if either company wants to make a profit.

105.    On January 22, 2015, Uber took steps to conceal its illegal conduct in poaching drivers from Lyft by releasing what was reported by *VentureBeat* as "an ambitious study of its U.S. drivers" that "argues the company's explosive growth is being fueled by ***competitive pay and flexible work schedules that are attracting hordes of new drivers***." Maintaining a robust pool of drivers was so critical that, according to an April 2, 2017 *New York Times* report, instability in Uber's driver pool ultimately "threatened to cap the company's growth and throw it into crisis."

106.    In May 2017, former Uber Manager of Global Intelligence Jacobs wrote a letter detailing Uber's misconduct with its competitors. According to Jacobs, Uber's Marketplace Analytics ("MA") team "fraudulently impersonates riders and drivers on competitor platforms, hacks into competitor networks, and conducts unlawful wiretapping." He said Uber used these tactics to obtain "supply data, including unique driver information," among other things. He explained:

By credibly impersonating both riders and drivers, the MA team could request thousands of rides in a given geographic area to study the responsiveness and capability of app, price quotes, and disposition of available drivers. MA further impersonated prospective customers to ascertain the identity of drivers through their names, license plate numbers, and make/model of their vehicles. Uber then used this information to recruit competitors to Uber's platform.

Jacobs claimed the MA team collected competitors' "supply data, . . . business metrics, business strategy information" and information about the "basic functionality . . . and security of their data" and then "delivered these collections directly to Kalanick."

107.     Uber subsequently confirmed the existence of Hell.  In September 2017, it was reported that the Company was under federal investigation by the FBI and the U.S. Attorney's Office for the Southern District of New York for its use of the program.  Reportedly, authorities are investigating whether Uber used Hell to illegally thwart competition and violate computer access laws.

**Uber's Toxic Culture of Institutionalized
Harassment and Discrimination**

108.     On February 19, 2017, former Uber engineer Fowler posted a blog exposing rampant misogyny, gender discrimination and sexual harassment at Uber.  Fowler detailed how in her first couple of weeks on the job her manager expressly propositioned her for sex.  When she reported the improper conduct to Uber's HR Department, they brushed off the offense because they "wouldn't feel comfortable giving him anything other than a warning and a stern talking-to" in light of the fact that the manager was a "'high performer.'"  In a perverse twist of proper procedures, Fowler was then told that if she stayed on the team she would likely be given a negative review because she had reported the individual to HR.

109.     Forced to rotate to another team to avoid continued harassment and repercussions, Fowler wrote that in the subsequent weeks she met many other women at Uber who had similar stories to hers, ***including with the same manager***.  She stated that these women "had reported inappropriate interactions with him long before I had even joined the company."  Despite the fact that several women had reported inappropriate conduct by this individual, each was told by HR it was his "first offense" so as to justify not taking any actions against him.

110.     Fowler also described gender discrimination that worked to block women from promotions and favorable job transfers at the Company.  She recounted how she was personally told she had "undocumented performance problems" as a means to prevent her from transferring to a position she wanted, even though she was eminently qualified.  Even after she achieved great

1    reviews and a flawless performance score, these scores were ***retroactively*** changed by her superiors

2    in order to keep her in her current position and prevent her upward trajectory.

3          111.   In addition, Fowler described a toxic corporate culture at Uber she compared to the

4    bloody television drama "game-of-thrones."  According to Fowler, "[i]t seemed like every manager

5    was fighting their peers and attempting to undermine their direct supervisor so that they could have

6    their direct supervisor's job."  Fowler gave examples of managers frequently boasting about ways

7    that they were trying to undercut their superiors in order to supplant them and rise up in the

8    organization.  She recounted a manager once even withholding "business-critical information from

9    one of the executives so that he could curry favor with one of the other executives (and, he told us

10   with a smile on his face, it worked!)."

11         112.   Fowler stated that institutionalized sexism occurred at Uber in a variety of forms,

12   both large and small.  When she reported clearly unequal treatment to HR, Fowler was told that she

13   was the problem.  The HR person then interrogated Fowler about her contacts with other women and

14   told she was being "unprofessional" by reporting an issue via email, presumably because it created a

15   record of the incident.  Shortly thereafter a manager threatened to fire Fowler because she had dared

16   to contact HR.  She voluntarily left the Company a week later.

17         113.   Fowler stated that when she joined Uber in November 2015, her organization was

18   25% women.  By the time she left in December 2016, the percentage of female employees had

19   plummeted by more than 80% due to organizational chaos and institutionalized sexism.

20         114.   Fowler's blog post quickly went viral.  Within days its accusations had morphed into

21   a full-blown publicity crisis for the Company.  New reports began to surface of Uber's toxic "bro-

22   culture" and the unhealthy and counterproductive work environment it fostered.  Perhaps most

23   shocking, it came to light that Kalanick and other top Uber executives had led an official Company

24   outing to a female escort bar in South Korea in 2014.  Girls, tagged with numbers, were paid to sit

25   with male Uber employees as they sang karaoke.  A female manager later complained to Uber's HR

26   Department that the experience "made me feel horrible as a girl (seeing those girls with number tags

27   and being called out is really degrading)."  Following Fowler's blog post, Uber's Senior Vice

28   President of Business Emil Michael reached out to Kalanick's former girlfriend, who had attended

1    the event, to make sure that she had not spoken to reporters about it and that, if asked, she would tell

2    people that they had just gone for karaoke and "had a good time."

3        115.   After Fowler's blog post, *The New York Times* documented employees who came

4    forward with similar experiences.  In a February 22, 2017 article, *The New York Times* reported that

5    "[i]nterviews with more than 30 current and former Uber employees, as well as reviews of internal

6    emails, chat logs and tape-recorded meetings, paint a picture of an often unrestrained workplace

7    culture."  One employee emailed Kalanick concerning harassment, and at least two "notified Thuan

8    Pham, the company's chief technical officer, of workplace harassment at the hands of managers and

9    colleagues in 2016."

10       116.   By the end of February 2017, Uber was facing mounting negative publicity.  To avoid

11   a complete collapse of the Company, Uber was forced to hire former U.S. Attorney General Holder

12   to investigate the sexual harassment claims and evaluate the Company's work culture.  A special

13   committee of the Board was formed to oversee the work shortly thereafter.

14       117.   On February 23, 2017, venture capital fund Kapor Capital – an investor in Uber since

15   2010 – published "An Open Letter to the Uber Board and Investors" expressing disappointment,

16   frustration and concerns that it had "hit a dead end in trying to influence the company quietly from

17   the inside."  The letter stated that "[a]s early investors in Uber, starting in 2010, we have tried for

18   years to work behind the scenes to exert a constructive influence on company culture."  Kapor

19   Capital stressed that Uber's impressive valuations and revenue "can never excuse a culture plagued

20   by disrespect, exclusionary cliques, lack of diversity, and tolerance for bullying and harassment of

21   every form."  The fund was also dissatisfied with the selection of Holder, Arianna Huffington and

22   Liane Hornsey, who reported to Kalanick's executive team, to investigate the "destructive culture"

23   as these individuals had "inherent conflicts that impede the necessary independence to make a deep

24   and accurate assessment."

25       118.   Over the next few months, Holder and his team at Covington led a far-reaching

26   investigation of Uber.  Covington conducted over 200 interviews with current and former

27   employees; retained a consulting firm to hold online focus groups of Uber employees; and reviewed

28   over three million Company documents.  The results of the investigation and recommendations by

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG

1  Covington were approved by the Board in June, and released to the public in a report shortly

2  thereafter (the "Holder Report").  The Holder Report proposed sweeping changes to the Company's

3  leadership, organization, management and culture, offering proscriptions that contradicted

4  defendants' prior representations about Uber's culture and workplace.

5          119.    First and foremost, the Holder Report proposed changes to Uber's senior leadership,

6  including reducing Kalanick's responsibilities.  It encouraged the Company to find leaders who

7  would promote diversity and inclusion, hold senior executives accountable to improve the work

8  culture and reduce complaints and compliance issues, and require the HR Department to actually

9  implement the workplace responsibilities delegated to it.  The Holder Report provided a laundry list

10  of additional recommendations, the breadth of which exposed the massive scope of the problems at

11  the Company.  These recommendations included: (1) increasing Board independence and oversight

12  of management; (2) enhancing the Company's internal controls, risk management, financial controls,

13  and compliance policies and procedures; (3) reformulating the Company's "cultural values," which

14  at the time promoted values such as "Always Be Hustlin" and "Principled Confrontation" that Uber

15  employees had used to justify misbehavior, to new values that would "reflect more inclusive and

16  positive behaviors"; (4) greatly expanding and improving employee training, including by teaching

17  Uber's executives how to implement effective corporate controls; (5) improving the employee

18  complaint process and revamping Uber's HR Department; (6) promoting diversity and inclusiveness

19  initiatives; and (7) implementing a variety of policies, procedures, and practices that the Company

20  lacked to combat discrimination, harassment, and inappropriate workplace conduct.

21          120.    According to a June 6, 2017 *Business Insider* article, in conjunction with hiring

22  Covington, Uber also hired law firm Perkins Coie LLP to investigate 215 "inappropriate workplace

23  incidents."  These incidents included discrimination (25%), sexual harassment (22%), unprofessional

24  behavior (21%), bullying (15%), harassment (9%), retaliation (6%), and other offenses.  The

25  majority of the incidents took place in the San Francisco headquarters.  "The Perkins Coie

26  investigation lays the groundwork for the investigation being conducted for Uber by Eric Holder,"

27  according to the article.

28

121.    Uber attempted to clean house in connection with the Holder Report and investigation, firing at least 20 employees for misconduct.  An additional 31 employees were subject to further training, 7 received final warnings, and as of the *Business Insider* article, 57 claims were under continued review.  Uber took no action on the remaining 100 claims.

122.    On June 21, 2017, *The New York Times* reported that five investors – Benchmark, First Round Capital, Lowercase Capital, Menlo Venture and Fidelity Investments – representing 25% of Uber's stock and 40% of the voting power, demanded Kalanick's resignation.

**Uber Takes Its Law Breaking Global**

123.    A string of disclosures have called into question the legality, and thus sustainability, of Uber's rapid international expansion.  For example, on April 26, 2017, *Reuters* reported that a South Korean court had ruled that the Company had been using private vehicles for commercial purposes in violation of South Korean law.  In June 2013, Uber had entered the South Korean market with its UberBlack service in violation of South Korean law prohibiting paid chauffeur services.  In August 2014, Uber doubled down on its illegal expansion into South Korea with its UberX service in knowing violation of the country's Passenger Transport Services Act.  Similarly, in July 2017, a senior adviser to the European Court of Justice, Europe's highest court, issued an adverse opinion against the Company that it needed to comply with European transportation rules and that Uber should be regulated as a taxi service.  As a result, certain of Uber's low-cost current services could be banned as illegal.  In France, a court had found that Uber had been operating an illegal taxi service in the country following the launch of Uber's low-cost UberPOP service in February 2014 in violation of French criminal law.  It was later reported in 2017 that in South Korea, France, and several other international jurisdictions Uber had been using Greyball to evade authorities.

124.    Then, on August 3, 2017, *The Wall Street Journal* reported, in an article entitled "Smoke, Then Fire: Uber Knowingly Leased Unsafe Cars to Drivers," that Uber had intentionally leased out unsafe Honda SUVs subject to a recall to its drivers in Singapore in order to chase breakneck growth.

125.    According to *The Wall Street Journal*, which cited internal Company documents and interviews with employees in the region, Uber managers in Singapore were aware of the Honda

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                          - 63 -

recall when they bought more than 1,000 defective Vezels and rented them to drivers without needed repairs. After Uber expanded into Singapore in 2013, it struggled to find enough drivers owing to the high cost of car ownership in the country. To remedy this problem, Uber created a unit that would rent Uber-purchased vehicles to drivers for a daily rate. In early 2016, Kalanick approved a plan to borrow 800 million Singapore dollars (about $590 million) in order to buy thousands of new cars. However, instead of acquiring the cars from authorized dealers, Uber purchased the vehicles from auto importers who reportedly operate in a legal gray zone, a channel outside manufacturers' authorized networks where safety, service and legal contracts are difficult to enforce. This maneuver allowed the Company to pay approximately 12% less for the vehicles.

126.    On April 4, 2016, Honda issued a recall for new, gas-powered Vezel SUVs, advising owners to have them serviced as quickly as possible. The issue was an electrical component that was prone to overheating. Despite being aware of the recall and safety issue, Uber knowingly purchased over 1,000 Honda Vezels. Uber was unable to procure the necessary replacement parts for many of the vehicles, but rented out the unsafe vehicles anyway in disregard for the safety of Uber drivers and their riders. Then, on January 11, 2017, an Uber driver reported that his Company-supplied Honda Vezel had caught on fire soon after he dropped off a passenger. Flames reportedly burst from the dashboard, melting the interior of his car and cracking a football-sized hole in his windshield.

127.    Shortly thereafter, Company executives, including those in the San Francisco office, were informed of the fire. Rather than take the defective cars off of the road until Uber could perform the necessary repairs, Uber decided to keep the cars in service so as not to lose revenues or "alarm" drivers. Uber placed the onus on drivers to seek repairs of their own accord in a vaguely worded notice, although the notice failed to mention the overheating and fire dangers Honda had spelled out in its advisory. As a result, Uber drivers and passengers were not apprised of the true risks to their safety and well-being from the defective cars. Rather than come clean, Uber's communication team developed an information campaign designed to limit any negative publicity that may result from the fire and Uber's actions. By February 2017, more than 65% of the defective

1  vehicles had still not been repaired, even as internal emails by Uber managers reviewed by *The Wall*

2  *Street Journal* joked about the "Vezel snafu" and "other shenanigans" at the Company.

3      128.    Since news of the Singapore fire broke, Uber's international legal issues have

4  continued to mount.  On August 29, 2017, it was reported that the DOJ had taken preliminary steps

5  to investigate whether Uber managers had violated the FCPA, which bans the use of bribes to

6  foreign officials to get or keep business.   As a result, the legality of the Company's entire

7  international operations has been called into question.   According to a *Bloomberg* report on

8  September 20, 2017, Uber retained O'Melveny & Myers LLP to investigate its foreign payments in

9  at least five countries: Malaysia, Indonesia, China, South Korea, and India.  On December 15, 2017,

10  the Court in the *Waymo* case publicly released a letter from Uber's former Manager of Global

11  Intelligence Jacobs, which had previously been filed under seal.  In the letter, dated May 5, 2017,

12  Jacobs claimed he "reasonably believed that bribery of foreign officials was taking place" in

13  violation of the FCPA.  The letter says:

14      Jacobs was aware that Uber was targeting government officials in order to learn:

15      • who might be compelled to end costly enforcement activities or partner with Uber to
           unblock the market;
16
17      • what local network of contacts has connections to police and regulatory authorities;

18      • what political leaders may be persuaded to stop any opposition; and

19      • if senior political officials would be willing to push a ride-sharing agenda through the
           city or national government.
20
21  If a formal investigation goes forward and finds Uber violated the FCPA, the Company and its

22  employees may be subject to civil and criminal penalties and some may even face imprisonment.

23      129.    On September 22, 2017, London's transport authority held that Uber "is not fit and

24  proper to hold a private hire operator licence [sic]" and declined to renew the Company's license to

25  operate in the city.   As reasons for the decision, London's transport authority cited Uber's

26  demonstrated "lack of corporate responsibility in relation to a number of issues which have potential

27  public safety and security implications," including the Company's "approach to reporting serious

28  criminal offences [sic]," handling of London's inquiry into Greyball, failure to conduct proper driver

background checks, and other issues. According to reports, London accounts for about 5% of Uber's global active user base of 65 million, and nearly a third of its active user base of 11 million in Europe, casting further doubt on the viability of the Company's global growth prospects.

130. On December 20, 2017, Uber lost another major legal battle when the European Court of Justice, the European Union's highest court, ruled that Uber qualified as a transportation company rather than merely an online platform. The ruling obligates Uber to pay the same costly licensing fees and employee benefits borne by taxi companies in the region. The added expenses will undercut Uber's effort to charge competitive prices, severely limiting its potential to succeed in European markets.[105]

**Uber Executives Steal a Victim's Medical
Records in Order to Discredit Her**

131. Allegations against Uber went from very bad to much worse when, in June 2017, news organizations reported that Alexander, a top Uber executive, had illicitly obtained a passenger's medical records in December 2014 for the unconscionable purpose of discrediting her claim that she had been sexually assaulted by an Uber driver on a ride. Alexander brought the medical files to the attention of Kalanick and other executives. Kalanick reportedly reviewed the report and discussed it at length with Alexander. Uber executives then discussed the preposterous claim that the victim had fabricated the whole incident in order to bolster Uber's rival in India, even though none of the executives had medical training and the perpetrator had already been convicted of rape and sentenced to life in prison. Alexander reportedly carried around the victim's medical files for months without her knowledge.

132. Alexander's actions caused serious concerns among former and current Uber employees. On June 7, 2017, *Bloomberg* reported that, as part of the Holder investigation, former and current employees discussed the India case with Holder's investigators. Some employees "expressed misgivings about Alexander's cavalier attitude toward sharing the private information of an alleged rape victim."

---

[105] Liz Alderman, *Uber Deal Setback After European Court Rules It Is a Taxi Service*, N.Y. Times (Dec. 20, 2017), https://www.nytimes.com/2017/12/20/business/uber-europe-ecj.html.

133.     On June 23, 2017, *The New York Post* reported that Uber retained O'Melveny & Myers LLP to also investigate how Alexander obtained the victim's medical records.

134.     Defendants' conduct behind the scenes directly contradicted their representations to the public at the time of the incident in 2014.  Then, Kalanick offered public support and solidarity with the victim, releasing the following statement on December 7, 2014:

> What happened over the weekend in New Delhi is horrific. Our entire team's hearts go out to the victim of this despicable crime. ***We will do everything, I repeat, everything to help bring this perpetrator to justice and to support the victim and her family in her recovery***.
>
> We will work with the government to establish clear background checks currently absent in their commercial transportation licensing programs.  We will also partner closely with the groups who are leading the way on women's safety here in New Delhi and around the country and invest in technology advances to help make New Delhi a safer city for women.

135.     Far from "doing everything" to support the victim, Uber associates actually went out of their way to belittle her trauma and invade the victim's most sensitive personal information.  By focusing on "whether she was really raped at all," and painting the victim as an opportunist and a liar, defendants seemed to be assuring themselves that the only reason why a woman would report a sexual assault is for personal gain, rather than to prevent similar crimes or to right an injustice.  The callous episode demonstrates the radical extremes to which defendants would push (and often exceed) the bounds of acceptable business conduct in order to chase growth and/or stifle competition.

136.     The shocking disclosure has further battered Uber's already tattered reputation and spawned a lawsuit by the victim against the Company for unlawful intrusion of private affairs, the public disclosure of private facts and defamation.

**Kalanick Oversaw Every Facet of Uber's Business Since Its Inception**

137.     Kalanick not only founded Uber, but also managed nearly every aspect of its operations.  He acted as the primary solicitor of Uber investments, giving countless interviews, holding conference calls, and stoking public interest in the growing Company.  He often sat with reporters from major financial news outlets such as *Forbes*, *Bloomberg*, *Fortune*, and *CNBC* to tout the Company's prospects.  Leading into the Series G Preferred Stock fundraising round in 2015,

1  Kalanick personally wrote to all existing investors offering to sell Uber securities to raise capital to

2  fund Uber's operations in China.  In the five-page letter, Kalanick described the Chinese market and

3  competitive landscape in detail, claiming "[s]imply stated, China is the #1 priority for Uber's global

4  team."  He cited the "enormity of the opportunity," announced that Uber would be "formally

5  launching a fundraising process" and "would welcome participation from our existing investor

6  base."[106]  In February 2016, after his efforts resulted in Uber's largest influx of cash to date – at least

7  $5.6 billion – Kalanick discussed the Series G round, and stressed the importance of his

8  participation.  He said, "'[g]lobal domination ain't cheap,'" and "'I prefer building rather than

9  fundraising.  But if I don't participate in the fundraising bonanza, I'll get squeezed out by others

10  buying market share.'"[107]

11         138.    Kalanick also kept a close watch on day-to-day operations.  In April 2017, after the

12  scandals had begun to unfold, *Fortune* published an article describing how Uber's culture would be

13  difficult to change because Kalanick had an "iron grip" on Company operations.  The article

14  described how Kalanick micromanaged everything at Uber, including the design of the logo, the

15  phrasing of press releases, and even "the exact hour the beer taps will open at the company's San

16  Francisco headquarters."  According to the article, "Kalanick is known to obsess over details like

17  office decor alongside big issues like pricing strategy and driver relations."[108]  In the *Waymo* case,

18  Uber's Vice President and Deputy General Counsel of Litigation and Employment Padilla testified

19  that "our practice was to escalate everything to Travis that was going to turn into an internal

20  investigation unless he, himself, personally was the target of the investigation."[109]

21

22

23  [106]   June 2015 letter to investors from Travis Kalanick, http://im.ft-static.com/content/images/b11657c0-
    1079-11e5-b4dc-00144feabdc0.pdf.

24  [107]   Thornton McEnery, *After Raising $9 Billion in Funding, Travis Kalanick Now Concerned By This
25  Irrational Funding Environment*, DealBreaker (Feb. 17, 2016), https://dealbreaker.com/2016/02/travis-
    kalanick-irrational-funding-environment/.

26  [108]   *A Challenge to Finding Uber's New COO: Its CEO*, Fortune (Apr. 13, 2017) http://fortune.com/2017/04/
27  13/ceo-kalanick-coo-search-culture/.

    [109]   *Waymo*, 11/29/17 Hearing Tr. at 48:15-18.
28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                      - 68 -

139.    Kalanick used his already immense power to force Uber shareholders to yield voting rights to him.  He instituted an employee repurchase program that compelled employees to surrender voting power for all their shares to Kalanick if they sold even a portion of them back to the Company.  As a result, Kalanick had a vested interest in each employee stock sale, because each transaction altered the rights, preferences, privileges, and restrictions of the employees' shares in his favor.[110]

140.    Uber's culture of illegality is derived, in large part, from Kalanick himself, who promoted cutthroat business tactics.  Kalanick demonstrated a reckless obsession with success – and a disregard for the law – long before he started Uber.  In 1998, he co-founded Scour, a peer-to-peer Napster-style file sharing service, but filed for bankruptcy in 2000 after the National Picture Association of America sued him for copyright infringement and sought $250 billion.  Months later, Kalanick launched another file sharing service called Red Swoosh, which he also operated illegally. Kalanick took tax dollars from his employees' paychecks to pay company debts, in clear violation of U.S. tax law.[111]  He ultimately had to pay the Internal Revenue Service $110,000 to avoid jail time.[112]  Kalanick introduced and promoted the same breakneck mindset at Uber, where *USA Today* described his regard for the law as "ignore and proceed."[113]  In 2015, he personally authored Uber's "14 Cultural Values," many of which encouraged aggressive tactics, such as "Always Be Hustlin'," "Toe-Stepping," and "Principled Confrontation."  Kalanick repeatedly reinforced these values to his employees.  For instance, during a lavish Company retreat in Las Vegas in late 2015, Kalanick reportedly gave a Company-wide lecture reviewing the 14 cultural values and, for each, pulled an

---

[110]    Katie Benner, *How Uber's chief is gaining even more clout in the company*, CNBC (June 12, 2017), https://www.cnbc.com/2017/06/12/uber-chief-travis-kalanick-gains-voting-rights-through-stock-buyback.html.

[111]    Mike Isaac, *Uber's C.E.O. Plays With Fire*, N.Y. Times (Apr. 23, 2017), https://www.nytimes.com/2017/04/23/technology/travis-kalanick-pushes-uber-and-himself-to-the-precipice.html.

[112]    Richard Feloni, *How Uber CEO Travis Kalanick Went From A Startup Failure To One Of The Hottest Names In Silicon Valley*, Business Insider (Sept. 24, 2014), http://www.businessinsider.com/uber-ceo-travis-kalanicks-success-story-2014-9.

[113]    Marco della Cava, Jessica Guynn & Jon Swartz, *Uber's Kalanick faces crisis over 'baller' culture*, USA Today (Feb. 24, 2017), https://www.usatoday.com/story/tech/news/2017/02/24/uber-travis-kalanick-/98328660/.

1  employee on stage to recognize his or her exemplification of the purported virtue.[114]  The Holder

2  Report, which was commissioned by Uber in the wake of the sexual discrimination and harassment

3  scandal, found that Kalanick's focus on these values only propagated Uber's culture of misconduct,

4  and that Uber personnel used them to "justify poor behavior."

5        141.    Kalanick also helped spawn and perpetuate Uber's culture of misogyny.  Indeed, long

6  before the discrimination allegations, Kalanick exhibited a propensity to make inappropriate sexual

7  comments.  For example, in an interview published in *GQ* in February 2014, Kalanick wisecracked

8  about his increased desirability since the Company found success, claiming he could call women on

9  demand: "Yeah, we call that Boob-er."  Kalanick's inappropriate words translated into inappropriate

10  actions in 2014, when he led an official Company outing to a female escort bar in South Korea.

11  Female employees attended the event, where escorts, tagged with numbers, were paid to sit with

12  male Uber employees as they sang karaoke.

13        142.    When Kalanick resigned in June 2017, he acknowledged the negative influence he

14  has had on the Company, admitting "'[t]he ultimate responsibility, for where we've gotten and how

15  we've gotten here rests on my shoulders.'"[115]

16  **Benchmark Lawsuit**

17        143.    On August 10, 2017, Benchmark, one of Uber's earliest investors, filed a complaint in

18  Delaware Chancery Court accusing the Company and Kalanick of fraud, fiduciary breach, and

19  contract violations (the "Benchmark Complaint").  Specifically, the Benchmark Complaint alleged

20  that Kalanick had intentionally concealed and failed to disclose his gross mismanagement and other

21  misconduct at Uber, including:

22        •     his personal involvement in the alleged misappropriation of self-driving car trade
              secrets from a competitor;
23

24

---

25  [114]   Mike Isaac, *Inside Uber's Aggressive, Unrestrained Workplace Culture*, N.Y. Times (Feb. 22, 2017),
26  https://www.nytimes.com/2017/02/22/technology/uber-workplace-culture.html.

27  [115]   *Why Travis Kalanick was an asset as well as a liability for Uber*, LiveMint (June 14, 2017),
     http://www.livemint.com/Companies/xSqtKdbd0Hg60Wnw3xufsM/Why-Travis-Kalanick-was-an-asset-as-
28  well-as-a-liability-for.html.

- an Uber executive's alleged theft of a woman's medical records following her sexual assault by an Uber driver;

- the use of Greyball to deceive authorities in markets where law enforcement had banned or resisted Uber's services;

- a pervasive culture of gender discrimination and sexual harassment that ultimately prompted an investigation by former U.S. Attorney General Eric Holder; and

- a "host of other inappropriate and unethical directives issued by Kalanick."[116]

144. According to the Benchmark Complaint, Kalanick knew he would likely be forced to resign as CEO once these misdeeds came to light, and "fraudulently acquired" additional power that he would yield after his resignation. Benchmark claims Kalanick leveraged Uber's recent success to induce Benchmark to sign off on an amendment to the voting rights agreement. The amendment obtained by Kalanick changed the rights, preferences, privileges, or restrictions of the outstanding securities, requiring the owners thereof to "vote their Uber shares to fill . . . [three] Board seats with individuals 'designated by Travis Kalanick.'" Benchmark claims it would not have voted in favor of the amendment if Kalanick had disclosed these issues, and the amendment would not have passed without Benchmark's consent. Benchmark now seeks to unwind the agreement, which has allowed Kalanick to maintain his disproportionate influence over the Board even after his forced resignation.

145. Benchmark's lawsuit has been called "extraordinary" and "unprecedented" by media outlets and demonstrates that even the Company's closest and oldest investors were duped by Kalanick and the Uber story.

**Plaintiff and the Class Have Been Damaged as Their Uber Investments Plummet**

146. As a result of defendants' conduct, plaintiff and the Class have lost billions of dollars. While Uber shares are not publicly traded, in connection with Uber's Series G preferred stock financing round in 2016, Uber's valuation skyrocketed to approximately $68 billion. Plaintiff invested in Uber in connection with this round of financing through New Riders, which was formed for the sole purpose of distributing Uber's Series G preferred stock to investors.

---

[116] *See Benchmark Capital Partners VII, L.P. v. Kalanick, et al.*, No. 2017-0575, Verified Complaint, ¶5 (Del. Ch. Aug. 10, 2017).

147.    In 2017, Uber disclosed corporate scandal after corporate scandal, causing media headlines to deem it the "Year from Hell" and a "Nonstop Trainwreck." Without doubt, 2017 was an unmitigated disaster for the Company. In the first quarter, Waymo filed suit, Fowler wrote her blog detailing rampant sexual discrimination throughout the Company, and the *New York Times* broke the "Greyball" scandal. In the second quarter, *The Information* published its detailed account of the "Hell" program, South Korea found Uber's operations illegal, and news about the rape in New Delhi made national headlines. In the third quarter, the DOJ began investigations into Uber's foreign practices, the FBI began investigating "Hell," London decided not to renew Uber's license, and major investor Benchmark filed suit. Most recently, in the fourth quarter, news about Uber's massive data breach, illegal cover-up, and concealment of the Jacobs letter in the *Waymo* litigation made headlines again. At the same time, dozens of employees, including many of the Company's most senior officers, have fled the Company.

148.    These scandals and departures have significantly impaired the Company's business, operations, and prospects, and Uber's brand has been gravely tarnished. Consequently, investors have suffered substantial damages. In April 2017, media outlets reported that Uber had lost $10 billion of its value.[117] By August, as a direct result of the continued drumbeat of bad news, mutual fund companies such as Vanguard Group and T. Rowe Price Inc. marked down their shares of Uber by as much as 15%. In September, news reports indicated that Japanese tech firm SoftBank Group Corp. ("SoftBank") sought to purchase Company shares at a valuation of $50 billion, representing at least $18 billion in lost market capitalization. *Fortune* attributed the lower valuation to the wave of bad news, claiming "investors may be keen to cash out after a tumultuous year."[118] *Bloomberg*

---

[117]    Anita Balakrishnan, *Scandals may have knocked $10 billion off Uber's value, a report says*, CNBC (Apr. 25, 2017), https://www.cnbc.com/2017/04/25/uber-stock-price-drops-amid-sexism-investigation-greyballing-and-apple-run-in--the-information.html.

[118]    David Meyer, *Softbank Reportedly Wants a Big Discount for Uber Investment*, Fortune (Sept. 15, 2017), http://fortune.com/2017/09/15/softbank-uber-discount-investment-valuation/.

1  surmised that the Company had "become less valuable" because of the many "scandals that

2  undermined Uber's story."[119]

3       149.    Since the 2016 data breach was revealed in November 2017, Uber's value has

4  dropped further.  On November 27, 2017, SoftBank made a tender offer to Uber investors that

5  valued the Company at just $48 billion.  This valuation represents ***$20 billion*** of lost capitalization –

6  an astronomical drop of 30%, and coincides with a 40% increase in its quarterly losses.  Analysts

7  and industry experts again attributed the massive downturn to Uber's conduct.  *Bloomberg* quoted

8  Kirk Boodry, an analyst at New Street Research, who said the lower valuation "'builds in all the

9  negative news,'" which has "'contributed to the downside.'"[120] *Vanity Fair* reported that valuation

10  "served as a tangible sign that Uber's year-long public-relations crisis is having tangible effects on

11  its value as a business."[121]  The *Los Angeles Times* reported that "industry experts . . . attributed the

12  loss in Uber's value to the string of blows dealt to its brand this year."[122]

13       150.    Khosrowshahi put it best in an email to employees following the news that London

14  had barred Uber from operating in the city: "The truth is that there is a high cost to a bad reputation."

15                              **CLASS ALLEGATIONS**

16       151.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

17  of Civil Procedure and seeks certification of the following Class:

18       All persons or entities who, directly or indirectly, purchased or committed to
         purchase (and subsequently closed a binding commitment to purchase) an interest in
19       Uber securities between June 6, 2014 and November 27, 2017.

20

21

22  [119]  Matt Levine, *SoftBank Thinks Some Uber Shares Are Worth More Than Others*, Bloomberg (Nov. 15,
    2017), https://www.bloomberg.com/view/articles/2017-11-16/softbank-thinks-some-uber-shares-are-worth-
23  more-than-others.

24  [120]  Eric Newcomer, *SoftBank Bids to Buy Uber Shares for 30% Less Than Current Value*, Bloomberg (Nov.
    27, 2017), https://www.bloomberg.com/news/articles/2017-11-28/softbank-is-said-to-seek-uber-shares-at-48-
25  billion-valuation.

26  [121]  Maya Kosoff, *Uber's Year from Hell Keeps Getting Worse*, Vanity Fair, https://www.vanityfair.com/
    news/2017/11/ubers-year-from-hell-keeps-getting-worse.

27  [122]  Tracey Lien, *SoftBank is ready to buy a chunk of Uber – at a 30% discount*, L.A. Times (Nov. 28, 2017),
28  http://beta.latimes.com/business/technology/la-fi-tn-uber-softbank-20171128-story.html.

1   Excluded from the proposed Class are defendants, their officers and directors, and members of their

2   immediate families or their legal representatives, heirs, successors or assigns, and any entity in

3   which defendants have or had a controlling interest.

4        152.    The members of the proposed Class are so numerous that joinder of all members is

5   impracticable.  Plaintiff believes that there are several hundred members in the proposed Class.

6   Members of the proposed Class may be identified from records maintained by defendants.

7        153.    Plaintiff's claims are typical of the claims of the members of the proposed Class as all

8   members of the proposed Class are similarly affected by defendants' wrongful conduct as alleged

9   herein.

10       154.    Plaintiff will fairly and adequately protect the interests of the members of the

11  proposed Class and has retained counsel competent and experienced in complex class litigation.

12       155.    Common questions of law and fact exist as to all members of the proposed Class and

13  predominate over any questions solely affecting individual members of the proposed Class.  Among

14  the questions of law and fact common to the proposed Class are:

15              (a)    Whether defendants misrepresented material facts;

16              (b)    Whether defendants' statements omitted material facts necessary in order to

17  make the statements made, in light of the circumstances under which they were made, not

18  misleading;

19              (c)    Whether defendants knew or had reasonable grounds to believe that their

20  statements were false or misleading;

21              (d)    Whether defendants' statements were made for inducing the purchase of Uber

22  securities by others; and

23              (e)    The extent of damage sustained by class members.

24       156.    A class action is superior to all other available methods for the fair and efficient

25  adjudication of this controversy since joining all members is impracticable, and this action will be

26  manageable as a class action.

27

28

1

**COUNT I**

2

**For Violation of Cal. Corp. Code §§25400(d) and 25500
Against All Defendants**

3

4

157.    Plaintiff repeats and realleges the allegations contained above as if fully set forth

5

herein.

6

158.    Defendants directly and/or indirectly, for the purpose of inducing the purchase of

7

Uber securities by others, made or materially participated in making false and misleading statements

8

of material fact and/or omitted to state material facts necessary in order to make the statements

9

made, in light of the circumstances under which they were made, not misleading.   These

10

misrepresented and omitted material facts include, but are not limited to, an extensive advertising

11

campaign that employed press releases, interviews with the media, and extensive social media,

12

including web pages, in which they made statements that were materially false, misleading, or

13

contained material omissions.   Defendants sold, offered to sell, and engaged in market activity

14

related to Uber securities and, through their actions, did or attempted to change the rights,

15

preferences, privileges, or restrictions of Uber securities.

16

159.    Defendants made these statements with the intent to induce the purchase of Uber

17

securities by others.

18

160.    Defendants knew or had reasonable grounds to believe that these statements and

19

omissions were false and misleading.

20

161.    As a direct and proximate result of the fraudulent conduct of defendants, plaintiff and

21

the Class have been damaged.

22

**PRAYER FOR RELIEF**

23

WHEREFORE, plaintiff prays for judgment as follows:

24

A.    Determining that this action is a proper class action, certifying plaintiff as Class

25

Representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's

26

counsel as Class Counsel;

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                                             - 75

1      B.      Awarding compensatory damages in favor of plaintiff and the other class members

2  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

3  wrongdoing, in an amount to be proven at trial, including interest thereon;

4      C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

5  action, including counsel fees and expert fees; and

6      D.      Awarding such other and further relief as the Court may deem just and proper.

7                          **JURY DEMAND**

8      Plaintiff demands a trial by jury.

9  DATED:  December 22, 2017              ROBBINS GELLER RUDMAN
                                            & DOWD LLP
10                                         JASON A. FORGE
                                           LUKE O. BROOKS
11                                         DARRYL J. ALVARADO
                                           JEFFREY J. STEIN
12                                         ERIKA OLIVER

13

14                                              s/ LUKE O. BROOKS
                                                LUKE O. BROOKS
15
                                           655 West Broadway, Suite 1900
16                                         San Diego, CA  92101-8498
                                           Telephone:  619/231-1058
17                                         619/231-7423 (fax)

18                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
19                                         SHAWN A. WILLIAMS
                                           Post Montgomery Center
20                                         One Montgomery Street, Suite 1800
                                           San Francisco, CA  94104
21                                         Telephone:  415/288-4545
                                           415/288-4534 (fax)
22
                                           Attorneys for Plaintiff
23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500 - 3:17-cv-05558-HSG                                    - 76 -

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on December 22, 2017, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List.

5

I certify under penalty of perjury under the laws of the United States of America that the

6

foregoing is true and correct.  Executed on December 22, 2017.

7

                                              s/ LUKE O. BROOKS
                                           LUKE O. BROOKS

8

9

ROBBINS GELLER RUDMAN
     & DOWD LLP
655 West Broadway, Suite 1900

10

San Diego, CA  92101-8498
Telephone:  619/231-1058

11

619/231-7423 (fax)

12

E-mail:  lbrooks@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:17-cv-05558-HSG Irving Firemen's Relief & Retirement Fund v. Uber Technologies et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl James Alvarado**
  dalvarado@rgrdlaw.com

- **Alvin Matthew Ashley**
  mashley@irell.com,sknight@irell.com

- **Stephen Patrick Blake**
  sblake@stblaw.com,nanderson@stblaw.com

- **Luke O Brooks**
  lukeb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kenneth Jerome Brown**
  kbrown@wc.com

- **Walter F. Brown**
  wbrown@orrick.com

- **Brian Edward Cochran**
  bcochran@rgrdlaw.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andra Barmash Greene**
  agreene@irell.com,kbrozzo@irell.com

- **James Neil Kramer**
  jkramer@orrick.com,jcopoulos@orrick.com,cfleetwood@orrick.com,mwatkins@orrick.com

- **James Glenn Kreissman**
  jkreissman@stblaw.com,sblake@stblaw.com

- **Angel Puimei Lau**
  alau@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Nathaniel H. Lipanovich**
  nlipanovich@irell.com,ltheilacker@irell.com

- **Erika Limpin Oliver**
  eoliver@rgrdlaw.com

- **Joseph G. Petrosinelli**
  jpetrosinelli@wc.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Siegel**
  dsiegel@irell.com,kschmidt@irell.com,csilver@irell.com,mxanten@irell.com

- **Jeffrey James Stein**
  jstein@rgrdlaw.com,kmccormack@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`