1   ROBBINS GELLER RUDMAN
        & DOWD LLP
2   LUKE O. BROOKS (212802)
    LUCAS F. OLTS (234843)
3   DARRYL J. ALVARADO (253213)
    JEFFREY J. STEIN (265268)
4   ERIKA OLIVER (306614)
    655 West Broadway, Suite 1900
5   San Diego, CA  92101-8498
    Telephone:  619/231-1058
6   619/231-7423 (fax)
    lukeb@rgrdlaw.com
7   lolts@rgrdlaw.com
    dalvarado@rgrdlaw.com
8   jstein@rgrdlaw.com
    eoliver@rgrdlaw.com
9          – and –
    DENNIS J. HERMAN (220163)
10  Post Montgomery Center
    One Montgomery Street, Suite 1800
11  San Francisco, CA  94104
    Telephone:  415/288-4545
12  415/288-4534 (fax)
    dherman@rgrdlaw.com
13
    Attorneys for Plaintiff
14

<div align="right">REDACTED DOCUMENT SOUGHT TO BE SEALED</div>

15                       UNITED STATES DISTRICT COURT

16                     NORTHERN DISTRICT OF CALIFORNIA

17  IRVING FIREMEN'S RELIEF &            )   Case No. 4:17-cv-05558-HSG
    RETIREMENT FUND, Individually and on  )
    Behalf of All Others Similarly Situated,  )   CLASS ACTION
18                                       )
                        Plaintiff,        )   SECOND AMENDED COMPLAINT FOR
19                                       )   VIOLATIONS OF CALIFORNIA
         vs.                             )   CORPORATIONS CODE §§25400 AND
20                                       )   25500
    UBER TECHNOLOGIES INC., et al.,      )
21                                       )
                        Defendants.       )
22  _____ )   DEMAND FOR JURY TRIAL

23

24

25

26

27

28

1486279_2

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ...........................................................................1

II.   PARTIES ......................................................................................................2

III.  JURISDICTION AND VENUE ....................................................................4

IV.  BACKGROUND AND OVERVIEW ............................................................4

V.   UBER'S OFFERINGS TO THE CLASS ....................................................11

VI.  MATERIAL MISREPRESENTATIONS AND OMISSIONS .....................14

    A.   Defendants Misrepresented the Risks to Uber's Business from
           Government Regulations and Investigations .....................................14

          1.   Greyball.................................................................................22

          2.   FCPA Violations....................................................................27

    B.   Defendants Misrepresented the Risks to Uber's Business from
           Competition........................................................................................28

    C.   Defendants Misrepresented the Risks to Uber's Business from Data
           Security Breaches...............................................................................39

          1.   Uber's Risk Disclosures Were Materially Incomplete and
               Misleading.............................................................................40

          2.   Uber Deliberately Concealed the 2014 Data Breach from Investors
               in the Series E Offering.........................................................43

          3.   Uber Misled Investors in the Series F and G Offerings by Omitting
               to Disclose that It Had Not Corrected the Known Conditions that
               Caused the 2014 Data Breach ...............................................47

          4.   The Data Security Risks Deliberately Concealed from Investors
               Manifested After the Offerings Were Completed, Causing the
               Value of Their Investments to Decline ..................................53

    D.   Defendants Misrepresented the Risks to Uber's Business from Negative
           Publicity and Other Events that Could Curtail Its Rapid Growth.........................56

    E.   Defendants Also Concealed the Risks to Uber's Reputation and Growth
           from Their Efforts to Steal Self-Driving Technology from Competitors.............65

    F.   Defendants Concealed the Risks to Uber's Reputation and Growth from
           Their Failure to Address or Correct Repeated Allegations of Sexual
           Harassment and Gender Discrimination ................................................71

VII. LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS...................79

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                          - i -

1

2                                                                                          **Page**

3

4           1.      Revelations of the True State of Uber's Business Reduced
                    Expected Cash Flows .................................................................................82

5           2.      Revelations of the True State of Uber's Business Increased Uber's
                    Risk Profile and Discount Rate ...............................................................84
6

7           3.      Revelations of Uber's True Financial Condition Delayed Expected
                    Liquidity Events .......................................................................................85

8           4.      Market Evidence of Declining Value Due to Revelations of the
                    True State of Uber's Business ..................................................................87
9

10          5.      Uber's Valuation Decline Was Not Caused by Non-Fraud Related
                    Factors ......................................................................................................91

11  VIII.   CLASS ALLEGATIONS ...........................................................................................91

12  IX.     CLAIM FOR RELIEF .................................................................................................92

13  X.      PRAYER FOR RELIEF ..............................................................................................93

14  XI.     JURY DEMAND .........................................................................................................93

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Plaintiff Irving Firemen's Relief & Retirement Fund ("plaintiff" or the "Retirement Fund"),

2  individually and on behalf of all others similarly situated, alleges the following based on the

3  investigation conducted by and through plaintiff's attorneys which included, among other things, a

4  review of Uber Technologies Inc. ("Uber" or the "Company") releases, media reports, articles, court

5  documents, regulatory filings, and other online materials.  Plaintiff believes that substantial

6  additional evidentiary support will exist for the allegations set forth herein after a reasonable

7  opportunity for discovery.

8  **I.      NATURE OF THE ACTION**

9  1.      Uber is a private technology startup that develops, markets, and operates car

10  transportation and food delivery mobile applications, or "apps."  Founded in San Francisco in 2009,

11  the Company's most popular service is an app that allows users to remotely hail car rides.  Since its

12  inception, Uber has raised more than $11.5 billion in financing through a series of private equity and

13  debt offerings to investors, and in the process became one of the largest tech startup "unicorns" in

14  history.[1]  As is typical in the tech industry, these offerings were conducted through limited

15  partnerships, special purpose entities, and other investment vehicles that were formed with the

16  consent and cooperation of the Company specifically and exclusively to acquire and hold Uber

17  securities.

18  2.      The Retirement Fund brings this action on behalf of itself and a class of persons (as

19  more specifically defined in ¶206 below) who directly or indirectly acquired securities issued in

20  connection with Uber's offerings of Series D, E, F, or G Preferred Stock (the "Offerings").  The

21  claims asserted herein are brought under §§25400(d) and 25500 of the California Corporation Code

22  against Uber and its former Chief Executive Officer ("CEO") Travis Kalanick ("Kalanick"), and

23  arise from their dissemination of false and misleading statements and omissions about Uber and its

24  operations, which statements were made to induce the purchase of billions of dollars of Uber

25  securities.

26

27

28

[1]      A "unicorn" is a tech startup with a valuation in excess of $1 billion.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                                      - 1 -

1    3.    In particular, plaintiff alleges that Uber and Kalanick misled investors by concealing

2 material risks to the business, including illegal business practices that the Company had used to

3 increase its growth, stifle competition, and avoid regulatory enforcement.  Defendants' concealment

4 of these practices permitted them to market and sell Uber securities at prices that were higher than

5 they would have been had the illegal practices been revealed.  After all of the Offerings had been

6 completed, the concealed practices and risks to the business were revealed.  These revelations caused

7 Uber's valuation to decline, reducing the value of plaintiff's and class members' securities, and their

8 actual and anticipated investment returns by billions of dollars.  This loss of value is compensable as

9 damages under the statutory violations alleged herein.

10 **II.    PARTIES**

11    4.    Plaintiff Irving Firemen's Relief & Retirement Fund is a retirement fund operated for

12 the benefit of retired firefighters for the City of Irving, Texas.  Plaintiff has its principal place of

13 business in and is organized under the laws of Texas.  Plaintiff purchased Uber securities through an

14 interest in New Riders LP ("New Riders"), a Delaware limited partnership, on February 16, 2016.

15 The sole purpose of New Riders is to invest in Uber Series G preferred shares.  New Riders is

16 managed by Morgan Stanley Investment Management Inc.; its general partner is MS Alternatives

17 Holding D Inc., an entity owned by Morgan Stanley.

18    5.    Defendant Uber Technologies Inc. is an on-demand ride service and transportation

19 technology company based in San Francisco, California.  Uber's principal place of business is in

20 California, and it is incorporated in Delaware.

21    6.    Defendant Travis Kalanick founded Uber and was its CEO until June 20, 2017.[2]  He

22 currently serves as a member of the Company's Board of Directors ("Board").  During his time as

23 CEO, Kalanick managed nearly every aspect of Uber's operations.  From Uber's inception until

24 June 2017, Kalanick acted as the Company's primary spokesperson to give interviews, inform the

25 public about the Company, and solicit investment.  During that timeframe Kalanick participated in

26 substantial market activities related to Uber's capital fundraising, and offered to sell, and sold, Uber

27
28

---

[2]    Mike Isaac, *Uber Founder Travis Kalanick Resigns as C.E.O.*, N.Y. Times, June 21, 2017, https://www.nytimes.com/2017/06/21/technology/uber-ceo-travis-kalanick.html.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                          - 2 -

1  securities.  As a result of his positions, roles, and share ownership, Kalanick exerted substantial

2  influence over Uber's operations and fundraising at all relevant times.

3          7.      Kalanick intended his many media appearances and public statements to be widely

4  disseminated and impact the demand for and price of the Company's securities.  He often sat with

5  reporters from major financial news outlets including *Forbes*, *Bloomberg*, *Fortune*, and *CNBC* to

6  tout the Company's prospects and induce investment in Uber.  For example, during the Series F

7  offering in June 2015, Kalanick personally wrote to all existing investors offering to sell Uber

8  securities to raise capital to fund Uber's operations in China.  In the five-page letter, Kalanick cited

9  the "enormity of the opportunity," announced that Uber would be "formally launching a fundraising

10  process," and "would welcome participation from our existing investor base."[3]  In February 2016,

11  after his efforts resulted in billions of dollars of investments, Kalanick stressed the importance of his

12  participation.  He said "'[g]lobal domination ain't cheap,'" and "'I prefer building rather than

13  fundraising.  But if I don't participate in the fundraising bonanza, I'll get squeezed out by others

14  buying market share.'"[4]

15          8.      Kalanick actively worked to consolidate his power and control over Uber, including

16  by demanding that other employee shareholders in the Company yield their voting rights to him.  To

17  do so, Kalanick instituted an employee repurchase program that required employees to surrender

18  voting power associated with all their shares to Kalanick if they sold even a portion of them back to

19  the Company.  As a result, Kalanick had a vested interest in each employee stock sale, because each

20  transaction altered the rights, preferences, privileges, and restrictions of the employees' shares in his

21  favor, and increased his overall control of the Company.[5]  At the end of 2017, Kalanick reportedly

22  owned about 10% of Uber's stock and about 35% of its Class B common shares, and held

23  ──────────────

[3]      June 2015 letter to investors from Travis Kalanick, *Uber successful in China*, http://im.ft-
24  static.com/content/images/b11657c0-1079-11e5-b4dc-00144feabdc0.pdf.

25  [4]      Thornton McEnery, *After Raising $9 Billion in Funding, Travis Kalanick Now Concerned By
    This Irrational Funding Environment*, DealBreaker, Feb. 17, 2016, https://dealbreaker.com/2016/02/
26  travis-kalanick-irrational-funding-environment/.

27  [5]      Katie Benner, *How Uber's chief is gaining even more clout in the company*, CNBC, June 12,
    2017,  https://www.cnbc.com/2017/06/12/uber-chief-travis-kalanick-gains-voting-rights-through-
28  stock-buyback.html.

1    approximately 16% of Uber's voting power.[6]  In addition, Kalanick reportedly controls at least three

2    of the eleven seats on Uber's Board.

3    **III.    JURISDICTION AND VENUE**

4        9.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

5    §1332(d)(2) as this is a class action where at least one of the members of the class is a citizen of a

6    state different from any defendant, and the matter in controversy exceeds the sum or value of

7    $5,000,000.

8        10.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) and (b)

9    because: (1) one or more defendants reside in this District; and (2) a substantial part of the events or

10   omissions giving rise to the claims occurred in this District.

11   **IV.    BACKGROUND AND OVERVIEW**

12       11.    Uber was founded in 2009 by Kalanick and others as a luxury car service.  Following

13   a beta run, Uber's services and mobile app officially launched in San Francisco in 2011.  The

14   Company started as an on-demand luxury ("black car") car service that allowed users to hail rides

15   using a text message or an app.  Uber collected the fee for the ride, deducted a percentage or set

16   amount, and remitted the remainder to the driver.  In July 2012, the Company introduced UberX, a

17   lower cost service that allowed anyone to drive for Uber using their own car, subject to a background

18   check and certain vehicle requirements.  By early 2013, the service was operating in 35 cities and

19   Uber was experimenting with other on-demand services.  During this time, the Company grew from

20   75 employees to more than 300 and claimed month-to-month revenue growth of 18%.

21       12.    While Uber was one of the first companies in the ride-sharing space, it was subject to

22   stiff competition from traditional taxi companies seeking to protect their historic monopoly on on-

23   demand ride services, as well as emerging companies, such as Lyft, which had developed competing

24   apps to take advantage of the market opportunity that Uber had initially created.  To fend off this

25   competition, Uber required cash, and lots of it.  Between 2011 and 2016, Uber raised more than

26   _____

27   [6]    In January 2018, Kalanick sold 29% of his shares to SoftBank in a deal valuing the Company at $48 billion.  Matt Weinberger, *Ousted Uber CEO Travis Kalanick is reportedly planning to sell a $1.4 billion stake in the company*, Business Insider, Jan. 4, 2018, https://www.businessinsider .com/travis-kalanick-selling-14-billion-in-uber-shares-2018-1.

28

1  $11.5 billion as it aggressively sought to expand its business by moving into new markets ahead of

2  upstarts like Lyft while fending off regulatory challenges from traditional taxi operators and others

3  seeking to put the brakes on its rapid growth.

4        13.    Uber's initial seed round of investment took place in August 2009 with the sale of

5  $200,000 in securities.  In October 2010, Uber raised an additional $1.3 million from 29 angel

6  investors.  At the time of its initial seed round, the Company was valued at $4 million.  Thereafter,

7  the Company's valuation skyrocketed as it embarked on a series of larger and larger offering rounds

8  of preferred Uber stock.  In 2011, Uber completed its Series A and B funding rounds, raising

9  $48 million, and exited the year with a valuation of approximately $350 million.  In less than two

10  years, the Company's valuation climbed to $3.5 billion, permitting it to raise an additional

11  $363 million in its Series C funding round completed in August 2013.  The lead investors in these

12  early funding rounds included leading Silicon Valley Venture Capitalists (Benchmark Capital,

13  Lowercase Capital, Sequoia Capital, and TPG Equity Partners, among others), tech industry titans

14  (including Google Ventures and Amazon CEO Jeff Bezos), and other well-known investors, such as

15  rap star and entrepreneur Jay-Z Carter.

16        14.    By June 2014, the Company's valuation had grown more than five-fold, to more than

17  $18 billion, and the size and frequency of its stock sales rapidly increased.  Beginning in June 2014,

18  Kalanick and Uber began several private fundraising rounds in which they offered to sell and sold

19  Uber securities, raising multi-billions in new capital from investors, either directly or indirectly by

20  way of pass-through investment vehicles such as New Riders.  Between June 2014 and May 2016,

21  Kalanick and Uber completed four preferred stock offerings, raising more than ***$10 billion*** in

22  additional capital, nearly quadrupling Uber's implied valuation to $68 billion.

23        15.    By mid-2016, Uber appeared to have reached a valuation of nearly ***$70 billion*** –

24  making it the most highly valued private technology startup.  At this rarefied level, Uber was more

25  valuable than Ford Motor Company, General Motors, Twenty-First Century Fox, eBay, and other

26  long-time members of the S&P 500.  The following graphic from *The Wall Street Journal* illustrates

27  this stunning growth of the Company amid its voracious solicitation of private investment:

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



**Driving Growth**

Uber's valuation rose rapidly as it pursued global market share.

**Uber's valuation***

*Uber last raised funding at a $68 billion valuation one year ago before a series of scandals

Sources: Dow Jones VentureSource; WSJ staff reports

16    16.    Uber's rapid rise correlated with the astronomical growth in its platform, as more and

17    more riders in more and more places began using Uber instead of taxis, buses, personal vehicles, or

18    other modes of transportation to get from place to place.  Around the time of, and in connection with,

19    each of the Offerings, Kalanick and other Company officials regularly touted this phenomenal

20    growth, boasting about gross bookings and net revenue that had more than doubled year-over-year

21    while publicizing their plans for a rapid global expansion that would ultimately see the Company

22    operating in more than 700 cities and more than 80 countries worldwide.  This growth would be

23    realized, defendants said, as a result of the Company's entrepreneurial culture, its commitment to

24    pushing technology through deep research and investments in self-driving vehicles and other

25    innovations, and its strong commitment to values that fostered trust and loyalty among its users,

26    drivers, and employees.

27    17.    Defendants' statements were made for the purpose of, and did, induce investors to

28    directly and indirectly invest billions of dollars in Uber.  With the Uber narrative of exponential but

1   principled growth firmly planted in the public's perception by defendants, beginning in 2014 Uber

2   and Kalanick ramped up their media and mass marketing campaign in order to induce billions of

3   dollars of new funding from investors.   Uber regularly informed investors of its business

4   performance each quarter via conference calls, and issued a barrage of press releases and media

5   materials.  Meanwhile, Kalanick made the rounds on the venture capital and startup circuits, posted

6   on his blogs and Uber's website, spoke at technology conferences, and sat for numerous interviews

7   with widely circulated publications and television stations in order to induce additional investment in

8   the Company.

9        18.    However, while they were actively soliciting huge investments in the Company,

10  defendants concealed that Uber's rapid growth and expansion was built upon policies and practices

11  that involved deliberate and repeated violations of applicable law to expand the territory in which it

12  operated and stifle its competition.   For instance, Uber developed a secret program code-named

13  "Hell" that it used to pilfer driver and rider data from its main competitor, Lyft.  Uber also developed

14  another covert program code-named "Greyball" that it used to mislead regulators and evade

15  detection by government officials in jurisdictions in which it was operating illegally or had faced

16  opposition.  To help drive future growth, Uber conspired to steal self-driving technology being

17  developed by a Google subsidiary, Waymo.  To expand its foreign operations, Uber sought out

18  officials it could bribe to revise regulations restricting its operations or ignore violations of existing

19  laws.  By concealing these institutionalized practices and programs, and the risks they created, from

20  investors, defendants were able to sell billions of dollars in securities at prices that were materially

21  higher than they would have been had the truth about Uber's business activities been known.

22       19.    Defendants also concealed other risks to Uber's growth, including conditions and

23  events that existed at the time of the Offerings and would have a disastrous impact on Uber's

24  reputation if disclosed, causing drivers and riders to abandon its platform in favor of competitors.

25  Uber claimed, for example, that it had patched the gaps in its security systems that had exposed the

26  personal information of 50,000 drivers to theft, when in fact it had not.  While publicly touting its

27  innovative workforce and progressive culture, behind the scenes Uber was a misogynistic workplace,

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 7 -

1    with rampant sexual harassment that was repeatedly ignored while the victims were threatened with

2    reprisals for reporting misconduct.

3        20.    In early 2017, defendants' story began to unravel.  In a span of only a few months a

4    shocking litany of corporate misconduct came to the fore, and investors learned startling truths about

5    the willingness of Uber's C-Suite executives to flout local, national, and international law, stifle

6    competition, misappropriate trade secrets, expose tens of millions of its users' data to cyberattack,

7    secretly pay bribes to criminal enterprises, and seek vengeance against detractors.   And the

8    Company's vaunted corporate culture was revealed to actually consist of a toxic hotbed of misogyny,

9    sexual discrimination, and disregard for the law that threatened the Company's reputation, business,

10   and prospects.

11       21.    As a result of this pervasive pattern of unlawful behavior, Kalanick was forced to

12   resign as Uber's CEO in June 2017 and the Company has lost many high-level employees, impairing

13   its business, operations, and prospects.  Since the beginning of 2017, the Company has parted ways

14   with at least 15 top executives, including its president, chief business officer, chief security officer,

15   and its heads of communications, ride-sharing, advanced technologies, finance, artificial intelligence,

16   maps and business platform, engineering, product, and self-driving car divisions.  Most recently, the

17   Company's chief legal officer, global compliance officer, and several key members of its security

18   team have resigned.

19       22.    Uber also has become the subject of multiple criminal investigations, and is named as

20   a defendant in numerous lawsuits.  Numerous municipalities have sued Uber for its failure to secure

21   users' information and the subsequent cover-up of the 2014 and 2016 data breaches.  Meanwhile,

22   Uber's discovery conduct in *Waymo LLC v. Uber Techs., Inc.*, No. 3:17-cv-00939-WHA (N.D. Cal.)

23   ("*Waymo*"), spurred Judge Alsup to state, "I have never seen a case where there were so many bad

24   things . . . like Uber has done in this case."

25       23.    In August 2017, one of the Company's earliest investors, Benchmark Capital Partners

26   VII, L.P. ("Benchmark"), which controls a seat on Uber's Board, sued the Company claiming it had

27   been defrauded by Kalanick and accusing him of intentionally concealing and failing to disclose his

28   gross mismanagement and other misconduct at Uber.  The allegations included many of the same

1    illegal actions alleged here, including misappropriation of Waymo's technology, use of Greyball to

2    evade authorities, a culture of discrimination and harassment, and a "host of other inappropriate and

3    unethical directives issued by Kalanick."[7]  According to Benchmark, Kalanick leveraged Uber's

4    recent success to induce investors to sign off on an amendment to the voting rights agreement that

5    changed the rights, preferences, privileges, or restrictions of the outstanding securities, requiring the

6    owners thereof to "vote their Uber shares to fill . . . [three] Board seats with individuals 'designated

7    by Travis Kalanick.'"  Benchmark asserted it would not have voted in favor of the amendment if

8    Kalanick had disclosed these issues, and the amendment would not have passed without

9    Benchmark's consent.

10          24.    The seriatim disclosures that Uber was operating a business far different than what

11   investors had been led to believe have caused the value of the Company's securities to plummet.

12   *Infra*, §VII.  Over the course of 2017, Uber's $68 billion valuation dramatically decreased.  In

13   April 2017, for example, media outlets reported that Uber had lost $10 billion since the start of the

14   year as a result of the disclosures of its misconduct.  In August 2017, several investors, including

15   Vanguard Group ("Vanguard"), Principal Funds, Hartford Funds, and T. Rowe Price, marked down

16   their Uber investments by as much as 15%, or $10.2 billion.[8] █████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ██████████████████████████████████████████

20          25.    In September 2017, news reports indicated that SoftBank valued the Company at

21   $50 billion, representing at least $18 billion in lost value.  In October 2017, BlackRock joined other

22

23

24   [7]      *See Benchmark Capital Partners VII, L.P. v. Kalanick, et al.*, No. 2017-0575, Verified
         Complaint, ¶5 (Del. Ch. Aug. 10, 2017).

25   [8]      *Mutual funds reportedly mark down investments in Uber by up to 15%*, Reuters, Aug. 23,
26       2017, https://www.cnbc.com/2017/08/23/mutual-funds-mark-down-investments-in-uber-by-up-to-
         15-percent-wsj-reports.html.

27   [9]      Erin Griffith, *No, Mutual Funds Aren't "Dumb Money" Startup Investors*, Fortune, Aug. 3,
28       2017, http://fortune.com/2017/08/03/mutual-fund-markdown-uber-valuations/.

1    mutual fund investors, marking down its Uber investment by 16%.[10]  In November 2017, SoftBank

2    made a tender offer to buy approximately $8 billion of shares from existing shareholders at $32.96

3    per share – a $48 billion valuation for the Company – representing an $18 billion loss or a "30

4    percent-plus haircut" from Uber's valuation "just 12 months before."[11]  In response to SoftBank's

5    tender offer, investors sought to sell more shares (at the significantly reduced price) than SoftBank

6    was willing to purchase.  Indeed, the wild success of the tender offer, "rais[ed] the question of

7    whether that valuation was actually too high and the company was worth even less."[12]  Following the

8    tender offer, Fidelity Investments ("Fidelity") marked down its Uber investment by 21%,[13] a

9    significant move by a fund that "rarely change[s] its private valuations on its high profile portfolio

10   companies anymore."[14]  Vanguard also marked down its Uber investment by another 15.3%, taking

11   it down to $35.10, in December, 2017.[15]

12        26.    As Uber's new CEO, Dara Khosrowshahi ("Khosrowshahi"), summed it up in a

13   September 2017 e-mail to Uber employees following London's decision to not renew the Company's

14   operating license: "The truth is that there is a high cost to a bad reputation."[16]

15

16

---

17   [10]    Theodore Schleifer, *Uber's valuation dropped 20 percent, according to investors*, Recode
      (Jan. 11, 2018), https://www.recode.net/2018/1/11/16879370/mutual-funds-uber-wall-street-fidelity-
18      principal-blackrock-valuation.

19   [11]    John Divine, *The 2019 Uber IPO Is Less Attractive Every Day*, U.S. News, Feb. 21, 2018,
      https://money.usnews.com/investing/stock-market-news/articles/2018-02-20/uber-ipo.

20   [12]    Theodore Schleifer, *Uber's valuation dropped 20 percent, according to some investors*,
21      Recode (Jan. 11, 2018), https://www.recode.net/2018/1/11/16879370/mutual-funds-uber-wall-street-
      fidelity-principal-blackrock-valuation.

22   [13]    *Id.*

23   [14]    Erin Griffith, *No, Mutual Funds Aren't "Dumb Money" Startup Investors*, Fortune, Aug. 3,
24      2017, http://fortune.com/2017/08/03/mutual-fund-markdown-uber-valuations/.

25   [15]    Ian Wenik, *Vanguard marks up Uber stake by 14%: The mutual fund giant upped the
      valuation of its position in the ride-sharing company to $40 per share*, City Wire (July 31, 2018),
26      https://citywireusa.com/professional-buyer/news/vanguard-marks-up-uber-stake-by-14/a1143115.

27   [16]    Anita Balakrishnan, *Uber CEO on losing London license: 'There is a high cost to a bad
      reputation,'* CNBC, Sept. 22, 2017, https://www.cnbc.com/2017/09/22/uber-ceo-email-weighs-in-
28      on-fight-with-london-regulators.html.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 10 -

V.     **UBER'S OFFERINGS TO THE CLASS**

27.     Between June 6, 2014 and May 24, 2016, defendants completed the Offerings, raising more than $10 billion in capital as its valuation nearly quadrupled, to $68 billion:

| Preferred Security Funding Round | Announced Date | Closing Date | Amount | Price/ Share | Company Valuation |
|---|---|---|---|---|---|
| Series D | | June 6, 2014 | $1.2 billion | $15.513 | $18 billion |
| Series E | November 7, 2014 | February 18, 2015 | $2.8 billion | $33.318 | $42 billion |
| Series F | May 26, 2015 | July 31, 2015 | $1.0 billion | $39.638 | $51 billion |
| Series G | February 9, 2016 | May 24, 2016 | $5.6 billion | $48.772 | $68 billion |

28.     Defendants offered to sell and sold Uber's Series D, E, F, and G securities through limited partnerships and other entities formed specifically for the purpose of attracting investors and holding the securities to be issued in the Company's Offerings.  Plaintiff acquired its interests in Uber securities, for example, by becoming a limited partner of New Riders, a Delaware limited partnership formed, together with a Cayman Islands exempted limited partnership ("New Riders Cayman Feeder L.P."), to make an investment in Uber's Series G Preferred Stock.  On information and belief, the manner in which New Riders was structured, and the manner in which plaintiff obtained its interests in Uber, was typical of the manner in which other investment vehicles were structured and other class members obtained their interests in the Company.

29.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG



30.    Uber worked closely and directly with New Riders and each of the other entities formed to acquire and hold Uber securities to structure the Offerings, provided the substantive information about the Company for use by the entity and its members in making their investment decisions, and retained the right to approve or reject any individual investor who desired to acquire an interest in Uber through such entities.

31.



36. Defendants nevertheless caused or permitted materially false and misleading information to be provided to potential investors in the Offerings to induce those investors to participate in those Offerings. The misrepresentations and omissions were disseminated to investors through information in the offering memoranda that was deliberately incomplete, including risk warnings that appeared to be comprehensive but that in fact omitted to disclose numerous instances in which conditions, events, or circumstances that investors were told ***could*** negatively impact the Company had in fact ***already*** occurred. Defendants compounded the misleading impact of these risk warnings by making numerous public statements, as alleged herein, that falsely assured investors that those conditions, events, and circumstances had not occurred.

## VI. MATERIAL MISREPRESENTATIONS AND OMISSIONS

37. Defendants made numerous misrepresentations and omissions that induced prospective investors to purchase the preferred securities it sold in its Offerings. At the time of each of these offerings, defendants omitted to disclose circumstances, conditions, and events that created material risks to Uber's business, such that they had reason to know that the statements made to investors at the time of each of these offerings would be, and were, materially misleading in light of all of the surrounding circumstances and the total mix of information available to investors. Each of the false and misleading statements and omissions alleged herein was made in and/or emanated from California.

### A. Defendants Misrepresented the Risks to Uber's Business from Government Regulations and Investigations

38. At the time of the Offerings, Uber was aggressively attempting to expand its operations to fend off competition and maintain its position as one of the fastest-growing tech startups in history. But as Uber's operations expanded, its operations drew increasing attention from government officials seeking to impose regulations that would limit or restrict Uber's growth. While defendants outwardly proclaimed that they were working with government regulators through

1  appropriate channels to address their concerns, behind the scenes the Company was aggressively

2  attempting to evade legal requirements by concealing its operations from regulators.

3  39.



SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG

1

2

3

4

5

6

7

8

9

10

40. ████████████████████████████████████████████████

11

████████████████████████████████████████████████████████

12

██████████████████████████████████████████████

13

14   41.    The description of the legal and regulatory risks facing the Company was misleading

15   because it omitted to disclose the deliberate illegal activities the Company was taking to circumvent

16   regulation, as exemplified by the "Greyball" program, described in more detail below.  Without the

17   disclosure of activities and programs like Greyball, investors were left with the misimpression that

18   Uber was transparent about its activities in markets where local regulators had sought to restrict or

19   prohibit its activities, and was acting in good faith to attempt to address legal challenges to its

20   operations through legitimate lobbying efforts and litigation.  The truth was that Uber knew that its

21   activities violated local laws, and was deliberately attempting to circumvent local regulation by

22   illegally concealing its activities from local law enforcement and government officials.  As a result,

23   the warned-of risks were not uncertain or remote, but had already manifested and were negatively

24   affecting the Company's performance, or would have done so but for defendants' illegal scheme to

25   conceal Uber's activities.

26   42.    Had investors known about Greyball or other similar activities, the price of Uber

27   securities sold in the Offerings would have been materially less to account for the increased risks

---

22   ████████████

28

1  those activities presented to the Company's earnings, growth, and reputation, and the potential delay

2  those activities could cause for Uber's initial public offering ("IPO") or other liquidity event.

3      43.    Defendants' public statements around the time of the Offerings further misled

4  investors with similar false and misleading assurances about the manner in which the Company was

5  working with regulators to address legal challenges to its right to operate.  These misrepresentations

6  also caused the prices of the securities sold in the Offerings to be higher than they would have been

7  had the nature and extent of the Company's activities to evade regulatory detection been disclosed.

8  For example:

9      (a)    In an interview with *The Wall Street Journal* on June 6, 2014, just as the

10  Series D offering was getting underway, Kalanick strongly rejected the notion that the Company's

11  growth was at risk from regulatory challenges to its operations:

12      WSJ:  How big of a risk factor is Uber's regulatory challenge?  It seems like
     Uber is constantly fighting with regulators?

13

14      Mr. Kalanick:  We've now launched in 130 cities, and there's only one
     product in one city that we ever backed out of: Vancouver. . . .  There are flare-ups,
     the taxi industry will put pressure on a city government to stifle competition and then

15      that's when Nairi [an Uber spokeswomen] and I are up late. . . .  In the win column
     we have 130 and in the loss column we have one.  So yes, these are battles but we

16      we've lost one battle out of many.[23]

17      (b)    On July 12, 2014, shortly after the Series D offering closed, Uber issued a

18  statement claiming "*[w]e've been working in good faith with regulators* to modernize laws and to

19  find a permanent home for Uber in cities around the world."[24]

20      (c)    On October 3, 2014, just two months before the Series E offering, Kalanick

21  claimed the Company had engaged with municipalities to ensure Uber understood their expectations:

22  "*We work with regulators and cities to make things work*."[25]

23

24  [23]    Evelyn M. Rusli, *Uber CEO Travis Kalanick, We're Doubling Revenue Every Six Months*,

25  Wall St. J., June 6, 2014, https://blogs.wsj.com/digits/2014/06/06/uber-ceo-travis-kalanick-were-
   doubling-revenue-every-six-months/.

26  [24]    Tom Fontaine, *Despite challenges, ride-sharing operations flourish*, Trib  Total Media,

27  July 12, 2014, https://triblive.com/news/allegheny/6411422-74/companies-uber-ride.

28  [25]    BBC News Broadcast Transcript (Oct. 3, 2014).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 17 -

1    (d)    On December 13, 2014, coincident with the launch of the Series E offering,

2 *The Washington Post* quoted David Plouffe ("Plouffe"), Uber's "campaign manager" as saying the

3 Company has aimed to "***work with regulators, work with elected officials, to find a way forward***" in

4 dealing with laws.[26]

5    (e)    On June 3, 2015, shortly after the Series F offering was launched and before it

6 closed, Kalanick again stressed Uber's purported commitment to compliance, claiming "***whenever***

7 ***we're asked to abide by modern regulations that protect the rights and safety of passengers and***

8 ***drivers, we do***."[27]

9    44.    Each of the misrepresentations alleged in ¶43 was made, in whole or in part, for the

10 purpose of inducing potential investors to participate in the contemporaneous Offerings.  Each of

11 these misrepresentations was materially false and misleading to investors because they painted a

12 false picture of the nature and success of Uber's regulatory compliance activities, and omitted to

13 disclose deliberate, systemic and illegal activities like Greyball the Company was taking to mislead

14 regulators and evade detection of the Company's illegal operating activities:

15    (a)    By touting Uber's purported track record in defeating regulatory challenges

16 (¶43(a), *supra*), Kalanick intended to, and did, paint a picture of a Company that was operating

17 within the bounds of the law in the face of unfounded challenges from legacy on-demand operators,

18 whereas the truth was that Uber had an institutionalized practice of evading regulatory oversight of

19 its activities, such that the fact that the Company had only had to pull out of one city was not an

20 accurate or reliable indicator of its regulatory compliance or its prospects for growth and expansions

21 into additional markets.

---

25 [26]    Rosalind S. Helderman, *Uber pressures regulators by mobilizing riders and hiring vast*
*lobbying network*, Wash. Post, Dec. 13, 2014, https://www.washingtonpost.com/politics/uber-
26 pressures-regulators-by-mobilizing-riders-and-hiring-vast-lobbying-network/2014/12/13/3f4395c6-
7f2a-11e4-11e4-95a187e4c1f7_story.html?utm_term=.8beb5b419489.

27 [27]    *Uber, 5-Year Anniversary Remarks from Uber CEO Travis Kalanick*, YouTube (June 3,
28 2015), https://www.youtube.com/watch?v=idjrouG_8vY.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 18 -

1           (b)     The assertion that Uber was "working in good faith with regulators" (¶43(b),

2 *supra*), was false; Uber was deliberately attempting to evade regulatory detection and oversight in

3 bad faith.

4           (c)     The assertion that defendants "work with regulators and cities to make things

5 work" (¶43(c), *supra*), was false, because programs like Greyball evidenced Uber's efforts to evade

6 regulators and city officials, not to work with them to find a mutually acceptable way for Uber to

7 provide ride-sharing services in their jurisdiction.

8           (d)     The assertion that defendants "work with regulators, work with elected

9 officials, to find a way forward" (¶43(d), *supra*), was similarly false, because programs like Greyball

10 were intended to work against, not with, regulators and elected officials to find a mutually acceptable

11 way for Uber to provide ride-sharing services in their jurisdiction.

12           (e)     The assertion that "whenever we're asked to abide by modern regulations that

13 protect the rights and safety of passengers and drivers, we do" (¶43(e), *supra*), was false, because

14 programs like Greyball were intended to protect Uber from having to abide by local regulations

15 governing its provision of ride-sharing services.

16     45.    Had investors understood the nature and extent of the Company's activities to conceal

17 its operations from local regulators, they would have understood that the risks to the Company from

18 governmental enforcement actions were much greater than reasonable investors would conclude

19 from the public mix of information available to them at the time of the Offerings.

20     46.    The misrepresentations alleged in ¶43 above were neither qualified nor aspirational.

21 They were direct, objective, and verifiable assurances of the purported nature of Uber's past, current,

22 and ongoing interactions with regulators, and the nature of its activities designed to assure that the

23 Company was operating in compliance with local laws and regulations.  The existence of, and the

24 failure to disclose, the Company's institutional programs designed to evade regulators rendered each

25 of these statements materially misleading to investors.

26     47.    Each of the misrepresentations alleged in ¶43 was also misleading because of the

27 cumulative nature of defendants' repeated assurances that Uber was successfully confronting

28

1 regulatory challenges directly and in good faith, including similar assurances that defendants had

2 made during earlier rounds of investment activity.  For example:

3         (a)    On September 12, 2012, during a Disrupt conference hosted by TechCrunch,

4 Kalanick defended the legality of Uber's practices in response to an interviewer question: "***Hold***

5 ***on . . . .  I do pay attention to the rules***."[28]  He explained Uber's practice of first checking the

6 regulations before entering a new market: "***[Y]ou go in, you look at the rules, and then you roll out***

7 ***your business***."[29]

8         (b)    Kalanick insisted Uber operated lawfully: "[Q.] Are you legal?  [A.] ***We are***

9 ***legal, we are legal***.  [Q.] According to you or according to the Taxi and Limo Commission?  [A.]

10 ***According to the law***."[30]

11         (c)    On October 20, 2012, Kalanick stated: "In DC we had a really interesting

12 situation.  We went there, by the way, we were ***as far as we could tell we were totally legal, White***

13 ***Glove legal***."[31]

14         (d)    In January 2013, Kalanick wrote in a since-deleted blog post that "Uber will

15 roll out ridesharing on its existing platform in ***any market where the regulators have tacitly***

16 ***approved doing so***."[32]

17         (e)    At the Founders 2013 event on March 14, 2013, in response to a question

18 concerning whether Kalanick "expected to have to fight regulatory issues at every turn and whether

19

20

21

_____

22 [28]    TechCrunch, *Travis Kalanick Onstage at Disrupt*, YouTube (Sept. 21, 2012), https://www.youtube.com/watch?v=O7iokgEsWcM.

23 [29]    *Id*.

24 [30]    *Id*.

25 [31]    Y Combinator, *Travis Kalanick at Startup School 2012*, YouTube (Oct. 25, 2012),
26 https://www.youtube. com/watch?v=rQ6GoY2_Ujw.

27 [32]    Eric Newcomer, *Uber Pushed the Limits of the Law. Now Comes the Reckoning*, Bloomberg, Oct. 11, 2017, https://www.bloomberg.com/news/features/2017-10-11/uber-pushed-the-limits-of-
28 the-law-now-comes-the-reckoning.

1    he knew that Uber was 'illegal' in many locations," Kalanick emphatically stated, "[w]e don't beg

2    for forgiveness . . . **because we're legal**."[33]

3            (f)     In an interview with *Fortune Magazine* on June 14, 2013, Kalanick claimed

4    he actually **preferred** jurisdictions with "a clear set of rules," because they avoided "regulatory

5    ambiguity" that made it "very hard for a real company to operate."[34]

6            (g)     During an interview at the Brainstorm Tech conference on July 23, 2013,

7    Kalanick unambiguously stated: "***We go into cities where we're legal; we operate where we're***

8    ***legal***."[35]

9            (h)     In an August 2013 interview with *Forbes*, Kalanick again confirmed, "***we***

10    ***make sure [when] we go into cities we're legal***."[36]

11       48.     Each of the statements alleged in ¶¶43, 47 remained alive and uncorrected in the

12    market until after the Offerings were completed.  As a result, those statements altered the total mix

13    of information available to investors at the time each of the Offerings took place, contributing to the

14    misleading impression investors were given of the regulatory risks to Uber's growth.

15       49.     Uber and Kalanick knew or had reason to believe that the statements alleged in ¶¶43,

16    47 misrepresented material facts and/or omitted material facts necessary to make the statements

17    made, at the time made and in light of the circumstances under which they were made, not

18    misleading, including because: (a) the secret Greyball program that was then being used to evade

19    regulators had been authorized, established, and was being operated under the express direction and

20

21

---

22   [33]     Matthew Panzarino, *F.ounders 2013: Uber's Travis Kalanick on surge pricing, corruption and 'being baller' in SF*, The Next Web (Mar. 14, 2013), https://thenextweb

23   .com/insider/2013/03/14/f-ounders-2013-ubers-travis-kalanick-on-surge-pricing-corruption-and-being-baller-in-sf/.

24   [34]     Fortune Magazine, *The Future Model of Transportation*, YouTube (June 18, 2013), https://

25   www.youtube.com/watch?v=Edob6hpJBQY.

26   [35]     Fortune Magazine, *Travis Kalanick CEO of Uber Technologies Speaks at Brainstorm Tech 2013*, YouTube (July 23, 2013), https://www.youtube.com/watch?v=vGbuitwkZiM&t=40s.

27   [36]     Forbes, *UBER on Moving into Resistant Markets | Forbes*, YouTube (Aug. 9, 2013),

28   https://www.youtube.com/watch?v=X0A9mpx0hFc.

1   oversight of Kalanick and other top executives of the Company; and (b) Uber was also actively

2   attempting to find foreign officials it could bribe in order to expand its business overseas.

### 1.   Greyball

4       50.   Uber's Greyball program began in 2014 or earlier, and was being used by the

5   Company, but concealed, at the time each of the Offerings took place.  The existence of the program

6   was not publicly reported or known to unaffiliated investors before March 3, 2017, when *The New*

7   *York Times* published an article describing the practices.  The article, titled "How Uber Deceives the

8   Authorities Worldwide," described how Uber had used data collected from the Uber app and other

9   techniques to identify and circumvent officials who were trying to assess and/or regulate the

10  ride-sharing service.

11      51.   Greyball was used by Uber to attempt to circumvent regulation in Portland, Boston,

12  Paris, Las Vegas, Australia, China, South Korea, and other jurisdictions where laws prohibited or

13  restricted its operations.  For example, Greyball was used:

14          (a)   in Las Vegas, a market Uber entered illegally in October 2014 and was

15  initially banned from the following month;[37]

16          (b)   in Portland, where the Public Bureau of Transportation ("PBOT") found that

17  Uber had used Greyball to evade authorities in December 2014 by blocking 16 rider accounts

18  belonging to government officials and denying 29 ride requests by city transportation enforcement

19  officers while the Company operated in the city illegally without the required permits or

20  inspections;[38]

21

22  _____

    [37]      Chanelle Bessette, *Uber Suspends Services In Nevada After Court Order*, Forbes, Nov. 30,
23  2014, https://www.forbes.com/sites/chanellebessette/2014/11/30/uber-suspends-services-in-nevada-
    after-court-order/#21c9509d5579; *see also* Heather Sommerville, *Portland probe finds Uber used*
24  *software to evade 16 government officials*, Reuters, Sept. 14, 2017, https://www.reuters.
    com/article/us-uber-portland/portland-probe-finds-uber-used-software-to-evade-16-government-
25  officials-idUSKCN1BQ08Z.

26  [38]      Heather Sommerville, *Portland probe finds Uber used software to evade 16 government*
    *officials*, Reuters, Sept. 14, 2017, https://www.reuters.com/article/us-uber-portland/portland-probe-
27  finds-uber-used-software-to-evade-16-government-officials-idUSKCN1BQ08Z; *see also* PBOT,
    *News Release: Uber and its drivers may face penalties, fines for operating illegally in Portland,*
28  *Transportation Bureau warns*, The City of Portland Oregon (Dec. 5, 2014),
    https://www.portlandoregon.gov/transportation/article/511752; *see also* PBOT, *Greyball Audit*

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                - 22

1    (c)    in Philadelphia, where authorities determined that inspectors were being

2 blocked from Uber rides before a settlement was reached in December 2016 that permitted the

3 Company to operate lawfully in the city, but mandated that Uber reinstate accounts associated with

4 credit cards and telephone numbers blocked "as a result of Uber's enforcement activities," *e.g.*,

5 Greyball;[39]

6    (d)    in South Korea, where Uber had entered the market in June 2013 with its

7 UberBlack service in violation of laws prohibiting paid chauffeur services, and expanded its service

8 in August 2014 by introducing its UberX service in violation of the country's Passenger Transport

9 Services Act;[40]

10    (e)    in France, where a court found that Uber had been operating an illegal taxi

11 service in the country following the launch of Uber's low-cost UberPOP service in February 2014 in

12 violation of French criminal law;[41] and

13    (f)    in Italy, where a court declared UberPOP illegal for allowing drivers without

14 commercial licenses to unfairly compete against highly regulated taxi drivers.[42]

15    52.    According to *The New York Times'* article, when Uber entered a new city the

16 Company appointed a general manager to head the Company's Greyball operations.  This person

17 would then use at least a dozen technologies and techniques to try to spot enforcement officers.  One

18  *Report*, The City of Portland Oregon (Apr. 2017), https://www.portlandoregon.gov/
19 saltzman/article/637492.

20 [39]    Tom Krisher, *Feds probe Uber's use of fake app to stymie city inspectors*, The Gainesville
   Sun, May 5, 2017, https://www.gainesville.com/news/20170505/feds-probe-ubers-use-of-fake-app-
21 to-stymie-city-inspectors; *see also* Bobby Allyn, *Feds investigate Uber over use of tool to evade
   Philly authorities*, WHYY (May 4, 2017), https://whyy.org/articles/feds-investigate-uber-over-use-
22 of-tool-to-evade-philly-authorities/.

23 [40]    Hyunjoo Jin, *South Korea court says Uber violated transport law, latest setback for U.S.
   firm*, Reuters, Apr. 25, 2017, https://www.reuters.com/article/us-uber-tech-southkorea/south-korea-
24 court-says-uber-violated-transport-law-latest-setback-for-u-s-firm-idUSKBN17S09F.

25 [41]    Chine Labbé, *French court fines Uber, execs for illegal taxi service*, Reuters, June 9, 2016,
   https://www.reuters.com/article/us-france-ubertech-court/french-court-fines-uber-execs-for-illegal-
26 taxi-service-idUSKCN0YV1DQ.

27 [42]    Stephanie Kirchgaessnen, *Uber ordered to discontinue Pop service in Italy*, The Guardian,
   May 26, 2015, https://www.theguardian.com/technology/2015/may/26/uber-pop-italy-order-
28 discontinue-unfair-competition-taxi.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 23

technique involved drawing a digital perimeter, or "geofence," around the government offices on a digital map of a city that Uber was monitoring.  The Company watched which people were frequently opening and closing the app – a process known internally as "eyeballing" – near such locations as evidence that the users might be associated with city agencies.  Other techniques included looking at a user's credit card information and determining whether the card was tied directly to an institution like a police credit union.  Another involved sending employees to look up device numbers of the cheapest mobile phones that were likely to be acquired by local officials as part of their sting operations against the Company.  In addition, Uber employees would search social media profiles and other information available online to identify officers.

53.     Once government officials were identified by the Company, they would be internally tagged with a small piece of code that read "Greyball" followed by a string of numbers, and provided a dummy version of the Uber app.  This dummy version would mimic the real version, but allowed the Company to populate the screen with ghost cars or show that no cars were available in order to allow Uber drivers to evade detection.  Occasionally, if a driver accidentally picked up someone tagged as an officer, Uber called the driver with instructions to end the ride.

54.     Elsewhere, it was reported that Uber had also turned Greyball on cabdrivers in an effort to thwart them from using the Uber app to learn the whereabouts of Uber drivers.  The secret program thus became another tool in Uber's vast toolbox to gain improper advantages over the Company's competition.

55.     Once the Greyball tool was put in place and tested, Uber engineers compiled a playbook with a list of tactics and distributed the playbook to general managers in more than a dozen countries on five continents.  The development and use of Greyball was not the product of some rogue group of employees, but an official Company-sponsored program.  It was developed and operated by at least 50 Uber employees and approved by Uber's central office and highest executives, including the Company's Senior Vice President of Global Operations.

56.     In a March 9, 2017 press release by its then-Chief Security Officer Joe Sullivan, Uber confirmed the existence of the Greyball program and that it had been used to target government officials, stating that Uber is now "expressly prohibiting its use to target action by local regulators

going forward."[43]  This confession was reiterated in an April 21, 2017 letter to Portland's PBOT, in which Uber admitted that in December 2014, it added Greyball tags to 17 accounts, "with the majority of those tags placed on accounts that we have concluded bear the names of government employees."[44]

57.     Shortly after Uber admitted Greyball's existence, the San Francisco Board of Supervisors called for an investigation by the San Francisco District Attorney's Office, condemning Greyball as an apparent obstruction of justice.[45]  The District Attorney's Office, however, had already opened an investigation.[46]  In May 2017, Uber was also the target of a criminal probe by the U.S. Attorney's Office for the Northern District of California into the Company's use of the Greyball program.   The U.S. Attorney's Office has issued subpoenas to public officials in Portland, Philadelphia, and Austin and is being assisted by the Federal Bureau of Investigation ("FBI") in connection with its investigation.  That investigation remains ongoing.[47]  The legal violations by Uber as a result of its use of the program include violations of the federal Computer Fraud and Abuse Act and intentional obstruction of justice.

58.     Kalanick, as a result of his position as a hands-on manager and CEO of Uber and the Company-wide distribution and use of the Greyball program as a central component of Uber's growth strategy, knew about the program and that it was illegal.

---

[43]     Joe Sullivan, *An update on "greyballing,"* Uber Newsroom (Mar. 9, 2017), https://www.uber.com/newsroom/an-update-on-greyballing.

[44]     Portland Bureau of Transp., Greyball Audit Report (Apr. 2017), https://www.portlandoregon.gov/saltzman/article/637492.

[45]     S.F., Cal. City & Cty. Resol. No. 85-17, Urging the District Attorney to Investigate Transportation Network Companies' Use of "Greyball" Technology as Potential Obstruction of Justice (Mar. 14, 2017), https://sfbos.org/sites/default/files/r0085-17.pdf; Joe Fitzgerald Rodriguez, *SF district attorney investigating Uber for evading authorities with secret app*, S.F. Examiner, Mar. 9, 2017, http://www.sfexaminer.com/sf-district-attorney-investigating-uber-evading-authorities-secret-app/.

[46]     Joe Fitzgerald Rodriguez, *SF district attorney investigating Uber for evading authorities with secret app*, S.F. Examiner, Mar. 9, 2017, http://www.sfexaminer.com/sf-district-attorney-investigating-uber-evading-authorities-secret-app/.

[47]     Collin Woodard, *Uber is officially involved in a federal criminal investigation*, Motor Trend (Dec. 15, 2017), https://www.motortrend.com/news/uber-now-federal-criminal-investigation/.

1    59.    Kalanick's knowledge of the illegal nature of Greyball is further demonstrated by

2  attacks he has made on Uber's competitors over their purported efforts to evade local regulation.  For

3  example, in a 2013 tech conference, Kalanick reflected on the introduction of Lyft's rideshare

4  business model to the competitive landscape, calling its rival's nearly-identical model "criminal" and

5  the reason Uber was "staying out of this one for a little bit":[48]

> The way to think about it: Lyft basically goes into the markets that Uber is in and
> then gets folks who don't have commercial licenses and don't have commercial
> insurance and says 'bring your own car' and provide Uber-like service. . . .  It's
> regulatory arbitrage. . . .   I'm like, holy cow, every trip that's happening – I'm
> reading the law – every trip that's happening is a criminal misdemeanor being
> committed by the person driving.  I don't think that's a good law.  **But that is the
> law**.[49]

10    60.    Uber's culture of illegality is derived, in large part, from Kalanick himself, who

11  promoted cutthroat business tactics.  Kalanick demonstrated a reckless obsession with success – and

12  a disregard for the law – long before he started Uber.  In 1998, he co-founded Scour, a peer-to-peer

13  Napster-style file-sharing service, but filed for bankruptcy in 2000 after the National Picture

14  Association of America sued him for copyright infringement and sought $250 billion.  Months later,

15  Kalanick launched another file-sharing service called Red Swoosh, which he also operated illegally.

16  Kalanick took tax dollars from his employees' paychecks to pay company debts, in clear violation of

17  U.S. tax law.[50]  He ultimately had to pay the Internal Revenue Service $110,000 to avoid jail time.[51]

18  Kalanick introduced and promoted the same breakneck mindset at Uber, where *USA Today*

19  described his regard for the law as "ignore and proceed."[52]

20

---

21  [48]    *Uber calls competitor service 'criminal'*, CNN Business: Brainstorm Tech.,
https://money.cnn.com/video/technology/2013/07/24/t-bst-uber-lyft.fortune/index.html.

22  [49]    *Id.*

23  [50]    Mike Isaac, *Uber's C.E.O. Plays With Fire*, N.Y. Times, Apr. 23, 2017, https://www.nytimes
24  .com/2017/04/23/technology/travis-kalanick-pushes-uber-and-himself-to-the-precipice.html.

25  [51]    Richard Feloni, *How Uber CEO Travis Kalanick Went From A Startup Failure To One Of
The Hottest Names In Silicon Valley*, Business Insider, Sept. 24, 2014, http://www.business
26  insider.com/uber-ceo-travis-kalanicks-success-story-2014-9.

27  [52]    Marco della Cava, Jessica Guynn & Jon Swartz, *Uber's Kalanick faces crisis over 'baller'
culture*, USA Today, Feb. 24, 2017, https://www.usatoday.com/story/tech/news/2017/02/24/uber-
28  travis-kalanick-/98328660/.

### 2.    FCPA Violations

61.    Uber has also been accused of engaging in other illegal conduct to support its rapid growth and expansion.  Credible allegations have been made regarding bribes paid to foreign officials in at least five countries: Malaysia, Indonesia, China, South Korea, and India.  On May 5, 2017, an attorney sent a letter to Uber Associate General Counsel Angela Padilla ("Padilla") on behalf of his client, Uber's former Manager of Global Intelligence Richard Jacobs ("Jacobs").  The letter stated that "Jacobs reasonably believed that bribery of foreign officials was taking place" in violation of the Foreign Corrupt Practices Act ("FCPA").[53]  Uber has reportedly retained O'Melveny & Myers LLP to investigate records of payments made in Asia.[54]

62.    According to the letter, Jacobs became aware during his employment that Uber was targeting government officials in order to learn:

(a)    "who might be compelled to end costly enforcement activities or partner with Uber to unblock the market";

(b)    "what local network of contacts has connections to police and regulatory authorities";

(c)    "what political leaders may be persuaded to stop any opposition"; and

(d)    "if senior political officials would be willing to push a ride-sharing agenda through the city or national government."[55]

63.    Jacobs' letter provides a further credible basis for establishing that investors were misled by Uber's warnings about the risks of legal and regulatory compliance. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[53]    *Waymo v. Uber Techs., Inc.*, No. 3:17-cv-00939-WHA, ECF No. 2401-1 at 26 (Dec. 15, 2017).

[54]    Eric Newcomer, *Uber Faces Widespread Asia Bribery Allegations Amid U.S. Criminal Probe*, Bloomberg, Sept. 20, 2017, https://www.bloomberg.com/news/articles/2017-09-20/uber-is-said-to-review-asia-dealings-amid-u-s-criminal-probe.

[55]    Letter from Clayton D. Halunen, to Angela Padilla, Assoc. Gen. Counsel, Litig. & Emp't (May 5, 2017), https://www.complianceweek.com/sites/default/files/uberletter.pdf.

1

2

3



4

5

6

7

8

9

10

11

12

13    64.    It was misleading to investors to warn of the consequences of FCPA violations *without* disclosing that Uber was then engaging in activities proscribed by the FCPA, and/or attempting to take advantage of the "high levels of corruption" that existed in areas where it did business by bribing officials to facilitate Uber's expansion or look the other way when its activities violated local laws and regulations.

14

15

16

17           **B.    Defendants Misrepresented the Risks to
                      Uber's Business from Competition**

18

19    65.    Among the most significant risks to the Company was its competition with Lyft and other ride-sharing services for qualified and reliable drivers.  Because the pool of drivers was limited, the Company's success in attracting drivers had a significant impact on the availability of its services and, as a result, its competition for riders and its revenues and earnings.  The "Analysis and Valuation" section of the New Riders Series G Offering Memorandum recommended an investment in Uber based, in part, on "the sustainability of a company's competitive advantage" due to the

20

21

22

23

24

25

26

27

_____
56

28

1    Company's "strong network effect of its installed base and its first mover advantage in recruiting

2    drivers and attracting riders."[57]



SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG

69.

70.

59

60

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                          - 30 -

1 ██████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ██████████████████████████████████████████████

8 ████████████████████████████

9       71.     Had investors known about Hell or other similar anti-competitive activities, the price

10  of Uber securities sold in the Offerings would have been materially less to account for the increased

11  risks those activities presented to the Company's earnings, growth, and reputation.

12       72.     Defendants' public statements around the time of the Offerings further misled

13  investors with similar false and misleading assurances about the activities Uber engaged in to

14  attempt to confront competition for ride-sharing services.  Defendants repeatedly distinguished Uber

15  from its competitors – Lyft, traditional taxi services, and others – who they accused of employing

16  underhanded tactics to thwart Uber's success.  In fact, it was Uber that was resorting to unfair and

17  misleading forms of competition like the Hell and Greyball programs, and whose activities were

18  being concealed from investors, riders, drivers, and government regulators.

19       73.     For example, in a letter e-mailed to prospective investors in Uber's June 22, 2015

20  fundraising round to support its operations in China, Kalanick warned that competing in China "is

21  not for the faint of heart," then went on to describe purported actions by Uber's competitors in China

22  to block its accounts, stage fake protests, and forge text messages to drivers claiming that the

23  Company was going out of business.  Kalanick then assured prospective investors that Uber had not

24  been harmed by and would not stoop to such tactics:

25            This is why it is important for our team and technology to be resilient – so
            far, none of these maneuvers have dented our growth.  We at Uber pride ourselves on

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                                - 31 -

1   being fierce and principled competitors – we plan to succeed by continuing to win the hearts and minds of riders and drivers with a superior product experience.[61]

2

3   74.   Another example:  At the Code Conference on May 28, 2014, just ahead of Uber's

4   Series D offering, Kalanick discussed Uber's need to raise a "'record-breaking'" amount of cash to

5   fend off competition, particularly from legacy taxi companies.  "'[T]he opponent is an a**hole

6   named Taxi,'" Kalanick said.  "'Nobody likes him, he's not a nice character, but he's so woven into

7   the political machinery and fabric that a lot of people owe him favors. . . .  We have to bring out the

8   truth about how dark and dangerous and evil the taxi side is.'"[62]

9   75.   Yet another:  In August 2014 reports surfaced that, in an attempt to lure drivers to its

10  platform, Uber had paid people to book rides with Lyft drivers using dummy accounts to try to

11  recruit them to Uber, and had also had its employees book and cancel more than 5,000 rides on Lyft

12  to make their cars unavailable to ride-sharing customers.[63]  With its Series D offering just completed

13  and its Series E offering set to take place in just four months, Uber – without disclosing the secret

14  Hell program that was then operating – falsely assured investors and others that its practices were

15  above-board and transparent.  As reported by *c/net* on August 26, 2014:

16  ***Uber has remained adamant that its marketing tactics are transparent, including "never intentionally canceling rides."***  In a blog post published Tuesday, Uber maintained that its goal is to recruit more drivers and suggested there's nothing nefarious about its tactics.  The company also confirmed it uses "brand ambassadors" and will take rides with competitors to recruit drivers.

17

18

19  "There's been a lot of discussion – and a lot of misinformation – about Uber's driver recruitment and the ridesharing industry's [sic] at large," Uber wrote.  "We'd like to set the record straight and demystify our recruiting efforts, which we call Operation SLOG (Supplying Long-term Operations Growth).  With millions of riders

20

21

22  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [61]   June 2015 letter to investors from Travis Kalanick, *Uber successful in China*, http://im.ft-static.com/content/images/b11657c0-1079-11e5-b4dc-00144feabdc0.pdf; *see also Uber boasts one*

23  *millions transactions a day in China*, China Travel News, June 12, 2015, https://www.chinatravelnews.com/article/93049.

24  [62]   Liz Gannes, *Travis Kalanick: Uber is Raising More Money to Fight Lyft and the "Asshole"*

25  *Taxi Industry*, Recode, May 28, 2014, http://www.recode.net/2014/5/28/11627354/travis-kalanick-uber-is-raising-more-money-to-fight-lyft-and-the.

26  [63]   Dara Kerr, *Uber designs secret recruiting crusade – Operation SLOG*, C/NET (Aug. 26,

27  2014), https://www.cnet.com/news/uber-designs-secret-recruiting-crusade-operation-slog/;  Dara Kerr, *Uber accused of playing dirty in competition with Lyft*, C/NET (Aug. 11, 2014),

28  https://www.cnet.com/news/uber-said-to-be-playing-dirty-in-competition-with-lyft/.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 32

and ever-increasing demand for more rides in even more cities, we are always working hard to recruit new drivers onto the platform."[64]

76.     On the same day, during an interview with *Bloomberg TV*, Kalanick denied using Hell or any other program designed to book and cancel competitors' rides:

> [Interviewer:] Travis, let me ask you about some allegations that surfaced recently by Lyft. Lyft saying that Uber plays dirty tricks and they're accusing your company of having booked roughly 5,000 rides and then canceling them as a way to sort of thwart competition.  What do you say in response to that?

<div align="center">*        *        *</div>

> [Kalanick:] Look, any – 10 percent of all requests that are ever made on our system are cancellations by people who are just using the system. That's a natural thing. And so ***there was never any - any kind of intention or anything like what was being proposed.  We just categorically deny it***.  And I really think the accusation in the first place was the real dirty trick.[65]

77.     The denials continued.  Throughout several rounds of financing, Kalanick made false or misleading assurances about the Company's ability to compete based upon its higher-quality product and superior performance, rather than its use of anticompetitive programs like Hell.  For example, he said:

(a)     "***[T]he way we compete first is making sure the highest quality service, lowest pick up times, and the least expensive ride*** so the – the most affordable ride. So make it affordable.  Make it highest quality.  Have really quick pick up times, and you kind of – you kind of win.  And what happens is when you have a head start and you have a whole bunch of activity going in a particular market, the trips per hour that drivers can get because lots of people are using is it really high, which means that the cost per ride can be much lower because they're staying very active."[66]

---

[64]     Dara Kerr, *Uber designs secret recruiting crusade – Operation SLOG*, c/net (Aug. 26, 2014), https://www.cnet.com/news/uber-designs-secret-recruiting-crusade-operation-slog/.  The blog post described in the article has since been removed from Uber's website.

[65]     *Uber CEO Travis Kalanick and David Plouffe on Bloomberg TV*, Bloomberg TV, Aug. 19, 2014.

[66]     *Uber CEO Travis Kalanick & AMEX Pres. Edward Gilligan on BB TV*, Bloomberg TV, June 9, 2014.

1        (b)     "At the end of the day, ***you've gotta be in . . . the cities providing a great***

2   ***service and that's ultimately what wins***.  Where the money flows from one company to another is

3   not as important as the reliability, the affordability, and, again, that little bit of magic you can add to

4   every experience, and the continued innovation to . . . increase expectations over time."[67]

5        78.    Uber's false assurances about the nature of its competitive activities remained alive

6   and uncorrected in the market until after the Series E, F, and G offerings were completed.  As a

7   result, the misrepresentations altered the total mix of information available to investors at the time

8   each of the offerings took place.

9        79.    Each of the misrepresentations alleged in ¶¶73-77 above was materially false or

10   misleading by reason of the omission to disclose programs like Greyball and Hell, or the other illegal

11   and unfair methods of competition Uber was using to lure drivers and riders away from its

12   competitors, and for the additional reasons set forth below:

13        (a)    The representation that "[w]e at Uber pride ourselves on being fierce and

14   principled competitors" and "we plan to succeed by continuing to win the hearts and minds of riders

15   and drivers with a superior product experience" (¶73, *supra*) was misleading; while defendants

16   accused Uber's competitors of employing underhanded tactics to thwart Uber's business, defendants

17   concealed that Uber was then engaging in the same types of unfair and illegal forms of competition

18   like Hell and that it was those activities, rather than "a superior product experience," that was driving

19   its growth and competitive success.

20        (b)    The representation that Uber needed the "record-breaking" amount of cash

21   raised in the offering "to bring out the truth about how dark and dangerous and evil the taxi side is"

22   (¶74, *supra*) was misleading because it falsely suggested Uber was playing by the rules while legacy

23   taxi services were not, whereas the truth was that Uber itself was using illegal and unfair methods of

24   competition, including concealed programs like Hell and Greyball.

25        (c)    The representation that "the way we compete first is making sure the highest

26   quality service, lowest pick up times, and the least expensive ride" (¶77(a), *supra*) was misleading

---

27   [67]     ET Now, *In Conversation With Uber Inc.'s CEO – Travis Kalanick*, YouTube (Sept. 23,

28   2015), https://www.youtube.com/watch?v=ByF2MVufBlU

1    because Uber omitted to disclose it was resorting to unfair and misleading forms of competition like

2    the Hell and Greyball programs to gain an unfair competitive advantage.

3                 (d)      The representation that Uber's marketing tactics are transparent, including

4    "never intentionally canceling rides"(¶75, *supra*) was false, because Uber was actively ***concealing***

5    programs that did exactly that.  At the time this statement was made, Greyball was being used to

6    cancel ride requests from government officials and regulators while Hell was being used to divert

7    rides from competitors' platforms and lure drivers away from Lyft and other competitors.  The

8    statement was particularly misleading because it was used to discredit and deny public reports that

9    Uber had paid people to book rides with Lyft to try to recruit the drivers (¶75, *supra*), including by

10   claiming that competitors had provided "a lot of misinformation [] about Uber's driver recruitment"

11   when, in fact, the misinformation was originating from Uber itself.

12                (e)      Kalanick's response to the interviewers' question on *Bloomberg TV* (¶76,

13   *supra*) was false, because Uber was in fact booking rides on its competitors' systems for the purpose

14   of recruiting drivers.  Thus, the representation that "there was never any – any kind of intention or

15   anything like what was being proposed" in response to a question about Uber booking and cancelling

16   rides with Lyft drivers (¶76, *supra*) was likewise misleading because Uber was using its Hell

17   program to gain this and other unfair competitive advantages.

18                (f)      The representation that "you've gotta be in . . . the cities providing a great

19   service, and that's ultimately what wins" (¶77(b), *supra*) was misleading because Uber concealed its

20   use of programs like Hell that were intended to give Uber an unfair upper hand over its competitors

21   to win.

22           80.     Uber's Hell program was in existence and being used by Uber during each of the

23   Offerings.  Although the program was reportedly discontinued in 2016, it was not publicly revealed

24   until April 12, 2017, when an article describing the program was published by *The Information*, a

25   subscription-based technology news service.  The article, based on information obtained from "a

26   person who was involved in the program and a person who was briefed about it," said  that Hell was

27   being used by Uber "between 2014 and the early part of 2016" and was designed to "show . . . Uber

28

1   employees which of the tracked drivers were driving for both Lyft and Uber, helping Uber figure out

2   how to lure those drivers away from its rival."[68]

3          81.    Uber and Kalanick knew or had reason to believe that the statements alleged in ¶¶73-

4   77 misrepresented material facts and/or omitted material facts necessary to make the statements

5   made, at the time made and in light of the circumstances under which they were made, not

6   misleading, including because the secret Hell program that was then being used to steal drivers and

7   riders from Lyft had been authorized, established, and was being operated under the express

8   direction and oversight of Kalanick and other top executives of the Company.

9          82.    As reported by *The Information*:

10             Only a small group of Uber employees, including top executives such as CEO
        Travis Kalanick, knew about the program, said the person who was involved in it.

11      Not even Uber's then-powerful "general managers" who ran the business in
        individual cities were supposed to know about it.

12
               The program, part of the company's competitive intelligence, or "COIN,"

13      group, was referred to as "Hell" because it paralleled Uber's dashboard of Uber
        drivers and riders known as "God View," or "Heaven."

14
                             *         *         *
15
               Hell was overseen by several employees, including a product manager and

16      data scientists who had special access to a room at Uber's headquarters in San
        Francisco, where the intel on Lyft's drivers was collected via computers that had the

17      spoof accounts, this person said.[69]

18         83.    Uber's use of the Hell program was directly contrary to defendants' assurances about

19   the transparent nature of Uber's driver-recruiting efforts, and defendants' denial that the Company

20   was engaged in underhanded or unfair recruitment practices.  The use of the Hell program also was

21   inconsistent with the risk warnings alleged in ¶68, which asserted that the Company's success in

22   recruiting drivers would result from the advantages of its platform and its ability to offer competitive

23   compensation and benefits when, in truth, Uber was simply hacking its competitor's system to steer

24   drivers toward its own customers so as to secretly prevent them from working for Lyft.

25

26   [68]    Amir Efrati, *Uber's Top Secret "Hell" Program Exploited Lyft's Vulnerability*, The
     Information (Apr. 12, 2017), https://www.theinformation.com/articles/ubers-top-secret-hell-
     program-exploited-lyfts-vulnerability.

27   [69]    *Id*.

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                          - 36 -

84.     As reported by *The Information*:

Hell started like this: Uber created fake Lyft rider accounts and used commonly available software to fool Lyft's system into thinking those riders were in particular locations, according to the person. (That in and of itself is a violation of Lyft's terms of service, which prohibits users from "impersonat[ing] any person or entity," which Lyft riders must agree to when they open the app.)

The spoofed Lyft accounts made by Uber then could get information about as many as eight of the nearest available Lyft drivers who could accommodate a ride request. Uber made sure that in each city where it was competing with Lyft, the fake rider locations were organized in a grid-like format so that it could view the entire city.

In other words, Uber could see, nearly in real time, all of Lyft's drivers who were available for new rides – and where those drivers were located. That also allowed Uber to track the prices Lyft would offer to riders for certain trips, and how many cars were available to pick up riders at a particular time in one city or another.

Lyft's Flaw

But Uber executives realized there was vulnerability in Lyft's system. The information about the nearby Lyft drivers included a special numbered ID, or token, that was tied to each individual driver. That ID remained consistent over time. So Uber could identify the same drivers again and again no matter where they were in a city. Thus, it learned some of those drivers' habits, such as what time of day or what days of the week they would run the Lyft app. (Uber constantly changes the IDs of its drivers for the Uber app so they can't be tracked in the same way, said the person involved with Hell.).

Here's the critical part of Hell: Because Uber tracked Lyft's drivers over time, it was able to figure out which of them were driving for Uber too, because it would be able to match the locations of its own drivers with those of Lyft. In many cities, more than 60% of Lyft's drivers also drive for Uber because they want to maximize their earnings. (As of a year ago, Lyft said it had about 315,000 drivers.) Uber thus had specific identities and contact information for the majority of Lyft's weekly or monthly active drivers in a particular place. "We achieved ground truth," said the person involved in the program.

Armed with data about when and where Lyft's drivers were operating, Uber aimed to sway them to work only for Uber instead, this person said. One way was to give them special financial bonuses for reaching a certain number of rides per week.

Uber employees involved with the Hell program passed along a list of drivers that should be targeted by the city general managers, who oversaw driver bonus budgets at that time.

Another goal of the program was to make sure Uber steered rides more reliably to Uber drivers who were also available on the Lyft network than to those who weren't, this person said. In other words, if there were several Uber drivers near an Uber rider but one of those drivers was also frequently available on the Lyft network, as seen by the Hell program, Uber's ride-dispatch team was supposed to "tip" that ride request to the driver who was "dual apping," or typically looking for riders through both the Lyft and Uber apps, sometimes by using two different smartphones at the same time.

The person involved in the program called it "privileged dispatch" and said Uber aimed to use that to squeeze Lyft's supply of drivers.  This person didn't know how much the ride-dispatch team used data derived from Hell as part of its calculations.  An Uber spokesman said the company does not give preference to "dual-apping" drivers.[70]

85.   The account in *The Information* was corroborated by Uber's former Manager of Global Intelligence Jacobs, whose lawyer described similar practices in a May 2017 letter written to Uber Associate General Counsel Padilla detailing Uber's misconduct with its competitors.  According to Jacobs' letter, which Padilla forwarded to Kalanick, Uber's Marketplace Analytics ("MA") team "fraudulently impersonates riders and drivers on competitor platforms, hacks into competitor networks, and conducts unlawful wiretapping."  He said Uber used these tactics to obtain "supply data, including unique driver information," among other things.  He explained:

By credibly impersonating both riders and drivers, the MA team could request thousands of rides in a given geographic area to study the responsiveness and capability of app, price quotes, and disposition of available drivers.  MA further impersonated prospective customers to ascertain the identity of drivers through their names, license plate numbers, and make/model of their vehicles.  Uber then used this information to recruit competitors to Uber's platform.[71]

86.   Jacobs claimed the MA team collected competitors' "supply data, . . . business metrics, business strategy information" and information about the "basic functionality . . . and security of their data," and then "delivered these collections directly to Kalanick."[72]

87.   Uber did not deny Jacobs' allegations regarding the illegality of the Hell program.  Instead, within four months after Uber received Jacobs' letter, the Company agreed to pay him and his lawyer $7.5 million in exchange for his promise not to discuss the allegations with anyone unless compelled to do so during a government investigation.  When the letter came to light days before the *Waymo* trial was set to start in November 2017, Judge Alsup observed that "'[p]eople don't pay that kind of money for B.S.'"

---

[70]   *Id.*

[71]   Letter from Clayton D. Halunen, to Angela Padilla, Assoc. Gen. Counsel, Litig. & Emp't (May 5, 2017), https://www.complianceweek.com/sites/default/files/uberletter.pdf.

[72]   *Id.*

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG                                                                      - 38

88.     On October 11, 2017, reports surfaced that several Uber employees had anonymously confirmed the existence of Hell.  These employees explained that the Company formally approved the program after "[t]he legal team decided the law was unclear on such tactics."[73]  Soon thereafter, new CEO Khosrowshahi acknowledged that the Company was "'***probably trading off doing the right thing for growth, and thinking about competition maybe a bit too aggressively, and some of those things were mistakes***.'"[74]

89.     In September 2017, it was reported that the Company was under federal investigation by the FBI and the U.S. Attorney's Office for the Southern District of New York for its use of the Hell program.  Reportedly, authorities are investigating whether Uber used Hell to illegally thwart competition and violate computer-access laws.  These investigations remain ongoing.

C.     **Defendants Misrepresented the Risks to Uber's Business from Data Security Breaches**

90.     In May 2014, internet hackers infiltrated Uber using information obtained on the coding website GitHub,[75] stealing personal data from 50,000 Uber drivers.  Defendants discovered this breach in September 2014, just as the Company prepared for its Series E financing round.  At the time of the discovery, the vast majority of U.S. states required prompt disclosure of the breach.[76] Rather than obey these laws, defendants concealed the breach until the Series E offering closed five months later to avoid the negative publicity.  Between learning of the breach and closing of the Series E offering, defendants made false and misleading statements about the security of its systems, claiming, for example, that "access to rider and driver accounts is being closely monitored and audited by data security specialists on an ongoing basis" in order to "protect[] [it] from . . .

---

[73]     Eric Newcomer, *Uber insiders describe culture of rule-breaking that comes from the top*, Independent, Oct. 11, 2017, https://www.independent.co.uk/news/business/news/uber-culture-dara-khosrowshahi-rule-breaking-criminal-probes-scandals-drivers-taxi-app-a7994196.html.

[74]     Sheelah Kolhatkar, *At Uber, A New C.E.O. Shifts Gears*, The New Yorker, Apr. 9, 2018, https://www.newyorker.com/magazine/2018/04/09/at-uber-a-new-ceo-shifts-gears.

[75]     GitHub is a source code repository that allows developers to publicly access the code from any location.

[76]     National Conference of State Legislatures, *Security Breach Notification Laws* (Sept. 29, 2018),   http://www.ncsl.org/research/telecommunications-and-information-technology/security-breach-notification-laws.aspx.

1 unauthorized access."[77]  When defendants eventually disclosed the breach in February 2015 (*after*

2 the Series E offering was completed), they assured investors that the deficiencies in its security

3 systems had been corrected and claimed they were doing everything in their power to prevent future

4 breaches.  In reality, according to the Federal Trade Commission ("FTC"), former Uber employees,

5 and several enforcement actions filed by government agencies throughout the country, Uber *never*

6 implemented many of the promised changes.[78]  Uber's failure to correct even the most obvious

7 security deficiencies, which was deliberately concealed from investors in the Series F and G

8 offerings, led to a second, nearly identical breach in October 2016 (after both those offerings were

9 completed), in which the data of more than *57 million* drivers and customers was compromised.  A

10 new round of lawsuits and government investigations unfurled, contending that the Company had

11 not made the corrections it promised in 2014, reducing the value of the securities sold in those

12 offerings.  Uber has paid more than $148 million to settle these claims to date.

13
        **1.**      **Uber's Risk Disclosures Were Materially Incomplete and Misleading**



24 [77]     Paul Carr, *Amid escalating scandal, Uber publishes new data privacy statement*, Pando,
25 Nov. 18, 2014, https://pando.com/2014/11/18/amid-escalating-scandal-uber-publishes-new-data-privacy-statement/.

26 [78]     *City of Chicago v. Uber Techs. Inc.*, No. 2017-CH-15594 (Ill. Cir. Ct. Nov. 27, 2017); Cyrus
27 Farivar, *Chicago: Uber's claim that hackers fully deleted stolen data is "nonsensical,"* Ars Technica
(Nov. 28, 2017), https://arstechnica.com/tech-policy/2017/11/in-data-breach-lawsuit-chicago-slams-uber-for-trusting-word-of-criminals/.

28



93.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                    - 41 -

1

2

3

4   94.

5

6

7

8   95.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                   - 42 -

1

### 2.    Uber Deliberately Concealed the 2014 Data Breach from Investors in the Series E Offering

2

3    96.    Uber concealed the 2014 data breach from investors in the Series E offering on

4    December 12, 2014.  On September 17, 2014, Uber learned that hackers had stolen valuable private

5    information – including names, driver's license numbers, and some bank account information and

6    social security numbers – from 50,000 of its drivers, which the hackers could use to commit identity

7    theft, financial fraud, and other identity-related crimes.  Hackers breached Uber's systems by simply

8    obtaining a single "'security key'" that Uber employees made available on one or more GitHub

9    webpages, and then used that key to gain "full administrative privileges to all data and documents

10   stored within [Uber's] Amazon S3 Datastore."[81]

11   97.    When defendants discovered the breach in September 2014, all states but two, and all

12   major U.S. territories, had enacted statutes requiring companies to follow specific procedures after a

13   data breach, and nearly all of them required prompt disclosure regardless of the damage inflicted.[82]

14   For example, California, New York, and at least two dozen other states dictate that "disclosure shall

15   be made in the most expedient time possible and without unreasonable delay."[83]  Several states and

16   territories place specific time restrictions on disclosure, and none allow more than 90 days.[84]

17

18   _____

[81]    Uber "relies on the Amazon S3 Datastore to store a wide variety of files that contain sensitive
19   personal information.  These files include, among other things, full and partial backups of Uber
databases.  The database back-ups contain a broad range of Rider and Driver personal information,
20   including, among other things, names, nicknames, e-mail addresses, postal addresses, phone
numbers, unique device identifiers, trip records, geolocation information, and driver's license
21   numbers.  The files also include documents provided by Uber Drivers, such as vehicle registration
receipts, proof of insurance documents, and images of driver's licenses."  *In the Matter of Uber*
22   *Techs., Inc.*, No. 1523054, Complaint, ¶¶15, 18 (F.T.C. Aug. 15, 2017), https://www.ftc.gov/system/
files/documents/cases/1523054_uber_technologies_complaint.pdf; Kieren McCarthy, *FORK ME!*
23   *Uber hauls GitHub into court to find who hacked database of 50,000 drivers*, The Register, Feb. 28,
2015, http://www.theregister.co.uk/2015/02/28/uber_subpoenas_github_for_hacker_details/.

24   [82]    The other two states – Alabama and South Dakota – have since enacted similar statutes.
25   http://www.ncsl.org/research/telecommunications-and-information-technology/security-breach-
notification-laws.aspx.

26   [83]    Cal. Civ. Code §1798.29; N.Y. State Tech. Law 208.

27   [84]    *See, e.g.*, Idaho Stat. §28-51-105 (24 hours); 10 Laws of Puerto Rico §4052 (10 days); Colo.
28   Rev. Stat. §6-1-716 (30 days); Ohio Rev. Code Ann. §1349.19 (45 days).

1    98.    Uber knew, however, that the breach would raise significant concerns over its ability

2    to protect the privacy of its drivers and riders and would negatively impact the Company's revenues,

3    financial results, and reputation.  Indeed, for years prior to the 2014 breach, the development and

4    security industries have widely understood that storing credentials on GitHub repositories increases

5    the risk of a data breach.[85]  To avoid alerting investors to these risks, defendants simply ignored the

6    disclosure laws and kept the breach secret until the Series E offering was complete.  The

7    concealment of the 2014 data breach was materially misleading to investors in the Series E offering,

8    because it concealed significant, known risks to the Company that had manifested at the time that

9    securities were sold to investors in that offering.  The risk to the Company from the undisclosed data

10   breach was particularly significant in light of the risks to Uber's business from drivers discontinuing

11   use of its platform, as discussed *supra* at §VI.B.

12   99.    Uber's own use of the data provided to it by riders came under scrutiny on

13   November 17, 2014, when *Buzzfeed* reported that Emil Michael ("Michael"), Uber's senior vice

14   president of business, had publicly threatened to use that data to retaliate against journalists who

15   criticized the Company's business practices.  Michael suggested the Company would spend "'a

16   million dollars'" to form a team of "opposition researchers" to look into the "'personal lives'" and

17   "'families'" of offending journalists, and that Uber would get away with it because "'[n]obody

18   would know it was us.'"[86]  The next day, on November 18, 2014, *Buzzfeed* published another article

19   that described an internal aerial tracking tool, referred to as "'God View,'" that Uber executives were

20   using to covertly target and track journalists who released negative reports about the Company.[87]

21   These reports were widely circulated in the press and caused considerable consumer uproar.  In

22

23   [85]    *See Best Practices for Managing AWS Access Keys*, Wayback Machine (Dec. 8, 2017),
     https://web.archive.org/web/20171208015922/http://docs.aws.amazon.com/general/latest/gr/aws-
24   access-keys-best-practices.html.

25   [86]    Ben Smith, *Uber Executive Suggests Digging Up Dirt On Journalists*, Buzzfeed News,
     Nov. 17, 2014, https://www.buzzfeednews.com/article/bensmith/uber-executive-suggests-digging-
26   up-dirt-on-journalists.

27   [87]    Johana Bhuiyan, *"God View": Uber Investigates Its Top New York Executive For Privacy
     Violations*, Buzzfeed News, Nov. 18, 2014, https://www.buzzfeednews.com/article/
28   johanabhuiyan/uber-is-investigating-its-top-new-york-executive-for-privacy.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                                    - 44 -

1    response to the public outcry, the New York Attorney General launched an investigation into Uber's

2    use of consumer data.[88]  However, neither the investigation nor the media reports that precipitated it

3    revealed the 2014 data breach, which continued to be concealed by defendants.

4           100.     In response to the negative publicity, and in order to quell investor concern in

5    advance of the Series E offering, on November 18, 2014, Uber posted the following statement on its

6    website, which again did not disclose the known 2014 data breach:

> Uber has a strict policy prohibiting all employees at every level from accessing a
> rider or driver's data.  The only exception to this policy is for a limited set of
> legitimate business purposes.  Our policy has been communicated to all employees
> and contractors.
>
> *       \*       \**
>
> The policy is also clear that ***access to rider and driver accounts is being
> closely monitored and audited by data security specialists on an ongoing basis, and
> any violations of the policy will result in disciplinary action***, including the
> possibility of termination and legal action.[89]

13           101.     Two days later, on November 20, 2014, Uber announced it had hired experts to

14    examine its privacy policies, claiming "'***we understand that we must treat [rider data] carefully***

15    ***and with respect, protecting it from unauthorized access***.'"[90]  Again, the 2014 data breach remained

16    concealed from investors.

17           102.     The November 18 and November 20, 2014 announcements were both materially

18    misleading to investors because while they touted Uber's security programs, defendants concealed

19    that hackers stole valuable information from 50,000 of its drivers, a fact they learned months before.

20           103.     On January 30, 2015, while the Series E offering was still underway, Uber

21    spokesperson Molly Spaeth ("Spaeth") announced the findings of Uber's privacy experts.  Again,

---

[88]     Press Release, N.Y. State Office of the Attorney Gen., A.G. Schneiderman Announces Settlement with Uber to Enhance Rider Privacy (Jan. 6, 2016), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-uber-enhance-rider-privacy.

[89]     Paul Carr, *Amid escalating scandal, Uber publishes new data privacy statement*, Pando, Nov. 18, 2014, https://pando.com/2014/11/18/amid-escalating-scandal-uber-publishes-new-data-privacy-statement/.

[90]     James Kosur, *Uber Hires Outside Privacy Experts To Examine Company Policies*, Business 2 Community, Nov. 21, 2014, https://technopreneurph.wordpress.com/2014/11/21/uber-hires-outside-privacy-experts-to-examine-company-policies-james-kusur/.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG               - 45 -

1 defendants concealed the 2014 data breach.  In the announcement, Spaeth, on behalf of Uber,

2 asserted that:

3         (a)    "The review was comprehensive and found that overall our Privacy Program

4 is strong."

5         (b)    "Our approach is to constantly review and iterate on our policies, processes

6 and technology so that we ultimately become a leader in the area of privacy and data protection."

7         (c)    "Our promise to the Uber Community is that when it comes to privacy, our

8 commitment doesn't stop with the findings of this report; it is ongoing.  We won't rest until our

9 Privacy Program is world class and we are confident our roadmap will get us there."[91]

10       104.    Each of the foregoing statements was materially false and misleading by reason of

11 Uber's continuing concealment of the 2014 data breach.  Each of the statements was also misleading

12 for the additional reasons set forth below:

13         (a)    The statement that "[t]he review was comprehensive and found that overall

14 our Privacy Program is strong" (¶103(a), *supra*) was misleading because defendants omitted to

15 disclose that "it was not in the scope of [the] review to perform a technical audit of Uber's data

16 security controls," *e.g.*, the review did not assess whether "the systems storing [Uber's] data" were

17 "sufficiently secure to protect against unauthorized access and loss."[92]

18         (b)    The statement that "[o]ur approach is to constantly review and iterate on our

19 policies, processes and technology so that we ultimately become a leader in the area of privacy and

20 data protection" (¶103(b), *supra*) was false and misleading because defendants in fact did not

21 implement security measures they knew were required, including changes and improvements to

22 Uber's security protocols that they had publicly touted.

23         (c)    The assertion that Uber's "commitment doesn't stop with the findings of this

24 report" and that it "won't rest until our Privacy Program is world class and we are confident our

---

25 [91]    Molly Spaeth, *Protecting Privacy: Our Commitment*, Uber Newsroom (Jan. 30, 2015),

26 https://www.uber.com/newsroom/protecting-privacy-our-commitment.

27 [92]    Review and Assessment of Uber's Privacy Program 24 (Jan. 2015), https://

28 newsroom.uber.com/wp-content/uploads/2015/01/Full-Report-Review-and-Assessment-of-Ubers-Privacy-Program-01.30.15.pdf.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG        - 46 -

1  roadmap will get us there" (¶103(c), *supra*) was false because defendants lacked the commitment

2  they claimed to have, as evidenced by the fact that the Company had not addressed the known

3  vulnerabilities in its system that had led to the 2014 data breach, such that they had no actual or

4  reasonable basis for a belief that the Company was developing a "world class" Privacy Program.

5  **3.    Uber Misled Investors in the Series F and G Offerings by Omitting to Disclose that It Had Not Corrected the Known Conditions that Caused the 2014 Data Breach**

6

7  105.    Defendants finally disclosed the 2014 data breach on February 26, 2015, five months

8  after they discovered it and just eight days after the Series E offering closed.  In a statement, Uber's

9  managing counsel of data privacy, Katherine Tassi ("Tassi"), admitted the Company became aware

10  of a vulnerability in its system in September 2014, but assured the public that the breach was limited

11  to "'a *one-time* unauthorized access to an Uber database by a third party.'"[93]  In response to the

12  disclosure, the New York Attorney General expanded his existing investigation into Uber's use of

13  consumer data to include the breach and the Company's response to it.[94]

14  106.    On April 2, 2015, the Company announced the hiring of Joe Sullivan ("Sullivan"), a

15  former Facebook security executive, as First Chief Security Officer. In connection with the hire,

16  Kalanick assured investors that the Company had "invested significantly in expanding and

17  improving safety and security."[95]  In the same release, Sullivan reinforced the state of Uber's

18  security:

19          I'm excited about Uber's mission of revolutionizing transportation and, like
        Travis and the leadership team at Uber, firmly believe building world-class safety
20          and security are critical to that mission.  I had the good fortune to work at two
        amazing companies – eBay and Facebook – when they were growing rapidly.  I look
21          forward to bringing the best practices that I've learned along the way to Uber and
        doing defining work in bridging the divide between the digital and physical worlds.
22

23  [93]    Marlize van Romburgh, *50,000 drivers could be affected in Uber data hack, Marlize van

24  Romburgh*, S.F. Bus. Times, Feb. 27, 2015, https://www.bizjournals.com/sanfrancisco/blog/techflash/2015/02/uber-data-hack-driver-information-breach.html.

25  [94]    Press Release, N.Y. State Office of the Attorney Gen., A.G. Schneiderman Announces

26  Settlement with Uber to Enhance Rider Privacy (Jan. 6, 2016), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-uber-enhance-rider-privacy.

27  [95]    Travis Kalanick, *Joe Sullivan Joining Uber as First Chief Security Officer*, Uber Newsroom

28  (Apr. 2, 2015).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 47 -

There's a great foundation of safety already in place; my goal is to make it even stronger.

This is a chance to help build the culture of a young and growing organization, and to continue building upon the safety and security initiatives that are the backbone of Uber's success.[96]

107.    Uber announced the Series F offering the following month, on May 26, 2015.

108.    Two days later, to alleviate concerns about its ability to protect the data of its drivers and riders and the risks of events like the 2014 data breach to its business, Uber posted "An Update on Privacy at Uber" on its website, in which Tassi stated:

We care deeply about the privacy of our riders and drivers. It's why we're always looking at ways to improve our practices. In the last few months we have doubled the size of our privacy team, overhauled our data protection training for employees, published an external review of our privacy program and hired Joe Sullivan, a former cybercrime prosecutor, as our Chief Security Officer.[97]

109.    The update was misleading because it touted Uber's purported improvements in its security programs while simultaneously failing to disclose that the Company had deliberately failed to correct known security weaknesses that had led to the 2014 breach. Thus, it was misleading to assert that Uber had "overhauled [its] data training for employees" while omitting to disclose that it was still permitting employees to access rider and driver data through unsecured networks like GitHub without using multifactor authentication that was necessary to block intruders, or to again tout the findings of its "external review" of the privacy program that was misleading for reasons alleged above. As shown by Uber's failure to correct known security flaws in its data protection programs, it was not true that Uber "care[d] deeply about the privacy of [its] riders and drivers" or that it was "always looking at ways to improve [its] practices."

110.    On June 22, 2015, the Electronic Privacy Information Center ("EPIC") filed a complaint with the FTC challenging Uber's privacy policies and warning that the Company could use its app to track the location of riders and drivers even when the app was not in use, or to access a

---

[96]    *Id*.

[97]    Katherine Tassi, *An Update on Privacy at Uber*, Uber Newsroom (May 28, 2015), https://www.uber.com/newsroom/an-update-on-privacy-at-uber.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG                                                                                              - 48 -

1    person's contacts for purposes of sending them ads and messages.[98]  In response, Uber released a

2    statement that there was "'no basis for this complaint,'" adding: "We care deeply about the privacy

3    of our riders and driver-partners, and have significantly streamlined our privacy statements in order

4    to improve readability and transparency."[99]

5         111.    The statement that there was "no basis" for the complaint was false because Uber had

6    in fact used private data to track the movements of journalists critical of the Company, as well as to

7    monitor the activities of public officials and regulators through programs like Greyball.  In addition,

8    it was misleading to assert that the Company "care[s] deeply about the privacy of our riders and

9    driver-partners" given its actions that were unequivocally and directly contrary to the statement,

10   including its failure to implement even minimal changes to address the known vulnerabilities that led

11   to the 2014 data breach.

12        112.    As *The New York Times* recognized in reporting on the EPIC suit, Uber's desire and

13   ability to protect the privacy of riders and drivers was key to its valuation:

14              The stakes could be high for Uber . . . .  To date, Uber has raised nearly
                $6 billion in venture capital and is valued at more than $40 billion; the company has
15              plans to raise at least $1 billion more, according to a person with knowledge of the
                company's plans, which could value it at $50 billion.[100]
16
     Added another report on EPIC's allegations: "So the real question for any possible future investor in
17
     Uber is: How long amid all of the scandals and complaints will the company be able to maintain its
18
     billion Dollar plus valuation?"[101]
19
20        113.    In order to support the Company's valuation ahead of the Series G offering,

21   defendants continued to assert that it had addressed the problems that led to the 2014 data breach and

22   [98]     *In the Matter of Uber Techs., Inc.*, No. 152-3054, Complaint, Request for Investigation,
     Injunction, and Other Relief (F.T.C. June 22, 2015), https://www.scribd.com/document
23   /269315119/EPIC-FTC-Uber-Complaint.

24   [99]     Natasha Singer & Mike Isaac, *Uber Data Collection Changes Should Be Barred, Privacy
     Group Urges*, N.Y. Times, June 22, 2015, https://www.nytimes/2015/06/23/technology/uber-data-
25   collection-changes-should-be-barred-privacy-group-urges.html.

26   [100]    *Id.*

27   [101]    Gil Tanenbaum, *Uber Could Get Up To $1 Billion From New Chinese Investor*, Jewish Bus.
     News, June 23, 2015, http://jewishbusinessnews.com/2015/06/23/uber-could-get-up-to-1-billion-
28   from-new-chinese-investor/.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                          - 49 -

1   to assure that the Company was investing resources and taking actions needed to reliably reduce the

2   likelihood of future data breaches.  For example, the Company provided the following statement to

3   *The Huffington Post* for use in an August 18, 2015 article recounting the 2014 data breach and

4   discussing Uber's ability to keep consumer data safe:  "'We are scaling teams – including the

5   security team – across the company to match our growth, not in reaction to any events.'"[102] The

6   Company also said **it had instituted a multifactor authentication process** to prevent hackers from

7   gaining access to its data through the same means the hackers employed during the 2014 data

8   breach.[103]

9          114.    The foregoing statements were materially misleading to investors because they falsely

10  portrayed the Company as one that took extraordinary measures to adopt all reasonable measures to

11  protect its users' data such that the risk of future data breaches was from improved techniques by

12  hackers when in reality, the Company did not address easily correctible flaws in its data security.

13         115.    As the Series G offering approached and sales began, defendants continued to assure

14  investors, riders, drivers, and others about the strength of its privacy practices and programs

15  whenever concerns over its practices came to light.  For example:

16             (a)     On January 6, 2016, Uber and the New York Attorney General announced

17  they had settled the investigation into the 2014 data breach.  The deal required Uber to "pay $20,000

18  for failure to provide notice of the data breach in a timely fashion to the affected drivers" and to

19  "[a]dopt protective technologies for the storage, access, and transfer of private information, and

20  credentials related to its access, including the adoption of **multi-factor authentication**, or similarly

21  protective access control methodologies," among other things.[104]  Rather than disclose its ongoing

22  vulnerabilities, an Uber spokesperson reiterated, "'**[w]e are deeply committed to protecting the**

---

[102]      Alexis Fitts, *Can Uber Keep Your Data Safe?  It's Trying*, Huffington Post, Aug. 18, 2015, https://www.huffingtonpost.com/entry/uber-data-security_us_55d230b7e4b07addcb43a7d8.

[103]      Anita Balakrishnan, *Uber agrees to 20 years of privacy audits after FTC says it 'failed consumers*,' CNBC, Aug. 15, 2017, https://www.cnbc.com/2017/08/15/uber-ftc-case-over-data-privacy-has-been-settled.html.

[104]      Press Release, N.Y. State Office of the Attorney Gen., A.G. Schneiderman Announces Settlement with Uber to Enhance Rider Privacy (Jan. 6, 2016), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-uber-enhance-rider-privacy.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG                                                                          - 50 -

1    *privacy and personal data of riders and drivers*.'"[105]   The Uber spokesperson also claimed the

2    Company already had "adopted all of the privacy measures requested by the attorney general,"

3    which included multifactor authentication.[106]

4            (b)     In a January 27, 2016, article reporting on an Uber driver whose social

5    security number was compromised, a Company spokesperson said: "'We take partner privacy very

6    seriously and *make every effort to ensure the security of personal information*.  Due to a bug in our

7    system, one partner's 1099 information was viewable by other drivers for a short period of time.

8    The bug has been fixed and we're deeply sorry.'"[107]

9        116.     Both of the foregoing statements were materially false and misleading to investors

10    because Uber had ***not***, and did not intend to adopt, multifactor authentication or any comparable

11    technology, such that it had ***not*** "take[n] partner privacy seriously" or "ma[d]e every effort to ensure

12    the security of personal information" and did not then have the claimed "deep[] commitment to

13    protecting the privacy and personal data of riders and drivers."

14        117.     Uber's false assurances about the existence and implementation of its improved data

15    security and privacy practices following the 2014 data breach remained alive and uncorrected in the

16    market until after the Series E, F, and G offerings were completed.  As a result, the

17    misrepresentations altered the total mix of information available to investors at the time each of the

18    offerings took place.

19        118.     Uber and Kalanick knew or had reason to believe that the statements alleged above

20    misrepresented material facts and/or omitted material facts necessary to make the statements made,

21    at the time made and in light of the circumstances under which they were made, not misleading.  The

22    Company had been repeatedly warned of its failure to remedy the deficiencies in its data-security

23

24    [105]     Douglas MacMillan, *Uber Agrees to $20,000 Fine and Controls on Data in Privacy Probe*, Wall St. J., Jan. 7, 2016, https://blogs.wsj.com/digits/2016/01/06/uber-agrees-to-20000-fine-and-

25    controls-on-data-in-privacy-probe/.

26    [106]     *Id*.

27    [107]     Kelly P. Erb, *'Bug' Exposes Uber Driver's Tax Info, Including Name and Social Security Number*, Forbes, Jan. 27, 2016, https://www.forbes.com/sites/kellyphillipserb/2016/01/27/bug-

28    exposes-uber-drivers-tax-info-including-name-and-social-security-number/#1b8027468ef0.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG                  - 51

1  systems and had not taken measures to mitigate the risk of additional data breaches, including the

2  measures it agreed to take as part of the settlement with the New York Attorney General.   A

3  company insider has corroborated that defendants did not implement the changes they knew were

4  needed following the 2014 data breach.  Michael Sierchio ("Sierchio"), a senior security engineer at

5  Uber from early 2015 until June 2016, said in a December 12, 2016 article published by the Center

6  for Investigative Reporting that Uber had "'never enforced'" its obligation to limit access to user

7  data, as required by the New York Attorney General settlement.[108]

8      119.    On August 15, 2017, after the Offerings were completed, the FTC filed a complaint

9  against Uber because of the 2014 data breach.  In the complaint, the FTC faulted Uber for its failure

10  to "use distinct access keys" or "require multi-factor authentication" for access to its database, which

11  it alleged would have "prevented or mitigated the failures . . . through relatively low-cost

12  measures."[109]  The FTC complaint also alleged:

> Despite Respondent's representation that its practices would continue on an ongoing basis, Respondent has not always closely monitored and audited its employees' access to Rider and Driver accounts since November 2014.  Respondent developed an automated system for monitoring employee access to consumer personal information in December 2014 but ***the system was not designed or staffed to effectively handle ongoing review of access to data*** by Respondent's thousands of employees and contingent workers.
>
> In approximately August 2015, Respondent ceased using the automated system it had developed in December 2014 and began to develop a new automated monitoring system.  From approximately August 2015 until May 2016, Respondent did not timely follow up on automated alerts concerning the potential misuse of consumer personal information, and for approximately the first six months of this period, Respondent only monitored access to account information belonging to a set of internal high-profile users, such as Uber executives.  During this time, Respondent did not otherwise monitor internal access to personal information unless an employee specifically reported that a co-worker had engaged in inappropriate access.[110]

---

[108]    Will Evans, *Uber said it protects you from spying.  Security sources say otherwise*, Reveal, Dec. 12, 2016, https://www.revealnews.org/article/uber-said-it-protects-you-from-spying-security-sources-say-otherwise/.

[109]    *In the Matter of Uber Techs., Inc*., No. 1523054, Complaint, ¶¶18-19 (F.T.C. Aug. 15, 2017), https://www.ftc.gov/system/files/documents/cases/1523054_uber_technologies_complaint.pdf.

[110]    *Id*., ¶¶12-13.

1

**4.     The Data Security Risks Deliberately Concealed from
Investors Manifested After the Offerings Were Completed,
Causing the Value of Their Investments to Decline**

2

3      120.    At the time of the Series E, F and G offerings, the Company had not implemented and

4    was not using multifactor authentication or similar technologies or otherwise providing the increased

5    protections and improved procedures that it had publicly asserted were being implemented following

6    the 2014 data breach.  These persisting deficiencies left the Company's database vulnerable to

7    another attack, as exemplified by the ***second*** data breach that occurred in October 2016, in which

8    hackers exploited the same deficiencies that caused the 2014 data breach.

9      121.    This time, the private information of ***57 million*** Uber drivers and riders – including

10   names, e-mail addresses, and phone numbers – was stolen by internet hackers.  As with the prior

11   breach, defendants failed to disclose the breach, violating the express statutes of nearly every state in

12   the U.S.  They paid the hackers a $100,000 ransom in exchange for a promise to keep quiet about the

13   breach and did not disclose it until ***over a year later***.

14   122.    The 2016 data breach occurred as a result of the hackers' ability to exploit the same

15   security flaws that led to the 2014 data breach, demonstrating that defendants knew or had reason to

16   know that their assurances about the improvements in Uber's data privacy systems and procedures

17   were misleading.  For example, following the 2014 data breach, Uber said it had instituted a

18   multifactor authentication process to prevent hackers from gaining access to its data.  The 2016 data

19   breach revealed that Uber, in fact, had not made this improvement and was still storing driver and

20   rider data in the same unsecure way, without the critical multi-factor identification process.

21   123.    Investors were unaware, at the time of the Series E, F, and G offerings, that the

22   Company had failed to correct the conditions that led to the 2014 security breach.  Had investors in

23   those offerings known of the uncorrected weaknesses in Uber's security and the risks that presented

24   to Uber's reputation and financial condition as a result of the likelihood of future breaches, the prices

25   paid for the securities sold in those offerings would have been materially lower than it was.

26   124.    After Kalanick was ousted, the Company acknowledged that the 2016 security breach

27   was preventable.  Uber's CEO Khosrowshahi wrote in a blog post entitled "2016 Data Security

28   Incident":

1

2

    You may be asking why we are just talking about this now, a year later. ***I had the same question*** . . . .

<p align="center">*  *  *</p>

3

4

5

    ***None of this should have happened, and I will not make excuses for it***. While I can't erase the past, I can commit on behalf of every Uber employee that we will learn from our mistakes.  We are changing the way we do business, putting integrity at the core of every decision we make and working hard to earn the trust of our customers.[111]

6

7

   125. Following disclosure of the 2016 data breach, numerous security experts and

8

commentators observed that the security flaws were obvious and easily correctible.  James Maude, a

9

senior security engineer at cyberattack specialist Avecto, criticized Uber's continued practice of

10

"'storing the keys to its data store on a GitHub code repository which the attackers could access.'"

11

He said, "'[t]his is the digital equivalent of writing the password down on a bit of paper.  Once the

12

attackers had this key, they could access data easily.'"[112]  Centrify, a cybersecurity leader, similarly

13

deemed the most recent hack "'utterly preventable.'"[113]

14

   126. On October 5, 2016, Samuel Ward Spangenberg ("Spangenberg"), a former forensic

15

investigator at Uber who sued the Company for age discrimination and retaliation, filed a declaration

16

describing his repeated attempts to raise concerns about Uber's security systems.  In the declaration,

17

he wrote:

18

19

20

21

22

    Specifically, I complained that ***Uber did not have regard for data protection***, including, among other items, that payroll information for all Uber employees was contained in an unsecure Google spreadsheet.  I also reported that Uber's lack of security regarding its customer data was resulting in Uber employees being able to track high profile politicians, celebrities, and even personal acquaintances of Uber employees, including ex-boyfriends/girlfriends, and ex-spouses.  I also reported that Uber's lack of security, and allowing all employees to access this information (as opposed to a small security team) was resulting in a violation of governmental regulations regarding data protection and consumer privacy rights.

<p align="center">*  *  *</p>

23

24

25

26

27

28

---

[111] *Id.*

[112] Phil Muncaster, *Uber Shock: Firm Hid Breach of 57 Million Users*, Infosecurity Magazine, Nov. 22, 2017, https://www.infosecurity-magazine.com/news/uber-shock-firm-hid-breach-57/.

[113] *57m Uber data breach "utterly preventable*," Scoop Media, Nov. 22, 2017, http://www.scoop.co.nz/stories/BU1711/S00725/57m-uber-data-breach-utterly-preventatable.htm.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG

*During my employment, I also reported that Uber lacked security regarding its storage of driver information, including social security numbers, which were available, again, to all Uber employees, without regard to any particular level of employment or security clearance.*[114]

127.   On April 12, 2018, the FTC revised its complaint against Uber to include allegations related to the 2016 data breach.  Significantly, the revised complaint **deleted** language describing how Uber "took steps to prevent further unauthorized access" after the 2014 breach.  The FTC maintained allegations that the Company had failed to properly protect users' sensitive personal information by storing it in unsecured locations, which "could have prevented or mitigated . . . through relatively low-cost measures."  However, the revised complaint changed the alleged date of this deficiency from "[u]ntil approximately March 2015" to "[u]ntil at least November 2016."  It also noted the similarity between the two breaches:

On or about November 14, 2016, Respondent learned of another breach of consumer personal information stored in Uber's Amazon S3 Datastore. **Once again**, intruders gained access to the Amazon S3 Datastore using an access key that an Uber engineer had posted to GitHub.  This time, the key was in plain text in code that was posted to a private GitHub repository.[115]

128.   On the same day as the revised complaint, the FTC announced an updated settlement of the 2014 data breach in light of the 2016 data breach, which included additional reporting and record-keeping requirements imposed due to the unreliability of the Company's past representations about its privacy practices and risks.[116]  As explained in an FTC press release issued on that date:

---

[114]   *Spangenberg v. Uber Techs., Inc.*, No. CGC-16-552156, Declaration of Samuel Ward Spangenberg filed in Opposition to Defendant's Motion to Compel Arbitration (Cal. Sup. Ct. – San Francisco Cty. Oct. 5, 2016).

[115]   *In the Matter of Uber Techs., Inc.*, No. 1523054, Complaint, ¶¶18, 22 (F.T.C. Aug. 15, 2017), https://www.ftc.gov/system/files/documents/cases/1523054_uber_technologies_complaint.pdf; *In the Matter of Uber Techs., Inc.*, No. 1523054, Complaint, ¶¶18-19, 24 (F.T.C. Apr. 12, 2018), https://www.ftc.gov/system/files/documents/cases/1523054_uber_technologies_revised_complaint_0.pdf.

[116]   Previously, on August 15, 2017, Uber and the FTC reached a settlement related to just the 2014 breach in which Uber agreed to regularly "certify that the privacy controls are operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of Personal Information."  The 2016 breach had already been discovered at the time of the settlement, but Uber did not disclose it to the FTC. *In the Matter of Uber Techs, Inc.*, No. 1523054, Decision and Order at 4 (F.T.C. Apr. 11, 2018), https://ftc.gov.system/files/documents/cases/1523054_uber_technologies_decision_and_order.pdf.

1  "After misleading consumers about its privacy and security practices, Uber
2  compounded its misconduct by failing to inform the Commission that it suffered
   another data breach in 2016 while the Commission was investigating the company's
3  *strikingly similar* 2014 breach," said Acting FTC Chairman Maureen K. Ohlhausen.
   "The strengthened provisions of the expanded settlement are designed to ensure that
4  Uber does not engage in similar misconduct in the future."[117]

5  129.    Further, on September 26, 2018, Uber announced that it had agreed to pay

6  $148 million to settle claims and inquiries brought by attorneys general of all 50 states and the

7  District of Columbia arising from the 2016 data breach.  The settlement does not resolve claims of

8  Uber's drivers or riders who suffered injuries as a result of their data being compromised by the

9  Company.   Uber released a statement from Tony West, its Chief Legal Officer, who said the

10 Company was "pleased" about the deal:

11          Our current management team's decision to disclose the incident was not
           only the right thing to do, it embodies the principles by which we are running our
12         business today: transparency, integrity, and accountability.  *An important
           component of living up to those principles means taking responsibility for past
13         mistakes, learning from them, and moving forward*.[118]

14     **D.    Defendants Misrepresented the Risks to Uber's Business from
              Negative Publicity and Other Events that Could Curtail Its Rapid
15            Growth**

16 130.    Throughout its fundraising rounds, Uber portrayed itself as a fast-growing company

17 that was primed to continue its explosive growth well into the future.  Kalanick and other Uber

18 executives repeatedly touted Uber's track record of growth as they sought to raise billions of dollars

19 in funding that Uber needed to fend off competition and continue its growth.  However, throughout

20 this period, and specifically at the time of the Offerings that are the subject of this Complaint,

21 defendants failed to disclose numerous material risks to Uber's ability to continue its growth

22 trajectory, including concealed conditions and events that had materially contributed to its apparent

23 past success and/or gave rise to significant risks that growth would suffer if those activities became

24 publicly known.  These statements were misleading because defendants failed to disclose specific

25 ―――――――――――――
26 [117]    Press Release, Uber Agrees to Expanded Settlement with FTC Related to Privacy, Security
   Claims  (Apr. 12, 2018), https://www.ftc.gov/news-events/press-releases/2018/04/uber-agrees-
   expanded-settlement-ftc-related-privacy-security.

27 [118]    Tony West, *Turning the Page on the 2016 Data Breach*, Uber Newsroom (Sept. 26, 2018),
28 https://www.uber.com/newsroom/2016-data-breach-settlement/.

1    events and circumstances that Uber had warned investors *could* happen but which had in fact

2    *already* occurred.



SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 57 -

1 ████████████████████████████████████████████████████████

2 ██████████████████████

3   133.   The foregoing warning was misleading because it failed to disclose that, at the time of

4 the Series G offering (and the other offerings where similar warnings were provided), Uber was

5 engaged in activities that gave rise to the very risks it warned investors **could** damage its brand and

6 reputation and harm the Company **if** they occurred and were publicly exposed:

7        (a)    It was misleading to tell investors that the Company's brand and reputation

8 may suffer if drivers became concerned with the risks of local regulation **without** disclosing that

9 Uber was illegally using Greyball to circumvent such regulation in order to conceal those risks. *See*

10 *supra* §VI.A.2.

11        (b)    It was misleading to tell investors that Uber's business could be harmed by

12 privacy violations that discouraged riders from using its platform **without** disclosing that Uber had

13 failed to correct security flaws in its platform that it had learned about in the 2014 data breach or

14 take other actions it said it would do in settling claims arising from that breach. *See supra* §VI.C.

15        (c)    It was misleading to warn investors that negative public perception of its

16 management and business practices could harm its reputation **without** disclosing Uber's pattern and

17 practice of illegal activity, including its use of the Hell program, its theft of trade secrets, its bribery

18 of foreign officials, its pattern of institutionalized sexual harassment and misogyny, and similar

19 activities that were occurring and gave rise to heightened risks of exposure and negative publicity

20 that would harm Uber's business and reputation. *See supra* §VI.A.2., B. & *infra* §VI.E.-F.

21        (d)    It was misleading to warn investors that some of these activities had happened

22 "in the past" or that harm to the business could occur even if media reports were "misleading or

23 inaccurate," because those statements falsely assured investors that Uber was **not** currently engaging

24 in activities that could harm its reputation and falsely suggested that past reports of Uber's business

25 misconduct were incorrect, thereby inducing investors to purchase Uber securities by

26 misrepresenting the risk of harm to the Company from negative publicity.

27   134.   The concealed risks to Uber's growth included the risks to the Company from

28 exposure of its secret surveillance of government regulators, its hacking of a competitors' system to

render its drivers unavailable to pick up customers, and its failure to correct security weaknesses that had led to the 2014 data breach, all as described above.  In addition, defendants failed to disclose other risks to Uber's growth that they knew about at the time of the Offerings, including Uber's plans to steal the self-driving technology that was necessary to its future growth, and risks from Kalanick's perpetuation of a toxic corporate culture defined by misogyny, gender discrimination, sexual harassment, and a flagrant disregard for the law as Uber attempted to expand its business. Defendants' concealment of these risks rendered numerous statements they made around the time of the Offerings, and that were intended to and did induce investors to participate in those Offerings, materially false and misleading.

135.    Some of the concealed risks (*e.g.*, Greyball, Hell, and the theft of technology) were the result of highly secret corporate initiatives that were never disclosed until long after the Offerings were completed.  For others (*e.g.*, data security, sexual harassment claims, and bribery of foreign officials), Uber disclosed the risks, but – as with the warnings alleged above – did so only by presenting them as possibilities of negative events that ***might*** occur in the future, misleading investors by failing to disclose that the events giving rise to those risks had ***already*** occurred, and were continuing to occur, such that the risk of harm to the Company was not "if" but "when."

136.    The concealed conditions and events described herein were highly material to investors, both individually and cumulatively, because of the impact disclosure could have on Uber's business.  Each of the events, if disclosed, had the potential to seriously damage Uber's reputation, which would dissuade drivers and riders from using its platform, resulting in a loss of business to competitors that would reduce Uber's revenues and growth, cause the Company's valuation to decline, and threaten the Company's plans for an IPO.

137.    As Kalanick acknowledged in an interview published by *Bloomberg* on July 30, 2013, just prior to the launch of Uber's Series C funding round: "'***Companies that are meeting aggressive growth targets are able to raise money faster than the average company***.'"[120]  Thus, to encourage

---

[120]    Debra Mao, *Uber Seeking "Hundreds of Millions" in New Financing*, Bloomberg, July 30, 2013, https://www.bloomberg.com/news/articles/2013-07-30/uber-seeking-hundreds-of-millions-in-new-financing.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG                                                                           - 59

1    investors to participate in Uber's funding rounds and generate the cash needed to keep the Company

2    afloat and expand its business, Kalanick and other Uber officers repeatedly touted the Company's

3    high revenue and growth rates as an indicator of both its past and future success.

4         138.    However, defendants failed to disclose that Uber's explosive growth had resulted in

5    large part from the illegal and unfair conduct described herein, including its attempt to thwart

6    regulation and competition through its Greyball and Hell programs or bribing foreign officials.  Nor

7    did defendants warn that the Company's growth was at risk from exposure of other misconduct that

8    was likely to reduce ridership and increase regulation and expense, including its failure to correct

9    known security weaknesses in its data-storage systems and procedures, its conspiracy to steal self-

10   driving technology from Waymo, or its failures to address repeated claims of sexual harassment.  As

11   a result, investors were misled about both the circumstances that had led to Uber's past growth and

12   its future prospects for success.

13        139.    In a December 2016 *Reveal* article concerning the 2014 data breach, for example,

14   Sierchio summarized Uber's mindset: "'Early on, "growth at all costs" was the mantra, so you can

15   imagine that security was an afterthought.'"  The article also cited three anonymous former

16   employees, who corroborated Sierchio's experience, claiming the Company "pushed back against

17   security protections in favor of unbridled growth."[121]

18        140.    Between 2012 and the commencement of the Series D funding round in June 2014,

19   Kalanick repeatedly touted Uber's growth rates to generate investor interest in the Company.  In

20   numerous interviews and speeches in mid-2012, for example, he told investors that Uber was

21   growing 26% month-over-month over the past year, boasting on July 5, 2012 that the Company was

22   "sixteen times bigger today than we were exactly a year ago."[122]  These statements remained alive in

23   the market for Uber securities and uncorrected at the commencement of the Series D offering.

24

25   ───────────────
     [121]    Will Evans, *Uber said it protects you from spying.  Security Sources say otherwise*, Reveal,
26   Dec. 12, 2016, https://www.revealnews.org/article/uber-said-it-protects-you-from-spying-security-
     sources-say-otherwise/.

27   [122]    *Bloomberg Television Interview with Travis Kalanick*, Bloomberg, July 5, 2012; *see also*
28   Brad Stone, *Travis Kalanick on Leading Uber, a Car* Service, Bloomberg, Aug. 9, 2012,
     https://www.bloomberg.com/news/articles/2012-08-09/travis-kalanick-on-leading-uber-a-car-

141.    As Uber sought to attract billions of dollars of additional investment in the Company, defendants doubled down on their growth story, repeatedly touting the Company's historical growth rate in numerous interviews, speeches, and other public statements.[123]   Following are a few representative examples of the types of statements defendants made ahead of and during each of its funding rounds, each of which was misleading because it touted the Company's growth record and prospects while concealing the material risks to that growth described above:

(a)    When asked to explain Uber's valuation in its Series D offering, Kalanick said: "It comes down to our revenue numbers, the growth of those numbers and our business model itself. . . .  The [numbers] are incredibly compelling."[124]  Kalanick also claimed that "our size and our growth . . . meet[] the numbers that people are putting out there for . . . our stock."[125]

(b)    On December 4, 2014, as the Series E offering was getting underway, Kalanick posted the following statement on his blog:

> 2014 has been a year of tremendous growth for Uber.  It was just a year ago that Uber was operating in 60 cities and 21 countries – today we are in over 250 cities in 50 countries.  We are 6 times bigger today than 12 months ago – and grew

---

service; Y Combinator, *Travis Kalanick at Startup School 2012*, YouTube (Oct. 20, 2012), https://www.youtube.com/watch?vrQ6GoY2_Ujw.

[123]    *E.g.*, Shu Zhang & Gerry Shih, *Uber seen reaching $10.8 billion in bookings in 2015: fundraising presentation*, Reuters, Aug. 20, 2015, https://www.reuters.com/article/us-uber-tech-fundraising-idUSKCN0QQ0G320150821; Gina Hall, *Uber's revenue in Q3 eclipsed all of 2014, but its losses are even bigger*, Silicon Valley Bus. J., Jan. 22, 2106, https://www.bizjournals.com/sanjose/blog/techflash/2016/01/ubers-revenue-in-q3-eclipsed-all-of-2014-but.html;    Tracy Alloway, *Five Things You Need to Know to Start Your Day*, Bloomberg, Apr. 17, 2017, https://www.bloomberg.com/news/articles/2017-04-17/five-things-you-need-to-know-to-start-your-day; Matt Levine, *Insider Trading, Bitcoin, and Libor*, Bloomberg, Aug. 25, 2017, https://www.bloomberg.com/view/articles/2017-08-25/insider-trading-bitcoin-and-libor; *Uber CEO Kalanick: Our Valuation Is $18.2 Billion*, YouTube (July 17, 2014), https://www.youtube.com/watch?v=VcD6oY3pLlk.

[124]    Brad Stone, *Q&A: Travis Kalanick on Uber's New $17 Billion Valuation*, Bloomberg, June 6, 2014, https://www.bloomberg.com/news/articles/2014-06-06/q-and-a-travis-kalanick-on-ubers-new-17-billion-valuation.

[125]    Travis Kalanick, Co-Founder and CEO, Uber, & Edward Gilligan, President, American Express are Interviewed on Bloomberg TV Regarding Partnership Tr. (June 9, 2014).

faster this year than last. ***This progress is remarkable, but it is in the coming years that Uber truly scales and the impact in cities becomes visible***.[126]

(c)      During the DLD conference on January 18, 2015, as the Series E offering was continuing, Kalanick said: "***[T]his is an exponentially growing company with operations that exponentially grow in each of the cities***. So what happens when that triples the year after and doubles the year after that? It becomes a huge job generator."[127]

(d)      On February 2, 2015, while the Series E offering was continuing, Senior Vice President of Policy and Strategy Plouffe stated: "Uber is growing every month, and is becoming a bigger part of not just cities and transportation systems, but of the whole economy . . . . We're likely to be one of the biggest job-producing companies for the economy over the coming years."[128]

(e)      On June 3, 2015, while Series F was continuing, Kalanick remarked on Uber's growth over the last five years, commenting that

> those original hundred friends and ten drivers have become tens of millions of people in 300 cities across six continents. Every single month, Uber is adding hundreds of thousands of drivers around the world. Already, there are over 26,000 drivers in New York, 15,000 drivers in London, 10,000 in Paris, and 42,000 in Chengdu, China, and 22,000 of course here in San Francisco.[129]

(f)      

---

[126]      Alyson Shontell, *Uber Raises $1.2 Billion at a $41 Billion Valuation, Vows to Become Smarter and More Humble*, Bus. Insider, Dec. 4 2014, http://www.businessinsider.com/uber-just-raised-1.2-billion-2014-12.

[127]      *Speech and Interview at the DLD-Conference in Munich*, YouTube (Jan. 18, 2015), https://www.youtube.com/watch?v=gS6OsUaHCi4.

[128]      Mike Isaac, *Hard-Charging Uber Tries Olive Branch*, N.Y. Times, Feb. 1, 2015, https://www.nytimes.com/2015/02/02/business/hard-charging-uber-tries-olive-branch.html.

[129]      Uber, *5 Year Anniversary Remarks from Uber CEO Travis Kalanick*, YouTube (June 3, 2015), https://www.youtube.com/watch?v=idjrouG_8vY.

[130]

142.    Uber's false representations about its growth remained alive and uncorrected in the market until after the Offerings were completed.  As a result, the misrepresentations altered the total mix of information available to investors at the time each of the Offerings took place.

143.    As with the risk warnings identified in ¶131 above, each of the foregoing statements was materially misleading in context with the other public information available to investors because defendants had failed to disclose the existential risks to Uber's reputation and growth arising from its Greyball and Hell programs and uncorrected data security problems alleged *supra* in §VI.C.  Thus:

(a)    The representation that "our revenue numbers, the growth of those numbers, and our business model itself," "[t]he [numbers] are incredibly compelling," and "our size and our growth . . . meet[] the numbers that people are putting out there for our stock" (¶141(a), *supra*) was misleading because it concealed known risks posed to that growth, including the impact of public exposure of programs like Hell and Greyball, or from Uber's failure to protect the privacy of it users, each of which could, and did, result in harm to Uber's reputation that caused drivers and riders to switch to competing services and increased regulatory oversight and enforcement along with related fines and penalties.

(b)    The representation that 2014's "progress is remarkable, but it is in the coming years that Uber truly scales and the impact in cities becomes visible" (¶141(b), *supra*) was likewise misleading because it omitted to disclose the risks to Uber's growth, including that its growth had resulted in part from its use of Greyball and Hell and because it concealed the 2014 data breach that defendants had learned about two months before the statement was made.

(c)    The representation that "this is an exponentially growing company with operations that exponentially grow in each of the cities" (¶141(c), *supra*) was also misleading because it continued to conceal the risks posed by the Greyball and Hell programs and Uber's continuing data security weaknesses.

(d)    The representation that "Uber is growing every month, and is becoming a bigger part of not just cities and transportation systems, but of the whole economy" (¶141(d), *supra*) was similarly misleading because it touted historic growth while omitting to disclose the risks attendant to Uber's use of illegal programs and continuing concealment of the 2014 data breach.

1        (e)    The representation that "those original hundred friends and ten drivers have

2    become tens of millions of people in 300 cities across six continents" and that "[e]very single month,

3    Uber is adding hundreds of thousands of drivers around the world" (¶141(e), *supra*) was misleading

4    for continuing to conceal the risks to Uber's growth posed by its use of Greyball and Hell and the

5    data security problems it had not remedied.

6        (f)    The representation that "sustainable competitive advantages, large market

7    opportunity, and growth prospects," as well as its "strong brand recognition," as supporting its

8    investment valuation and making it an attractive investment opportunity (¶141(f), *supra*) was

9    misleading because programs like Hell and Greyball, and Uber's continuing data security

10   weaknesses, posed undisclosed risks to Uber's growth.

11       144.    The foregoing statements (as well as the risk warnings alleged in ¶131) were also

12   materially misleading due to defendants' failure to disclose other known risks to Uber's growth and

13   reputation that existed in its operations at the time of the Offerings described below, including that

14   its future growth was premised on plans to steal self-driving technology from its competitors, and

15   that its ability to attract and retain the personnel needed to realize that growth was jeopardized by

16   repeated incidents of sexual harassment that defendants had been told about but failed to correct.

17       145.    Uber and Kalanick knew or had reason to believe that the statements alleged in

18   ¶¶131, 143 misrepresented material facts and/or omitted material facts necessary to make the

19   statements made, at the time made and in light of the circumstances under which they were made,

20   not misleading, including: (i) that Kalanick, as a result of his position as a hands-on manager and

21   CEO of Uber and the Company-wide distribution and use of the Greyball program as a central

22   component of Uber's growth strategy, knew about the program and that it was illegal; (ii) that the

23   Hell program had been authorized, established ,and was being operated under the express direction

24   and oversight of Kalanick and other top executives of the Company; (iii) that the Company had been

25   repeatedly warned of the failure to remedy the deficiencies in its data-security systems and practices

26   or comply with the terms of the attorney general settlement, and the risks that additional data

27   breaches would occur; (iv) that Kalanick schemed with Anthony Levandowski ("Levandowski") a

28   manager at Waymo, to steal Waymo's self-driving car technology; and (v) that Kalanick perpetuated

1   a toxic corporate culture defined by misogyny, gender discrimination, sexual harassment, and a

2   flagrant disregard for the law as Uber attempted to expand its business.  Further, defendants knew

3   that if the existence of Greyball and Hell programs, the data security failures, the stealing of Waymo

4   technology, and the Company's toxic culture were made public that the Company's growth would

5   suffer through reduced rider engagement, increased regulation, and additional expenses.

6        **E.**    **Defendants Also Concealed the Risks to Uber's Reputation and**
               **Growth from Their Efforts to Steal Self-Driving Technology from**

7               **Competitors**

8       146.    Uber's ability to continue its strong growth trajectory into the future was significantly

9   premised in part on its plans to utilize self-driving vehicles.  At the time of the Series D, E, F, and G

10   Offerings, competition in the ride-sharing business was largely focused on recruiting and retaining

11   qualified drivers, as described in §VI.B. above.  Like its competitors, Uber saw self-driving vehicles

12   as the solution to that problem, as it could significantly reduce or even eliminate the Company's

13   dependence on independent contractors to provide the rides that Uber was selling.  At the May 28,

14   2014 Code Conference ahead of the Series D offering, for example, Kalanick said self-driving cars

15   were the way of the future.  "'The reason Uber is expensive is not the car, it's the other dude in the

16   car,'" he said.  "'When there's no dude in the car, the cost of taking the vehicle somewhere becomes

17   cheaper then owning a vehicle.'"[131]

18       147.    Defendants positioned Uber as a technological innovator that was uniquely positioned

19   to lead the transition to self-driving vehicles, and repeatedly touted its plans to develop its own

20   proprietary self-driving technology to give it a competitive advantage over other ride-sharing

21   companies.  However, defendants failed to disclose that, to succeed in this endeavor, Uber had

22   secretly conspired to steal critical self-driving technology from its competitor.

23       148.    In fact, Uber said just the opposite – that ***it*** was at risk if competitors stole Uber's

24   trade secrets. ████████████████████████████████████████

25   ████████████████████████████████████████████████████

26

27   ───────────────────────

     [131]    Liz Gannes, *Travis Kalanick: Uber is Raising More Money to Fight Lyft and the "Asshole"*

28   *Taxi Industry*, Recode, May 28, 2014, https://www.recode.net/2014/5128/11627354/travis-Kalanick-Uber-is-raising-more-money-to-fight-lyft-and-the.

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████



11  149.  ████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████

15

16  150.  It was misleading to warn investors of the risk to the Company from theft of its trade secrets by others without disclosing that Uber was also at risk because *it* was then actively engaged in efforts to steal trade secrets from others.  Because these activities were being conducted at the direction of (and with the participation of) Kalanick and other senior Uber executives, defendants had reason to know that the foregoing warning, and the other statements regarding risks to the Company's reputation and competitive success, and about self-driving technology in particular, were and would be misleading to prospective investors in the Series F and G offerings.  Defendants' illegal activities presented even greater risks of time-consuming, expensive, and distracting litigation, negative legal outcomes, and competitive disadvantages than did the activities that the Company warned investors about.  In addition, those activities also presented grave but undisclosed



1   risks of harm to the Company's brand and reputation that could also negatively impact its growth,

2   and thus further rendered the risk warning pleaded above materially false and misleading.

3        151.    Had investors known that Uber was relying on theft of trade secrets to advance its

4   self-driving car efforts, the price of Uber securities sold in the Offerings would have been materially

5   lower to account for the increased risks that presented to the Company's earnings, growth, and

6   reputation.

7        152.    On February 2, 2015, in advance of the Series F offering, Uber announced "a strategic

8   partnership" with Carnegie Mellon University that included the creation of the Uber Advanced

9   Technologies Center in Pittsburgh.[135]   The following day, *CNBC* celebrated the partnership as "a

10  move analysts believe could eventually mean driverless cars."[136]

11       153.    At the time of this announcement, Google and its affiliate, Waymo, were also racing

12  to develop driverless car technologies.[137]   Uber claimed that it was working with Google to develop

13  that technology.[138]   In fact, however, Uber was plotting to steal Waymo's technology from Google.

14  The details of Uber's misconduct would not be revealed until February 23, 2017 – long after the

15  Series F and G offerings were completed – when Waymo sued Uber for theft of its trade secrets.

16       154.    In August 2015, the Company reaffirmed its commitment to self-driving technology

17  by announcing a partnership with the University of Arizona "focuse[d] on research and development

18

19  [135]    Byron Spice, Ken Walters & Kristin Carvell, *Uber, Carnegie Mellon Announces Strategic Partnership and Creation of Advanced Technologies Center in Pittsburg*, Carnie Mellon U. News,

20  Feb. 2, 2015, https://www.cmu.edu/news/stories/archives/2015/february/uber-partnership.html.

21  [136]    Arjun Knarpal, *Uber to develop driverless cars in Google challenge*, CNBC, Feb. 3, 2015, https://www.cnbc.com/2015/02/03/uber-to-develop-driverless-cars-in-google-challenge.html.

22  [137]    Waymo had developed and improved extremely valuable laser technology, known as

23  "LiDAR," that was a key component to the successful development of autonomous vehicles. Whereas Waymo relied on its in-house LiDAR systems, Uber relied on third-party vendors for its

24  LiDAR systems, a function of the Company jumping into the self-driving car space at least five years behind Waymo.

25  [138]    For example, in a *New York Times* article published on February 8, 2015, shortly after the

26  Carnegie Mellon partnership was announced, Uber spokesperson Nairi Hourdajian asserted that "'Uber has a strong relationship with Google'" and "'look[s] forward to continuing our collaborative

27  dialogue with Google about the future of our partnership in the years to come.'"   Mike Isaac, *A Prickly Partnership for Uber and Google*, N.Y. Times, Feb. 8, 2015, https://prickly-partnership-for-

28  uber-and-google.html.

1   in the optics space for mapping and safety."[139]  Brian McClendon, Uber vice president of advanced

2   technologies, described the innovations that Uber was working to develop: "'A lot of this is about

3   lenses and the acquisition of imagery and in other cases technologies like LIDAR (a remote-

4   measurement technology using a laser) that scanning the world around you in high resolution

5   depends on . . . ."[140]  He explained that the technology "get[s] detail like street names, street address,

6   or more importantly things like the depth of potholes, being able to read the exact geometry of the

7   world around you and determining if it is part of your environment or a dynamic object that will be

8   here today and gone tomorrow, and we need to know how to react to that."[141]  He concluded, "'we'll

9   be working on this project for years.'"[142]

10          155.    Documents and other evidence that became public as a result of Waymo's lawsuit

11   revealed that, by the middle of 2015, Levandowski had begun to devise a scheme to steal Waymo's

12   self-driving car technologies.  Public filings in Waymo's lawsuit against Uber show that Uber's

13   then-Chief Product Officer, Jeff Holden, initially attempted to recruit Levandowski as early as

14   January 2014.  Uber and Levandowski began meeting in earnest as early as July 2015 – while the

15   Series F offering was underway.  In October 2015, Kalanick himself contacted Levandowski,

16   making it clear that Uber did not want to merely be Levandowski's customer.  Following that

17   meeting, Levandowski and Lior Ron ("Ron") – Levandowski's colleague at Waymo and Ottomotto

18   LLC's ("Ottomotto") eventual President and CEO – went to Uber to *discuss selling a non-existent*

19   *company*.

20          156.    In the following months, Levandowski and Kalanick exchanged hundreds of text

21   messages.  And in November 2015 and December 2015 – *i.e.*, just ahead of the Series G offering –

22   Levandowski met with Uber representatives five times, during which Kalanick suggested that

---

23   [139]    *UA to Partner with Uber on Research*, U. of Ariz. News (Aug. 25, 2015),
24   https://uanews.arizona.edu/story/ua-to-partner-with-uber-on-research.

25   [140]    David Wichner, *Uber teams with UA on driverless-car research*, Tucson, Aug. 25, 2015,
26   https://tucson.com/business/local/uber-teams-with-ua-on-driverless-car-research/article_891b9c57-719a-5f17-a2da-0ead2e0ec96e.html.

27   [141]    *Id.*

28   [142]    *Id.*

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                  - 68 -

1    Levandowski create a company for Uber to acquire to gain access to the technology.  Internal Uber

2    documents revealed that at a December 22, 2015 meeting with Uber's former head of the Advanced

3    Technology Center, John Bares, Kalanick made clear he wanted "**all of their data**," a "pound of

4    flesh," and "**IP**."[143]

5          157.    Just before the Series G offering was underway at the beginning of 2016,

6    Levandowski had registered an internet domain for his new startup, secretly downloaded 14,000

7    Waymo proprietary files and other highly sensitive data, and attempted to erase any evidence of his

8    actions.  On January 15, 2016, the day after he attended a high-level executive meeting at Uber,

9    Levandowski formed Ottomotto.  Levandowski officially left Waymo just over a week later, and the

10   next month, in February 2016 – *i.e.*, when the Series G offering was officially announced –

11   Ottomotto and Uber signed a term sheet.  Incredibly, the term sheet included a broad agreement to

12   indemnify Levandowski for any "Bad Act," which included "fraud, misappropriation of Waymo's

13   patents, copyrights, trademarks or trade secrets, breach of a fiduciary duty owed to Waymo, or

14   breach of a non-solicitation agreement with Waymo."[144]

15          158.    In March 2016, while the Series G offering was underway, Uber hired Stroz

16   Friedberg to prepare a due diligence report (the "Stroz Report") in anticipation of the Ottomotto

17   acquisition.  In preparation for the report, Stroz Friedberg interviewed Levandowski and other

18   Ottomotto employees, conducted a forensic examination of their electronic devices, reviewed

19   documents, and investigated Levandowski's disposal of Google materials.

20          159.    The Stroz Report affirmed many of Waymo's allegations.  During their interviews

21   with Stroz Friedberg personnel, Levandowski and Ron conceded that Levandowski possessed and

22   had accessed Google intellectual property, including prototypes, source code, and software, well

23   after he left Waymo.  Stroz Friedberg's review of Levandowski's computer turned up tens of

24   thousands of Google work e-mails and hundreds of files, many of which included crucial proprietary

25   information such as pictures, videos, source code, diagrams, and system files.  Levandowski said he

26   ───────────────
    [143]    Waymo Opening Statement Slide Deck, https://sc.cnbcfm.com/applications/cnbc.com

27   /resources/editorialfiles/2018/02/05/waymo%20Slides%20Redacted.pdf.

28     [144]    *Waymo v. Uber Techs., Inc.*, No. 3:17-cv-00939, ECF No. 566 at 2 (N.D. Cal.).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                        - 69

1    did not know he had these materials, but forensic analysis proved he accessed them even after he left

2    Waymo.  Levandowski admitted he destroyed materials just a week before his interview with Stroz

3    Friedberg because Kalanick told him to "do what he needed to do" to get rid of them.

4         160.    The following month in April 2016 – while the Series G offering was underway – the

5    Uber Board was presented with a review of the proposed acquisition.  Even though Stroz Friedberg

6    had not even completed its work, according to Benchmark's representative on the Uber Board,

7    "Kalanick told the board that the Stroz report of that investigation came up clean" and that

8    Kalanick's misrepresentation was "critical" to Benchmark's decision to vote in favor of the

9    acquisition.[145]  Kalanick later testified at a deposition that he knew the due diligence investigation

10   was taking place, but did not care if the Stroz Report "came up clean."[146]  Within hours of obtaining

11   the Board's approval, Uber executed the Put Call Agreement, Indemnification Agreement, and Joint

12   Defense Agreement.  With the acquisition, Uber acquired Ottomotto's "in-house" LiDAR system, a

13   proprietary laser system critical to the development of self-driving cars, which Uber executives

14   described as "the sauce" and what would "be[] critical to [autonomous vehicle] success."[147]

15        161.    Ultimately, Uber and Waymo settled their lawsuit on the fifth day of trial on

16   February 9, 2018, entitling Waymo to 0.34% of Uber's equity.  The agreement also prohibits Uber

17   from using any of Waymo's hardware or software trade secrets.[148]  The year of litigation prior to the

18   settlement, however, was a "PR nightmare" for Uber.[149]  In a May 2017 order, Judge Alsup found

19

20   [145]    *Waymo v. Uber Techs., Inc.*, Sept. 27, 2017 Hearing Tr. at 95:1-3, 99:22.

21   [146]    *Waymo v. Uber Techs., Inc.*, No. 3:17-cv-00939, ECF No. 2194-2 at 471:14-473:20 (N.D.
     Cal.).

22   [147]    Waymo Opening Statement Slide Deck, https://www.recode.net/2018/2/5/16974668/uber-
23   alphabet-waymo-self-driving-trade-secrets.

24   [148]    Alexandria Sage, Dan Levine & Heather Somerville, *Waymo accepts $245 million and
     Uber's 'regret' to settle self-driving car dispute*, Reuters, Feb. 9, 2018,
25   https://www.reuters.com/article/us-alphabet-uber-trial/waymo-accepts-245-million-and-ubers-regret-
     to-settle-self-driving-car-dispute-idUSKBN1FT2BA; Sean O'Kane, Andrew J. Hawkins & Sarah
26   Jeong, *Waymo and Uber reach a surprise settlement*, The Verge, Feb. 9, 2018,
     https://www.theverge.com/2018/2/9/16995254/waymo-uber-lawsuit-trial-settlement.

27   [149]    Sarah Jeong, *Who blinked first in Waymo v. Uber?*, The Verge, Feb. 9, 2018,
28   https://www.theverge.com/2018/2/9/16997394/waymo-v-uber-trial-settlement-explained.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG

1    that Waymo had presented evidence that Levandowski had downloaded proprietary Waymo files

2    before resigning, that Uber had planned to acquire Ottomotto and hire Levandowski as the head of

3    its self-driving car technologies, that Uber had specifically prepared for litigation with Waymo in

4    connection with its acquisition of Ottomotto, and that the evidence indicated that Uber had acquired

5    Ottomotto with reason to believe that Levandowski had taken confidential trade secrets from

6    Waymo.  Judge Alsup also referred the matter to the U.S. Attorney's Office for investigation of

7    possible theft of trade secrets from Waymo.  Levandowski was subsequently fired from Uber after

8    refusing to assist the Company in its internal investigation.  In October 2017, the Stroz Report was

9    publicized.  In late November 2017, the U.S. Attorney's Office sent the Jacobs letter to Judge Alsup,

10   which was publicly released in December 2017 and described how Uber's Strategic Services Group

11   communicated using self-destructing messages, exchanged and stored "sensitive" information using

12   non-attributable devices, and concealed meetings between Kalanick and Levandowski prior to the

13   Ottomotto acquisition.

      **F.**     **Defendants Concealed the Risks to Uber's Reputation and Growth**
             **from Their Failure to Address or Correct Repeated Allegations of**
             **Sexual Harassment and Gender Discrimination**

16       162.   Uber's reputation – and thus its attractiveness to riders and drivers and its growth –

17   were also threatened by defendants' deliberate perpetuation of a workplace culture that was hostile

18   to women.  These activities also gave rise to a significant risk of negative publicity that would harm

19   Uber's brand and reputation, particularly in the political climate existing at the time of the Offerings.

20       163.   Uber's pattern and practice of sexual harassment and misogyny also concealed the

21   risks to its business from its inability to hire or retain qualified personnel needed to run and grow its

22   business.



150

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                         - 71

164. ███████████████████████████████████████

165.    The foregoing risk warning was misleading for similar reasons, because defendants had failed, there or elsewhere, to disclose numerous material risks that threatened Uber's growth and reputation, as described *supra* at §§VI.A.-VI.E.  It was misleading to warn investors about the risk of hiring and retaining employees without disclosing that Uber had repeatedly ignored, and was continuing to ignore, credible claims of sexual harassment lodged against key employees, as detailed below, simply because it feared that taking action would cause employees to leave and negatively impact its growth.

166.    The misleading impact of the warning was heightened by defendants' repeated boasts about Uber's forward-thinking workplace and culture, and defendants' repeated claims of supporting equal treatment of women in the workplace.  On December 4, 2014, Kalanick kicked off the Series E fundraising round by stating in his blog that Uber would be refining its "company culture

---

151 ██████

effectively."[152]  Again, on September 16, 2015, shortly before the Series G fundraising round, for the purpose of inducing the purchase of Uber securities, Kalanick held up Uber's corporate culture as principled and central to its operations:

> "I don't know how many companies and how many people go as deep as they need to on culture.  We're in the process right now of creating essentially what I call a philosophy of work.  You know you spend half of your day working and it should matter.  It should be more than just work; it should be something you believe in and how you do it should matter, the principles and in how you approach your work should matter . . . I've mentioned one of our cultural values is celebrate the city right so that's so perfect for us you really wouldn't see that on any other company's cultural values but it matters to us."[153]

167.    As it sought to raise billions of dollars in capital, defendants repeatedly highlighted Uber's commitment to women as well as its purported commitment to "diversity, fairness and equality" as important aspects of the Company's culture.

(a)     Salle Yoo ("Yoo"), general counsel, in an interview with *Reuters* on March 10, 2015: when asked by a journalist on why women might find working for Uber attractive, Yoo responded that Uber "offers [women] the chance to be entrepreneurial, the chance to balance work and family."[154]

(b)     Kalanick's joint statement with UN Women's executive director on March 10, 2015: "Today, UN Women and Uber are launching a partnership to work together around the world toward a shared vision of equality and women's empowerment. . . .  This important mission can only be accomplished when all women have direct access to safe and equitable earning opportunities."[155]

---

[152]    Travis Kalanick, *The Ride Ahead*, Uber Newsroom (Dec. 4, 2014), https://newsroom.uber.com/the-ride-ahead.

[153]    *Fireside Chat with Travis Kalanick and Marc Benioff*, YouTube (Sept. 17, 2015), https://www.youtube.com/watch?v=Zt8L8WSSr1g.

[154]    *Uber pledges to enlist 1 million female drivers by 2020*, Reuters, Mar. 10, 2015, https://www.reuters.com/article/us-uber-women-drivers-idUSKBN0M60RH20150310.

[155]    *UN Women + Uber = A Vision For Equality*, Uber Newsroom (Mar. 10, 2015), https://newsroom.uber.com/us-dc/un-women-uber-vision-for-equality-3/.

1          (c)     Uber's March 20, 2015 statement: "Uber will be seeking advice from UN

2  Women and groups around the world on the best way to achieve the important goal of economic

3  equality and opportunity for women."[156]

4          (d)     Uber's July 27, 2015 press release: "For many women, Uber is a flexible,

5  equitable opportunity that not only gives them control over their schedules and supplements income,

6  but also helps them pursue their passions."[157]

7          (e)     Ryan Graves, Uber's Executive Sponsor, in a press release on September 3,

8  2015: "Uber's leadership is a strong example of innovation stemming from the creation of more

9  diverse and inclusive environments." [158]

10         (f)     Rachel Holt, Head of American Operations, in a statement published by

11  *HuffPost* on October 31, 2016: "Discrimination has no place in society, and no place on Uber."[159]

12       168.    The foregoing statements were misleading because, contrary to defendants' public

13  representations, Uber was plagued with a toxic work culture rife with misogyny, gender

14  discrimination, and sexual harassment.  As a result:

15         (a)     The assertion that Uber "offers [women] the chance to be entrepreneurial, the

16  chance to balance work and family" (*supra* ¶167(a)) was misleading because Uber repeatedly

17  ignored, and was continuing to ignore, credible claims of sexual harassment against key employees.

18         (b)     The assertion that "UN Women and Uber are launching a partnership to work

19  together around the world toward a shared vision of equality and women's empowerment. . . . This

20  important mission can only be accomplished when all women have direct access to safe and

---

21  [156]    Rupert Neate, *UN backs out of Uber collaboration over concern that app fails to protect

22  women*, The Guardian, Mar. 23, 2015, https://www.theguardian.com/technology/2015/
mar/23/united-nations-uber-womens-safety.

23  [157]    *Meet The Uber Team Driving Our Women Partner Program*, Uber Newsroom (July 27,

24  2015).

25  [158]    *Reaching the Stars: An Evening with Jose Hernandez and Los Ubers*, Uber Newsroom (Sept.
2, 2015), https://www.uber.com/blog/reaching-for-the-stars-an-evening-with-jose-hernandez-and-

26  los-ubers/.

27  [159]    Ryan Grenoble, *Uber, Lyft Drivers Discriminate Based On Race, Gender, Study Finds*,
Huffington Post, Oct. 31, 2016, https://www.huffingtonpost.com/entry/uber-lyft-race-gender-

28  discrimination-study_us_58175a23e4b064e1b4b37de7.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                           - 74

1   equitable earning opportunities" (*supra* ¶167(b)) was similarly misleading in light of Uber's

2   documented history of ignoring credible claims of sexual harassment, including at its headquarters.

3           (c)     The assertion that Uber had a "goal of economic equality and opportunity for

4   women (*supra* ¶167(c)) was misleading in light of its longstanding contrary conduct;

5           (d)     The assertion that "[f]or many women, Uber is a flexible, equitable

6   opportunity that not only gives them control over their schedules and supplements income, but also

7   helps them pursue their passions" (*supra* ¶167(d)) was likewise misleading because of defendants'

8   deliberate perpetuation of a workplace culture that was hostile to women.

9           (e)     The assertion that "Uber's leadership is a strong example of innovation

10  stemming from the creation of more diverse and inclusive environments" (*supra* ¶167(e)) was also

11  misleading because it omitted to disclose Uber's documented toxic workplace culture.

12          (f)     The assertion that "[d]iscrimination has no place in society, and no place on

13  Uber" (*supra* ¶167(f)) was misleading because it failed to disclose Uber's corporate culture of

14  misogyny and discrimination that actually existed at the time.

15          169.    Kalanick helped spawn and perpetuate Uber's culture of misogyny.  Indeed, long

16  before the discrimination allegations, Kalanick exhibited a propensity to make inappropriate sexual

17  comments.  For example, in a Company-wide e-mail sent on October 25, 2013 before an event in

18  Florida celebrating Uber reaching its 50th global city, Kalanick provided a list of "DON'Ts,"

19  including: "[n]o lives should begin or end at" the party; and "Do not have sex with another employee

20  UNLESS a) you have asked that person for that privilege and they have responded with an emphatic

21  'YES! I will have sex with you' AND b) the two (or more) of you do not work in the same chain of

22  command.  Yes, that means that Travis will be celibate on this trip.  #CEOLife #FML."[160]

23  Kalanick's bad behavior continued in 2014, wisecracking in an interview published in *GQ* in

24  February 2014 about his increased desirability since the Company found success, claiming he could

25  call women on demand: "Yeah, we call that Boob-er."  Kalanick's inappropriate words translated

26  

27  _____

[160]    Kara Swisher & Johana Bhuiyan, *Uber CEO Kalanick advised employees on sex rules for a company celebration in 2013 'Miami letter,'* Recode (June 8, 2017), https://www.recode.net/

28  2017/6/8/15765514/2013-miami-letter-uber-ceo-kalanick-employees-sex-rules-company-celebration.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                          - 75

1   into inappropriate actions in 2014, when he led an official Company outing to a female escort bar in

2   South Korea.  Female employees attended the event, where escorts, tagged with numbers, were paid

3   to sit with male Uber employees as they sang karaoke.

4        170.    Defendants knew or had reason to believe that the repeated statements about the

5   equality of Uber's workplace, as well as the risks to the Company from negative publicity or the

6   inability to successfully hire, manage, and integrate workers in the workplace, were misleading to

7   investors, given the corporate culture that actually existed at the time each of these statements were

8   made.  Uber and Kalanick had encouraged and fostered a toxic corporate culture defined by

9   misogyny, gender discrimination, sexual harassment, and a flagrant disregard for the law, that would

10  cause immense damage to the Company's reputation, brand, and ability to attract and retain qualified

11  employees, customers, and drivers once its true nature became publicly known.

12       171.    Uber's toxic culture, and the extent of its misogynistic practices, was first revealed in

13  a February 19, 2017, blog post by former Uber engineer Susan Fowler ("Fowler") who worked for

14  Uber from November 2015 until December 2016.  In her blog post, Fowler asserted that Uber's H.R.

15  department had brushed off her complaint of a manager propositioning her for sex just a few weeks

16  after she arrived – *i.e.*, just before the Series G offering took place – detailing how the department

17  was loathe to discipline the manager because he was a "high performer," how Fowler was required

18  to rotate to a new job to avoid getting a negative review for reporting the harassment, and how

19  Fowler later learned of other women who had previously been propositioned by the same manager

20  and reported the incidents to H.R. without any action being taken.  Fowler's blog post described

21  other incidents of discrimination as well, reporting falsified H.R. records used to deny transfers,

22  threats of retaliation for reporting alleged discrimination to the H.R. department, and a precipitous

23  decline in the number of female employees at Uber due to its toxic workplace culture.

24       172.    Immediately following the post, an emergency meeting was called at Uber, during

25  which Kalanick and the most-senior women at the Company discussed what to do.  The response

26  was, "if this is true, we need to get serious."[161]  Two days later, Ariana Huffington – the only woman

27

28  ---

[161]    Sheelah Kolhatkar, *At Uber, A New C.E.O. Shifts Gears*, The New Yorker, Apr. 9, 2018, https://www.newyorker.com/magazine/2018/04/09/at-uber-a-new-ceo-shifts-gears.

1   on Uber's Board at the time – quipped that Uber should add to its cultural values, "[n]o brilliant jerks

2   allowed."[162]

3       173.    Fowler's blog post quickly went viral.  Within days its accusations had morphed into

4   a full-blown publicity crisis for the Company.  New reports began to surface of Uber's toxic "bro-

5   culture" and the unhealthy and counterproductive work environment it fostered.[163]  In a February 22,

6   2017 article, *The New York Times* reported that "[i]nterviews with more than 30 current and former

7   Uber employees, as well as reviews of internal e-mails, chat logs and tape-recorded meetings, paint a

8   picture of an often unrestrained workplace culture."  One employee e-mailed Kalanick concerning

9   harassment, and at least two "notified Thuan Pham, the company's chief technical officer, of

10   workplace harassment at the hands of managers and colleagues in 2016."[164]

11       174.    The disclosures created a firestorm of controversy for the Company, damaged its

12   reputation, and led to the dismissal of numerous top executives, including Kalanick.   In

13   February 2017, Uber hired former U.S. Attorney General Eric Holder ("Holder") to investigate the

14   sexual harassment claims and evaluate the Company's work culture.  A special committee of the

15   Board was formed to oversee the work shortly thereafter.  Holder and his team at Covington &

16   Burling LLP ("Covington") led a far-reaching investigation of Uber, conducting over 200 interviews

17   with current and former employees; retained a consulting firm to hold online focus groups of Uber

18   employees; and reviewed over three million Company documents.

19       175.    Among the incidents uncovered during the Holder investigation was a report of the

20   Company's response to an alleged rape committed by one of its drivers in New Delhi in

21   December 2014, as Uber was launching its Series E offering.  Kalanick publicly expressed outrage at

22   the time of the incident and promised to "'do everything, I repeat, everything to help bring this

23

24   [162]    *Id.*

25   [163]    Kara Swisher, *With her blog post about toxic bro-culture at Uber, Susan Fowler proved that*

26   *one person can make a difference*, Recode (June 21, 2017), https://www.recode.net/2017/6/21/15844852/uber-toxic-bro-company-culture-susan-fowler-blog-post.

27   [164]    Mike Isaac, *Inside Uber's Aggressive, Unrestrained Workplace Culture*, N.Y. Times,

28   Feb. 22, 2017, https://www.nytimes.com/2017/02/22/technology/uber-workplace-culture.html.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG

1   perpetrator to justice."[165]   Contrary to that representation, the Holder investigation uncovered

2   evidence that, at the time that statement was made, a top Uber executive, Eric Alexander, had

3   illicitly obtained copies of the rape victim's medical records, showed them to Kalanick, and the two

4   had discussed how the records could be used to discredit the rape report by suggesting that the victim

5   had fabricated it at the urging of Uber's competitors.

6         176.   The results of the investigation and recommendations by Covington were approved

7   by the Board in June, and released to the public in a report shortly thereafter (the "Holder Report").

8   The Holder Report proposed sweeping changes to the Company's leadership, organization,

9   management, and culture, offering proscriptions that contradicted defendants' prior representations

10   about Uber's culture and workplace, including: (1) reducing Kalanick's responsibilities; (2)

11   increasing Board independence and oversight of management; (3) enhancing the Company's internal

12   controls, risk management, financial controls, and compliance policies and procedures; (4)

13   expanding and improving employee training, improving employee complaint procedures, and

14   revamping Uber's H.R. department; and (5) implementing a variety of other policies, procedures,

15   and practices that the Company lacked to combat discrimination, harassment, and inappropriate

16   workplace conduct.  A compliance consultant described the report as "one of the most remarkable

17   discussions of a complete workplace disaster that has ever been rendered for a multi-billion business.

18   If you changed some of the business and legal language, you might well think you were reading a

19   report on Animal House."[166]

20         177.   According to a June 6, 2017 *Business Insider* article, in conjunction with hiring

21   Covington, Uber also hired law firm Perkins Coie LLP to investigate 215 "inappropriate workplace

22

23

---

24   [165]   Janet Burns, *Rape Victim is Suing Uber for Company's Use of Her Private Medical Records*,
25   Forbes, June 15, 2017, https://www.forbes.com/sites/janetwburns/2017/06/15/rape-victim-is-suing-uber-for-companys-use-of-her-private-medical-records/#5328b6604a82.

26   [166]   Sheelah Kolhatkar, *At Uber, A New C.E.O. Shifts Gears*, The New Yorker, Apr. 9, 2018,
27   https://www.newyorker.com/magazine/2018/04/09/at-uber-gets-a-new-ceo-shifts-gears; Thomas R. Fox,
*The Uber Board Report – Part I*, FCPA Compliance & Ethics (June 15, 2017),
28   http://fcpacompliancereport.com/2017/06/uber-board-report-part/.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG

1   incidents."[167]   These incidents included discrimination (25%), sexual harassment (22%),

2   unprofessional behavior (21%), bullying (15%), harassment (9%), retaliation (6%), and other

3   offenses.  The majority of the incidents took place in the San Francisco headquarters.  "The Perkins

4   Coie investigation lays the groundwork for the investigation being conducted for Uber by Eric

5   Holder,"[168] according to the article.  At least 20 employees were reportedly fired for misconduct

6   revealed by the investigation, and 38 others received warnings or were required to undergo further

7   training.

8        178.    On June 21, 2017, *The New York Times* reported that five investors – Benchmark,

9   First Round Capital, Lowercase Capital, Menlo Venture, and Fidelity – representing 25% of Uber's

10  stock and 40% of the voting power, had previously demanded Kalanick's resignation.  Kalanick

11  resigned as Uber's CEO on June 20, 2017.  When Kalanick resigned, he acknowledged the negative

12  influence he has had on the Company, admitting "'[t]he ultimate responsibility, for where we've

13  gotten and how we've gotten here rests on my shoulders.'"[169]

14  **VII.    LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS**

15       179.    As a result of defendants' conduct, plaintiff and the class have lost billions of dollars.

16  Plaintiff invested in Uber in connection with the Series G round of financing through New Riders,

17  which was formed for the sole purpose of distributing Uber's Series G Preferred Stock to investors.

18  While Uber shares are not publicly traded, when class members purchased their interests in Uber, the

19  prices established for each of the Offerings reflected investor expectations of future cash flows from

20  the business, discounted to reflect expectations of timing and risk – *i.e.*, how long it would take for

21  an IPO or other liquidity event to occur, and what the risks to the business were that could reduce

22

23

---

24  [167]    Biz Carson, *Uber fired more than 20 employees after receiving 215 claims in probe of sex harassment and other incidents*, Bus. Insider, June 6, 2017, https://www.businessinsider.com/uber-fired-more-than-20-employees-as-part-of-its-sex-harassment-probe-2017-6.

25

26  [168]    *Id.*

27  [169]    *Why Travis Kalanick was an asset as well as a liability for Uber*, LiveMint (June 14, 2017), http://www.livemint.com/Companies/xSqtKdbd0Hg60Wnw3xufsM/Why-Travis-Kalanick-was-an-asset-as-well-as-a-liability-for.html.

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE §§25400 AND 25500- 4:17-cv-05558-HSG                                                        - 79

1   expected cash flows or delay the liquidity event, requiring them to hold their shares for a longer

2   period.[170]

3          180.     Defendants' false and misleading statements and material omissions caused Uber's

4   shares sold in the Offerings to be overvalued at the time they were purchased by plaintiff and the

5   class.  Had the true state of Uber's business been known, investors would have adjusted their

6   valuation of Uber to reflect: (1) reduced cash flows; (2) higher risks; and (3) IPO timing delays.

7   Each of these adjustments would have reduced the value of holdings in Uber and the price plaintiff

8   and the class would have been willing to pay for their interests.  As a result, class members would

9   not have purchased shares at the prices established by the Company for each of the Offerings.  When

10  the true state of Uber's business was revealed, Uber's market value was reduced to reflect the

11  increased risks, lowered cash flow expectations, and longer expected holding period for the shares.

12         181.     Investors (such as plaintiff and the class here) buy assets because they expect them to

13  generate cash flows for use in the future.[171]  According to the well-recognized Discount Cash Flow

14  ("DCF") model commonly used in valuing private companies like Uber, the value of an asset can be

15  calculated using the expectations of future cash flows along with associated expectations of timing

16  and risk.[172]  At any point in time, the value of an asset is the sum of all future economic benefits,

17  discounted to the present day to reflect the time value of money and risk (*i.e.*, uncertainty) associated

18  with those benefits.[173]

19         182.     Thus, asset valuations discount expected economic benefits to reflect the extent to

20  which: (1) those benefits will be received in the future (as opposed to the present); and (2) there is a

21  risk that actual benefits will be lower than expectations (or that no benefits will be received at all).

22

---

23  [170]    *See, e.g.*, Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 15-16 (John Wiley & Sons, Inc. 5th ed. 2014).

24  [171]    *See, e.g.*, Aswath Damodaran, *Strategic Risk Taking: A Framework for Risk Management* (Pearson Education, Inc. 2007).

25

26  [172]    *See, e.g.*, Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 15-16 (John Wiley & Sons, Inc. 5th ed. 2014).

27  [173]    *See, e.g.*, Frank K. Reilly & Keith C. Brown, *Investment Analysis and Portfolio Management* 5 (The Dryden Press, 5th ed. 1997).

28

1    The more time and risk that investors must bear before receiving an economic benefit, or cash flow,

2    the less that cash flow will be worth today.[174]  In a DCF model, value increases when expected cash

3    flows increase.  Similarly, value declines with higher risk, which is reflected through a higher

4    discount rate, as well as when more time elapses between the present day and the date of an expected

5    cash flow.

6         183.    In 2017, the previously-concealed material risks to Uber's business, including illegal

7    business practices that the Company had used to increase its growth, stifle competition, and avoid

8    regulatory enforcement, were revealed in a series of negative announcements.  As a result,

9    commentators dubbed 2017 as Uber's "Year from Hell" and a "Nonstop Trainwreck."

10        (a)    In the first quarter, Waymo filed suit, Fowler wrote her blog detailing rampant sexual

11   discrimination throughout the Company, and *The New York Times* broke the "Greyball" scandal.

12        (b)    In the second quarter, *The Information* published its detailed account of the "Hell"

13   program, South Korea found Uber's operations illegal, and news about the rape in New Delhi made

14   international headlines.

15        (c)    In the third quarter, the U.S. Department of Justice began investigations into Uber's

16   foreign practices, the FBI began investigating "Hell," London decided not to renew Uber's license,

17   and major investor Benchmark filed suit.

18        (d)    In the fourth quarter, news about Uber's massive data breach, and concealment of the

19   Jacobs letter in the Waymo litigation made headlines again.  At the same time, dozens of employees,

20   including many of the Company's most senior officers, fled the Company.

21        184.    Had the true state of Uber's business been known at the time of the Offerings,

22   investors would have adjusted their valuation of Uber to reflect: (1) reduced cash flows; (2) higher

23   risks; and (3) IPO timing delays.  Each of these adjustments would have reduced the value of

24   holdings in Uber and, consequently, what investors would have been willing to pay for their Uber

25   interests.  When the true state of Uber's business was revealed, Uber's market value was reduced,

26   causing damage to plaintiff and the class.

27   _____

[174]    *See, e.g.*, Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and*

28   *Examples* 17 (John Wiley & Sons Inc., 5th ed. 2014).

### 1.    Revelations of the True State of Uber's Business Reduced Expected Cash Flows

185.    When the true state of Uber's business was revealed, the value of plaintiff's and the class' investments in Uber fell precipitously, causing economic loss.  The above revelations of the previously-concealed material risks and the resulting exodus of highly-valued employees significantly impaired the Company's business, operations, and prospects, and tarnished Uber's brand, reducing its value to investors.  An example of the negative impact of the disclosures is a May 2017 market survey showing that "'negative perceptions' of Uber tripled to 27 percent in the wake of [its] scandals," and that one-in-four existing customers planned to use Uber's services less often.[175]

186.    A May 2018 eMarketer research report based upon rider data from Uber and Lyft and multiple market surveys studied "the effect of a series of scandals at Uber" in 2017.[176]  As reported by *Reuters*, "[t]he report quantifies the effect of a series of scandals at Uber last year, which included an internal probe of sexual harassment and workplace behavior; a U.S. Department of Justice investigation into whether Uber managers violated U.S. laws against bribery of foreign officials; a lawsuit by Alphabet Inc. (GOOGL.O) alleging trade secrets theft that Uber settled for $245 million; and the departure of Uber's chief executive officer, who was pushed out by investors concerned about the growing list of problems."[177]  The research report noted fewer than 41 million people used Uber in 2017, missing projections for 2017 by three million users.[178]  The research firm also lowered its growth projection for 2018 users by another 3 million users, down to 48 million from 51 million users, and "lowered its forecasts for Uber's growth every year through 2021, reflecting the

---

[175]      Faiz Siddqui, *#DeleteUber Will Have Lasting Fallout for Ride-Hailing App, Study Says*, Wash. Post, May 16, 2017, www.washingtonpost.com/news/dr-gridlock/wp/2017/05/16/deleteuber-will-have-lasting-fallout-for-ride-hailing-app-study-says/?noredirect=on&utm_term=.c8687ef2467d.

[176]      Heather Somerville, *Study finds Uber's growth slows after year of scandal; Lyft benefits*, Reuters, May 14, 2018, https://www.reuters.com/article/us-uber-growth/study-finds-ubers-growth-slows-after-year-of-scandal-lyft-benefits-idUSKCN1IF31A.

[177]      *Id.*

[178]      *Id.*

company's competitive disadvantage after last year's problems."[179]   The report's authors also

concluded that the true state of Uber's business, once revealed, opened the door for its primary

competitor Lyft:  "'Uber's brand image took an even bigger hit than expected as it grappled with a

series of scandals and PR disasters in 2017,' said Shelleen Shum, eMarketer's forecasting director.

'Lyft, which had been rapidly expanding its coverage, seized on the opportunity to brand itself as a

more socially conscious alternative.'"[180]

187.     The value of Uber's business was also impacted by an increase in recurring costs

resulting from the scandals.  For example, Uber has created new executive positions such as Chief

Brand Officer and Chief Diversity Officer, and devoted approximately $500 million to a new

advertising campaign aimed at repairing its public image.[181]  These recurring expenses would not

have been anticipated by investors before the revelations, causing them to overvalue the shares sold

in the Offerings.

188.     Increased litigation and regulatory expenses in the wake of the scandals also

increased Uber's recurring expenses by amounts materially higher than what investors anticipated at

the time of the Offerings.  After the revelations of the true state of Uber's business, investors also

realized that Uber would need to devote significant capital to defend numerous civil and criminal

probes facing the Company.  For instance, Uber is being investigated for violations of the FCPA in

at least five countries: Malaysia, Indonesia, China, South Korea, and India.[182]  A widely-referenced

empirical study of FCPA enforcement actions published in February 2012 presents actual

---

[179]     *Id.*

[180]     *Id.*

[181]     Jessica Guynn, *Uber Hires Chief Diversity Officer, the Third but Most Senior Person to Lead Those Efforts*, USA Today, Jan. 23, 2018, www.usatoday.com/story/tech/2018/01/23/uber-hires-chief-diversity-officer-third-but-most-senior-person-lead-those-efforts/1058292001/; John Glenday, *Uber to Splurge on Advertising with $500m Mea Culpa*, The Drum (June 7, 2018), www.thedrum.com/news/2018/06/07/uber-splurge-advertising-with-500m-mea-culpa; Carson Biz, "*Uber Hires a Former Apple Exec as Chief Brand Officer to Help Fix Its Image.*" Inc.com (June 6,  2017),  www.inc.com/business-insider/uber-hires-bozoma-saint-john-new-chief-brand-officer-fomer-apple-music-exec.html.

[182]     Eric Newcomer, *Uber Faces Widespread Asia Bribery Allegations Amid U.S. Criminal Probe*, Bloomberg, Sept. 19, 2017, www.bloomberg.com/news/articles/2017-09-20/uber-is-said-to-review-asia-dealings-amid-u-s-criminal-probe.

1  investigation expenses incurred by companies in response to FCPA actions as a percentage of market

2  capitalization, with an average investigation expense of 1.13% of market capitalization.[183]   Such

3  expenses resulted in lower expected cash flows that were not anticipated by investors before Uber's

4  pattern of misconduct was revealed.

**2.    Revelations of the True State of Uber's Business Increased Uber's Risk Profile and Discount Rate**

189.    The revelation of the true state of Uber's business revealed new risks to investors, which were not known and could not have been anticipated or considered at the time of the Offerings.  Had these new risks been known, investors would have assigned higher discount rates to expected cash flows, which would have lowered investors' estimates of Uber's value and, consequently, the price they were willing to pay in the Offerings.

190.    Uber's value was based in part on defendants' representations that the Company was experiencing growth due to its commitment to pushing technology through deep research and investments in self-driving vehicles and other innovations, had a large and expanding customer base, and was committed to complying with applicable regulations.  After the revelations of the true state of Uber's business became public, however, investors were faced with the reality that their investment was much riskier than anticipated.  For instance, the expected revenues from Uber's autonomous vehicle division became much less likely given the lawsuit filed by Waymo.  Further, the news of Uber's "Greyball" program and attempts to circumvent regulatory requirements called into question Uber's ability to comply with applicable regulations and operate in the jurisdictions where "Greyball" was being employed.

191.    In addition, the harm to Uber's reputation was also impacting its growth and market share, as illustrated by the May 2017 and May 2018 studies referenced above.

---

[183]    Jonathan Karpoff, D. Scott Lee & Gerald Martin, *The Impact of Anti-Bribery Enforcement Actions on Targeted Firms*, Baylor U. (Feb. 27, 2012), https://www.baylor.edu/business/finance/doc.php/229622.pdf.

### 3. Revelations of Uber's True Financial Condition Delayed Expected Liquidity Events

192.    With the revelations of the true state of Uber's business, including negative publicity and legal obstacles facing Uber, investors became aware that a near-term IPO would be infeasible, as Uber would need to address regulatory and compliance issues before such a transaction.  This extension of the time horizon associated with an eventual sale caused a decline in the value of investor's holdings.

193.    By the time of the revelations of Uber's fraudulent conduct, the Company had completed multiple rounds of financing, undertaken a global expansion, and was purportedly more valuable than General Motors, Ford, and Honda.[184]  Members of the class already had held interests in Uber between one year (Series G investors) and three years (Series D investors) and, at the time of the revelations, market participants and industry observers expected a relatively short investment horizon:

(a)    Paul Bard, Director of Research at Renaissance Capital, stated to *Forbes* that he saw an Uber IPO occurring "[i]f not [by] 2015, then [by] early 2016;"[185]

(b)    Hemant Taneja, Managing Director at General Catalyst, reported to *Forbes* in 2015 that he expected an Uber IPO "at some point in the near future;"[186]

(c)    Fred Wilson, partner at Union Square Ventures, criticized Uber in 2016 for not having performed an IPO, stating Uber "should be a publicly traded company" and "[has] a responsibility to give [investors their] money back."[187]

---

[184]    Liyan Chen, *At $68 Billion Valuation, Uber Will Be Bigger Than GM, Ford, And Honda*, Forbes, Dec. 4, 2015, https://www.forbes.com/sites/liyanchen/2015/12/04/at-68-billion-valuation-uber-will-be-bigger-than-gm-ford-and-honda/#68541d5732e3.

[185]    Steve Schaefer, *The IPO Class of 2015: After Alibaba, Is Uber the Next Blockbuster?*, Forbes, Dec. 22, 2014, https://www.forbes.com/sites/steveschaefer/2014/12/22/the-ipo-class-of-2015-after-alibaba-is-uber-the-next-blockbuster/#76ac8bfc7c52.

[186]    Mark Berniker, *As Airbnb, Snapchat Move Towards IPO's, Early Investor Sizes Up The Deal*, Forbes, Aug. 18, 2015, https://www.forbes.com/sites/markberniker/2015/08/18/as-airbnb-snapchat-move-towards-ipos-early-investor-sizes-up-the-deals/#c9be9426bf1a.

[187]    Alyson Shontell, *Legendary Startup Investor Fred Wilson Passed on Uber When it was Worth $300 Million*, Bus. Insider, Apr. 27, 2016, https://www.businessinsider.com/fred-wilson-passed-on-uber-when-it-was-300-million-2016-4.

194.    In a presentation to potential Series F investors which was obtained and described by *Reuters* in August 2015, an IPO of Uber was forecast to occur "within 18 to 24 months."[188]  Thus, according to this investor presentation, there was an expectation of a liquidity event occurring by 2017.  Such an expectation, regardless of whether Uber had committed to such a timeline, would have factored into investors' determinations of value and willingness to contribute capital to Uber, since there was no active secondary market on which investors could sell their interests.

195.    After the revelations of the true state of its business, Uber's new CEO stated an IPO was expected to occur by 2019 – nearly two years later than what was previously contemplated.[189]  Any delay in the expected IPO date represents an increase in the time that would elapse between the date of the investment and the return of the investment (along with any gain in value).  This reduces value, as investors forgo other opportunities to invest while bearing the risks associated with the invested capital.

196.    While Uber shares lacked marketability before revelations of Uber's false and misleading statements, the revelations amplified this discount by further delaying expectations of when its securities could be sold, thereby decreasing the value of its shares.  Such a discount to the value of Uber's shares known as a discount for lack of marketability, would have reflected the additional risk investors would bear by having to hold their interests for longer periods of time.[190]  Numerous studies support the existence of marketability discounts and demonstrate that longer holding periods correspond to higher discounts.  For instance, a widely-referenced study based on restricted stock transactions from 1980 to 2017 estimates the median discount for lack of marketability for a six-month holding period to be 11.4%; this figure increases to 15.7% and 22.1%

---

[188]    Zhang Shu & Gerry Shih, *Uber seen reaching $10.8 billion in bookings in 2015: fundraising presentation*, Reuters, Aug. 21, 2015, https://www.reuters.com/article/us-uber-tech-fundraising-idUSKCN0QQ0G320150821.

[189]    David Shepardson, *Uber 'On Track' for IPO in 2019, No Plans to Sell Tech Unit: CEO*, Reuters, Sept. 5, 2018, https://www.reuters.com/article/us-uber-ceo/uber-on-track-for-ipo-in-2019-no-plans-to-sell-tech-unit-ceo-idUSKCN1LL2MN.

[190]    The concept of a discount for lack of marketability is well established in financial and economic theory.  *See, e.g.*, James R. Hitchner, *Financial Valuation Applications and Models* 411-412 (John Wiley & Sons, Inc. 4th ed. 2017).

1  as holding periods increase to one year and two years, respectively.[191]  Thus, a security that is

2  required to be held (and is, therefore, unmarketable) for two years would sell for a price that is 22%

3  lower than the same security that was tradeable today.  Other studies have found the discount for

4  lack of marketability associated with a two-year holding period to be even higher.[192]

### 4.  Market Evidence of Declining Value Due to Revelations of the True State of Uber's Business

5

6      197.  Basic valuation concepts demonstrate why the revelations of the true state of Uber's

7  business reduced the value of the securities held by plaintiff and the class.  Analysts and industry

8  observers directly attributed the reduction in Uber's value to these revelations.  For instance,

9  *Bloomberg* quoted Kirk Boodry, an analyst at New Street Research, who said the reduction in prices

10  investors are willing to pay "'builds in all the negative news'" and that the revelations have

11  "'contributed to the downslide,'"[193] *Vanity Fair* reported that the reduced valuation "served as a

12  tangible sign that Uber's year-long public-relations crisis is having tangible effects on its value as a

13  business,"[194] while the *Los Angeles Times* reported that "industry experts…attributed the loss in

14  Uber's value to the string of blows dealt to its brand this year."[195]

15

16

17

18  ───────────────

[191]      *Stout Restricted Stock Study Companion Guide*, Stout Risius Ross, LLC 26 (2018 ed.).

19
20
[192]      *E.g.*, a study published in the Handbook of Advanced Business Valuation which analyzes transactions between 1980 and 1996 estimates the median discount associated with a two-year holding period of approximately 25%.  Robert F. Reily, Robert P. Schweihs, eds., *Handbook of Advanced Business Valuation* 97-116 (New York: McGraw-Hill, 2000).  Further, a study published by Charles Stryker and William Pittock examining transactions from 1978 to 1982 estimates the median discount associated with a two-year holding period of approximately 45%.  Charles Stryker & William F. Pittock, *Revenue Ruling 77-287 Revisited*, SRC Quarterly Reports 1-3 (Spring 1983).

21
22

23
[193]      Eric Newcomer, *SoftBank Bids to Buy Uber Shares for 30% Less Than Current Value*, Bloomberg, Nov. 27, 2017, https://www.bloomberg.com/news/articles/2017-11-28/softbank-is-said-to-seek-uber-shares-at-48-billion-valuation.

24

25
[194]      Maya Kosoff, *Uber's Year from Hell Keeps Getting Worse*, Vanity Fair, Nov. 30, 2017, https://www. vanityfair.com/news/2017/11/ubers-year-from-hell-keeps-getting-worse.

26

27
[195]      Tracey Lien, *SoftBank is ready to buy a chunk of Uber – at a 30% discount*, L.A. Times, Nov. 28,   2017,   http://beta.latimes.com/business/technology/la-fi-tn-uber-softbank-20171128-story.html.

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                      - 87 -

198.    These reports are consistent with the actions taken by holders of Uber's securities. For example, after the revelations, multiple funds holding stakes in Uber recognized significant mark-downs in the values of their positions, as shown in the chart below:

199.    By the beginning of 2018, investors had determined that Uber's value dropped by nearly 30% or more after the revelations of the true state of Uber's business.  Hartford, one of the funds that wrote down its investment in Uber, stated that the reduction in value was the "result of

---

[196]    *BlackRock Funds; Fidelity Securities Fund; The Hartford Mutual Funds, Inc.; Principal Funds, Inc.; T. Rowe Price Growth Stock Fund, Inc. & Vanguard World Funds*. Form N-Q and N-CSR SEC Filings from Q4 2016 to Q2 2018.

1    several well publicized negative events and the ultimate departure of its CEO."[197] ███████

2    ████████████████████████████████████████████████████████████

3    ██████ ████████

4        200.    The impact of the revelations also was reflected in market transactions.  As discussed

5    previously, on November 27, 2017 SoftBank led a consortium of investors who made a tender offer

6    to purchase a stake in Uber from existing holders for approximately $8 billion – at approximately

7    $33 per share – implying a $48 billion valuation of Uber.[199]   The sale was completed in

8    January 2018. Kalanick also sold nearly a third of his 10% stake in Uber for about $1.4 billion at the

9    $48 billion valuation pursuant to the tender offer.

10        201.    This implied value represented a significant discount to Uber's valuation during its

11    most-recent round of financing prior to the revelations described above (which implied a value of

12    approximately $68 billion).  Thus, while Uber had been valued at approximately $68 billion in 2016

13    (at the time of the Series G offering), after the revelations of the true state of Uber's business became

14    public, investors were willing to accept an offer of nearly 30% less.  In fact, SoftBank's secondary

15    transaction was oversubscribed, as investors sought to sell more shares (at the significantly reduced

16    price) than SoftBank was willing to purchase.[200]

17        202.    Valuation experts and market observers also attributed the revelations of truth

18    regarding the true state of Uber's business to a reduction in the Company's value.  For example, one

19    prominent finance professor at New York University's Stern School of Business who has valued

20

21    [197]    *The Hartford Mutual Fund, Inc*. Form N-CSR Certified Shareholder Report of Registered
        Management Investment Companies for Period Ending October 31, 2017; January 8, 2018.

22    [198]    ███████████████████████████████████████████████████████
23    █████████████████████████████████████████

24    [199]    Eric Newcomer, *Uber Completes Sale of $9.3 Billion in Stock Led by SoftBank*, Bloomberg,
25    Jan. 18, 2018, https://www.bloomberg.com/news/articles/2018-01-18/uber-completes-sale-of-9-3-
        billion-in-stock-led-by-softbank.  Eric Newcomer, *SoftBank Bids to Buy Uber Shares for 30% Less
26    Than Current Value*, Bloomberg, Nov. 27, 2017, https://www.bloomberg.com/news/articles/2017-
        11-28/softbank-is-said-to-seek-uber-shares-at-48-billion-valuation.

27    [200]    Leslie Hook, *SoftBank deal helps clear path towards IPO*, Fin. Times, Dec. 29, 2017,
28    https://www.ft.com/content/a079da14-ec58-11e7-bd17-521324c81e23.

1486279_2

Uber on multiple occasions, Dr. Aswath Damodaran ("Damodaran"), concluded that Uber's value declined as a result of the concealed misconduct alleged herein (which he euphemistically refers to as "Uber's Extracurricular Activities"). As Damodaran explained:

> The effect of the last week may be to bring the [prices] back to earth, by reminding investors that there is a long way to go for Uber to convert potential to profits. ***Prior to these news stories, Uber was a rule breaking company with a business model that delivered revenue growth but offered a very narrow path to profitability. After these news stories, the story remains the same but Uber has just made its narrow path even narrower and much rests on who will head the company on this path.***[201]

203.    Damodaran attributed an increase in Uber's expected risk (which reduced its valuation) to the impact of "crisis costs" on Uber's business as he illustrated in the following graphic:[202]

**Illustration of Uber's "Crisis Costs"**[203]



[201]    Aswath Damodaran, *Uber's bad week: Doomsday Scenario or Business Reset?* Blogspot, (June 21, 2017), http://aswathdamodaran.blogspot.com/2017/06/ubers-bad-week-doomsday-scenario-or.html.

[202]    *Id.*

[203]    *Id.*

### 5. Uber's Valuation Decline Was Not Caused by Non-Fraud Related Factors

204.     Uber's valuation decline was not caused by events unrelated to the revelations of Uber's fraudulent misstatements and omissions.   There were no negative macro-economic or industry-specific events that explain the decline, nor any Company-specific events other than those alleged herein that could have caused the price of Uber securities to decline.  In fact, Uber's steep decline in value occurred in spite of increasingly optimistic growth projections for the ride hailing industry.

205.     While Uber reported a 40% increase in its quarterly losses around the time of the SoftBank tender offer, investors had already significantly marked-down their holdings in Uber prior to the release of Uber's quarterly results.  Further, Uber had consistently experienced mounting losses since its inception yet had seen its value increase dramatically, since investors in high growth technology companies assess value based on future earnings potential (not fluctuations in reported quarterly earnings).  Thus, the increase in quarterly losses does not explain the dramatic decline in Uber's value following the disclosure of the misconduct alleged herein.

## VIII.   CLASS ALLEGATIONS

206.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and seeks certification of the following class:

> All persons or entities who, directly or indirectly, purchased or committed to purchase (and subsequently closed a binding commitment to purchase) an interest in Uber securities sold in the Company's Series D, E, F, or G offerings, as defined elsewhere herein.

> Excluded from the proposed class are defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

207.     The members of the proposed class are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are several hundred members in the proposed class.  Members of the proposed class may be identified from records maintained by defendants.

208.     Plaintiff's claims are typical of the claims of the members of the proposed class as all members of the proposed class are similarly affected by defendants' wrongful conduct as alleged herein.

209.   Plaintiff will fairly and adequately protect the interests of the members of the proposed class and has retained counsel competent and experienced in complex class litigation.

210.   Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely affecting individual members of the proposed class.  Among the questions of law and fact common to the proposed class are:

(a)   whether defendants misrepresented material facts;

(b)   whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)   whether defendants knew or had reasonable grounds to believe that their statements were false or misleading;

(d)   whether defendants' statements were made for inducing the purchase of Uber securities by others; and

(e)   the extent of damage sustained by class members.

211.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joining all members is impracticable, and this action will be manageable as a class action.

## IX.   CLAIM FOR RELIEF

### For Violation of Cal. Corp. Code §§25400(d) and 25500 Against All Defendants

212.   Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

213.   Defendants directly and/or indirectly, for the purpose of inducing the purchase of Uber securities by others, made or materially participated in making the false and misleading statements alleged in §VI of this Complaint, each of which contained false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

1    214.   Defendants sold, offered to sell, and engaged in market activity related to Uber

2    securities and, through their actions, did or attempted to change the rights, preferences, privileges, or

3    restrictions of Uber securities.

4    215.   Defendants made these statements with the intent to induce the purchase of Uber

5    securities by others.

6    216.   Defendants knew or had reasonable grounds to believe that these statements and

7    omissions were false and misleading.

8    217.   As a direct and proximate result of the fraudulent conduct of defendants, plaintiff and

9    the class have been damaged.

10   **X.   PRAYER FOR RELIEF**

11   WHEREFORE, plaintiff prays for judgment as follows:

12        A.   Determining that this action is a proper class action, certifying plaintiff as class

13   representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's

14   counsel as class counsel;

15        B.   Awarding compensatory damages in favor of plaintiff and the other class members

16   against all defendants, jointly and severally, for all damages sustained as a result of defendants'

17   wrongdoing, in an amount to be proven at trial, including interest thereon;

18        C.   Awarding plaintiff and the class their reasonable costs and expenses incurred in this

19   action, including counsel fees and expert fees; and

20        D.   Awarding such other and further relief as the Court may deem just and proper.

21   **XI.   JURY DEMAND**

22        Plaintiff demands a trial by jury.

23   DATED: October 17, 2018          ROBBINS GELLER RUDMAN
                                        & DOWD LLP
24                                     LUKE O. BROOKS
                                       LUCAS F. OLTS
25                                     DARRYL J. ALVARADO
                                       JEFFREY J. STEIN
26                                     ERIKA OLIVER

27                                            s/ LUKE O. BROOKS
                                            LUKE O. BROOKS

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
DENNIS J. HERMAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
§§25400 AND 25500- 4:17-cv-05558-HSG                                                    - 94 -

1

<u>CERTIFICATE OF SERVICE</u>

2

      I hereby certify under penalty of perjury that on October 17, 2018, I authorized the electronic

3

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

5

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

6

non-CM/ECF participants indicated on the attached Manual Notice List.

7

                                 s/ LUKE O. BROOKS

8

                                LUKE O. BROOKS

9

                                ROBBINS GELLER RUDMAN
                                    & DOWD LLP

10

                                655 West Broadway, Suite 1900
                                San Diego, CA  92101-8498
                                Telephone:  619/231-1058

11

                                619/231-7423 (fax)

12

                                E-mail:  LBrooks@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:17-cv-05558-HSG Irving Firemen's Relief & Retirement Fund v. Uber Technologies et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl James Alvarado**
  dalvarado@rgrdlaw.com

- **Alvin Matthew Ashley**
  mashley@irell.com,sknight@irell.com

- **Stephen Patrick Blake**
  sblake@stblaw.com,nanderson@stblaw.com

- **Luke O Brooks**
  lukeb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kenneth Jerome Brown**
  kbrown@wc.com

- **Walter F. Brown**
  wbrown@orrick.com,casestream@ecf.courtdrive.com

- **Brian Edward Cochran**
  bcochran@rgrdlaw.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andra Barmash Greene**
  agreene@irell.com,kbrozzo@irell.com

- **Michael David Harbour**
  mharbour@irell.com

- **James Neil Kramer**
  jkramer@orrick.com,lpatts@orrick.com,mwatkins@orrick.com,vmorse@orrick.com

- **James Glenn Kreissman**
  jkreissman@stblaw.com,sblake@stblaw.com

- **Angel Puimei Lau**
  alau@rgrdlaw.com,8467512420@filings.docketbird.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Nathaniel H. Lipanovich**
  nlipanovich@irell.com,ltheilacker@irell.com

- **Erika Limpin Oliver**
  eoliver@rgrdlaw.com

- **Lucas F. Olts**
  Lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com,9870190420@filings.docketbird.com

- **Joseph G. Petrosinelli**
  jpetrosinelli@wc.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Siegel**
  dsiegel@irell.com,kschmidt@irell.com,csilver@irell.com,mxanten@irell.com

- **Jeffrey James Stein**
  jstein@rgrdlaw.com,kmccormack@rgrdlaw.com,2859905420@filings.docketbird.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)